**THIS SOLICITATION IS BEING CONDUCTED, PRIOR TO THE FILING OF A VOLUNTARY PETITION UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, IN ORDER TO OBTAIN SUFFICIENT VOTES IN FAVOR OF A CHAPTER 11 PLAN OF REORGANIZATION TO ENABLE CONFIRMATION OF SUCH PLAN. BECAUSE NO CHAPTER 11 CASE HAS YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING COMMENCEMENT OF ITS CHAPTER 11 CASE, T H AGRICULTURE & NUTRITION, L.L.C. EXPECTS TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT, AS WELL AS THE SOLICITATION OF VOTES, AND CONFIRMING THE PREPACKAGED PLAN OF REORGANIZATION DESCRIBED HEREIN.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x

In re:                              :

**T H AGRICULTURE & NUTRITION, L.L.C.,**    :

          **Debtor.**           :

---------------------------------------------------------------------x

**Chapter 11**

**Case No. 08-_____ (_____)**

### DISCLOSURE STATEMENT WITH RESPECT TO A PREPACKAGED PLAN OF REORGANIZATION OF T H AGRICULTURE & NUTRITION, L.L.C. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Bruce R. Zirinsky
John H. Bae
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Dated: October 10, 2008

*The Plan of Reorganization, attached hereto as Exhibit A, provides for an "Asbestos PI Channeling Injunction" pursuant to section 524(g) of the Bankruptcy Code. For a description of the causes of action to be enjoined and the identities of the entities that would be subject to the injunction, see Section VIII.D of this Disclosure Statement and Article XI of the Plan.*

# SUMMARY OF THE PLAN OF REORGANIZATION
# AND THE ASBESTOS PI TRUST DISTRIBUTION PROCEDURES

## A.    Introduction.

T H Agriculture & Nutrition, L.L.C. ("<u>THAN</u>" or the "<u>Debtor</u>") is soliciting votes for the acceptance of its Plan from holders of Asbestos PI Claims and Intercompany Claims.  *Please refer to Article I of the Plan for definitions of terms used but not defined in this Disclosure Statement.*

The Plan contemplates the establishment of a trust under section 524(g) of the Bankruptcy Code (as defined in the Plan, the "<u>Asbestos PI Trust</u>") and an injunction (specifically, the Asbestos PI Channeling Injunction) that will channel all current asbestos-related Claims and future asbestos-related Demands to the Asbestos PI Trust.  The injunction will cover all asbestos-related personal injury and wrongful death Claims and Demands based in whole or in part on the alleged conduct or products of THAN.  The injunction will also channel all current asbestos-related Claims and future asbestos-related Demands based in whole or in part upon asbestos-related personal injury and wrongful death Claims and Demands against certain parties related to THAN, including, but not limited to, past and present affiliates of THAN, past and present officers and directors of THAN, predecessors in interest to THAN, and any entity that owned a financial interest in THAN or its affiliates or predecessors.

Specifically, the Asbestos PI Channeling Injunction will cover Asbestos PI Claims and Demands against THAN and Reorganized THAN, as well as Asbestos PI Claims and Demands against THAN's parent company, Philips Electronics North America Corporation ("<u>PENAC</u>"), and its Affiliates, based on any purported liability arising from its ownership of or relation to THAN, parties that have a right of indemnity against THAN or PENAC, and parties that have actual or alleged liability with respect to Asbestos PI Claims or Demands in each case related to or arising from the conduct or products of THAN that purportedly caused asbestos-related personal injury or wrongful death, including any claim based upon a theory of veil piercing, alter ego, successor liability, fraudulent conveyance or conspiracy. Insurance carriers that have consensually settled remaining coverage with THAN and PENAC prior to the confirmation of the Plan will be protected by the Asbestos PI Channeling Injunction to the extent (i) such Insurance Settlement Agreement provides that (a) THAN and/or PENAC agreed to seek the protections under section 524(g) of the Bankruptcy Code for such Asbestos Insurance Entity or (b) THAN and/or PENAC agreed to indemnify such Asbestos Insurance Entity with respect to any Asbestos PI Claim that may be channeled to the Asbestos PI Trust, (ii) the proceeds of such Insurance Settlement Agreement are included in the THAN Contribution and the PENAC Asbestos PI Trust Contribution to be contributed to the Asbestos PI Trust on the Effective Date, and (iii) such Insurance Settlement Agreement is sufficiently comprehensive to warrant that such Asbestos Insurance Entity receive treatment under section 524(g) of the Bankruptcy Code.  Insurance carriers that consensually settle remaining coverage with THAN and PENAC after confirmation of the Plan and THAN's emergence from bankruptcy will also be protected by the Asbestos PI Channeling Injunction to the extent THAN determines such settlements are comprehensive enough to warrant that such insurers be provided such protections under the Plan.

The effect of "channeling" Asbestos PI Claims and Demands to the Asbestos PI Trust is that they may only be pursued through, and paid from, the Asbestos PI Trust; Asbestos PI Claims or Demands may not be asserted against THAN, PENAC and the other parties listed above and described more fully in this Disclosure Statement.

The Asbestos PI Trust will be funded with Cash from THAN and contributions from PENAC, on behalf of itself and other parties, including the following:  Cash; residual Cash as of the

Effective Date, if any, whether (i) drawn under the DIP Agreement and not used by THAN or (ii) remaining under any pre-Commencement Date advance made to THAN by PENAC, to the extent such residual Cash will not be necessary for distributions under the Plan on account of Allowed General Unsecured Claims; and, from both THAN and PENAC, the Cash in the Insurance Settlement Proceeds Trust as of the Effective Date. Reorganized THAN and the Asbestos PI Trust shall execute the Promissory Note and Reorganized THAN, the Parent Trust and the Asbestos PI Trust shall enter into the Pledge Agreement. In addition, the Asbestos PI Trust shall be the sole beneficiary of another Trust (the "Parent Trust"), described herein, that will hold legal title to 100% of the membership interests of Reorganized THAN, such that any dividends paid by Reorganized THAN to the Parent Trust in the ordinary course of business shall be paid as distributions to the Asbestos PI Trust in accordance with the Parent Trust Documents (provided, however, that dividends shall be paid to the Parent Trust by Reorganized THAN under applicable law and only if funds are available after meeting Reorganized THAN's operating expenses, financing obligations, and certain reserve requirements). The assets of the Asbestos PI Trust will be used to pay current and future asbestos-related personal injury and wrongful death claimants in accordance with the terms of the Asbestos PI Trust Distribution Procedures established under the Plan.

The Asbestos PI Trust's assets, which are limited, must be managed by the Asbestos PI Trustees to ensure that funds are available to pay all current claimants as well as all expected future claimants. Nevertheless, for all the reasons detailed in this Disclosure Statement, THAN believes that there will be substantially more assets available to pay claimants under the Plan than would be the case if there were no Plan and THAN were forced to pay Claims solely from its own assets. Specifically, THAN estimates that only an amount between $169 million to $643 million would be available for distribution in a liquidation, compared to more than $900 million that will be available under the Plan, and, moreover, in the event of a liquidation, additional claims associated with Intercompany Claims in the amount of $124 million would arise and have claims on those same assets.

Substantially more assets will be available under the Plan because, among other reasons, PENAC is contributing substantial assets to the Asbestos PI Trust as part of the Plan in exchange for the protections provided to PENAC and its Affiliates under the Plan, which would not be contributed otherwise. Moreover, without the settlements and distribution procedures in the Plan, there likely would be years of costly and time-consuming litigation involving creditors and other parties that could be avoided through the Plan's orderly administrative process. Absent the Plan, distributions to creditors would be delayed and, due to the costs of litigation, the funds actually available for creditors would be reduced substantially. For this and other reasons explained in detail herein, THAN believes that each of the holders of asbestos-related personal injury and wrongful death Claims who are entitled to vote should vote to accept the Plan.

> **RECOMMENDATION:**
>
> **THAN, the Asbestos Claimants Group and the Future Claimants'
> Representative believe that the Plan provides a fair and reasonable
> recovery to current claimants and future Demand holders and that
> acceptance of the Plan is in the best interests of all claimants and
> Demand holders. Accordingly, THAN, the Asbestos Claimants Group
> and the Future Claimants' Representative urge you to vote to accept
> the Plan.**
>
> **Please note that if there is any inconsistency between the Plan and the
> descriptions in the Disclosure Statement, the terms of the Plan will
> govern.**

**B.      Contributions to Asbestos PI Trust.**

THAN and PENAC will make contributions to the Asbestos PI Trust consisting of various elements, all of which, together, shall not exceed $900 million as of the Effective Date.

THAN will contribute to the Asbestos PI Trust:

- Cash on the Effective Date, in an amount such that the Asbestos PI Trust Contributions shall equal $900 million as of the Effective Date.

PENAC, on behalf of itself, the other PENAC Related Parties and Elementis, will make the following contributions to the Asbestos PI Trust:

- Cash on the Effective Date, in an amount such that the Asbestos PI Trust Contributions shall equal $900 million as of the Effective Date; and

- residual Cash as of the Effective Date, if any, whether (i) drawn under the DIP Agreement and not used by THAN or (ii) remaining under any pre-Commencement Date advance made to THAN by PENAC, to the extent such residual Cash will not be necessary for distributions under the Plan on account of Allowed General Unsecured Claims.

THAN and PENAC will also contribute the Cash in the Insurance Settlement Proceeds Trust as of the Effective Date to the Asbestos PI Trust.

To the extent any of the foregoing contributions by either THAN or PENAC cause the total Asbestos PI Trust Contributions to exceed $900 million as of the Effective Date, such excess amounts shall be returned to PENAC.

**C.      The Promissory Note and the Pledge Agreement.**

In addition, Reorganized THAN and the Asbestos PI Trust will execute the Promissory Note, secured by all of Reorganized THAN's membership interests, which provides for the payment of a principal amount of $1,000,000, with interest, in equal quarterly installments. The Parent Trust,

Reorganized THAN as Obligor, and the Asbestos PI Trust will also enter into the Pledge Agreement as of the Effective Date to memorialize and effectuate the granting of the security interest in 100% of the outstanding membership interests of Reorganized THAN to the Asbestos PI Trust.

**D.      PENAC's Contributions to Reorganized THAN.**

On the Effective Date, PENAC, on behalf of itself and the other PENAC Related Parties and Elementis, will assume the Known Environmental Liabilities of Reorganized THAN, contribute certain revenue-generating real property to Reorganized THAN, forgive any amounts drawn from the DIP Agreement and used by THAN, and release any and all Liens, Claims, Encumbrances or other interests of PENAC on THAN's or Reorganized THAN's assets that served as security for the DIP Agreement, cover costs, if any, associated with extending THAN's insurance coverage to cover Reorganized THAN under the Unknown Environmental Liability Insurance Policy, contribute to Reorganized THAN a one-time Cash payment in the amount of $1,000,000, and assume any and all obligations with respect to retiree benefits owed to former employees of THAN or employees of THAN as of the Effective Date.

**E.      Reorganized THAN's Business.**

As of the Commencement Date, THAN owns one revenue-generating commercial real property.  On the Effective Date, as part of the PENAC Debtor Contribution, PENAC will contribute an additional revenue-generating commercial real property to Reorganized THAN.  Both properties will be leased under separate, long-term triple-net leases to a AAA-rated tenant.  The monthly rents from the two leases together will generate approximately $650,000 in annual revenue.

**F.      How Asbestos Claimants Receive Distributions from the Asbestos PI Trust.**

1.      *The Asbestos PI Trust Distribution Procedures.*

The goal of the Asbestos PI Trust is to treat all present and future asbestos claimants similarly and equitably and in accordance with the requirements of section 524(g) of the Bankruptcy Code.  Under the Plan, to further that goal, the Asbestos PI Trust will pay Asbestos PI Claims in accordance with the "Asbestos PI Trust Distribution Procedures," the form of which is attached to the Plan as Exhibit C and is incorporated herein by reference.  The Asbestos PI Trust will make payments to holders of Asbestos PI Claims pursuant to the Asbestos PI Trust Distribution Procedures while maintaining sufficient resources to pay future valid Asbestos PI Claims on a substantially equivalent basis.

(a)      *Disease Categories and Scheduled and Maximum Values.*

The Asbestos PI Trust Distribution Procedures establish a schedule of eight asbestos-related diseases ("Disease Levels"): (i) Mesothelioma (Disease Level VIII), (ii) Lung Cancer 1 (Disease Level VII), (iii) Lung Cancer 2 (Disease Level VI), (iv) Other Cancer (Disease Level V), (v) Severe Asbestosis (Disease Level IV), (vi) Asbestosis / Pleural Disease (Disease Level III), (vii) Asbestosis / Pleural Disease (Disease Level II), and (viii) Other Asbestos Disease (Disease Level I).

To qualify for payment, claimants must submit specific medical and exposure evidence as provided in the Asbestos PI Trust Distribution Procedures.

The Asbestos PI Claim values for each Disease Level are set forth below.[*] The Asbestos PI Trust Distribution Procedures also provide values for "Extraordinary Claims" (as that term is defined in the Asbestos PI Trust Distribution Procedures) that exceed those set forth below.

| Level | Disease Category | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|---|
| VIII | Mesothelioma | $150,000 | $238,000 | $900,000 |
| VII | Lung Cancer 1 | $ 65,000 | $ 89,900 | $250,000 |
| VI | Lung Cancer 2 | None | $ 20,000 | $ 75,000 |
| V | Other Cancers | $ 30,000 | $ 50,000 | $ 70,000 |
| IV | Severe Asbestosis | $ 60,000 | $ 67,600 | $250,000 |
| III | Asbestosis/Pleural Disease | $ 8,000 | None | None |
| II | Asbestosis/Pleural Disease | $ 3,800 | None | None |
| I | Other Asbestos Disease | $ 500 | None | None |

      (b)      *Review and Payment of Claims under the Asbestos PI Trust Distribution Procedures.*

Beginning prior to the Commencement Date and continuing through to the Effective Date, the Debtor engaged Verus Claims Services, LLC ("Verus") to review Asbestos PI Claims using the standards set forth in the Asbestos PI Trust Distribution Procedures. Asbestos PI Claims determined by Verus in the Pre-Effective Date Claims Review process to be approved for payment are referred to herein and in the Plan as "Qualified Asbestos PI Claims," and, in accordance with Article 4.4 of the Plan, will be paid by the Asbestos PI Trust on the Effective Date or as soon thereafter as is reasonably practicable.

With respect to Asbestos PI Claims not approved in the Pre-Effective Date Claims Review process and not constituting "Qualified Asbestos PI Claims," the Asbestos PI Trust Distribution Procedures provide that claims generally will be processed in "First In, First Out" ("FIFO") order so that the oldest claims will be processed first.

Asbestos PI Claims will be processed through either the "Expedited Review Process" or the "Individual Review Process" provided for in the Asbestos PI Trust Distribution Procedures. The "Expedited Review Process" is intended to provide an expeditious, efficient and inexpensive method for liquidating Asbestos PI Claims based on the assigned, disease-specific "Scheduled Value" applicable to the Asbestos PI Claim as set forth in the schedules contained in the Asbestos PI Trust Distribution Procedures and set forth in the table above. Pursuant to the Asbestos PI Trust Distribution Procedures, claimants (other than those alleging Disease Level VI (Lung Cancer 2) and Foreign Claims,[1] which may *only* be liquidated pursuant to the Individual Review Process) will have the option to submit their Asbestos PI Claims through the Individual Review Process to pursue a value in excess of "Scheduled Value" or to seek approval of a claim that does not satisfy the presumptive medical and exposure criteria. A claimant alleging Disease Levels I-V, VII and VIII that does not meet the presumptive medical and

---

[*] The figures presented here represent claim values for settlement purposes only. The parties reserve all rights with respect to actual claim values in the event the Plan is not confirmed.

[1]   A "Foreign Claim" is an Asbestos PI Claim with respect to which the claimant's exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which THAN has alleged legal responsibility occurred outside of the United States and its Territories and Possessions and outside the Provinces and Territories of Canada.

exposure criteria for the relevant Disease Level may be offered an amount up to the Scheduled Value of that Disease Level if the Asbestos PI Trust is satisfied that the Claim would be cognizable and valid in the tort system.

Claimants also have the option of engaging in binding or nonbinding arbitration to establish their Asbestos PI Claims, but only after they have completed the Individual Review Process as well as a mediation process, in accordance with Alternative Dispute Resolution Procedures to be adopted by the Asbestos PI Trust in accordance with the provisions of the Asbestos PI Trust Distribution Procedures. The arbitrator may return awards only in accordance with the values set forth in the Asbestos PI Trust Distribution Procedures. Only if a claimant elects nonbinding arbitration and rejects the arbitration award may the claimant then litigate in court against the Asbestos PI Trust to establish its claim. Awards in litigation will be paid as specifically provided in the Asbestos PI Trust Distribution Procedures.

As a condition to making payment to a claimant with respect to an Asbestos PI Claim, the Asbestos PI Trust shall obtain, for the benefit of the Asbestos PI Trust and the Asbestos Protected Parties, a release of liability with respect to the claimant's Asbestos PI Claim.

2.      *Maximum Annual Payment and Claims Payment Ratio.*

Aggregate distributions to claimants in each year shall not exceed a "Maximum Annual Payment" amount determined for that year, consisting of the income earned during that year (net of taxes payable with respect thereto) plus a portion of principal calculated such that the application of the Asbestos PI Trust's funds over its entire life will correspond with the estimated initial backlog of claims and the estimated anticipated future flow of claims. If there are insufficient funds to pay Claims in any year, the unpaid Claims will be carried over for priority payment in the next year. The Maximum Annual Payment will not apply to Qualified Asbestos PI Claims.

In each year, after the determination of the Maximum Annual Payment, 90% of that amount will be available to pay Asbestos PI Claims involving severe asbestosis and malignancies (Disease Levels IV – VIII) and 10% will be available to pay Asbestos PI Claims involving non-malignant diseases (Disease Levels II – III). This claims payment ratio expressed as a percentage is referred to as the "Claims Payment Ratio." The Claims Payment Ratio will apply to all Asbestos PI Claims except Qualified Asbestos PI Claims and claims involving Other Asbestos Disease (Disease Level I).

3.      *Application of the Payment Percentage.*

Except for Asbestos PI Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment), all Asbestos PI Claims paid by the Asbestos PI Trust are subject to the Payment Percentage. The Payment Percentage is the percentage of the full liquidated value of a claim that claimants will receive from the Asbestos PI Trust. The claimant will receive a payment equal to the Payment Percentage multiplied by the liquidated value of the claim. The initial Payment Percentage has been set in the Asbestos PI Trust Distribution Procedures at 100%. The Payment Percentage is subject to change as provided in the Asbestos PI Trust Distribution Procedures.

4.      *Analysis of Current and Future Claims.*

As of the date of this Disclosure Statement, THAN believes there are approximately 45,490 Asbestos PI Claims pending against THAN. This number reflects the Asbestos PI Claims submitted to Verus in its Pre-Effective Date Claims Review process. THAN believes this number

includes most, though not all, Asbestos PI Claims pending against THAN in the tort system prior to the commencement of the Verus process.

In its claims review process, which began prior to the Commencement Date and will continue through to the Effective Date, Verus reviewed each individual Asbestos PI Claim submitted to it, analyzing the data using methods developed in its work on other asbestos cases, to determine whether the Asbestos PI Claim should be approved for payment under the standards set forth in the Asbestos PI Trust Distribution Procedures. Prior to the Effective Date, any alteration of the review standards applied during the Pre-Effective Date Claims Review period to Asbestos PI Claims reviewed by Verus must be approved by the putative Asbestos PI Trustees, with the consent of the Asbestos Claimants Group and the Future Claimants' Representative. Through this process, Verus notified counsel for the asbestos claimants of those Asbestos PI Claims which were approved for payment under the standards of the Asbestos PI Trust Distribution Procedures. Verus also reviewed numerous Asbestos PI Claims for which evidence necessary to approve the claim for payment was not provided. With respect to these Asbestos PI Claims, Verus provided notice to counsel and a reasonable period to cure such deficiencies. Where the deficiencies were cured, the Asbestos PI Claims were determined to be approved for payment under the Asbestos PI Trust Distribution Procedures. Where the deficiencies were not cured, Verus determined, based on the standards set forth in the Asbestos PI Trust Distribution Procedures, that such Asbestos PI Claims were inadequate as submitted, and communicated the inadequacy of such Asbestos PI Claims to counsel for the asbestos claimant.

Those Asbestos PI Claims which Verus determined should be approved for payment under the Asbestos PI Trust Distribution Procedures shall be treated as Qualified Asbestos PI Claims under the Plan, and paid by the Asbestos PI Trust on the Effective Date or as soon thereafter as is reasonably practicable. Those Asbestos PI Claims Verus did not approve for payment may be resubmitted to the Asbestos PI Trust and reconsidered in accordance with the standards set forth in the Asbestos PI Trust Distribution Procedures. From and after the Effective Date, the Asbestos PI Trust may retain Verus or such other third party claims reviewer as the Asbestos PI Trustees and the Future Claimants' Representative deem appropriate to review and liquidate all Asbestos PI Claims submitted to the Asbestos PI Trust in accordance with the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.

Accordingly, THAN believes that, as of the date of this Disclosure Statement, there are approximately 3,918 Asbestos PI Claims that would qualify for payment under the Asbestos PI Trust Distribution Procedures. These Asbestos PI Claims were reviewed only for their adequacy under the standards of the Asbestos PI Trust Distribution Procedures in consideration at the time. This number of Asbestos PI Claims cannot be taken as evidence of the true number of Asbestos PI Claims against THAN, or as the number of Asbestos PI Claims that would be paid by the Asbestos PI Trust.

The methodology for projecting future Asbestos PI Claims consists of several steps. First, the population of individuals occupationally exposed to asbestos fiber distributed by THAN, a product containing asbestos fiber distributed by THAN, or any asbestos-containing product distributed by THAN, is determined. This population extends from 1961 through 1982. In general, this information is derived from statistics kept by the U.S. Department of Labor and other data gathered by experts from other sources, such as union records. Second, the incidence of asbestos-related malignant disease in the exposed population is calculated based on the intensity and duration of occupational exposure and

generally accepted epidemiological studies.[2] These calculations result in the annual expected incidence of asbestos-related malignant disease in the population. Third, the types of claims that have been asserted against THAN in the past are evaluated, including the source of claims, the industries and occupations of the claimants, and their diseases. This information is compared to the population projected to contract each asbestos-related malignant disease to determine a "rate of claiming" (*i.e.*, the percentage, within any given occupational group, of individuals that historically have asserted claims against THAN). Fourth, future Asbestos PI Claims for non-malignant conditions are predicted based on their historical filing rate in comparison to malignancy Asbestos PI Claims (because there is no epidemiological formula to predict the incidence of non-malignant conditions). Experts may also adjust ratios to account for developments in tort law or the litigation environment. Thus, the estimated number of future Asbestos PI Claims likely to be asserted against THAN is based on historical filing rates and the projected future incidence of disease in the underlying population.

### G. Summary of Classification and Treatment under the Plan.

The Plan classifies Claims against and Equity Interests in THAN for all purposes, including voting, Plan confirmation, and Claims distribution, as set forth below. The following table is only a summary of the classification and treatment under the Plan of Claims and Equity Interests, and reference should be made to the entire Disclosure Statement and the Plan for a complete description of each classification and treatment.

| Class | Description | Treatment | Entitled to Vote | Amount of Claim(s) | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|--------------------|
| N/A | Administrative Expense Claims | Payment in full (or as otherwise agreed). | No | $0 | 100% |
| N/A | Priority Tax Claims | Payment in full on the Effective Date, or regular installment payments over five years from the Effective Date or payment as otherwise agreed. | No | $0 | 100% |
| N/A | DIP Claim | Forgiven by PENAC on the Effective Date as provided in Article 2.3 of the Plan. | No | Unknown | N/A |
| 1 | Priority Claims | Paid in full, in Cash, on the later of (i) the Effective Date and (ii) as soon as practicable after such Priority Claim becomes Allowed. | No | $0 | 100% |

---

[2] In general, the incidence of mesothelioma can be checked periodically against actual data. The incidence of lung cancer is based on a determination of "excess" cancer, *i.e.*, incidence in excess of expected underlying lung cancer rates.

| Class | Description | Treatment | Entitled to Vote | Amount of Claim(s) | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|--------------------|
| **2** | Secured Claims | Reinstated pursuant to section 1124(2) of the Bankruptcy Code, unless the claimholder agrees to less favorable treatment; with regard to any amount THAN may be required to pay pursuant to section 1124(2), payment in full, in Cash, on the latest of (i) the Effective Date, (ii) the date the Secured Claim becomes Allowed, or (iii) the date the Secured Claim becomes due and payable according to its terms, or (iv) such other date as mutually may be agreed to by and among the holder of such Secured Claim and THAN or Reorganized THAN. | No | $0 | 100% |
| **3** | General Unsecured Claims | Reinstated pursuant to section 1124(2) of the Bankruptcy Code, unless the claimholder agrees to less favorable treatment; with regard to any amount THAN may be required to pay pursuant to section 1124(2), payment in full, in Cash, from available Cash or borrowings under the DIP Agreement, on the latest of (i) the Effective Date, (ii) the date the General Unsecured Claim becomes Allowed, or (iii) the date the General Unsecured Claim becomes due and payable according to its terms, or (iv) such other date as mutually may be agreed to by and among the holder of such General Unsecured Claim and THAN or Reorganized THAN. | No | $70,148,832 [3] | 100% |

---

[3] Of such amount, approximately $62 million represent Known Environmental Liabilities and will be assumed by PENAC pursuant to Article 9.5 of the Plan, and the remainder will be satisfied as Allowed General Unsecured Claims as provided in Article 4.3 of the Plan.

| Class | Description | Treatment | Entitled to Vote | Amount of Claim(s) | Estimated Recovery |
|---|---|---|---|---|---|
| 4 | Asbestos PI Claims | Channeled to the Asbestos PI Trust, which will be funded pursuant to Article 9.4 of the Plan, and will be paid pursuant to the terms, provisions and procedures of the Plan, the Asbestos PI Trust Agreement, the Asbestos PI Trust Documents and the Asbestos PI Trust Distribution Procedures. The Asbestos PI Trust shall pay Qualified Asbestos PI Claims on the Effective Date or as soon thereafter as is reasonably practicable in accordance with the standards set forth in the Asbestos PI Trust Distribution Procedures. | Yes | Unknown | Unknown |
| 5 | Intercompany Claims | Eliminated and discharged as of the Effective Date, by either offset, distribution, cancellation, or contribution of such Intercompany Claims, or otherwise (as determined by the Debtor in its sole and absolute discretion). | Yes | $186,924,679 | Unknown |
| 6 | Equity Interests in THAN | On the Effective Date, all Equity Interests in THAN will be canceled. | No | N/A | N/A |

Pursuant to Article 12.1(c) of the Plan, it is a condition to confirmation of the Plan that at least seventy-five percent (75%) in number and two-thirds (⅔) in amount of the holders of Asbestos PI Claims who actually vote on the Plan must vote to accept the Plan. The conditions to confirmation also require that the Confirmation Order contain findings consistent with those required by section 524(g) of the Bankruptcy Code, which sets forth the statutory requirements for issuance of a "channeling injunction" of the type provided for under the Plan. For the Plan to be effective, the Confirmation Order must have been entered by the Bankruptcy Court or the District Court. If the Confirmation Order is issued by the Bankruptcy Court, the Confirmation Order must have been accepted and affirmed by the District Court. In addition, thirty-five (35) days must have passed since the Confirmation Order, containing the Asbestos PI Channeling Injunction, shall have been either entered by the Bankruptcy Court and accepted and affirmed by the District Court or issued by the District Court, on which date the PENAC Asbestos PI Trust Contribution and THAN Contribution shall be made to the Asbestos PI Trust and the Asbestos PI Trust shall begin to pay Asbestos PI Claims, including the Qualified Asbestos PI Claims.

**H.      Voting on the Plan.**

Not every claimant is entitled to vote on the Plan. Under the Bankruptcy Code, only those classes of Claims or Equity Interests that are "impaired" and are entitled to receive a distribution of (or retain) property under a plan of reorganization are entitled to vote to accept or reject the plan. Under THAN's Plan, only Class 4 holders of Asbestos PI Claims and Class 5 holders of Intercompany Claims are Impaired and are entitled to receive a distribution, *i.e.*, entitled to vote.

THAN is seeking acceptance of the Plan by holders of Asbestos PI Claims in Class 4 and Intercompany Claims in Class 5. THAN has been informed by counsel for holders of Intercompany

Claims in Class 5 that all such holders intend to vote in favor of the Plan. This Disclosure Statement and a Ballot are being sent to counsel for holders of Intercompany Claims.

With respect to holders of Asbestos PI Claims in Class 4, the Bankruptcy Code provides that in connection with confirmation of a plan seeking an injunction under section 524(g), such as the Asbestos PI Channeling Injunction, the Bankruptcy Court may issue such an injunction only if: (a) the holders of the Asbestos PI Claims to be channeled under the injunction are classified separately under the plan; and (b) seventy-five percent (75%) in number of the holders of the Asbestos PI Claims in that class who actually vote on the plan vote to accept the plan. For a more complete description of the requirements for acceptance of the Plan, see Section XII below.

Because THAN does not have readily accessible accurate records of the addresses of the overwhelming majority of individual holders of Asbestos PI Claims in Class 4, THAN has proposed special procedures for voting by counsel on behalf of holders of Asbestos PI Claims (if, as, and to the extent such counsel are authorized to do so) or else by the individual holders of Asbestos PI Claims. Accordingly, this Disclosure Statement and a form of Ballot and Master Ballot are being sent to counsel of record for holders of Asbestos PI Claims. Please review the voting procedures accompanying the Ballot or Master Ballot, as applicable, for detailed instructions regarding how to vote with respect to Asbestos PI Claims. If you did not receive a Ballot, it is because THAN believes that you are (i) not entitled to vote on the Plan or (ii) an individual holder of an Asbestos PI Claim who is represented by counsel to whom a Master Ballot has been sent.

If you have any questions about the type of Ballot you received, please contact THAN's balloting and solicitation agent, Kurtzman Carson Consultants LLC (the "Claims and Balloting Agent"), at 2335 Alaska Avenue, El Segundo, CA 90245, toll-free tel.: (866) 381-9100 (outside of the U.S., (310) 823-9000). Copies of the Plan and this Disclosure Statement are available upon request to the Claims and Balloting Agent, at the following address:

| Claims and Balloting Agent |
|---|
| THAN Ballot Processing Center<br>c/o Kurtzman Carson Consultants LLC<br>2335 Alaska Avenue<br>El Segundo, CA 90245<br><br>Toll-Free Tel.: (866) 381-9100<br>Outside of the U.S.: (310) 823-9000<br>Facsimile: (310) 751-1561 |

> The *last day* to vote to accept or reject the Plan is November 21, 2008.
> To be counted, your ballot must be *actually received* by the Claims and Balloting Agent by such date.
>
> The *record date* for determining which creditors may vote on the Plan is October 11, 2008.

Only actual votes will be counted. Failure to return a Ballot will not be counted as either a vote for or against the Plan. Any improperly completed or late Ballot will not be counted. Any Ballot that indicates both an acceptance and rejection of the Plan will not be counted. If a creditor casts more than one Ballot voting the same Claim or interest before the Voting Deadline, the latest dated Ballot received before the Voting Deadline will be deemed to reflect the voter's intent and thus to supersede any prior Ballots. Claimants must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split their votes within a particular Class; thus, a Ballot (or a group of Ballots) within a particular Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted.

Once an order confirming the Plan is issued by the Bankruptcy Court and affirmed by the District Court, or issued by the District Court, the Plan will bind all holders of Claims against and Equity Interests in THAN, whether or not they are entitled to vote or did vote on the Plan and whether or not they receive (or retain) any distributions or property under the Plan. Thus, you are encouraged to read this Disclosure Statement carefully. In particular, holders of Asbestos PI Claims and Intercompany Claims who are entitled to vote on the Plan are encouraged to read this Disclosure Statement, the Plan and the exhibits and schedules to the Plan and to the Disclosure Statement carefully and in their entirety before voting to accept or to reject the Plan.

I.      **Disclosure Statement Enclosures**.

Accompanying this Disclosure Statement are copies of:   (i) the Plan (Exhibit A); (ii) THAN's liquidation analysis (Exhibit B); and (iii) Reorganized THAN's financial projections (Exhibit C).

In addition, a Ballot or Master Ballot for accepting or rejecting the Plan is enclosed with this Disclosure Statement if you (or your clients, if you are counsel to asbestos-related personal injury or wrongful death claimants) are entitled to vote to accept or reject the Plan.

J.      **Disclaimers.**

**This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents related to the Plan, certain anticipated events in the case and certain financial information. Although THAN believes that the Disclosure Statement, and related document summaries, are fair and accurate, they are qualified to the extent they do not set forth the entire text of the Plan, such documents or any statutory provisions. The terms of the Plan govern in the event of any inconsistency with this Disclosure Statement. All exhibits to the Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if set forth in full herein. The statements contained in this Disclosure Statement are made as of the date hereof, unless otherwise specified, and THAN disclaims any obligation to update any such statements after the hearing on approval of the Disclosure Statement.**

**Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: All forward-looking statements contained herein or otherwise made by THAN involve material risks and uncertainties and are subject to change based on numerous factors, including factors that are beyond THAN's control. Accordingly, THAN's future performance and financial results may differ materially from those expressed or implied in any such forward-looking statements. Such factors include, but are not limited to, those described in this Disclosure Statement. THAN does not undertake to publicly update or revise its forward-looking statements even if experience or future changes make it clear that any projected results expressed or implied therein will not be realized.**

Except as otherwise specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not necessarily been prepared in accordance with Generally Accepted Accounting Principles.

For purposes of this Disclosure Statement, the following rules of interpretation shall apply: (i) whenever the words "include," "includes" or "including" are used they shall be deemed to be followed by the words "without limitation," (ii) the words "hereof," "herein," "hereby" and "hereunder" and words of similar import shall refer to this Disclosure Statement as a whole and not to any particular provision, (iii) section and exhibit references are to this Disclosure Statement unless otherwise specified, and (iv) with respect to any distribution under the Plan, "on" a date means on or as soon as reasonably practicable thereafter.

In connection with THAN's solicitation of acceptances of the Plan pursuant to section 1126(b) of the Bankruptcy Code, THAN is furnishing a solicitation package, consisting of the Disclosure Statement, the enclosures hereto, and a Ballot or Master Ballot, as applicable, to each record holder of Claims and Equity Interests eligible to vote as of the voting record date. This Disclosure Statement is to be used by each such eligible holder solely in connection with its evaluation of the Plan; use of this Disclosure Statement for any other purpose is not authorized. This Disclosure Statement may not be reproduced or provided to anyone other than advisors to the recipient without the prior written consent of THAN.

THAN has not commenced a reorganization case under chapter 11 of the Bankruptcy Code as of the date of the distribution of this Disclosure Statement. If, however, THAN receives properly completed Ballots (that are not subsequently revoked) indicating acceptance of the Plan in sufficient number and amount to meet the voting requirements prescribed by sections 524(g) and 1126 of the Bankruptcy Code, THAN intends to file with the Bankruptcy Court (but hereby expressly reserves the right in its sole and absolute discretion not to file) a voluntary petition for relief under chapter 11 of the Bankruptcy Code and to seek, as promptly thereafter as practicable, confirmation of the Plan. The Effective Date of the Plan is expected to occur thirty-five (35) days after the Confirmation Order, containing the Asbestos PI Channeling Injunction, shall have been either entered by the Bankruptcy Court and accepted and affirmed by the District Court or issued by the District Court, on which date the PENAC Asbestos PI Trust Contribution and THAN Contribution shall be made to the Asbestos PI Trust and the Asbestos PI Trust shall begin to pay Asbestos PI Claims, including the Qualified Asbestos PI Claims. There can be no assurance, however, as to whether or when confirmation of the Plan and the Effective Date actually will occur.

If THAN does not receive sufficient votes in favor of the Plan, THAN believes that it likely will have to file a petition for a traditional, non-prepackaged case under chapter 11 of the Bankruptcy Code. No provisions of the Plan shall be binding on any party in such a scenario and there can be no assurances that a Plan in a form substantially similar to the one proposed shall be proposed or possible in such a scenario. THAN believes that there will be substantially more assets available to pay claimants under the Plan than would be the case if there were no Plan and THAN were forced to pay Claims solely from its own assets. There can be no assurance, however, that THAN will be able to emerge from a case under chapter 11 of the Bankruptcy Code in such circumstances, and, as a result, THAN might be forced into liquidation under chapter 7 of the Bankruptcy Code. THAN believes that, if it is liquidated under chapter 7, the assets available to enable distributions to creditors, and the value thereof, would be significantly less than those contemplated by and under the Plan. See Sections IX.B and XIII.C.

**This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016(c) of the Federal Rules of Bankruptcy Procedure, and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law. This Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable holders of Claims against and Equity Interests in THAN to make informed judgments about the Plan.**

**TABLE OF CONTENTS**

Page

SUMMARY OF THE PLAN OF REORGANIZATION
    AND THE ASBESTOS PI TRUST DISTRIBUTION PROCEDURES ......................................... i

    A.    Introduction................................................................................................................. i
    B.    Contributions to Asbestos PI Trust.......................................................................... iii
    C.    The Promissory Note and the Pledge Agreement. ................................................... iii
    D.    PENAC's Contributions to Reorganized THAN. ..................................................... iv
    E.    Reorganized THAN's Business. ............................................................................... iv
    F.    How Asbestos Claimants Receive Distributions from the Asbestos PI Trust. ................. iv
        1.    The Asbestos PI Trust Distribution Procedures.................................................. iv
        2.    Maximum Annual Payment and Claims Payment Ratio. .................................... vi
        3.    Application of the Payment Percentage. ............................................................. vi
        4.    Analysis of Current and Future Claims. ............................................................. vi
    G.    Summary of Classification and Treatment under the Plan. .................................... viii
    H.    Voting on the Plan. .................................................................................................... x
    I.    Disclosure Statement Enclosures. ........................................................................... xii
    J.    Disclaimers. ............................................................................................................ xii

I.    Introduction......................................................................................................................... 1

II.    Business Description............................................................................................................ 1

    A.    Description and History of THAN's Business........................................................... 1
        1.    THAN's Origins. ................................................................................................. 1
        2.    Sale of THAN's Chemicals Businesses and Related Assets................................ 2
        1.    THAN's Historical Distribution of Materials Containing Asbestos and
            the Resulting Lawsuits....................................................................................... 2
        2.    THAN's Current Business. .................................................................................. 3
    B.    Asbestos-Related Personal Injury and Wrongful Death Claims against THAN................. 4
        1.    Claims Asserted in Prepetition Litigation.......................................................... 4
        2.    Claims Submitted to Verus for Review. ............................................................. 5
    C.    THAN's Environmental Liabilities........................................................................... 6
        1.    THAN's Identified Environmental Liabilities. ................................................... 6
        2.    THAN and Project Realty Service Level Agreement. ........................................ 7
        3.    THAN's Unidentified Potential Environmental Liabilities. ............................... 7
        4.    Insurance Coverage for Unidentified Environmental Liabilities......................... 7
    D.    THAN's Other Potential Liabilities........................................................................... 8
        1.    Agent Orange Liabilities..................................................................................... 8
        2.    Benzene Liabilities. .......................................................................................... 10
        3.    Other Potential THAN Liabilities..................................................................... 10
    E.    Asbestos-Related Personal Injury and Wrongful Death Claims against Entities
        Other than THAN. .................................................................................................. 10
        1.    Derivative Claims against PENAC..................................................................... 10
        2.    Successor Claims against Elementis. ................................................................ 11

F.    Insurance Coverage.....................................................................................13
      1.    Insurance Coverage..........................................................................13
      2.    Factors That May Reduce Available Insurance Coverage.................15
      3.    THAN/PENAC Joint Insurance Settlement Proceeds Trust............17
G.    Prepetition Financing of THAN's Operations. ...............................................18

III.    Prepetition Settlement Negotiations ............................................................................18

A.    THAN and PENAC's Prepetition Discussions with Current Holders of Asbestos
      PI Claims and the Future Claimants' Representative. .....................................19
      1.    Future Claimants' Representative......................................................19
      2.    Asbestos Claimants Group.................................................................21
      3.    Claims Review....................................................................................21
      4.    The Plan Settlement...........................................................................23

IV.    Solicitation of Holders of Asbestos PI Claims............................................................24

V.    Anticipated Events during the Chapter 11 Case ...........................................................26

A.    First-Day Motions..........................................................................................26
B.    Preliminary Injunction Motion. .....................................................................26
C.    Approval of the Disclosure Statement and Prepetition Solicitation, and
      Scheduling of Confirmation Hearing..............................................................27
D.    Motion to Waive Requirement for Post-petition Statutory Committee; Motion to
      Appoint a Future Claimants' Representative; Applications to Retain
      Professionals. .................................................................................................27

VI.    Treatment of Holders of Claims and Equity Interests under the Plan..........................28

A.    Summary of Classification and Treatment......................................................28
      1.    Classification. ....................................................................................28
      2.    Treatment of Claims by Class............................................................28
B.    Description of Unclassified Claims.................................................................30
      1.    Administrative Expenses....................................................................30
      2.    Fees and Expenses of Professionals...................................................30
      3.    Priority Tax Claims............................................................................31
      4.    Debtor-in-Possession Financing.........................................................31
C.    Description of Classified Claims and Equity Interests. ...................................31
      1.    Class 1 – Priority Claims....................................................................31
      2.    Class 2 – Secured Claims...................................................................32
      3.    Class 3 – Allowed General Unsecured Claims....................................32
      4.    Class 4 – Asbestos PI Claims.............................................................33
      5.    Class 5 – Intercompany Claims..........................................................34
      6.    Class 6 – Equity Interests...................................................................34

VII.    Description of the Parent Trust, the Asbestos PI Trust and Contributions by THAN and
      PENAC ...................................................................................................................35

A.    The Parent Trust.............................................................................................35
      1.    Creation of the Parent Trust...............................................................35

|  |  | 2. | Issuance of Equity Interests. ....................................................... | 35 |
|--|--|----|-----------------------------------------------------|----|
|  |  | 3. | Appointment of Parent Trustee. ................................................. | 35 |
|  |  | 4. | Pledge of Equity Interest. ........................................................... | 35 |
|  | B. | The Asbestos PI Trust. ................................................................................ | 35 |
|  |  | 1. | Creation of the Asbestos PI Trust. ........................................... | 35 |
|  |  | 2. | Appointment of Asbestos PI Trustees. ...................................... | 36 |
|  |  | 3. | Appointment of Future Claimants' Representative. .................. | 36 |
|  |  | 4. | Appointment of Asbestos PI Trust Advisory Committee Members. .................. | 36 |
|  |  | 5. | Claims Review. ........................................................................... | 36 |
|  |  | 6. | Contributions to the Asbestos PI Trust. ................................... | 36 |
|  |  | 7. | Promissory Note. ........................................................................ | 37 |
|  |  | 8. | Transfer of Claims and Demands to the Asbestos PI Trust. ..... | 37 |
|  |  | 9. | Discharge of Liabilities to Holders of Asbestos PI Claims. ..... | 37 |
|  |  | 10. | Indemnification by the Asbestos PI Trust. ................................ | 37 |
|  |  | 11. | Investment Policy. ...................................................................... | 37 |
|  |  | 12. | Parent Trust Distributions. ......................................................... | 37 |
|  |  | 13. | Books and Records. ..................................................................... | 38 |
|  | C. | Description of the Consideration Contributed to the Asbestos PI Trust. .......... | 38 |
|  |  | 1. | The THAN Contribution to the Asbestos PI Trust. ................... | 38 |
|  |  | 2. | The PENAC Contribution to the Asbestos PI Trust ................... | 38 |
|  |  | 3. | The Promissory Note and the Pledge Agreement. ..................... | 39 |
|  |  | 4. | The PENAC Contribution to Reorganized THAN. ..................... | 39 |
|  |  | 5. | Environmental Liabilities. ......................................................... | 39 |
|  | D. | Estimation of Asbestos PI Claims. .............................................................. | 40 |

| VIII. | Other Aspects of the Plan | ..................................................................................... | 41 |
|-------|--------------------------------------------|-----|
|  | A. | Distributions Other than on Account of Asbestos PI Claims. .................... | 41 |
|  |  | 1. | Distributions. ............................................................................... | 41 |
|  |  | 2. | Timing and Conditions of Distributions. .................................. | 42 |
|  |  | 3. | Delivery of Distributions. .......................................................... | 42 |
|  |  | 4. | Procedures for Treating Disputed Claims under the Plan. ........ | 42 |
|  |  | 5. | Preservation of Insurance. .......................................................... | 43 |
|  | B. | Treatment of Executory Contracts and Unexpired Leases. ......................... | 43 |
|  |  | 1. | Contracts and Leases Not Expressly Rejected Are Assumed. .... | 43 |
|  |  | 2. | Cure of Defaults. ........................................................................ | 44 |
|  |  | 3. | Rejection Damages Claims. ........................................................ | 44 |
|  | C. | Effect of Confirmation. ................................................................................ | 44 |
|  |  | 1. | Revesting of THAN's Assets. .................................................... | 44 |
|  |  | 2. | Preservation of Certain Causes of Action; Defenses. .............. | 45 |
|  |  | 3. | Institution and Maintenance of Legal and Other Proceedings. .... | 45 |
|  |  | 4. | Insurance Neutrality. .................................................................. | 46 |
|  |  | 5. | Terms of Injunction and Automatic Stay. ................................. | 46 |
|  |  | 6. | No Liability for Certain Released Claims. ................................. | 46 |
|  |  | 7. | Title to Asbestos PI Trust Assets. ............................................. | 47 |
|  |  | 8. | Dissolution of Committees; Creation of the Asbestos PI Trust Advisory Committee; Continuation of Future Claimants' Representative. ..................... | 47 |
|  | D. | Releases, Injunctions and Discharges. ........................................................ | 47 |
|  |  | 1. | Discharge of THAN. ................................................................... | 47 |
|  |  | 2. | Injunction. ................................................................................... | 48 |

|   | 3. | Exculpation. | 48 |
|   | 4. | Release of THAN's Officers and Directors. | 49 |
|   | 5. | Asbestos PI Channeling Injunction | 49 |
|   | 6. | Limitations of Injunctions. | 50 |
|   | 7. | Release and Indemnification by THAN. | 51 |
| E. | Miscellaneous Provisions. | | 51 |

**IX. Financial Information & Projections** ... 51

| A. | Projections. | 51 |
| B. | Liquidation Valuation Analysis. | 52 |

**X. Governance of Reorganized THAN** ... 52

| A. | Parent Trust. | 52 |
| B. | Senior Management. | 52 |
| C. | Corporate Governance. | 52 |

**XI. Certain Factors to Be Considered** ... 53

| A. | Certain Bankruptcy Considerations. | | 53 |
| B. | Risk Factors. | | 53 |
|   | 1. | Overall Risks to Recovery by Holders of Claims. | 53 |
|   | 2. | Certain Bankruptcy Considerations. | 53 |
|   | 3. | Projected Financial Information. | 54 |
|   | 4. | Appointment of Different Asbestos PI Trustees and/or Different Members of the Asbestos PI Trust Advisory Committee for the Asbestos PI Trust. | 54 |
|   | 5. | Distributions under the Asbestos PI Trust Distribution Procedures. | 54 |
|   | 6. | Risk of Post-Consummation Default. | 54 |
|   | 7. | The Asbestos PI Channeling Injunction. | 55 |

**XII. Voting Procedures and Results** ... 55

| A. | Vote Required for Acceptance by a Class. | 56 |
| B. | Classes Deemed to Accept. | 56 |
| C. | Class Deemed to Reject. | 56 |
| D. | Voting. | 56 |
| E. | Cram Down. | 57 |

**XIII. Confirmation of the Plan** ... 57

| A. | Confirmation Hearing. | 57 |
| B. | General Requirements of Section 1129. | 57 |
| C. | Best Interests Test. | 59 |
| D. | Feasibility. | 59 |

**XIV. Certain Federal Income Tax Consequences of the Plan** ... 59

| A. | Consequences to THAN. | 60 |

B.      Treatment of the Asbestos PI Trust and the Parent Trust. ................................ 61

C.      Consequences to Holders of Asbestos PI Claims. ........................................... 62

D.      Information Reporting and Withholding. ........................................................ 63

XV.    Conclusion ................................................................................................................. 63

EXHIBITS

Exhibit A        Plan of Reorganization

Exhibit B        THAN's Liquidation Analysis

Exhibit C        Reorganized THAN's Financial Projections

## I.

## Introduction

T H Agriculture & Nutrition, L.L.C. ("<u>THAN</u>" or the "<u>Debtor</u>") is soliciting votes from holders of Asbestos PI Claims and Intercompany Claims for the acceptance of its Plan prior to filing a voluntary petition that will commence a case under chapter 11 of the Bankruptcy Code.

This Disclosure Statement sets forth certain information regarding THAN's prepetition history, its material liabilities, the reorganization, and the anticipated post-reorganization operations and financing of Reorganized THAN. This Disclosure Statement describes the terms and provisions of the Plan, specifically including the creation of an Asbestos PI Trust pursuant to section 524(g) of the Bankruptcy Code to which all asbestos-related personal injury and wrongful death Claims will be channeled, pursuant to the injunction established for the benefit of THAN, PENAC and certain other parties. The Disclosure Statement also describes certain alternatives to the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan and from the Asbestos PI Trust. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims eligible to vote must follow for their votes to be counted.

Although THAN believes that the descriptions and summaries contained in this Disclosure Statement are fair and accurate in all material respects, they are qualified in their entirety to the extent that they do not set forth the entire text of the documents and statutory provisions discussed. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by THAN's management or a review of historical corporate accounts.

***For a description of the Plan and its provisions, please see Sections VI, VII, and VIII hereof. For a discussion of certain factors to be considered prior to voting, please see Section XI hereof.***

## II.

## Business Description

**A.     Description and History of THAN's Business.**

*1.     THAN's Origins.*

Thompson-Munro-Robbins Chemical Co. was incorporated under Missouri law in January 1917. The company changed its name in 1923 to Thompson, Hayward & Schlueter, Inc., and again, in 1925, to Thompson-Hayward Chemical Co. ("<u>Thompson-Hayward</u>"). The company was headquartered in the Kansas City, Missouri area and started as a small chemical sales company with only a few employees. Over the years, Thompson-Hayward grew into a mid-sized company with hundreds of employees. Its primary business was the distribution of industrial and agricultural products to companies and, by 1961, was organized into four operating divisions:

1.     Industrial Chemicals;

2.     Agricultural Chemicals;

3.     Textile Maintenance; and

4.     Feed & Nutrition (later renamed Nutrition & Health).

In 1961, a newly formed and wholly owned Delaware subsidiary of Consolidated Electronics Industries Corporation ("CEIC") purchased all of Thompson-Hayward's assets and, subsequently, Thompson-Hayward was reincorporated in Delaware as Thompson Hayward Chemical Company of Delaware ("THCC").  In April 1962, CEIC sold and transferred the capital stock of THCC to Philips Electronics and Pharmaceutical Industries Corp. ("PEPI"), a 66%-owned subsidiary of CEIC.

In 1969, CEIC changed its name to North American Philips Corporation ("NAPC").  On October 31, 1973, PEPI was merged into its parent, NAPC, and as a result, THCC once again became a direct, rather than indirect, subsidiary of NAPC (formerly CEIC).  Through a series of corporate transactions, NAPC changed its name to Philips Electronics North America Corporation (as defined in the Plan, "PENAC") in 1993.

*2.     Sale of THAN's Chemicals Businesses and Related Assets.*

THCC exited the chemicals business by selling its Industrial Chemicals and Textile Maintenance divisions in 1981 to H&C Acquisition Inc. ("H&C"), a subsidiary of Harrisons and Crosfield plc.  As part of the transaction, H&C acquired the THCC name and THCC changed its name to T H Agriculture & Nutrition Company, Inc. ("THAN, Inc.").

In 1982, and subsequently in 1984, THAN, Inc. sold the assets of its two remaining divisions, Agricultural Chemicals and Nutrition & Health, to Uniroyal, Inc., and Duphar Nutrition, Inc., respectively.

In 1997, Harrisons and Crosfield plc changed its name to Elementis plc, which today is a limited liability company incorporated and domiciled in the United Kingdom (together with its affiliated entities, "Elementis").  H&C is now known as Elementis Chemicals, Inc., a subsidiary in the Elementis group of companies.

In 1998, THAN, Inc. effectively converted into a Delaware limited liability company and changed its name to THAN.

*1.     THAN's Historical Distribution of Materials Containing Asbestos and the Resulting Lawsuits.*

From approximately 1960 to approximately 1980, THAN distributed in the United States bulk shipments of chrysotile asbestos fiber, the majority of which was supplied by Carey Canadian Mines, Ltd.  During this timeframe, THAN also distributed laundry products and vermiculite that may have contained asbestos.  In addition, THAN also distributed talc, which its internal records indicate was asbestos-free.

THAN has not been sued in any cases alleging exposure to laundry products, vermiculite, talc or any other asbestos-containing product.  Rather, every case in which THAN has been named as a defendant has alleged exposure to a third-party manufacturer's product that contained asbestos fiber distributed in bulk by THAN to the manufacturer for use in the manufacturing process.

A significant majority – estimated by THAN to be over eighty percent – of the asbestos-related personal injury and wrongful death cases filed against THAN in the tort system have alleged exposure to joint compound and joint cement products manufactured by two companies (and their predecessors): Bondex International, Inc. ("Bondex") and Kelly-Moore Paint Company ("Kelly-Moore"). During certain periods in the 1960s and 1970s, THAN distributed asbestos fiber to one of Bondex's manufacturing facilities at which Bondex produced joint compound and joint cement products. These joint compound and joint cement products, in turn, were distributed to certain locations in the United States but do not appear, on the basis of evidence produced in asbestos litigation, to have been distributed to Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont or Virginia. With regard to Kelly-Moore, THAN supplied asbestos fiber to several manufacturing facilities in Texas and Oklahoma in the 1960s and 1970s at which Kelly-Moore produced an asbestos-containing joint cement product labeled PACO Quik-Set; these facilities appear, based on evidence produced in asbestos litigation, to have supplied PACO Quik-Set to parts of the United States located west of the Mississippi River.

Most of the remaining personal injury and wrongful death cases that have been filed against THAN in the tort system have alleged exposure to asbestos-containing products manufactured by a handful of other companies that purchased asbestos fiber from THAN in the 1970s for use in the manufacturing process. These companies include Ruco, Inc., DAP, Inc., Flintkote Co., Welco, Certainteed Corp., Kaiser Gypsum Co., Inc., Proko Industries, Inc., W.R. Grace Co., Weyerhaeuser Co. and United States Gypsum Co. Evidence developed in asbestos litigation strongly suggests that THAN was not the exclusive supplier of asbestos fiber to most of these companies, but rather was one among a number of suppliers, making it impossible in most cases to determine whether the specific asbestos fiber giving rise to a specific case in the tort system was supplied to the manufacturing company by THAN as opposed to another supplier. Moreover, the periods during which THAN supplied asbestos fiber to these manufacturers and the types of asbestos-containing products they sold varied, further compounding the difficulty for any fact-finder in the tort system of determining whether THAN, as opposed to one of its competitors, supplied the fiber at issue in any particular case.

2.    *THAN's Current Business.*

As of the Commencement Date, THAN owns one revenue-generating commercial real property. On the Effective Date, as part of the PENAC Debtor Contribution, PENAC will contribute an additional revenue-generating commercial real property to Reorganized THAN. Both properties will be leased under separate, long-term triple-net leases to a AAA-rated tenant. The monthly rents from the two leases together will generate approximately $650,000 in annual revenue. In addition, THAN's remaining business is primarily focused on the management of asbestos-related claims against THAN based on historical operations.

THAN's President and the Chairman of its Board of Directors is Joseph L. Wolf, Jr., who has served in such positions since 2002. Mr. Wolf has been involved directly in all aspects of THAN's business and its reorganization efforts, including the development of a post-emergence business plan. Mr. Wolf has responsibility for, among other things, settlement negotiations with THAN's insurers to secure additional valuable assets that will be contributed to the Asbestos PI Trust. He participated in the formulation and negotiation of the Plan and has acted as liaison between THAN and PENAC to resolve significant issues related to THAN's reorganization efforts.

In 2007, THAN determined that it should retain a Chief Restructuring Officer ("CRO") in connection with the Debtor's restructuring efforts, including a possible restructuring of THAN's liabilities under the Bankruptcy Code. Accordingly, on December 20, 2007, THAN entered into an agreement with

Steven A. Carlson to act as its CRO. The CRO is an officer and director of THAN and reports directly to THAN's President and Board of Directors. Mr. Carlson has no interest in or affiliation with THAN's owners, members, or affiliates and serves as an independent representative of THAN in all of its restructuring efforts.

Mr. Carlson's duties include (i) acting on behalf of THAN in connection with the company's restructuring efforts and actively participating in the negotiation of a global settlement of THAN's liabilities; (ii) in matters where the interests of THAN may be adverse to the interests of THAN's owners, members or affiliates, he has primary responsibility, together with THAN's attorneys and other professionals, for representing THAN's independent interests; (iii) defining attainable financial and operational goals for the company, providing a concise plan to achieve those goals; (iv) communicating with all of the company's constituencies, professionals, and employees on issues critical to the company's restructuring efforts; and (v) acting as a representative of THAN throughout the chapter 11 restructuring efforts, and performing such other tasks as may be required in connection with THAN's restructuring and successful prosecution of the Chapter 11 Case and the Plan.

THAN's day-to-day operations are managed by its Secretary, Steven L. Carter. Mr. Carter is responsible for the administration of THAN, as well as coordinating discovery with respect to the various litigations against THAN and related parties and testifying for THAN in such litigations.

**B.**    **Asbestos-Related Personal Injury and Wrongful Death Claims against THAN.**

1.    *Claims Asserted in Prepetition Litigation.*

Although the Debtor ceased distributing any asbestos fiber in 1980 and exited the chemicals business in the early 1980s, a significant number of asbestos-related personal injury or wrongful death claims based on the Debtor's historical operations began to be filed against the Debtor in 2002. As of August 29, 2008, 5,588 active cases, representing 14,024 claimants, were pending against THAN, PENAC and/or Elementis in the tort system.

Although THAN has never had a judgment entered against it in connection with asbestos-related personal injury or wrongful death claims, as of August 29, 2008, approximately 6,516 asbestos-related personal injury and wrongful death claims, representing 4,099 cases, through settlements, dismissals or other resolution, have been resolved. THAN has settled claims for amounts it considered reasonable given the facts and circumstances of each case; in exchange for the settlement payment, the plaintiffs provided releases to THAN (and in some cases, parties related to THAN). With respect to settlements of all malignancy claims and certain non-malignancy claims, plaintiffs released all alleged asbestos-related personal injury and wrongful death claims against THAN. With respect to settlements of certain non-malignancy claims, due to the law of the jurisdictions in which those claims were brought, the plaintiffs released non-malignancy claims against THAN but retained the ability to sue THAN for potential malignancy claims.

In addition, numerous asbestos-related personal injury and wrongful death cases filed against THAN have been dismissed without prejudice as to THAN at the request of the plaintiff. In other instances, asbestos-related personal injury and wrongful death cases against THAN have been dismissed on summary judgment due to the plaintiff's inability to meet the product identification requirements.

THAN expended $2,007,250 in indemnity payments related to these liabilities prior to 2003. Indemnity payments totaled $30,157,250 in 2003, $39,259,000 in 2004, $30,439,250 in 2005,

$27,739,250 in 2006, $32,739,500 in 2007 and, as of July 9, 2008, $9,781,500 in indemnification payments in 2008.

2.    *Claims Submitted to Verus for Review.*

As described herein, the Debtor engaged Verus to review information submitted by counsel to claimants asserting Claims for personal injury or wrongful death allegedly caused by exposure to asbestos fiber distributed by THAN, a product containing asbestos fiber distributed by THAN, or any asbestos-containing product distributed by THAN. The Debtor, through Verus and through its national asbestos litigation counsel, sent letters to counsel for all holders of asbestos claims already asserted against the Debtor, inviting them to file their valid claims against THAN for review in this process.

In its claims review process, which began prior to the Commencement Date and will continue through to the Effective Date, Verus reviewed each individual Asbestos PI Claim submitted to it, analyzing the data using methods developed in its work on other asbestos cases, to determine whether the Asbestos PI Claim should be approved for payment under the provisions of the Asbestos PI Trust Distribution Procedures. Through this process, Verus determined certain Asbestos PI Claims should be approved for payment under the standards of the Asbestos PI Trust Distribution Procedures and communicated such information to the asbestos claimants' counsel. Verus also reviewed numerous Asbestos PI Claims submissions characterized by inadequate (or no) product identification, unsupported medical diagnoses, and various other deficiencies that would render the Asbestos PI Claim inadequate as submitted under the Asbestos PI Trust Distribution Procedures.

Thus, in addition to the claims asserted in litigation filed against THAN, PENAC and/or Elementis and detailed above, a substantial number of new claims against THAN were submitted in response to the claims review process engaged in by Verus.

Prior to the Effective Date, any alteration of the review standards applied during the Pre-Effective Date Claims Review period to Asbestos PI Claims reviewed by Verus must be approved by the putative Asbestos PI Trustees, with the consent of the Asbestos Claimants Group and the Future Claimants' Representative.

Those Asbestos PI Claims Verus determines should be approved for payment under the Asbestos PI Trust Distribution Procedures shall be treated as Qualified Asbestos PI Claims under the Plan, and paid by the Asbestos PI Trust on the Effective Date or as soon thereafter as is reasonably practicable. Those Asbestos PI Claims Verus deems inadequate may be resubmitted to the Asbestos PI Trust.

As previously noted, Asbestos PI Claims were reviewed by Verus only for their adequacy under the standards of the Asbestos PI Trust Distribution Procedures in consideration at the time. This number of Asbestos PI Claims cannot be taken as evidence of the true number of asbestos-related personal injury or wrongful death Claims against THAN.

Accordingly, approximately 45,490 Asbestos PI Claims have been asserted against THAN, PENAC and/or Elementis in the Verus Claims review process.[4]

---

[4]    Many, but not all, of the claims already filed against THAN and related parties in the tort system were re-submitted as part of the Verus Claims review process.

## C.  THAN's Environmental Liabilities.

1.  *THAN's Identified Environmental Liabilities.*

Of the 138 branch locations that THAN previously owned and/or operated, THAN has been notified that approximately 33 may have potential Environmental Liabilities.[5]  THAN is currently engaged in environmental investigation or remediation at 20 of these locations in 13 states.  THAN owns six of the sites currently undergoing remediation, located in Albany, Georgia; Montgomery, Alabama; Fresno, California; and Llano, Texas.  The Albany and Montgomery sites are listed on the National Priority List maintained under the federal Superfund program (the "NPL").  The NPL lists the nation's most critical hazardous waste sites as determined by the United States Environmental Protection Agency (the "EPA") and targeted for long-term cleanup and evaluation as established by the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA" or "Superfund").

Fifteen of the 20 sites currently undergoing remediation were sold to H&C (now known as Elementis) in 1981.  Pursuant to the 1981 Asset Purchase Agreement, PENAC and THAN agreed to indemnify Elementis with regard to environmental liabilities on these sites.  Two agreements exist between THAN and Elementis regarding allocation of remediation costs for 12 sites.

Moreover, each of the 138 branch locations may have utilized satellite warehouses, which are not currently owned by THAN, to store chemicals prior to 1984.  Of approximately 266 such satellite locations, THAN has been notified of only 2 that may have potential Environmental Liabilities.

In addition, THAN has been notified that it is considered a potentially responsible party ("PRP") at approximately 23 other sites.  With respect to 18 such sites, THAN disagrees with its designation as a PRP, and has not participated in any cleanup of these sites.[6]

THAN utilizes major environmental engineering firms and smaller firms to provide local support, as necessary.  THAN will pursue other PRPs when and where possible, usually in the context of being a member of a PRP committee.

THAN has estimated its environmental remediation costs (including its costs for project management) to be approximately $62 million over a maximum period of the next twenty years.  This estimate was prepared by the project managers of each site and is reviewed and revised on at least an annual basis and then audited by an independent audit firm.

In connection with the Plan, PENAC will assume all Known Environmental Liabilities, which are set forth on Exhibit I to the Plan (and no others, even if they are discovered to exist at sites associated with Known Environmental Liabilities), as provided in Article 9.5 of the Plan.

---

[5]    In addition, there are 12 branch locations at which THAN has been notified of potential Environmental Liabilities and remediation projects have been completed or THAN has participated in a "buy-out" of any potential liability.  THAN is not aware of any other Environmental Liabilities at these 12 branch locations.

[6]    In addition, there are 14 sites at which THAN has been identified as a PRP and remediation projects have been completed or THAN has participated in a "buy-out" of any potential liability.  THAN is not aware of any other Environmental Liabilities at these 14 sites.  With respect to certain of the sites listed as PRP sites, it is Elementis, rather than THAN, that has been named as a PRP, and THAN has an informal agreement with Elementis to pay a portion of related costs.

2.      *THAN and Project Realty Service Level Agreement.*

THAN entered into a Master Service Level Agreement with Project Realty LLC ("Project Realty"), a subsidiary of PENAC, to provide THAN with project management of various environmental remediation sites. Project Realty provides budget development and management and environmental reserve analysis at these sites. Project Realty interfaces with tenants and new property owners of former THAN properties, regulatory agencies, Philips, outside legal counsel, and others. Project Realty operates out of THAN's Kansas office. The estimated cost of such expenses for 2008 is $524,000, subject to a "true-up" of actual expenditures at year end.

Upon emergence from chapter 11, these services will be terminated insofar as all Known Environmental Liabilities will be assumed by PENAC.

3.      *THAN's Unidentified Potential Environmental Liabilities.*

Other than the potential Known Environmental Liabilities discussed above in Section II.C.1. and set forth on Exhibit I to the Plan, THAN lacks sufficient information to determine whether any of the remaining branch locations or satellite warehouses will result in Environmental Liabilities. THAN also shipped hazardous material to landfills, recycling facilities, or other properties not currently or previously owned, used or operated by THAN. Whether THAN has any Environmental Liabilities with respect to such activity is currently unknown and cannot be reasonably estimated.

PENAC shall not assume Unknown Environmental Liabilities; rather, as described in greater detail below, THAN has procured insurance with respect to Unknown Environmental Liabilities (the "Unknown Environmental Liability Insurance Policy"), to enhance or supplement existing insurance related to Unknown Environmental Liabilities.

4.      *Insurance Coverage for Unidentified Environmental Liabilities.*

In the 1990s, PENAC entered into approximately 25 confidential insurance coverage settlement agreements with various of its pre-1986 insurers in connection with liabilities arising out of then-known environmental remediation claims and various THAN historical work sites which had been the subject of environmental remediation claims prior to the settlements.[7] Subject to applicable policy terms and limits, as well as the terms of the prior settlement agreements, some of PENAC's pre-1986 insurance policies may still provide coverage for future environmental remediation claims involving historical THAN work sites. Generally speaking, such coverage would be available only if the claims involve sites that were not known to be the subject of prior environmental remediation claims at the time PENAC settled with its pre-1986 insurers. The total limit of potentially available coverage is in excess of $400 million. However, much of the potentially available insurance may be triggered only by very large claims.

Pursuant to Article 9.5 of the Plan, PENAC has agreed to assume all Known Environmental Liabilities, and THAN will not incur any costs or expenses in relation to those liabilities. In the event that THAN is notified of new or additional environmental claims or conditions in connection with the Known Environmental Liabilities ("New Claims") and PENAC believes that such New Claims are not included within the Known Environmental Liabilities assumed by PENAC at the time the

---

[7]    As discussed below in Section II.F., PENAC purchased comprehensive general liability insurance policies that provided insurance coverage to PENAC and its subsidiaries, including THAN.

Unknown Environmental Liability Insurance Policy was bound with ACE, and provided that PENAC has no independent contractual obligation to indemnify the party asserting any New Claims, THAN will seek coverage from ACE for any New Claims. To the extent ACE contends that the condition was included in the Known Environmental Liabilities and denies coverage, PENAC will either assume the condition as a Known Environmental Liability or, if PENAC does not agree to assume the New Claims, THAN will in good faith take all legal and equitable action, at the sole cost of PENAC, against ACE to compel ACE to provide coverage for such New Claims. In the event of a final order by a court of competent jurisdiction upholding ACE's denial of coverage, PENAC will assume such New Claim as a Known Environmental Liability. Nothing in this paragraph shall impact the rights and obligations provided in the Plan with respect to claims arising at any site other than sites included in Known Environmental Liabilities.

THAN will continue to be responsible for Unknown Environmental Liabilities. It is impossible to predict the number of any new environmental liabilities, if any, that may surface in the future. For that reason, THAN has procured the Unknown Environmental Liability Insurance Policy with respect to Unknown Environmental Liabilities associated with THAN's historical worksites to enhance or supplement existing insurance related to Unknown Environmental Liabilities. This policy provides coverage for a period of five years for such Unknown Environmental Liabilities, in excess of a self insured retention of $250,000 per pollution condition, $2 million aggregate, $100,000 maintenance, up to $10 million per claim, and an aggregate limit of $30 million. At the end of its initial five year term, the Unknown Environmental Liability Insurance Policy may be extended for an additional term of five years.

THAN has reviewed the historical rate of notification to THAN of new alleged environmental liability with respect to historical worksites over the past 10 years. While THAN cannot predict the future rate at which it may receive notification of alleged environmental liability, in the event Reorganized THAN were to receive notification of alleged environmental liabilities at a similar rate to the notifications that it received over the past 10 years, Reorganized THAN can expect the average annual cost to be approximately $254,000 per year, reflecting deductibles per claim under the Unknown Environmental Liability Insurance Policy. Any amount above the estimated deductibles for Unknown Environmental Liabilities would be covered by the Unknown Environmental Liability Insurance Policy, subject to applicable policy limits.

Moreover, in consideration of an event that Reorganized THAN is confronted with notifications of new liabilities at a rate that far exceeds the historical rate at which it received notifications, Reorganized THAN will maintain a reserve amount of $1,000,000 to the extent of available Cash generated from its operations to address any such unexpected liabilities.

Based upon its ten-year history with respect to notification and remediation of Environmental Liabilities, THAN believes that the insurance coverage detailed above as well as the reserve amount will be sufficient to cover any potential Environmental Liabilities that may arise in the next five years.

**D.      THAN's Other Potential Liabilities.**

1.      *Agent Orange Liabilities.*

THAN was one of several manufacturers that sold an herbicide, referred to commonly as Agent Orange, to the U.S. military during the period between 1965 and 1971. Agent Orange was used by the U.S. military in connection with defoliation operations in Vietnam. Since the late 1970s, THAN has been named as a defendant in suits brought by Vietnam veterans and other individuals based on personal injury and wrongful death that was allegedly the result of exposure to Agent Orange. THAN is aware of

approximately 29 cases currently pending in which it is named as a defendant, that consist of approximately 479 personal injury, wrongful death, loss of consortium, loss of services, and "genetic and somatic" injury claims.[8] Seven of the cases are either certified class actions or purported class actions. Three recent decisions by the Second Circuit Court of Appeals, described in detail below, affirmed the dismissal of certain related cases and, accordingly, THAN expects these cases will be dismissed shortly.

(a)     *The 1984 Agent Orange Settlement.*

Vietnam veterans and their families first filed Agent Orange class actions suits in the late 1970s, all of which were transferred to the Eastern District of New York. In 1983, the Eastern District of New York certified a class that included armed forces from the United States, New Zealand, and Australia that served in Vietnam between 1961 and 1972 and were exposed to Agent Orange. Seven defendants, including THAN, reached a settlement with the plaintiffs in 1984 that provided the defendants would put $180 million into a settlement fund (the "1984 Agent Orange Settlement"), $10 million of which was to be used to indemnify the defendants against future state court actions alleging the same claims.

The 1984 Agent Orange Settlement specifically included claimants whose injuries had not manifested themselves by the time of the settlement, but excluded claimants whose injuries manifested after 1994, which was when the trust created by the 1984 Agent Orange Settlement was to cease making payments. The 1984 Agent Orange Settlement was approved by Eastern District of New York in 1985. During the ten-year period of the 1984 Agent Orange Settlement, cash payments were made to approximately 52,000 class members.

(b)     *Claims outside of the 1984 Agent Orange Settlement.*

Additional claims have been brought against THAN and other Agent Orange defendants outside of the 1984 Agent Orange Settlement. In general, courts in the Eastern District of New York have granted the defendants' (including THAN) motions for summary judgment in those cases based on the government contractor defense. *See, e.g.*, *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223 (E.D.N.Y. 1985), *aff'd*, *In re "Agent Orange" Prod. Liab. Litig. MDL No. 381*, 818 F.2d 187, 190 (2d Cir. 1987). The government contractor defense, which stems from *Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988), grants defense contractors a complete defense from liability in personal injury cases where the defective product was manufactured according to military specifications, the government was aware of the design flaw or inherently dangerous aspect of the product and the government controlled the defendant's ability to label the product or issue warnings about it.

Some of the dismissals were included in an omnibus appeal before the Second Circuit Court of Appeals (and thus are considered pending cases against THAN). Argument was heard on this appeal in June of 2007. On February 22, 2008, the Second Circuit affirmed the dismissal of these cases. This should result in dismissals of all pending Agent Orange claims, and further suggests that any cases filed in the future should be dismissed on summary judgment.

Since the 1984 Agent Orange Settlement, THAN and the other defendants have settled a handful of additional Agent Orange claims for modest sums.

---

[8]     In one of the cases, Elementis, not THAN, is named as the defendant.

2.    *Benzene Liabilities.*

There have also been a limited number of cases filed against THAN, along with various other defendants, in connection with its alleged distribution of benzene, a chemical used as a solvent for various organic materials such as fats, oils, resins, gums and rubber. Historically, benzene is used most frequently in the blending of gasoline for fuel, as well as in laboratory testing processes.

There are currently approximately eleven (11) cases pending against THAN alleging personal injury or wrongful death related to exposure to benzene. THAN has participated in settlements with respect to approximately ten (10) cases relating to benzene exposure. THAN's portion of such settlements has been for *de minimis* amounts in the range of approximately $2,500 to $7,500.[9]    In addition, approximately seven (7) cases alleging benzene exposure have been dismissed.

3.    *Other Potential THAN Liabilities.*

THAN may also be party to other legal actions arising from the operation of its businesses. THAN believes that the outcome of these proceedings will not have a material adverse effect on its financial position. THAN has been notified of a personal injury claim asserted on the basis of alleged exposure to talc. The case never matured into a formal lawsuit, no liability has been found for any injury caused by such exposure or linking such exposure to a THAN-related product, and no amounts have been paid in connection therewith. Likewise, THAN is party to one personal injury claim asserted on the basis of alleged exposure to silica; no liability has been found for any injury caused by such exposure or linking such exposure to a THAN-related product, and no amounts have been paid in connection therewith.

There is no other material litigation pending against THAN.

**E.    Asbestos-Related Personal Injury and Wrongful Death Claims against Entities Other than THAN.**

In addition to the asbestos-related personal injury and wrongful death Claims asserted against THAN, certain plaintiffs have also asserted derivative or successor asbestos-related personal injury and wrongful death Claims arising out of the conduct or products of THAN against other parties related to THAN, including PENAC, Elementis and certain of their respective Affiliates (such Claims referred to herein as "Derivative Liability Asbestos PI Claims"). These Claims were included in the Claims submitted to Verus as part of the prepetition review process described herein.

Asbestos PI Claims asserted against PENAC and Elementis, as well as all other Asbestos Protected Parties, will be channeled to the Asbestos PI Trust under the Plan to the extent such Claims are based on allegations that such parties are somehow directly or indirectly liable for the conduct of, Claims against, or Demands on THAN.

1.    *Derivative Claims against PENAC.*

Plaintiffs have asserted asbestos-related personal injury and wrongful death Claims against THAN and PENAC (the parent corporation of THAN) derivatively, based upon theories such as

---

[9]    This is the standard amount for settlements; however, THAN participated in the settlement of one early case for a significantly greater amount.

successor liability, fraudulent conveyance or alter ego. As of August 29, 2008, approximately 2,184 claimants held pending Claims naming both THAN and PENAC as defendants, where PENAC is sued derivatively, as defendants allegedly responsible for the claimants' personal injury or wrongful death allegedly arising from exposure to asbestos fiber distributed by THAN, a product containing asbestos fiber distributed by THAN, or any asbestos-containing product distributed by THAN.

No judgment has ever been entered against PENAC in any of these cases, nor has PENAC ever paid any money on behalf of itself to plaintiffs in settlement of any of these cases. Where THAN has settled an asbestos-related personal injury or wrongful death case in which PENAC was a party, settling plaintiffs have released all alleged asbestos-related personal injury and wrongful death claims against PENAC (as well as THAN) that were alleged to be derivative of, based on, or related to, products containing asbestos distributed by THAN.

In exchange for the PENAC Contribution, all Derivative Liability Asbestos PI Claims against PENAC and the other PENAC Related Parties are being released, discharged and enjoined.

2.    *Successor Claims against Elementis.*

As noted above, Elementis acquired certain operating assets from THCC in 1981. As part of that transaction, THAN retained certain liabilities relating to such assets. The 1981 Asset Purchase Agreement contained an indemnification agreement that stated:

10.1 Indemnification by NAP and [THCC]. NAP and [THCC] hereby indemnify and hold [Elementis] harmless at all times from and after the date of this Agreement, against and in respect of all matters in connection with the following:

(a) All the Retained Liabilities,[10] and all suits, proceedings, demands, assessments, judgments, costs, reasonable attorneys fees and expenses incident to

---

[10]    Pursuant to Section 2.2.2 of the 1981 Asset Purchase Agreement, "Retained Liabilities" is defined as follows:

(a) All Liabilities of [THCC] for warranty claims, quality-related claims or product liability claims relating to products of the [business] shipped on or prior to the [closing date];

(b) Federal, state or foreign income or franchise taxes of [THCC] or other taxes incurred in respect of or measured by the income of [THCC] or income from the [business] earned prior to and including the [closing date];

(c) All Liabilities of [THCC] for any [federal], state or foreign sales taxes or other taxes incurred in respect of or measured by the sale of any product prior to the [closing date];

(d) All Liabilities arising out of [certain employee benefit plans] (except as otherwise expressly assumed by Purchaser in this Agreement) and Liabilities under or pursuant to the [certain employee benefit plans] not disclosed by [THCC] to [Elementis] in writing prior to the [closing date] which are required to be so disclosed by the terms of this Agreement;

(e) All Liabilities of [THCC] the existence of which would constitute a breach of any of [THCC]'s representations and warranties contained in Section 3 of this Agreement;

(f) All Liabilities with respect to payables of the [business] to [THCC] not accounted for on the [statement to be provided on the closing date of the transaction)];

(g) All Liabilities for all environmental, ecological, health or other claims pertaining to the [business] or the [assets included on a schedule to the Agreement] which relate to time periods or events occurring on or

any matters relating to the Retained Liabilities, including those reasonable costs, charges and expenses in respect of the participation of officers and employees of [Elementis] after the [closing date] in the defense thereof; and

(b) Any losses, liabilities, damages or deficiencies incurred by [Elementis] that result from any misrepresentation, breach of warranty or nonfulfillment of any agreement or covenant on the part of NAP or [THCC] under this Agreement, or from any certificate or other instrument furnished or to be furnished by NAP or [THCC] hereunder, and all suits, actions, proceedings, demands, assessments, judgments, costs, reasonable attorneys fees and expenses incident to any of the foregoing matters, including those reasonable costs, charges and expenses in respect of the participation of officers and employees of [Elementis] after the [closing date] in defense thereof.

As of August 29, 2008, Elementis has notified THAN of approximately 5,180 successor Claims filed against Elementis as a defendant allegedly responsible for the claimants' personal injury or wrongful death allegedly arising from exposure to asbestos fiber distributed by THAN, a product containing asbestos fiber distributed by THAN, or any asbestos-containing product distributed by THAN. Historically, pursuant to its contractual right to indemnification, Elementis has tendered to THAN and PENAC, for defense and ultimate satisfaction, certain personal injury and wrongful death Claims asserted against it, related to, or allegedly based on assets it acquired under the 1981 Asset Purchase Agreement.

In exchange for the PENAC Contribution, Asbestos PI Claims, including Indirect Asbestos PI Claims, against Elementis, as such claims relate to the indemnification provisions set forth in the 1981 Asset Purchase Agreement, are being enjoined and channeled to the Asbestos PI Trust under the Plan.

The rights and obligations of Elementis, THAN and PENAC under the 1981 Asset Purchase Agreement and any related agreements will not in any way be altered by THAN's Chapter 11 Case.

---

prior to the [closing date], including those relating to storage, transportation, manufacture or disposal of, or exposure of persons to, hazardous materials, chemicals or substances or the containers, cylinders, drums or other equipment used in connection therewith;

(h) All Liabilities incurred by [THCC] after the [closing date];

(i) All Liabilities which are attributable to the [retained assets] referred to in Section 2.1.2, including, without limitation, those attributable to Agent Orange, and all other Liabilities not related to the [business];

(j) All Liabilities which are attributable to (i) the disposal pursuant to Section 5.4 of damaged or dangerous inventories located on premises listed in Schedules 2.1.1(a) and 2.1.1(b), (ii) the disposal pursuant to Section 5.5 of damaged or contaminated containers and cylinders and (iii) the excavation and disposal of buried containers, cylinders, drums or cans pursuant to Section 16.5;

(k) All Liabilities based on tortious or illegal conduct by [THCC]; and

(l) All Liabilities relating to any and all litigation existing on the [closing date] to which [THCC] is a party.

"Liabilities" is defined as "all debts, liabilities and obligations, including those arising under any law, rule or regulation of any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or any arbitrator of any kind, and those arising under contracts, leases, commitments or undertakings of [THCC]."

**F.     Insurance Coverage.**

1.     *Insurance Coverage.*

(a)     *Insurance Coverage Generally.*

As is common for large companies with a number of subsidiaries, PENAC obtained comprehensive general liability insurance policies to provide coverage for itself and its subsidiaries, including THAN.   The comprehensive general liability insurance policies that PENAC and its subsidiaries purchased prior to July 1, 1985 are "occurrence-based" policies, which, subject to other policy terms, generally insure against "occurrences" that cause bodily injury or property damage during the applicable policy period, even if the injury or damage does not manifest itself until after the policy period.   "Occurrence" policies often provide insurance protection against asbestos and other "long-tail" claims, which are commonly asserted years or decades after the underlying injuries are alleged to have occurred.   THAN has been covered under these comprehensive general liability insurance policies since it became a PENAC subsidiary.   None of these insurance policies contain asbestos exclusions, and THAN contends that these insurance policies cover its liabilities, including defense and indemnity costs, for bodily injury, personal injury and wrongful death arising out of asbestos bodily injury claims.

PENAC purchased primary, umbrella and/or excess-layer comprehensive general liability policies between 1960 and 1985 with combined total limits of in excess of $1.2 billion.   There is a cap on the available proceeds from each of these comprehensive general liability policies.   Each policy typically contains per-occurrence and annual aggregate limits of liability and only covers claims to the extent any applicable lower level insurance for the covered period is or becomes exhausted or provides no coverage.   As a general matter, primary policies respond to claims first, then umbrella policies, followed by various layers of excess policies.

Some of the comprehensive general liability policies purchased by PENAC between 1960 and 1985 have been exhausted through settlements in connection with various third-party liabilities of insureds under the policies, including THAN and PENAC.   A significant portion of these insurance policies has been released through insurance coverage settlements and is no longer available to provide coverage for asbestos-related personal injury or other claims.

(b)     *Currently Available Pre-1986 Insurance Coverage.*

As of June 30, 2008, and excluding any insurance coverage that is available pursuant to any insurance-related settlement agreement, there remains approximately $382 million of solvent products liability/completed operations coverage available under the comprehensive general liability policies purchased by PENAC between 1960 and 1985, depending on how the limits of those policies are interpreted.

(c)     *Post-1985 Insurance Coverage.*

Beginning in 1985, with limited exception for certain European insurance policies covering the period 1997-2001, the comprehensive general liability insurance policies covering THAN contain express asbestos exclusions that exclude all coverage for asbestos-related personal injury claims.

Certain European insurance policies issued to the ultimate parent company of PENAC and THAN for the four-year period, December 31, 1997 through December 31, 2001, provide general liability insurance coverage and do not contain asbestos-related exclusions.   When THAN sought to

access these policies to cover asbestos personal injury claims, however, the insurers that issued the policies rescinded them for, among other reasons, alleged nondisclosure. The propriety of the insurers' rescission was the subject of legal proceedings, which were ultimately concluded, in the Netherlands. In settlement of this controversy, the insurers have agreed to pay THAN's and PENAC's ultimate parent company, Koninklijke Philips Electronics N.V. ("KPENV"), in exchange for agreement by KPENV to release the insurers from any and all asbestos-related coverage for KPENV and its affiliates worldwide and THAN's agreement to relinquish its right to all coverage under the policies. In the settlement agreement, THAN agreed that the European insurers would be protected by a channeling injunction pursuant to section 524(g) of the Bankruptcy Code in the event that THAN commenced bankruptcy proceedings pursuant to chapter 11 of the Bankruptcy Code. KPENV has transferred the proceeds of the settlement to the Insurance Settlement Proceeds Trust and THAN proposes to treat the European insurers as Settling Asbestos Insurance Entities under the Plan in accordance with its commitment to the European insurers. Notwithstanding the foregoing, the European insurers have not consented to the jurisdiction of a state or federal court in the U.S., including a U.S. bankruptcy court.

(d)     *Insurance Settlement Agreements.*

During the past twenty years, PENAC and THAN have engaged in insurance coverage litigation matters and other proceedings to secure coverage and payment from their insurers for a variety of claims. THAN and PENAC have been successful in resolving disputes with many insurers. Several of the settlement agreements that PENAC and/or THAN have entered into affect the insurance coverage available for asbestos-related bodily injury claims. Some of the agreements PENAC and/or THAN entered into were "buy-back" settlements, meaning that, in exchange for a specified dollar amount, the settlement agreement constituted a full policy buyback and completely released the insurer from any and all liability under the relevant insurance policies to the same effect as if the policies had never existed and were never issued. Other settlement agreements were "coverage-in-place" agreements, wherein the insurer agreed to provide coverage to THAN for asbestos-related liabilities as they are incurred up to a specified amount, pursuant to a negotiated allocation methodology. With respect to those coverage-in-place settlements, up to approximately $112 million of remaining limits of insurance are available for asbestos-related claims asserted against THAN.

(i)     Settled Hartford Coverage.

In September 2008, PENAC and THAN entered into a confidential settlement agreement (the "Hartford Agreement") with Hartford Financial Services Group, Inc. ("Hartford") to settle, among other things, disputes concerning insurance coverage for asbestos-related bodily injury claims asserted against PENAC and/or THAN under insurance policies issued by Hartford Accident and Indemnity Company. In exchange for a specified dollar amount, the Hartford Agreement, among other things, fully releases Hartford from any and all liability for THAN's asbestos-related bodily injury claims, under all insurance policies it ever issued to THAN and PENAC, to the same effect as if the policies had never existed and were never issued in the first place.

(ii)     Settled Travelers Coverage.

THAN settled asbestos-related coverage claims against The Travelers Indemnity Company, The Travelers Indemnity Company of Connecticut, Travelers Property Casualty Company of America, and Travelers Casualty and Surety Company (collectively, "Travelers") pursuant to a confidential settlement agreement entered into in September 2005 (the "Travelers Agreement"). The Travelers Agreement was an agreement between the parties to settle disputes concerning insurance coverage for asbestos-related bodily injury claims asserted against PENAC and/or THAN under insurance

policies issued by the various Travelers entities. Although certain Travelers policies are exhausted as a result of payments and/or settlements in connection with asbestos bodily injury claims asserted against THAN, certain of the Travelers policies have remaining coverage available for asbestos-related bodily injury claims asserted against THAN.

(iii)      Settled Northbrook Coverage.

THAN settled asbestos-related coverage claims against Allstate Insurance Company, as successor to Northbrook Excess and Surplus Company, formerly known as Northbrook Insurance Company (collectively "Northbrook"), pursuant to a Confidential Settlement Agreement, Release and Buy-Back, dated September 30, 2005 (the "Northbrook Agreement"). In exchange for a specified dollar amount, the settlement agreement constituted a full policy buyback and released Northbrook from any and all liability under the relevant insurance policies to the same effect as if the policies had never existed and were never issued to PENAC.

(iv)      Settled London Coverage.

In November 1995, as part of a comprehensive settlement of environmental and other coverage liabilities, PENAC entered into a Confidential Asbestos Bodily Injury Claims Letter of Agreement (the "London Asbestos Letter Agreement") with Certain Underwriters at Lloyd's, London and certain London market insurance companies (collectively, "London"). The London Asbestos Letter Agreement supersedes all London insurance policies issued to THAN during the period 1961 through 1986, and sets forth certain agreed rules and principles pursuant to which London must pay asbestos-related claims against PENAC and/or THAN up to a specified amount of money.

(v)      Settled TIG Coverage.

THAN settled asbestos-related coverage claims against TIG Insurance Company ("TIG"), as successor by merger to International Insurance Company, pursuant to a Confidential Settlement and Policy Release Agreement, entered into in February 2007 (the "TIG Agreement"). In exchange for a specified dollar amount, the settlement agreement constituted a full policy buyback and released TIG from any and all liability under the relevant insurance policies to the same effect as if the policies had never existed and were never issued to PENAC.

(vi)      Settled Transit Coverage.

In June 1999, PENAC entered into a confidential Settlement Agreement and Full Release (the "Transit Agreement") with Transit Casualty Company ("Transit"), which was insolvent and in Receivership. In exchange for a specified claim allowance amount, the settlement agreement constituted a full policy buyback and released Transit from any and all liability under the relevant insurance policies to the same effect as if the policies had never existed and were never issued to PENAC.

2.      *Factors That May Reduce Available Insurance Coverage.*

There are several factors that may reduce the amount of insurance coverage potentially available to THAN on account of asbestos-related personal injury Claims asserted against it.

(a) *Insurance Coverage Litigation.*

The outcome of pending insurance coverage litigation could effect the amount of insurance coverage available to THAN; however, because insurance is not being contributed to the Asbestos PI Trust, such recoveries will not affect the contributions to be made by THAN and PENAC to the Asbestos PI Trust.

THAN is currently involved in insurance coverage litigation with various of its pre-1986 excess-layer insurance carriers, which is pending in the Circuit Court of Cook County, Illinois, County Department, Chancery Division. THAN's First Amended Complaint in this action sets forth, among other causes of action, claims for declaratory relief against the defendant excess-layer insurance carriers. THAN seeks a declaration of insurance coverage for past, present and future asbestos-related liabilities under excess layer general liability policies covering the period 1965 through 1985. The defendant excess insurers have denied the allegations of THAN's First Amended Complaint and dispute that their policies provide coverage for some or all of the liabilities at issue. If the defendant excess insurers prevail on any of their defenses, this could limit or eliminate some or all of the coverage available under their policies to cover asbestos-related personal injury Claims against THAN.

(b) *Insolvent Insurers.*

Another factor that likely will reduce available coverage is the insolvency of certain insurers. Excluding comprehensive general liability policies that have been exhausted through settlements, there are approximately $185 million in products liability/completed operations limits under the comprehensive general liability policies purchased by PENAC between 1960 and 1985 that were issued by insurers that are in rehabilitation or liquidation proceedings, subject to an insolvent scheme of arrangement and/or have been declared insolvent. Recovery under policies issued by such insolvent insurers is subject to the uncertainties that result from each of the insolvent insurers' respective liquidation or rehabilitation proceedings or foreign scheme of arrangement; therefore, it is not possible to predict amounts, if any, that may be recovered ultimately from the insolvent insurers.

(c) *Policy Rights of Co-Insureds, Including PENAC.*

Another factor that may reduce THAN's available insurance coverage is the fact that PENAC and many of its corporate affiliates are also insured by the same pre-1986 policies under which THAN is seeking coverage for the asbestos-related Claims. As a result, there may be competing claims for such shared coverage, with respect to which THAN and PENAC have sought payment historically from insurers on a first-come, first-served basis. THAN is not aware of any existing claims by PENAC or any other additional insured that are likely to materially impact the coverage for the asbestos Claims asserted against THAN.

In addition, PENAC has been named as a defendant in many of the asbestos-related personal injury Claims arising from THAN's activities. Like THAN, PENAC has rights to seek coverage for these Claims under the pre-1986 policies. Finally, PENAC may seek coverage in the future for Claims that involve liabilities arising during the 1961-to-1985 time period.

(d) *Multi-Year and Stub Policies.*

Finally, THAN's potentially available, solvent insurance coverage also may be reduced because numerous policies within THAN's potential insurance coverage block for asbestos-related Claims cover multiple annual periods (*i.e.*, "multi-year" policies) or one or more annual periods and a

period of less than one year (*i.e.*, the "stub" period). Depending on the policy language of each of these policies and the applicable law, a court may consider a given multi-year policy to have a single policy limit, or it may find that the policy has multiple annual limits. With regard to policies with stub periods, a court may apply separate limits to each annual period and the stub period, it may find that a single policy limit applies to the annual period and stub period, or it may prorate the limits associated with the stub period to account for the shortened policy period of the stub policy.

Significantly, taking into account all of the insurance policies where multi-year/stub period issues arise, the potential difference in coverage depending on whether a court were to apply one limit or multiple limits may be as much as approximately $48 million.

3.      *THAN/PENAC Joint Insurance Settlement Proceeds Trust.*

As described above, THAN and/or PENAC have been engaged in numerous insurance coverage litigations and alternative dispute resolution proceedings to secure coverage and payment from their insurers for a variety of Claims. THAN and PENAC have also engaged in negotiations with certain of their insurers for the purpose of entering into agreements to settle various coverage disputes or agreements to settle coverage under certain of the insurance policies. To date, THAN and PENAC have entered into 7 such agreements with approximately 68[11] insurers. Under the terms of those agreements, the insurers pay THAN and PENAC a cash amount up front or over time in exchange for a release under the insurance policies being settled or commuted. As of the Commencement Date, THAN and PENAC have received approximately $304 million in cash and approximately $112 million to be received over time under such settlement agreements (much of this amount is not scheduled to be paid now and will not be paid to THAN for an extended period of time per the settlement agreement). The majority of this amount has already been used to fund settlements and defenses of personal injury and wrongful death claims. There remains approximately $170 million that constitutes available insurance for PENAC or THAN to fund settlements and defenses of personal injury and wrongful death claims (the "Net Insurance Proceeds").

For the purpose of preserving the rights of each of THAN and PENAC with respect to their shared insurance policies (the "Shared Asbestos Insurance Policies") and historical practice of seeking  payment from the insurers on a first-come, first-served basis, on March 7, 2008, THAN, PENAC, and Citibank, N.A., as trustee, established the THAN/PENAC Joint Insurance Settlement Proceeds Trust (the "Insurance Settlement Proceeds Trust"). THAN and PENAC are the sole beneficiaries of the Insurance Settlement Proceeds Trust, into which all Net Insurance Proceeds are required to be deposited. Under the Insurance Settlement Proceeds Trust, the rights of each of THAN and PENAC to draw on the Net Insurance Proceeds are identical in every respect to the rights they held to draw on the applicable insurance policies prior to their settlement. In particular, subject to receipt of satisfactory documentation, THAN and PENAC may draw on the funds on a first-billed, first-paid basis to pay settlements, judgments or defense costs relating to the types of claims that were previously covered by the settled insurance policies. To the extent the amount of Net Insurance Proceeds in the Insurance Settlement Proceeds Trust is insufficient to satisfy the amount of a bill submitted by THAN or PENAC, the unpaid portion of the bill is required to be paid as soon as additional Net Insurance Proceeds are deposited into the trust, and before any other bill submitted by THAN or PENAC is paid.

---

[11]     Of the 68 settling insurers, approximately 37 of are London market insurers that are all parties to a single settlement agreement with the Debtor.

As part of their contribution to the Asbestos PI Trust, on the Effective Date, PENAC and THAN will contribute Cash remaining in the Insurance Settlement Proceeds Trust as of the Effective Date.

On the Effective Date, THAN shall assign its rights to receive insurance proceeds from any Shared Asbestos Insurance Policy, Insurance Settlement Agreement and the Insurance Settlement Proceeds Trust to PENAC.

**G.    Prepetition Financing of THAN's Operations.**

As of the date hereof, THAN's principal assets consist of its rights under the Shared Asbestos Insurance Policies, other insurance policies and certain insurance settlement agreements (described above), which THAN relies on to fund the majority of its obligations arising from its asbestos-related and environmental liabilities.

From time to time, certain of the insurance policies' providers have failed to timely honor their obligations to make payments to THAN under the policies, or have disputed the existence or extent of such obligations.  In order to maintain THAN's ability to satisfy its liabilities to third parties, both asbestos-related and environmental, PENAC has provided loans and advances to THAN in order to bridge the period between THAN's payment of settlements, judgments, defense costs and other liabilities, and its receipt of amounts owed to it under the insurance policies.  As of the date hereof, THAN has received from PENAC approximately $186 million attributable to these loans.

On the Commencement Date, as set forth in Section V.A, THAN will seek approval to use "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code), to provide adequate protection for same, and to approve an agreement to obtain post-petition financing with super-priority and senior secured status (the "DIP Agreement").

## III.

### Prepetition Settlement Negotiations

The cost of defending and resolving personal injury and wrongful death Claims asserted against THAN has been and continues to be substantial.  Over the past three to four years, THAN has experienced a material increase in the number of mesothelioma claims filed against it and the amount being paid to resolve such claims.  These events have placed significant pressure on THAN's ability to manage its liabilities.  As of June 30, 2008, THAN has incurred approximately $172.1 million in settlement payments with respect to asbestos-related personal injury and wrongful death Claims and approximately $89.5 million to defend such Claims.  As of the date hereof, THAN's counsel is defending approximately 14,024 pending asbestos-related personal injury or wrongful death Claims.  THAN currently estimates that the remaining coverage available to it under the Shared Asbestos Insurance Policies and various insurance settlement agreements will not be sufficient to satisfy in full the pending and future Asbestos PI Claims asserted against THAN.

In light of these circumstances, THAN determined that it may be necessary to commence a case under chapter 11 of the Bankruptcy Code to preserve its remaining assets and to confirm a plan of reorganization that would allow THAN to satisfy its asbestos-related Claims in accordance with the requirements of section 524(g) of the Bankruptcy Code.  Section 524(g) provides for the creation of a trust to "assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for

damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products . . . ." 11 U.S.C. § 524(g)(2)(B)(i)(I). Section 524(g) further provides for a "channeling" injunction that directs all present and future asbestos-related "demands" to the trust for liquidation and satisfaction of allowed amounts. 11 U.S.C. 524(g)(1). This channeling injunction, however, is only valid and enforceable against future asbestos claimants if, "as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert [asbestos-related personal injury or wrongful death claims against the debtor] . . . ." 11 U.S.C. § 524(g)(4)(B)(i).

THAN believes that it is necessary for any such channeling injunction to cover all asbestos-related personal injury or wrongful death Claims and future Demands based on the conduct or products of THAN, against THAN and parties related to THAN including, but not limited to, past and present affiliates of THAN (such as PENAC), past and present officers and directors of THAN, predecessors in interest to THAN, and any entity that owned a financial interest in THAN or its affiliates or predecessors, and Elementis.

Accordingly, THAN and PENAC commenced negotiations with the holders of asbestos-related personal injury and wrongful death Claims arising out of the conduct or products of THAN (or their representatives) in order to establish a consensus on the framework for a chapter 11 plan of reorganization that would satisfy the requirements of section 524(g) of the Bankruptcy Code and treat all present and future claimants fairly and equitably.

## A. THAN and PENAC's Prepetition Discussions with Current Holders of Asbestos PI Claims and the Future Claimants' Representative.

In March 2007, counsel for THAN and counsel for PENAC began discussions with plaintiffs' counsel who represented a substantial majority of the current holders of Asbestos PI Claims against both THAN and PENAC in order to explore the feasibility of and the potential for a prepackaged chapter 11 plan of reorganization that would include an Asbestos PI Trust and a channeling injunction pursuant to section 524(g) of the Bankruptcy Code.

In addition, to satisfy the requirements of section 524(g) of the Bankruptcy Code with regard to obtaining a channeling injunction, THAN engaged an independent third-party representative (the Future Claimants' Representative ) for the purpose of protecting the rights of persons that might subsequently assert asbestos-related personal injury or wrongful death Claims against THAN (or, derivatively, against PENAC arising out of THAN's conduct or products). Counsel for THAN and counsel for PENAC engaged in prepetition discussions with the Future Claimants' Representative, described further below.

In August 2007, THAN retained Cadwalader, Wickersham & Taft, LLP as bankruptcy counsel and thereafter the firm became involved with THAN's discussions with both the current holders of Asbestos PI Claims and the Future Claimants' Representative.

### 1. *Future Claimants' Representative.*

Beginning in approximately March of 2007, to further explore whether a chapter 11 case was likely to provide the best means of quantifying and satisfying THAN's asbestos-related liabilities, THAN commenced a nationwide search for an individual to serve as the representative for the holders of future Demands alleging exposure to products containing asbestos supplied by THAN. In conducting its search for possible candidates to serve as Future Claimants' Representative, THAN focused on persons

with reputations of high integrity and with recognized experience and expertise in dealing with mass torts, particularly asbestos, and who would not have any actual or perceived conflict of interest.

After discussions with several potential qualified candidates, in approximately April 2007, THAN selected Samuel Issacharoff, Esq., based on his reputation for integrity, renown in the field of complex mass tort proceedings and extensive experience with asbestos-related personal injury litigation. Specifically, Professor Issacharoff, a graduate of Yale Law School and now Professor of Constitutional Law at the New York University School of Law, is an American Law Institute reporter on aggregate settlements, and has represented various constituents, including plaintiffs' lawyers, corporations and insurance companies in other litigations. Professor Issacharoff is also a frequent author and lecturer on many topics, including complex litigation and class actions.

Prior to assuming the role of Future Claimants' Representative, Professor Issacharoff had no association or relationship with, or other connection to, THAN or any affiliate of THAN, and had never represented any plaintiff, defendant, or insurer in any asbestos-related litigation against THAN.

Professor Issacharoff selected Sander L. Esserman, Esq. and his law firm, Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, as his principal bankruptcy counsel, the law firm of Brune & Richard LLP as litigation counsel, The Claro Group, LLC as his insurance consultant and Duff & Phelps LLC as his financial consultant. Professor Issacharoff also retained Hamilton, Rabinovitz & Alschuler, Inc. to act as his expert for the purpose of evaluating the Asbestos PI Claims against THAN.

Since May 2007, Professor Issacharoff and his professionals (collectively, the "Future Claimants' Representative Group") have conducted extensive due diligence concerning the background, nature, and scope of THAN's liability for Asbestos PI Claims. This investigation has included, among other things, careful review of the facts concerning THAN's historical involvement with asbestos; the nature and extent of past and pending asbestos litigation against THAN, including the types of claims asserted and the legal issues raised; the projected value of present and future Asbestos PI Claims; and the extent to which insurance and other THAN assets may be available to satisfy these liabilities in whole or in part. The Future Claimants' Representative Group has also examined the potential for recovery by claimants asserting asbestos-related Claims against PENAC, or some other affiliate of THAN, based upon a variety of legal theories, including derivative liability theories such as alter ego, successor liability, and/or fraudulent conveyance.

To date, millions of pages of THAN and PENAC documents have been made available to the Future Claimants' Representative Group, including more than 6 million pages located at THAN's document repository in Bonner Springs, Kansas, documents maintained by THAN's national counsel for asbestos litigation, Morgan Lewis & Bockius LLP, documents maintained by Mayer Brown LLP's offices in Chicago, Illinois, and more than 200,000 pages supplied by THAN and PENAC pursuant to approximately ten sets of written requests for information prepared by the Future Claimants' Representative Group.

The Future Claimants' Representative Group has also reviewed the sworn affidavits of a number of current and former THAN and PENAC employees and, on September 14, 2007, interviewed Robert N. Smith, Vice President of Tax for PENAC, and Raymond Fleming, Vice President and Controller for PENAC, to discuss the corporate relationship between THAN and PENAC and to obtain further information concerning various financial and corporate tax issues.

In addition, THAN, PENAC, and their respective counsel have provided detailed presentations to the Future Claimants' Representative Group on relevant legal issues, and have had multiple meetings with the Future Claimants' Representative Group to discuss these issues.

2.    *Asbestos Claimants Group.*

In order to facilitate negotiations, in March 2007, counsel for the holders of the majority of current asbestos-related Claims began meeting as a group (the "Asbestos Claimants Group"). The members of this group include James F. Early, Esq. (Early, Ludwick, Sweeney & Strauss), Matthew Bergman, Esq. (Bergman & Frockt), John D. Cooney, Esq. (Cooney & Conway), Peter A. Kraus (Waters & Kraus, LLP), Steve Baron, Esq. (Baron and Budd, P.C.), Tim Porter, Esq. (Porter & Malouf, P.A.), Patrick Malouf, Esq. (Porter & Malouf, P.A.), Steve Kazan, Esq. (Kazan, McClain, Abrams, Lyons & Greenwood, PLC), and Robert Phillips, Esq. (SimmonsCooper LLC). The Asbestos Claimants Group selected the law firm of Frank / Gecker LLP as its counsel. The Asbestos Claimants Group also selected Dr. Mark A. Peterson as its Claims valuation expert.

Over a period of approximately one year, the Asbestos Claimants Group and its professionals conducted substantial due diligence regarding THAN, PENAC, and the Asbestos PI Claims. Such due diligence included oral and written requests for documents and information and review of a substantial number of documents produced to them by THAN and PENAC, relating to THAN product history, asbestos litigation, and general THAN corporate matters. While such due diligence was progressing, THAN, PENAC, and their respective counsel engaged in numerous meetings with members of the Asbestos Claimants Group and their counsel and numerous telephone conferences with individual members of the Asbestos Claimants Group to discuss various issues, including the status of the Asbestos Claimants Group's document review and analysis, Claims valuation, and insurance matters. During this period, representatives of the Asbestos Claimants Group and the Future Claimants' Representative discussed a variety of issues, including Claims valuation and their respective due diligence efforts. PENAC and THAN responded to all requests for information posed by representatives of the Asbestos Claimants Group and the Future Claimants' Representative.

3.    *Claims Review.*

In February 2008, at the request of the Asbestos Claimants Group, THAN established a Claims review process with the object of determining the number of claimants asserting asbestos-related personal injury and wrongful death Claims who would be approved under the presumed standards of the Asbestos PI Trust Distribution Procedures to be paid by THAN's section 524(g) trust, once it was established.

In order to establish and maintain an objective Claims review process, THAN retained an independent third party to review claims submitted and to make objective determinations as to which Asbestos PI Claims would be approved for payment under the standards of the Asbestos PI Trust Distribution Procedures, based on medical and exposure evidence provided by the asbestos claimants' counsel. THAN contacted three separate claims processing firms that have experience in reviewing asbestos-related personal injury and wrongful death claims for established asbestos trusts, including (1) Claims Processing Facility, Inc.; (2) Verus Claims Services, LLC (as defined above, "Verus"); and (3) Delaware Group Claims Processing. Two of these firms were interviewed, and ultimately, by agreement dated February 26, 2008, THAN retained Verus to review the Asbestos PI Claims.

Verus has significant experience in reviewing and processing asbestos-related personal injury and wrongful death claims for asbestos trusts. It currently reviews and processes asbestos claims

filed against the 524(g) trusts established for Kaiser Aluminum Corporation, Combustion Engineering, Inc., Artra Group, Inc., Plibrico Company, A-Best Products Company, Inc., ABB Lummus Global Inc. and H.K. Porter Company, Inc.

After Verus's retention, THAN and THAN's national asbestos litigation counsel coordinated to send to Verus claims information for all Asbestos PI Claims previously asserted in litigation against THAN, PENAC and Elementis. THAN's national asbestos litigation counsel turned over all pending Asbestos PI Claims to Verus for its review. THAN also notified all members of the Asbestos Claimants Group of the retention of Verus and requested that the members submit claims information by March 21, 2008 to be included in the review process. In addition, on or about March 7, 2008, THAN, through its national asbestos litigation counsel, sent a letter to all known attorneys for the holders of all asbestos-related personal injury and wrongful death Claims asserted against THAN, inviting such counsel to submit claims information in order to have their clients' Asbestos PI Claims considered in the review process. Although the letter set a deadline of March 21, 2008 for the submission of Claims, Verus nevertheless considered Asbestos PI Claims that were submitted after such deadline. Verus continues to accept Asbestos PI Claims and will continue to review any Asbestos PI Claims submitted through to the Effective Date, at which time the Asbestos PI Trust will be established.

Approximately 45,490 Asbestos PI Claims in total were submitted to Verus (some of which were claims previously asserted in litigation filed against THAN, PENAC or Elementis). Prior to reviewing the Asbestos PI Claims, Verus worked with THAN and THAN's national asbestos litigation counsel to establish criteria for Asbestos PI Claims review using the standards of the Asbestos PI Trust Distribution Procedures. Verus used its computer model to rationalize the product identification and established a review process with national asbestos litigation counsel to determine when submitted Asbestos PI Claims overlapped with Asbestos PI Claims that had already been dismissed, settled or otherwise resolved by THAN.

Verus began the process of reviewing Asbestos PI Claims on March 24, 2008. Verus reviewed each individual Asbestos PI Claim, analyzing the data, using methods developed in its work on other asbestos cases, to determine whether the Asbestos PI Claim should be approved for payment under the provisions of the Asbestos PI Trust Distribution Procedures. Through this process, Verus determined certain Asbestos PI Claims should be approved for payment under the standards of the Asbestos PI Trust Distribution Procedures and communicated such information to the asbestos claimants' counsel. Verus also reviewed numerous Asbestos PI Claims submissions characterized by inadequate (or no) product identification, unsupported medical diagnoses, and various other deficiencies that would render the Asbestos PI Claim inadequate as submitted under the Asbestos PI Trust Distribution Procedures. With respect to these Asbestos PI Claims, Verus provided notice to counsel and a reasonable period to cure such deficiencies. Where the deficiencies were cured, the Asbestos PI Claims were deemed adequate under the Asbestos PI Trust Distribution Procedures. Where the deficiencies were not cured, Verus determined, based on the principles set forth in the Asbestos PI Trust Distribution Procedures, that such Asbestos PI Claims were inadequate as submitted, and communicated the inadequacy of such Asbestos PI Claims to the asbestos claimants' counsel.

On April 16, 2008, counsel to the Future Claimants' Representative met with representatives of Verus and counsel to THAN to discuss the Verus Asbestos PI Claims review process. Counsel to the Future Claimants' Representative thoroughly questioned the Verus representatives regarding the Asbestos PI Claims review process, with particular attention paid to how the process worked technically, how the criteria for judging Asbestos PI Claims was developed and from what information/sources, how Asbestos PI Claims were reviewed and whether it was typical of other cases, and many other areas. In addition, the representatives from Verus produced several documents to counsel

created in connection with the Asbestos PI Claims review process, and demonstrated how Verus would review a representative sample of Asbestos PI Claims.

In total, Verus reviewed approximately 45,490 Asbestos PI Claims. Of these, Verus reviewed the following total claims for each disease type: (i) 3,425 Mesothelioma claims, (ii) 4,377 Lung Cancer 1 claims, (iii) 564 Lung Cancer 2 claims, (iv) 1,196 Other Cancers claims, (v) 496 Severe Asbestosis claims, (vi) 11,686 Asbestosis/Pleural Disease (Level III) claims, (vii) 23,266 Asbestosis/Pleural Disease (Level II) claims, (viii) 79 Other Asbestos Disease claims, and 418 claims specifying no disease type. Ultimately, Verus found the following totals valid for each disease type: (i) 879 Mesothelioma claims, (ii) 342 Lung Cancer 1 claims, (iii) 100 Lung Cancer 2 claims, (iv) 133 Other Cancers claims, (v) 13 Severe Asbestosis claims, (vi) 704 Asbestosis/Pleural Disease (Level III) claims, (vii) 3,188 Asbestosis/Pleural Disease (Level II) claims, and (viii) 11 Other Asbestos Disease claims. Verus is continuing to review Asbestos PI Claims as received.

Verus reviewed Asbestos PI Claims only for their acceptability under the standards of the Asbestos PI Trust Distribution Procedures. The number of Asbestos PI Claims accepted by Verus cannot be taken as evidence of the true number of Asbestos PI Claims against THAN. As described elsewhere herein, THAN and PENAC have ultimately agreed on a settlement to fund the Asbestos PI Trust with contributions worth $900 million to enable the Asbestos PI Trust to pay Asbestos PI Claims.

Those Asbestos PI Claims Verus determines should be approved for payment under the Asbestos PI Trust Distribution Procedures shall be treated as Qualified Asbestos PI Claims under the Plan, and paid by the Asbestos PI Trust on the Effective Date or as soon thereafter as is reasonably practicable. Those Asbestos PI Claims Verus deems inadequate may be resubmitted to the Asbestos PI Trust.

Prior to the Effective Date, any alteration of the review standards applied during the Pre-Effective Date Claims Review period to Asbestos PI Claims reviewed by Verus must be approved by the putative Asbestos PI Trustees, with the consent of the Asbestos Claimants Group and the Future Claimants' Representative. From and after the Effective Date, the Asbestos PI Trust may retain Verus or such other third party claims reviewer as the Asbestos PI Trustees and the Future Claimants' Representative deem appropriate to review and liquidate all Asbestos PI Claims submitted to the Asbestos PI Trust in accordance with the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.

4.     *The Plan Settlement.*

Prior to the commencement of this solicitation, the Asbestos Claimants Group, Professor Issacharoff and the Future Claimants' Representative Group and representatives of THAN and PENAC spent considerable time negotiating the general terms of the respective contributions of THAN and PENAC to the Asbestos PI Trust and the principal terms of the Asbestos PI Trust Distribution Procedures. In addition, the parties explored the degree to which various Derivative Liability Asbestos PI Claims against PENAC were viable. Ultimately, the Asbestos Claimants Group and the Future Claimants' Representative Group determined not to contest any findings issued by the Bankruptcy Court and/or the District Court that THAN is, and was at all times prior to the Effective Date, a valid legal Entity separate and distinct from PENAC, and PENAC is not, and may not in the future be held liable for any liability of THAN based upon any legal or equitable theory, including those consisting of or relating to veil piercing, alter-ego, successor liability, fraudulent transfer, or conspiracy, including, but not limited to, fraudulent transfer or fraudulent conveyance claims under applicable state or federal law, denuding the corporation claims, single business enterprise claims, claims that THAN was the predecessor, mere instrumentality,

agent or alter-ego of a PENAC Related Party or of Elementis, trust fund claims, claims that a PENAC-Related Party or Elementis conspired with THAN, and any causes of action against a PENAC-Related Party or Elementis that belong to the Debtor or Debtor in Possession, whether or not included in the foregoing list. However, if the Plan does not become effective no party in interest in the Chapter 11 Case shall be bound or prejudiced by any representation, written or oral, made by any party in connection with the Plan or the negotiation or prosecution of the Plan, including without limitation the representations made in the Plan, the Disclosure Statement or the Confirmation Order.

In addition, the parties shall seek a finding of fact and/or conclusion of law in the Confirmation Order to be issued by the Bankruptcy Court and affirmed by the District Court or issued by the District Court providing that Reorganized THAN, and the Parent Trust and Asbestos PI Trust to be established pursuant to the Plan, are valid legal Entities separate and distinct from one another and each of Reorganized THAN, the Parent Trust and the Asbestos PI Trust are not and may not in the future be held liable for any liability of the other entities based upon any legal or equitable theory, including those consisting of or relating to veil piercing, alter ego, successor liability, fraudulent transfer, or conspiracy, including but not limited to fraudulent transfer or fraudulent conveyance claims under applicable state or federal law.

For a detailed description of the respective contributions of THAN and PENAC to the Asbestos PI Trust and the terms of the Asbestos PI Trust Distribution Procedures, please see the summary of the Plan provided at the beginning of this Disclosure Statement.

## IV.

### Solicitation of Holders of Asbestos PI Claims

THAN will commence solicitation of votes on the Plan on October 11, 2008 by mailing (via first-class U.S. mail, postage prepaid) the solicitation packages as described below. THAN will solicit the votes of only (i) holders of Asbestos PI Claims in Class 4, either directly or through their attorneys, and (ii) holders of Intercompany Claims in Class 5. No other parties in interest are entitled to vote on the Plan, as all other parties in interest are Unimpaired or are deemed to reject the Plan. The Claims and Balloting Agent will file vote certifications (the "Vote Certifications") certifying acceptances from the creditors entitled to vote and who actually vote.

THAN will send a solicitation package (the "Attorney Solicitation Package") to counsel who have filed suit in the tort system on behalf of a holder of an Asbestos PI Claim or submitted Claims and supporting evidence for review and verification by Verus during the prepetition claim review process. The Attorney Solicitation Package shall include:

(a) the Disclosure Statement (to which the Plan is annexed as an exhibit), in electronic format on a CD-ROM;

(b) a master ballot (the "Master Ballot");

(c) a preaddressed return envelope;

(d) a letter from THAN, with a recommendation from THAN, the Future Claimants' Representative and the Asbestos Claimants Group urging claimants to vote to accept the Plan; and

(e)      a cover letter describing the contents of the solicitation package and the enclosed CD-ROM, and instructions for obtaining (free of charge) hard copies of the materials provided in electronic format.

In addition to the Attorney Solicitation Packages, THAN will send solicitation packages directly to the holders of Class 4 Asbestos PI Claims who either contact THAN directly or refuse to grant their counsel permission to vote on their behalf and the holders of Intercompany Claims (the "Individual Solicitation Package") that shall include:

(a)      the Disclosure Statement (to which the Plan is annexed as an exhibit), in electronic format on a CD-ROM;

(b)      an individual ballot for voting a Class 4 Claim or Class 5 Claim, as applicable (the "Individual Ballot");

(c)      a preaddressed return envelope;

(d)      a letter from THAN, with a recommendation from THAN, the Future Claimants' Representative and the Asbestos Claimants Group urging claimants to vote to accept the Plan; and in some instances, a letter from the claimant's own legal counsel regarding THAN's Plan; and

(e)      a cover letter describing the contents of the solicitation package and the enclosed CD-ROM, and instructions for obtaining (free of charge) hard copies of the materials provided in electronic format.

In an additional effort to ensure that all individuals and counsel representing clients with Asbestos PI Claims are given the opportunity to request solicitation packages, THAN will publish a notice of the solicitation in the following publications: Boston Globe, Chicago Sun-Times, Cleveland Plain Dealer, Dallas Morning News, Houston Chronicle, Kansas City Star, Miami Herald, San Francisco Chronicle, Seattle Times & Post Intelligencer, St. Louis Post-Dispatch, Los Angeles Times, New York Times, USA Today National Edition, Mealey's Litigation Report: Asbestos, Mealey's Litigation Report: Asbestos Bankruptcy and the Wall Street Journal National Edition. Affidavits of such publication will be filed with the Court after the Commencement Date.

In a further effort to maximize notice and ensure that the solicitation process is as transparent as possible, THAN will make the Disclosure Statement available in electronic format on a special solicitation information website (*www.kcclc.net/THAN*) created by THAN.

As clearly stated on the Individual Ballots and Master Ballots, in order to be counted, completed ballots must be received by the Claims and Balloting Agent by 8:00 p.m., Eastern Standard Time, on November 21, 2008 (the "Voting Deadline"). Accordingly, claimants and their counsel will be given 40 days from the mailing of the Disclosure Statement to vote.

THAN believes that it will solicit votes on its Plan from substantially all holders of Asbestos PI Claims in Class 4 by its distribution of the Individual Solicitation Packages and Attorney Solicitation Packages. In addition, the Debtor will solicit votes on the Plan from all holders of Intercompany Claims in Class 5 by sending solicitation packages to such holders. The Debtor does not believe there is need for any further solicitation of votes on the Plan.

# V.

## Anticipated Events during the Chapter 11 Case

If THAN receives the requisite acceptances in response to the Solicitation, THAN intends to promptly commence a Chapter 11 Case and seek to expeditiously confirm its chapter 11 plan; provided that THAN reserves the right not to file such a case. From and after the Commencement Date, THAN will continue to operate its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

THAN does not anticipate a protracted Chapter 11 Case. To expedite its emergence from chapter 11, THAN intends to seek, among other things, the relief detailed below from the Bankruptcy Court on the Commencement Date. If granted, this relief will facilitate the administration of the Chapter 11 Case. There can be no assurance, however, that the Bankruptcy Court will grant the requested relief. Bankruptcy courts customarily provide various forms of administrative and other relief in the early stages of a chapter 11 case. THAN intends to seek all necessary and appropriate relief from the Bankruptcy Court in order to facilitate its reorganization goals, including the matters described below.

### A. First-Day Motions.

- *Case Administration*. These motions will seek Bankruptcy Court authorization to: (i) establish interim compensation procedures for professionals; (i) retain ordinary course professionals; (iii) waive the requirement for THAN to file its schedules and statements, or, alternatively, grant an extension of the time for THAN to file such schedules and statements; (iv) approve notice procedures and authorize email service; and (v) approve certain notice procedures in relation to personal injury claimants.

- *Business Operations*. These motions will seek Bankruptcy Court authorization to: (i) maintain THAN's existing bank accounts and operate its cash management system substantially as it existed prior to the Commencement Date; and (ii) provide adequate assurance to utility companies and establish procedures for determining requests for additional adequate assurance.

- *Financing*: THAN will also file a motion to seek Bankruptcy Court approval for use of "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code), to provide adequate protection for same, and to obtain post-petition financing with super-priority and senior secured status. On the Effective Date, PENAC will forgive any amounts THAN may have drawn and used from the DIP Agreement and PENAC will release any and all Liens, Claims, Encumbrances or other interests that PENAC may have on THAN's and Reorganized THAN's assets as security for the DIP Agreement on the Effective Date.

### B. Preliminary Injunction Motion.

In order to prevent asbestos claimants from depleting the Shared Asbestos Insurance Policies by pursuing Asbestos PI Claims against PENAC during the pendency of the Chapter 11 Case, which would threaten the feasibility of the Plan, on the Commencement Date, THAN will file a motion pursuant to sections 105(a) and 362(a) of the Bankruptcy Code for (i) a preliminary injunction enjoining (a) the commencement or continuation of any and all actions involving Asbestos PI Claims against PENAC and certain parties related to THAN and PENAC, including any past or present Affiliates,

predecessors in interest, any past or present officer or director, their respective Affiliates, or the predecessors in interest of each, and any Entity that owned or owns a financial interest in either, their respective Affiliates or the predecessors in interest of each, alleging personal injury or wrongful death based upon purported exposure to asbestos fiber, and enjoining all parties from taking any action with respect to any property in which THAN and PENAC have a legal, equitable, beneficial, contractual or other interest, including, but not limited to, the Shared Asbestos Insurance Policies; (b) the commencement or continuation of any and all actions involving Asbestos PI Claims against Elementis and its Affiliates and certain other parties alleging personal injury or wrongful death based upon purported exposure to asbestos fiber for which Elementis or such other party may assert a right of indemnification, contribution, reimbursement, or subrogation against THAN or PENAC; (c) the commencement or continuation of any and all Derivative Liability Asbestos PI Claims against the PENAC Related Parties and Elementis; and (d) the commencement or continuation of any and all actions involving Asbestos PI Claims against any Settling Asbestos Insurance Entity; and (ii) a temporary restraining order pending a hearing on the motion for a preliminary injunction.

THAN intends to file its motion for a preliminary injunction on the Commencement Date. THAN expects that, on or shortly after the Commencement Date, the Bankruptcy Court will enter a temporary restraining order which will enjoin asbestos related claims against the parties described above on an interim basis, and schedule a hearing on the motion for a preliminary injunction for the earliest possible date, on notice to all relevant parties. After an evidentiary hearing, THAN expects that the Bankruptcy Court will enter an order granting a preliminary injunction which would prevent all parties from taking any action with regard to any and all pending or future asbestos-related claims against the parties described above for the pendency of the Chapter 11 Case.

## C.     Approval of the Disclosure Statement and Prepetition Solicitation, and Scheduling of Confirmation Hearing.

THAN will file this Disclosure Statement and the Plan on the Commencement Date. To facilitate the prompt Confirmation and consummation of the Plan, THAN intends to file a motion on the Commencement Date seeking an order scheduling a hearing to (i) approve the Disclosure Statement as containing adequate information, as defined in section 1125 of the Bankruptcy Code, (ii) approve the prepetition Solicitation procedures, and (iii) schedule a hearing on confirmation of the Plan, for a date immediately following the end of the minimum notice period therefor, or as soon thereafter as the Bankruptcy Court's calendar permits.

## D.     Motion to Waive Requirement for Post-petition Statutory Committee; Motion to Appoint a Future Claimants' Representative; Applications to Retain Professionals.

On the Commencement Date, THAN will seek to waive the requirement that a statutory committee of creditors be formed under section 1102 of the Bankruptcy Code, or, in the alternative, seek to have the Asbestos Claimants Group appointed as the statutory committee of creditors. Simultaneously, THAN will also file a motion to approve the appointment of Professor Issacharoff as the Future Claimants' Representative.

THAN also intends to file applications seeking to retain certain professionals, including, but not limited to, Kurtzman Carson Consultants LLC, as the Claims and Balloting Agent, Dickstein Shapiro LLP, as insurance counsel, Morgan Lewis & Bockius LLP, as asbestos-related personal injury claims counsel, and Cadwalader, Wickersham & Taft LLP, as bankruptcy counsel.

# VI.

## Treatment of Holders of Claims and Equity Interests under the Plan

**A.** **Summary of Classification and Treatment.**

      **1.** *Classification.*

      The following table identifies the Classes of Claims under the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| N/A | Administrative Expense Claims | Unimpaired | No |
| N/A | Priority Tax Claims | Unimpaired | No |
| N/A | DIP Claim | Unimpaired | No |
| Class 1 | Priority Claims | Unimpaired | No (presumed to accept) |
| Class 2 | Secured Claims | Unimpaired | No (presumed to accept) |
| Class 3 | General Unsecured Claims | Unimpaired | No (presumed to accept) |
| Class 4 | Asbestos PI Claims | Impaired | Yes |
| Class 5 | Intercompany Claims | Impaired | Yes |
| Class 6 | Equity Interests in THAN | Impaired | No (presumed to reject) |

      **2.** *Treatment of Claims by Class.*

      The following table sets forth the treatment under the Plan for the Claims against and Equity Interests in THAN, as well as the estimated recovery for each Class. The table also identifies which Classes are entitled to vote on the Plan, based on the rules set forth in the Bankruptcy Code. Unless otherwise indicated, the characteristics and amount of the Claims or Equity Interests in the following Classes are based on the books and records of THAN, as of the date hereof.

| Class | Description | Treatment | Entitled to Vote | Amount of Claim(s) | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|--------------------|
| N/A | Administrative Expense Claims | Payment in full (or as otherwise agreed). | No | $0 | 100% |
| N/A | Priority Tax Claims | Payment in full on the Effective Date, or regular installment payments over five years from the Effective Date or payment as otherwise agreed. | No | $0 | 100% |
| N/A | DIP Claim | Forgiven by PENAC on the Effective Date as provided in Article 2.3 of the Plan. | No | Unknown | N/A |
| 1 | Priority Claims | Paid in full, in Cash, on the later of (i) the Effective Date and (ii) as soon as practicable after such Priority Claim becomes Allowed. | No | $0 | 100% |

| Class | Description | Treatment | Entitled to Vote | Amount of Claim(s) | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|--------------------|
| 2 | Secured Claims | Reinstated pursuant to section 1124(2) of the Bankruptcy Code, unless the claimholder agrees to less favorable treatment; with regard to any amount THAN may be required to pay pursuant to section 1124(2), payment in full, in Cash, on the latest of (i) the Effective Date, (ii) the date the Secured Claim becomes Allowed, or (iii) the date the Secured Claim becomes due and payable according to its terms, or (iv) such other date as mutually may be agreed to by and among the holder of such Secured Claim and THAN or Reorganized THAN. | No | $0 | 100% |
| 3 | General Unsecured Claims | Reinstated pursuant to section 1124(2) of the Bankruptcy Code, unless the claimholder agrees to less favorable treatment; with regard to any amount THAN may be required to pay pursuant to section 1124(2), payment in full, in Cash, from available Cash or borrowings under the DIP Agreement, on the latest of (i) the Effective Date, (ii) the date the General Unsecured Claim becomes Allowed, or (iii) the date the General Unsecured Claim becomes due and payable according to its terms, or (iv) such other date as mutually may be agreed to by and among the holder of such General Unsecured Claim and THAN or Reorganized THAN. | No | $70,148,832 [12] | 100% |
| 4 | Asbestos PI Claims | Channeled to the Asbestos PI Trust, which will be funded pursuant to Article 9.4 of the Plan, and will be paid pursuant to the terms, provisions and procedures of the Plan, the Asbestos PI Trust Agreement, the Asbestos PI Trust Documents and the Asbestos PI Trust Distribution Procedures. The Asbestos PI Trust shall pay Qualified Asbestos PI Claims on the Effective Date or as soon thereafter as is reasonably practicable in accordance with the standards set forth in the Asbestos PI Trust Distribution Procedures. | Yes | Unknown | Unknown |

---

[12]  Of such amount, approximately $62 million represent Known Environmental Liabilities and will be assumed by PENAC pursuant to Article 9.5 of the Plan, and the remainder will be satisfied as Allowed General Unsecured Claims as provided in Article 4.3 of the Plan.

| Class | Description | Treatment | Entitled to Vote | Amount of Claim(s) | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|--------------------|
| 5 | Intercompany Claims | Eliminated and discharged as of the Effective Date, by either offset, distribution, cancellation, or contribution of such Intercompany Claims, or otherwise (as determined by the Debtor in its sole and absolute discretion). | Yes | $186,924,679 | Unknown |
| 6 | Equity Interests in THAN | On the Effective Date, all Equity Interests in THAN will be canceled. | No | N/A | N/A |

B. **Description of Unclassified Claims.**

1. *Administrative Expenses.*

In order to confirm the Plan, Allowed Administrative Expense Claims must be paid in full on the Effective Date or in a manner otherwise agreeable to the holders of those Administrative Expense Claims. Administrative expenses are the actual and necessary costs and expenses of THAN's Chapter 11 Case, including post-petition salaries and other benefits earned by employees, officers and directors, post-petition rent for facilities and offices, amounts owed to vendors providing goods and services during the Chapter 11 Case, any indebtedness or obligations incurred or assumed by THAN as Debtor-in-Possession during the Chapter 11 Case, and all other debts incurred by THAN after the Commencement Date in the ordinary course of its business. Administrative expenses also include the actual, reasonable, and necessary fees and expenses of the professionals retained by THAN and certain other parties in the Chapter 11 Case.

Consistent with the requirements of the Bankruptcy Code, the Plan generally provides for Allowed Administrative Expense Claims to be paid in full by the later of (i) the Effective Date (or as soon thereafter as is reasonably practicable), and (ii) the first Business Day after the date that is thirty (30) days after the date such Administrative Expense Claim becomes Allowed, except with regard to Administrative Expense Claims incurred in the ordinary course of business, which may be paid by THAN in accordance with its past practice and the terms of the agreements governing such obligations.

Reorganized THAN, in its sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval. THAN or Reorganized THAN will have the right to object to any Administrative Expense Claim on the later of (i) 180 days after the Effective Date, subject to such extensions as may be granted from time to time by the Bankruptcy Court, and (ii) 30 days after the date such Administrative Expense Claim is filed. Unless THAN or Reorganized THAN objects to an Administrative Expense Claim, the Administrative Expense Claim will be deemed allowed in the amount requested. In the event that THAN or Reorganized THAN timely objects to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

2. *Fees and Expenses of Professionals.*

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330 or 503 of the Bankruptcy Code shall (i) file, on or before the deadline specified in the Confirmation Order, their respective applications for final allowance of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by

the Bankruptcy Court (A) upon the later of (1) the Effective Date and (2) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or (B) upon such other terms as may be mutually agreed upon by such holder and Reorganized THAN.

3.      *Priority Tax Claims.*

Priority Tax Claims are essentially the unsecured Claims of federal and state governmental authorities for the kinds of taxes specified in section 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes, excise taxes, and employment and withholding taxes. These unsecured Claims are given a statutory priority in right of payment. THAN estimates that, on the Effective Date, the Allowed Amounts of such Claims will aggregate approximately $0.

Except to the extent that the holder of an Allowed Priority Tax Claim has been paid by THAN prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, receive in full satisfaction, settlement and discharge of and in exchange for such Allowed Priority Tax Claim, either of the following, at the sole and absolute discretion of Reorganized THAN: (a) Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, on the latest of: (i) the Effective Date; (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable; (iii) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law; or (b) regular installment payments in Cash (i) of a total value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claim; (ii) over a period ending not later than five (5) years after the Effective Date; and (iv) in a manner not less favorable than the most favored nonpriority General Unsecured Claim provided for by the Plan (other than cash payments made to a Class of creditors under section 1122(b)).

4.      *Debtor-in-Possession Financing.*

On the Effective Date, the DIP Agreement shall terminate, and PENAC shall forgive any amounts THAN may have drawn upon and used from the DIP Agreement. Residual Cash as of the Effective Date, if any, whether (i) drawn under the DIP Agreement and not used by THAN or (ii) remaining under any pre-Commencement Date advance made to THAN by PENAC, to the extent such residual Cash will not be necessary for distributions under the Plan on account of Allowed General Unsecured Claims, shall be contributed to the Asbestos PI Trust as part of the PENAC Asbestos PI Trust Contribution. PENAC shall also agree to release any and all Liens, Claims, Encumbrances and any other interests of PENAC on THAN's or Reorganized THAN's assets that served as security for the DIP Agreement.

## C.      **Description of Classified Claims and Equity Interests.**

1.      *Class 1 – Priority Claims.*

Priority Non-Tax Claims include Claims that are granted priority in payment under section 507(a) of the Bankruptcy Code, such as certain wage, salary and other compensation obligations to employees of THAN (up to a statutory cap of $10,000 per employee). THAN estimates that on the Effective Date, the allowed amount of such Priority Claims will aggregate approximately $0.

Except to the extent a holder of an Allowed Priority Claim has been paid prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Claim shall receive in

full satisfaction, settlement and discharge of and in exchange for such Priority Claim, Cash in an amount equal to the unpaid portion of such Allowed Priority Claim on or before the later of: (a) the Effective Date; and (b) the date the Claim becomes an Allowed Priority Claim, or as soon thereafter as practicable. Any Allowed Priority Claim not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

Class 1 is Unimpaired under the Plan. Each holder of a Priority Claim is deemed to have accepted the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

2. *Class 2 – Secured Claims.*

Class 2 consists of Allowed Secured Claims, which would include Claims arising under agreements and obligations of THAN to the extent of the value of any security given by THAN therefor, and obligations secured by statutory liens. THAN estimates that on the Effective Date, the Allowed Amount of Secured Claims will aggregate approximately $0.

Except to the extent a holder of an Allowed Secured Claim agrees to different treatment of that Claim, each holder of an Allowed Secured Claim shall have such Claim reinstated pursuant to section 1124(2) of the Bankruptcy Code, such that the Secured Claim is rendered Unimpaired. The failure of THAN or any other party in interest to file an objection, prior to the Effective Date, with respect to any Secured Claim that is so reinstated shall be without prejudice to the rights of Reorganized THAN or any other party in interest to contest or otherwise defend against such Secured Claim in an appropriate forum when and if such Secured Claim is sought to be enforced. Any amount that THAN may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Allowed Secured Claim shall be paid in full, in Cash, on or as soon as practicable after the latest of (i) the Effective Date, (ii) the date on which such Secured Claim becomes Allowed, (iii) the date such Secured Claim becomes due and payable according to its terms, or (iv) such other date as mutually may be agreed to by and among the holder of such Secured Claim and THAN or Reorganized THAN.

Class 2 is Unimpaired under the Plan. Each holder of a Secured Claim is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

3. *Class 3 – Allowed General Unsecured Claims.*

Class 3 consists of Allowed general unsecured non-priority Claims, which generally include the Claims of trade and other business creditors for goods and services provided to THAN prior to the Commencement Date, damage Claims arising from THAN's rejection (if any) of executory contracts and unexpired leases, and non-asbestos personal injury and wrongful death-related litigation Claims in respect of events arising prior to the Commencement Date. General Unsecured Claims also include Asbestos Property Damage Claims. THAN estimates that on the Effective Date, the Allowed Amount of General Unsecured Claims will aggregate approximately $70 million. Of such amount, approximately $62 million represent Known Environmental Liabilities and will be assumed by PENAC pursuant to Article 9.5 of the Plan, and the remainder will be satisfied as Allowed General Unsecured Claims as provided in the following paragraph.

Except to the extent a holder of an Allowed General Unsecured Claim agrees to different treatment of that Claim, each holder of an Allowed General Unsecured Claim shall have such General Unsecured Claim reinstated pursuant to section 1124(2) of the Bankruptcy Code such that the General Unsecured Claim is rendered Unimpaired. The failure of THAN or any other party in interest to file an objection prior to the Effective Date with respect to any General Unsecured Claim that is so reinstated

shall be without prejudice to the rights of Reorganized THAN or any other party in interest to contest or otherwise defend against such General Unsecured Claim in an appropriate forum when and if such General Unsecured Claim is sought to be enforced. Any amount that THAN may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Allowed General Unsecured Claim shall be paid in full, in Cash, from available Cash or borrowings under the DIP Agreement, on or as soon as practicable after the latest of (i) the Effective Date, (ii) the date on which such General Unsecured Claim becomes Allowed, (iii) the date such General Unsecured Claim becomes due and payable according to its terms, or (iv) such other date as mutually may be agreed to by and among the holder of such General Unsecured Claim and THAN or Reorganized THAN.

Class 3 is Unimpaired under the Plan. Each holder of a General Unsecured Claim is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

4.      *Class 4 – Asbestos PI Claims.*

Asbestos PI Claims means each of the following: (i) a THAN Asbestos PI Claim; (ii) an Indirect Asbestos PI Claim; (iii) a Derivative Liability Asbestos PI Claim; (iv) a Qualified Asbestos PI Claim; and (v) an Asbestos PI Trust Expense. Asbestos PI Claim shall not include an Asbestos Property Damage Claim.

As of the Effective Date, liability for all Asbestos PI Claims shall automatically and without further act, deed or court order be channeled to and assumed by the Asbestos PI Trust in accordance with, and to the extent set forth in, Articles IX and XI of the Plan, the applicable Plan Documents and the Confirmation Order. The Asbestos PI Trust shall be funded in accordance with the provisions of Article 9.4 of the Plan. Each Asbestos PI Claim shall be determined and paid in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures. The sole recourse of the holder of an Asbestos PI Claim on account of such Asbestos PI Claim shall be to the Asbestos PI Trust, and no holder shall have any right whatsoever to assert its Asbestos PI Claim against any Asbestos Protected Party.

The Asbestos PI Trust shall pay Qualified Asbestos PI Claims on the Effective Date or as soon thereafter as is reasonably practicable in accordance with the standards set forth in the Asbestos PI Trust Distribution Procedures.[*]

---

[*]      The figures presented here represent claim values for settlement purposes only. The parties reserve all rights with respect to actual claim values in the event the Plan is not confirmed.

| Level | Disease Category | Scheduled Value | Average Value | Maximum Value |
|-------|------------------|-----------------|---------------|---------------|
| VIII  | Mesothelioma | $150,000 | $238,000 | $900,000 |
| VII   | Lung Cancer 1 | $ 65,000 | $ 89,900 | $250,000 |
| VI    | Lung Cancer 2 | None | $ 20,000 | $ 75,000 |
| V     | Other Cancers | $ 30,000 | $ 50,000 | $ 70,000 |
| IV    | Severe Asbestosis | $ 60,000 | $ 67,600 | $250,000 |
| III   | Asbestosis/Pleural Disease | $ 8,000 | None | None |
| II    | Asbestosis/Pleural Disease | $ 3,800 | None | None |
| I     | Other Asbestos Disease | $ 500 | None | None |

Class 4 is Impaired under the Plan. Each holder of an Asbestos PI Claim shall be entitled to vote to accept or reject the Plan to the extent and in the manner provided in Article V of the Plan and the Solicitation Procedures Order.

5.    *Class 5 – Intercompany Claims.*

Class 5 consists of the Claims of Affiliates against THAN and of THAN against Affiliates.

In full settlement, satisfaction, release and discharge of any and all Intercompany Claims, all Intercompany Claims shall be eliminated and discharged as of the Effective Date by either offset, distribution, cancellation, or contribution of such Claims, or otherwise (as determined by the Debtor in its sole and absolute discretion).

Class 5 is Impaired under the Plan. Holders of Intercompany Claims shall be entitled to vote to accept or reject the Plan, although any such votes to accept the Plan shall not be counted for purposes of satisfying section 1129(a)(10) of the Bankruptcy Code.

6.    *Class 6 – Equity Interests.*

Class 6 consists of the Equity Interests in THAN, all of which are held by PENAC and Remediation Services.

On the Effective Date, all Equity Interests in THAN shall be cancelled pursuant to the Plan.

On the Effective Date, one hundred percent (100%) of the membership interests of Reorganized THAN shall be issued to the Parent Trust.

Class 6 is Impaired under the Plan. PENAC and Remediation Services, as the holders of the Equity Interests, shall be deemed to reject the Plan, and shall not be entitled to vote to accept or reject the Plan.

# VII.

## Description of the Parent Trust, the Asbestos PI Trust and Contributions by THAN and PENAC

**A.     The Parent Trust**

1.        *Creation of the Parent Trust.*

On the Effective Date, immediately after the establishment of the Asbestos PI Trust, the Parent Trust shall be created in accordance with the Plan Documents and the Parent Trust Documents. The Parent Trust shall hold legal title to the membership interests of Reorganized THAN and is currently intended to constitute a "qualified settlement fund" within the meaning of section 468B of the Internal Revenue Code and the regulations issued thereunder.

2.        *Issuance of Equity Interests.*

Automatically on the Effective Date, immediately after the occurrence of each of Article 9.2(a) and (b) of the Plan, one hundred percent (100%) of the membership interests of Reorganized THAN shall be issued to the Parent Trust.

3.        *Appointment of Parent Trustee.*

The initial Trustee(s) of the Parent Trust shall be set forth in a Plan Supplement.

4.        *Pledge of Equity Interest.*

In connection with the execution of the Promissory Note, after the issuance to and vesting in the Parent Trust of one hundred percent of the membership interests of Reorganized THAN, the Parent Trust shall execute the Pledge Agreement granting to the Asbestos PI Trust a security interest in one hundred percent (100%) of the outstanding membership interests of Reorganized THAN.

**B.     The Asbestos PI Trust.**

1.        *Creation of the Asbestos PI Trust.*

On the Effective Date, the Asbestos PI Trust shall be created in accordance with the Plan Documents, the Asbestos PI Trust Documents and section 524(g) of the Bankruptcy Code.  The Asbestos PI Trust is intended to constitute a "qualified settlement fund" within the meaning of section 468B of the Internal Revenue Code and the regulations issued thereunder.  The purpose of the Asbestos PI Trust shall be to assume, liquidate and satisfy all liabilities determined to arise from or relate to the Asbestos PI Claims (whether existing as of the Effective Date or arising at any time thereafter) and to use the Asbestos PI Trust Assets to pay holders of Asbestos PI Claims in accordance with the terms of the Asbestos PI Trust Agreement, the Asbestos PI Trust Distribution Procedures, the Plan and the Confirmation Order, and in such a way as to provide reasonable assurance that the Asbestos PI Trust will value, and be in a financial position to pay, present Asbestos PI Claims and future Demands that involve similar claims in substantially the same manner, and to otherwise comply in all respects with the requirements of section 524(g)(2)(B) of the Bankruptcy Code.  The Asbestos PI Trust shall have no liability for any Claim other than an allowed Asbestos PI Claim.  On the Effective Date, all right, title and interest in and to the Asbestos PI Trust Assets and any proceeds thereof will be transferred to and vested in the Asbestos PI

Trust, free and clear of all Claims, Demands, Equity Interests, Encumbrances and other interests of any Entity without any further action of the Bankruptcy Court or any Entity.

Upon dissolution of the Asbestos PI Trust, after the wind-up of its affairs by the Asbestos PI Trustees and payment of all the Asbestos PI Trust's liabilities has been provided for (including, without limitation, the Asbestos PI Trust Expenses), all Asbestos PI Trust Assets will be donated to such organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which shall be as selected by the Asbestos PI Trustees in their reasonable discretion.

2.     *Appointment of Asbestos PI Trustees.*

The initial Trustees of the Asbestos PI Trust shall be set forth in a Plan Supplement.

3.     *Appointment of Future Claimants' Representative.*

Professor Samuel Issacharoff shall serve as the Future Claimants' Representative.

4.     *Appointment of Asbestos PI Trust Advisory Committee Members.*

The initial members of the Asbestos PI Trust Advisory Committee shall be those persons designated in the Confirmation Order.

5.     *Claims Review.*

The Claims Reviewer has been reviewing Asbestos PI Claims during the Pre-Effective Date Claims Review period using the standards set forth in the Asbestos PI Trust Distribution Procedures. Prior to the Effective Date, any alteration of these review standards must be approved by the putative Asbestos PI Trustees, with the consent of the Asbestos Claimants Group and the Future Claimants' Representative. All Asbestos PI Claims approved by the Claims Reviewer shall be designated as Qualified Asbestos PI Claims and treated in accordance with Article 4.4 of the Plan. To the extent an Asbestos PI Claim submitted during the Pre-Effective Date Claims Review period is not approved by the Claims Reviewer, such Asbestos PI Claim may be re-submitted to the Asbestos PI Trust and reconsidered in accordance with the standards set forth in the Asbestos PI Trust Distribution Procedures.

From and after the Effective Date, the Asbestos PI Trust may retain the Claims Reviewer or such other third-party claims reviewer as the Asbestos PI Trustees and the Future Claimants' Representative deem appropriate to review and liquidate all Asbestos PI Claims submitted to the Asbestos PI Trust in accordance with the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.

6.     *Contributions to the Asbestos PI Trust.*

As described more fully below, on the Effective Date, THAN and PENAC will make the THAN Contribution and PENAC Asbestos PI Trust Contribution, respectively, to the Asbestos PI Trust; provided, however, that, prior to the Effective Date, as part of the Asbestos PI Trust Contributions, THAN or PENAC shall pay to the putative Asbestos PI Trustees an amount not to exceed $500,000 for the preliminary expenses to be incurred by the Asbestos PI Trust. To the extent any contribution thereof causes the Asbestos PI Trust Contributions to exceed $900 million as of the Effective Date, the excess amount shall be returned to PENAC in Cash.

7. *Promissory Note.*

On the Effective Date, Reorganized THAN shall execute and deliver to the Asbestos PI Trust the Promissory Note in substantially the form attached hereto as Exhibit D to the Plan. For information about the tax implications of the Promissory Note, see Section XIV below.

8. *Transfer of Claims and Demands to the Asbestos PI Trust.*

On the Effective Date, all liabilities, obligations, and responsibilities relating to all Asbestos PI Claims and Demands will be transferred and channeled to the Asbestos PI Trust and shall be satisfied solely by the assets held by the Asbestos PI Trust. For more information about the Asbestos PI Channeling Injunction, see Sections VIII.D.5 and VIII.D.6 below. The Asbestos PI Trust shall have no liability for any Claims other than Asbestos PI Claims and no Claims other than Asbestos PI Claims shall be transferred and channeled to the Asbestos PI Trust.

9. *Discharge of Liabilities to Holders of Asbestos PI Claims.*

The transfer to, vesting in, and assumption by the Asbestos PI Trust of the Asbestos PI Trust Assets on or after the Effective Date, as contemplated by the Plan, will, among other things, discharge all obligations and liabilities of all Asbestos Protected Parties for and in respect of all Asbestos PI Claims.

10. *Indemnification by the Asbestos PI Trust.*

As and to the extent provided in the Asbestos PI Trust Indemnification Agreement, the Asbestos PI Trust shall indemnify and hold harmless each of the following Entities for any liability, or alleged liability, arising out of, or resulting from, an Asbestos PI Claim: (a) THAN and Reorganized THAN; (b) PENAC and any PENAC Related Party; (c) Elementis; and (d) any current or former Representative of any of the above, in their capacities as such.

11. *Investment Policy.*

During a period of five years following the Effective Date, except as otherwise authorized by prior written consent of each of the Asbestos PI Trustees, the Asbestos PI Trust Advisory Committee, the Future Claimants' Representative and PENAC, funds not immediately necessary for distribution to claimants shall be invested in money market funds (a) the managers of which are rated at least Aa3 or AA-, respectively, by Moody's Investor Services and Standard & Poor's, and (b) that invest exclusively in securities that (i) are issued by the United States Treasury or are directly and fully guaranteed or insured by the United States Government or any agency or instrumentality thereof, (ii) have maturities of not more than three (3) years from the date of acquisition, and (iii) are rated Aaa and AAA, respectively, by Moody's Investor Services and Standard & Poor's; and after such five-year period, such funds shall be managed in a manner to be determined by the Asbestos PI Trustees, the Asbestos PI Trust Advisory Committee, and the Future Claimants' Representative.

12. *Parent Trust Distributions.*

The Asbestos PI Trust shall be the sole beneficiary of the Parent Trust, and any distribution therefrom shall be paid to the Asbestos PI Trust in accordance with the Parent Trust Documents; provided, however, the Parent Trust shall only make distributions upon receipt of dividends from Reorganized THAN, and such dividends shall only be paid under applicable law and only if funds

are available after meeting Reorganized THAN's operating expenses, financing obligations, and certain reserve requirements.

     13.     *Books and Records.*

On the Effective Date, any Asbestos Records shall be treated in accordance with the Asbestos Records Cooperation Agreement, which shall be substantially in the form as set forth in a Plan Supplement.

## C.     Description of the Consideration Contributed to the Asbestos PI Trust.

THAN and PENAC will contribute to the Asbestos PI Trust the following assets, all of which, together, shall not exceed $900 million as of the Effective Date.

     1.     *The THAN Contribution to the Asbestos PI Trust.*

Pursuant to the Plan, on or after the Effective Date, THAN will provide the following to the Asbestos PI Trust (the "THAN Contribution"):

     (a)     Cash on the Effective Date in an amount such that the Asbestos PI Trust Contributions shall equal $900 million as of the Effective Date; and

     (b)     with PENAC, the Insurance Settlement Proceeds Trust Assets.

     2.     *The PENAC Contribution to the Asbestos PI Trust*

Prior to the commencement of the Chapter 11 Case, THAN engaged in intensive negotiations with PENAC, the Asbestos Claimants Group and the Future Claimants' Representative Group regarding the scope, nature, and extent of the contribution to be made by PENAC under the Plan. Those protracted discussions ultimately resulted in PENAC's agreement to, among other things, contribute, on behalf of itself and the other PENAC Related Parties, to the Asbestos PI Trust, in return for the benefits received under the Plan, the following contributions, which together with the THAN Contribution, shall make up $900 million as of the Effective Date (the "PENAC Asbestos PI Trust Contribution"):

     (a)     Cash on the Effective Date in an amount such that the Asbestos PI Trust Contributions shall equal $900 million as of the Effective Date;

     (b)     residual Cash as of the Effective Date, if any, whether (i) drawn under the DIP Agreement and not used by THAN or (ii) remaining under any pre-Commencement Date advance made to THAN by PENAC, to the extent such residual Cash will not be necessary for distributions under the Plan on account of Allowed General Unsecured Claims; and

     (c)     with THAN, the Insurance Settlement Proceeds Trust Assets.

To the extent any of the foregoing contributions by either THAN or PENAC cause the total Asbestos PI Trust Contributions to exceed $900 million as of the Effective Date, such excess amounts shall be returned to PENAC in Cash.

3.      *The Promissory Note and the Pledge Agreement.*

Reorganized THAN and the Asbestos PI Trust will execute the Promissory Note, for the payment of a principal amount of $1,000,000, with interest, in equal quarterly installments. In addition, the Parent Trust, Reorganized THAN, and the Asbestos PI Trust will enter into the Pledge Agreement as of the Effective Date to memorialize and effectuate the granting of the security interest in one hundred percent (100%) of the outstanding membership interests of Reorganized THAN to the Asbestos PI Trust.

4.      *The PENAC Contribution to Reorganized THAN.*

In addition to the PENAC Asbestos PI Trust Contribution, PENAC shall assume, on the Effective Date, the Known Environmental Liabilities of Reorganized THAN and contribute certain revenue-generating real property to Reorganized THAN (the "PENAC Debtor Contribution"). Also on the Effective Date, PENAC shall forgive any amounts drawn and used from the DIP Agreement and used by THAN and release any and all Liens, Claims, Encumbrances or other interests of PENAC on THAN's or Reorganized THAN's assets that served as security for the DIP Agreement, and, PENAC shall cover the costs, if any, associated with providing insurance coverage for Reorganized THAN under the Unknown Environmental Liability Insurance Policy. In addition, on the Effective Date PENAC shall contribute to Reorganized THAN a one-time Cash payment in the amount of $1,000,000. PENAC shall also assume any and all obligations with respect to retiree benefits owed to former employees of THAN or employees of THAN as of the Effective Date.

THAN and its advisors have determined that the PENAC Asbestos PI Trust Contribution and the PENAC Debtor Contribution are not only a fair compromise in exchange for PENAC and the PENAC Related Parties obtaining protection under the Asbestos PI Channeling Injunction, but that they also maximize the value of THAN's available assets for the benefit of THAN and all of its current claimants and future Demand holders.

5.      *Environmental Liabilities.*

As part of the PENAC Debtor Contribution, PENAC shall assume all Known Environmental Liabilities listed on Exhibit I to the Plan on the Effective Date. In addition, THAN has procured the Unknown Environmental Liability Insurance Policy identifying THAN as a named insured and providing coverage with respect to Unknown Environmental Liabilities to enhance or supplement existing insurance related to Unknown Environmental Liabilities, which policy shall be a five-year policy providing coverage only for such Unknown Environmental Liabilities, in excess of a self insured retention of $250,000 per pollution condition, $2,000,000 aggregate, $100,000 maintenance, up to $10,000,000 per claim and an aggregate limit of $30,000,000. At the end of its initial term, the policy may be automatically extended for an equal term (with any associated costs to be borne by Reorganized THAN).

The Unknown Environmental Liability Insurance Policy shall be deemed and treated as an executory contract pursuant to the Plan and shall be automatically assumed on the Effective Date by THAN and Reorganized THAN and shall continue in full force and effect. On the Effective Date, the Unknown Environmental Liability Insurance Policy shall vest in Reorganized THAN. On the Effective Date, or as soon as reasonably practicable thereafter, THAN or Reorganized THAN, as the case may be, shall assume such Unknown Environmental Liability Insurance Policy and Reorganized THAN shall be insured under such Unknown Environmental Liability Insurance Policy. Any and all costs of providing such insurance coverage for Reorganized THAN under such Unknown Environmental Liability Insurance Policy shall be borne by PENAC.

On the Effective Date, Reorganized THAN shall seek to have the Unknown Environmental Liability Insurance Policy amended to add the Parent Trust as an additional named insured; provided, however, that the costs of such amendment are determined to be reasonable to both Reorganized THAN and the Future Claimants' Representative, with such costs to be borne by Reorganized THAN.

Pursuant to Article 9.5 of the Plan, PENAC has agreed to assume all Known Environmental Liabilities, and THAN will not incur any costs or expenses in relation to those liabilities. In the event that THAN is notified of new or additional environmental claims or conditions in connection with the Known Environmental Liabilities ("New Claims") and PENAC believes that such New Claims are not included within the Known Environmental Liabilities assumed by PENAC at the time the Unknown Environmental Liability Insurance Policy was bound with ACE, and provided that PENAC has no independent contractual obligation to indemnify the party asserting any New Claims, THAN will seek coverage from ACE for any New Claims. To the extent ACE contends that the condition was included in the Known Environmental Liabilities and denies coverage, PENAC will either assume the condition as a Known Environmental Liability or, if PENAC does not agree to assume the New Claims, THAN will in good faith take all legal and equitable action, at the sole cost of PENAC, against ACE to compel ACE to provide coverage for such New Claims. In the event of a final order by a court of competent jurisdiction upholding ACE's denial of coverage, PENAC will assume such New Claim as a Known Environmental Liability. Nothing in this paragraph shall impact the rights and obligations provided in the Plan with respect to claims arising at any site other than sites included in Known Environmental Liabilities.

In conjunction with PENAC's assumption of the Known Environmental Liabilities, based upon its ten year history with respect to notification and remediation of Environmental Liabilities, THAN believes that the insurance coverage detailed above as well as the reserve amount will be sufficient to cover any potential Environmental Liabilities that may arise in the next five years. These contributions, however, will be made available by PENAC only if the Plan is confirmed, and will not be available to THAN should the Chapter 11 Case be converted to a case under chapter 7 of the Bankruptcy Code.

## D.    Estimation of Asbestos PI Claims.

Each of THAN, the Future Claimants' Representative and the Asbestos Claimants Group has hired a claims valuation expert to estimate the aggregate value of THAN's pending and future PI Asbestos PI Claims through 2050. Each of these experts has been provided with claims data and related information relevant to the estimation process, including a database of all asbestos personal injury and wrongful death claims filed against and resolved by THAN before the Commencement Date, and each has been provided an independent claims valuation.

In order to estimate an aggregate value, each of the experts prepared a forecast that estimates the number, type and year of filing of future asbestos-related personal injury and wrongful death claims against THAN along with the estimated cost of resolving those claims. To create such forecasts, each of the experts applied methodologies that he or she had employed and tested in other asbestos-related bankruptcies and other contexts, and each made certain assumptions about historical events and likely future behavior.

As the basis for their respective projections, each of the experts relied on THAN's historical litigation experience in the tort system. As a general matter, each of the experts first estimated the underlying aggregate population of individuals occupationally exposed to asbestos in the United States, and then used epidemiological studies of mesothelioma and lung cancer to calculate the number of occupationally exposed individuals who, in the view of the expert, will likely develop a malignant disease

due to asbestos exposure. Each of the experts then used THAN's claims history to produce his or her independent estimate of what percentage of persons who develop an asbestos-related malignant disease is likely to file claims against THAN.

Each of the experts also estimated the number of non-malignant claims likely to be filed in the future. Because there are no epidemiological studies to serve as the basis to predict the number of exposed individuals who might develop a non-malignant condition, the experts relied on THAN's historical claims experience – and, in particular, the historical ratio of non-malignant claims to certain malignant claims – to come up with independent predictions of the number of non-malignant claims likely to be filed against THAN in the future.

Finally, in order to determine the aggregate value of these estimated claims, each of the experts applied claim values by disease that he or she calculated based largely on historical indemnity values paid by THAN to resolve claims. The calculation of total indemnity value by each expert took into account not only the dollar value of historical settlements by disease type during a defined period of time, but also the rate at which historical claims against THAN have been dismissed. The total value was then calculated by each expert by multiplying the number of claims in each disease type that the expert had projected by the average value per claim that the expert had calculated, and applying a reasonable inflation rate to future indemnity values and discounting to present value.

Because each of the experts conducted an independent analysis using his or her own independent assumptions concerning issues such as the particular time period used to determine claim rates and indemnity values and the rate at which claims will be paid in the future, their valuations differ substantially from one another. THAN and PENAC believe the aggregate value of THAN's present and future liability for Asbestos PI Claims through 2050 is significantly lower than the valuations by either the Asbestos Claimants Group or the Future Claimants' Representative. However, the parties reached a compromise of $900 million, which THAN believes is more than sufficient to pay all present and future Asbestos PI Claims and Demands in accordance with the Asbestos PI Trust Distribution Procedures.

## VIII.

### Other Aspects of the Plan

**A.  Distributions Other than on Account of Asbestos PI Claims.**

One of the key concepts under the Bankruptcy Code is that only Claims that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" Claim simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the Claim, and the amount thereof, is in fact a valid obligation of the debtor. For an explanation of how Disputed Claims will be determined, see section VIII.A.4. below.

1.  *Distributions.*

Other than with respect to Distributions to be made to Asbestos PI Claims by and from the Asbestos PI Trust, Reorganized THAN will make all Distributions required to be made under the Plan as provided under Article VI of the Plan. All distributions to be made on account of Asbestos PI Claims will be made in accordance with the terms of the Asbestos PI Trust Agreement and the other Asbestos PI Trust Documents, including the Asbestos PI Trust Distribution Procedures.

2. *Timing and Conditions of Distributions.*

(a) *Date of Distributions.*

Except as otherwise provided in the Plan, Plan Documents and the Confirmation Order, any Distributions and deliveries to be made under the Plan on account of Allowed Claims (other than Asbestos PI Claims) or Equity Interests will be made on the Effective Date or as soon thereafter as is practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, or as soon thereafter as is practicable, but will be deemed to have been completed as of the required date.

(b) *Fractional Cents.*

Notwithstanding any other provision in the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with fractions of more than half of a penny being rounded up and fractions of half of a penny or less being rounded down.

3. *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim (other than Asbestos PI Claims) will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court, as may be required, or on the books and records of THAN or its agents, or in a letter of transmittal, unless THAN has been notified in writing of a change of address.

If any such holder's Distribution is returned as undeliverable, then no further Distributions to such holder will be made unless and until Reorganized THAN is notified of such holder's then-current address, at which time all missed Distributions shall be made to such holder (without interest). A Distribution that is not claimed by the expiration of six (6) months from the date that such Distribution was made will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and will revest in Reorganized THAN, and the claim of any holder to such Distributions will be discharged and forever barred. THAN or Reorganized THAN will not be required to attempt to locate any holder of an Allowed Claim.

4. *Procedures for Treating Disputed Claims under the Plan.*

(a) *Disputed Claims.*

A Disputed Claim is any Claim that is not an Allowed Claim (and has not already been disallowed by a Final Order of the Bankruptcy Court or withdrawn). Any Claim that is contingent, unliquidated, or disputed is a Disputed Claim. Any Claim as to which no objection or request for estimation has been filed, no litigation has commenced, and the Debtor otherwise has assented to the validity thereof (and as to which a proof of Claim has been properly and timely filed, to the extent required by the Plan or any order of the Bankruptcy Court), is an Allowed Claim. Any Claim as to which any objection or request for estimation that has been filed has been settled, waived, withdrawn or denied by a Final Order, is an Allowed Claim. Any Claim that is allowed (i) pursuant to the terms of a Final Order, (ii) pursuant to the terms of an agreement by and among the holder of such Claim and THAN (or Reorganized THAN, as the case may be) or (iii) under the terms of the Plan, is an Allowed Claim.

The term "Allowed" does not apply to Claims held by holders of Class 4 Asbestos PI Claims. All Asbestos PI Claims will be determined and paid by the Asbestos PI Trust in accordance with Article 9.4 of the Plan and the Asbestos PI Trust Documents, including the Asbestos PI Trust Distribution Procedures. After the Effective Date, all Asbestos PI Claims must be submitted solely to the Asbestos PI Trust for payment, which shall be in accordance with the Asbestos PI Trust Distribution Procedures, and only the Asbestos PI Trust will have the right to object to and/or resolve Asbestos PI Claims.

(b)     *Objections to Claims.*

THAN and Reorganized THAN will be entitled to file objections to Claims that have been or properly should have been brought in the Bankruptcy Court (other than Asbestos PI Claims), on or before the first (1st) anniversary of the Effective Date (unless such day is not a Business Day, in which case such deadline shall be the next Business Day thereafter), as the same may be extended from time to time by the Bankruptcy Court, and shall be authorized to settle, compromise, withdraw or litigate to judgment such objections without further approval of the Bankruptcy Court.

5.     *Preservation of Insurance.*

Nothing in the Plan, the Plan Documents or the Confirmation Order, including the discharge and release of THAN and the Asbestos PI Channeling Injunction, will diminish or impair the enforceability of any insurance policy or settlement agreement with any Asbestos Insurance Entity that may be obligated to provide, or has settled the issue of, coverage for Asbestos PI Claims and Demands against THAN or any other party.

**B.     Treatment of Executory Contracts and Unexpired Leases.**

1.     *Contracts and Leases Not Expressly Rejected Are Assumed.*

Subject to approval of the Bankruptcy Court, section 365 of the Bankruptcy Code allows a debtor to assume or reject its executory contracts and unexpired leases.

THAN shall assume, as of the Effective Date, all Executory Contracts to which THAN is a party, except for:  (a) the Executory Contracts specifically listed in the Schedules to the Plan Supplement, which shall either be rejected or assumed and assigned, respectively, as described therein; and (b) the Executory Contracts specifically addressed in the Schedules to the Plan Supplement or pursuant to a Final Order of the Bankruptcy Court entered on or before the Effective Date.  THAN may, at any time on or before the Effective Date, amend the Schedules to the Plan Supplement to delete therefrom or add thereto any Executory Contract.  THAN shall provide notice of any such amendment to the parties to the Executory Contract(s) affected thereby and to the parties on any master service list established by the Bankruptcy Court in the Chapter 11 Case.  The fact that any contract or lease is listed in the Schedules to the Plan Supplement will not constitute or be construed to constitute an admission that such contract or lease is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or that THAN or any successor in interest to THAN (including Reorganized THAN) has any liability thereunder.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such (a) rejections, (b) assumptions, or (c) assumptions and assignments, as the case may be, as of the Effective Date, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code.

2.    *Cure of Defaults.*

Generally, if there has been a default under an executory contract or unexpired lease (other than a default specified in section 365(b)(2) of the Bankruptcy Code), the debtor can assume the contract or lease only if the debtor cures the default.

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract to be assumed (including any Executory Contract to be assumed and assigned) pursuant to Article 7.1 of the Plan, Reorganized THAN shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within thirty (30) days after the Effective Date, file and serve a pleading with the Bankruptcy Court listing the amount of the proposed Cure for each such Executory Contract. The non-Debtor party or parties to each such Executory Contract will have fifteen (15) days from service of the Cure Notice to object to the proposed Cure with respect to that Executory Contract. Within thirty (30) days after service of any objection to the proposed Cure for an Executory Contract, THAN shall (i) resolve such objection, which resolution will not require approval of the Bankruptcy Court, (ii) schedule a hearing before the Bankruptcy Court to determine the proper Cure for the Executory Contract, or (iii) determine to reject the Executory Contract, and provide notice thereof to the applicable non-Debtor party or parties.

3.    *Rejection Damages Claims.*

In the event that the rejection of an Executory Contract by THAN, pursuant to the Plan or otherwise, results in damages to the non-Debtor party or parties to such Executory Contract, a Claim for such damages shall be forever barred and shall not be enforceable against THAN, Reorganized THAN, or their respective properties or interests in property as agents, successors or assigns unless a Proof of Claim with respect to such damages is filed with the Bankruptcy Court and served upon counsel for THAN on or before (i) if such Executory Contract is rejected pursuant to Articles 7.1 and 7.2 of the Plan, the later of: (a) thirty (30) days after entry of the Confirmation Order or (b) fifteen (15) days after the non-Debtor party receives notice of the rejection of such Executory Contract pursuant to Article 7.2 of the Plan; or (ii) if such Executory Contract is rejected pursuant to a Final Order of the Bankruptcy Court granting a motion filed by THAN to reject that Executory Contract, fifteen (15) days after entry of such order.

## C.    Effect of Confirmation.

1.    *Revesting of THAN's Assets.*

On the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Documents or the Confirmation Order, the property of the Estate of THAN (except for the THAN Contribution and subject to Article 2.3 of the Plan regarding unused Cash drawn under the DIP Agreement that will not be necessary for distributions on account of Allowed General Unsecured Claims in Class 3) shall vest in Reorganized THAN free and clear of any and all Liens, Claims, Encumbrances and other interests of any Entity. From and after the Effective Date, Reorganized THAN may operate its business and may use, acquire, and dispose of property free of any restrictions imposed under the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. Without limiting the generality of the foregoing, Reorganized THAN may, without application to, or approval by, the Bankruptcy Court, pay Professional fees and expenses that Reorganized THAN incurs after the Effective Date.

2.    *Preservation of Certain Causes of Action; Defenses.*

Except as otherwise provided in Article 10.6 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, Reorganized THAN, as successor in interest to THAN and its Estate, will retain and may enforce any and all rights, Claims, and Causes of Action accruing to or that are property of THAN or its Estate pursuant to the Bankruptcy Code or any statute or legal theory, including any Avoidance Action, any rights to, Claims or Causes of Action for recovery under any policies of insurance issued to or on behalf of THAN, and any rights, Claims, and Causes of Action against third parties related to or arising out of Allowed Claims.  Reorganized THAN will also retain and may enforce all defenses and counterclaims to all Claims asserted against THAN or its Estate, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.  The Plan provides that Reorganized THAN may pursue such Claims, rights, or Causes of Action, as appropriate, in accordance with its best interests, as determined by the trustee of the Parent Trust or a membership committee or board of managers appointed by such trustee for Reorganized THAN.  Notwithstanding anything in Article 10.2 of the Plan to the contrary, neither THAN nor Reorganized THAN shall have any rights to pursue any Derivative Liability Claims against a PENAC Related Party or Elementis or any of their Representatives.

Notwithstanding anything in Article 10.2 of the Plan to the contrary, on the Effective Date all Claims, defenses, rights and Causes of Action of THAN and Reorganized THAN relating to Asbestos PI Claims, other than any rights or Causes of Action for recovery under any policies of insurance issued to or on behalf of THAN, will be transferred and assigned to the Asbestos PI Trust. Except as otherwise provided in Article 10.2 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Asbestos PI Trust will retain and may enforce such Asbestos PI Claims, defenses, rights and Causes of Action and shall retain and may enforce all defenses and counterclaims to all Claims or Demands asserted against the Asbestos PI Trust with respect to such Asbestos PI Claims, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code; provided, however, that no such defenses, Causes of Action, or counterclaims may be asserted against any Asbestos Protected Party (including but not limited to THAN Related Parties, PENAC Related Parties, Settling Asbestos Insurance Entities and Post-Confirmation Settling Asbestos Insurance Entities).  The Asbestos PI Trust will be deemed to be the appointed representative to, and may, pursue, litigate, compromise and settle any rights, Claims, or Causes of Action transferred to it, as appropriate, in accordance with its and its beneficiaries' best interests.

Nothing in Article 10.2 of the Plan, however, will be deemed to be a transfer by THAN or Reorganized THAN of any Claims, rights, Causes of Action, or defenses relating to assumed Executory Contracts or which otherwise are required by Reorganized THAN to conduct its business in the ordinary course subsequent to the Effective Date.

3.    *Institution and Maintenance of Legal and Other Proceedings.*

From and after the Effective Date, Reorganized THAN will be empowered and entitled, in its sole and absolute discretion, to pursue, compromise or settle THAN's or Reorganized THAN's interests in any and all Asbestos Insurance Actions.  The duties, obligations and liabilities of any Asbestos Insurance Entity under all insurance policies, including but not limited to the Shared Asbestos Insurance Policies, all Insurance Settlement Agreements, and all other settlement agreements are not enlarged or diminished, reduced or eliminated by any aspect of the Chapter 11 Case, provided that all Asbestos PI Insurer Coverage Defenses are preserved in accordance with Article 10.4 of the Plan.

4. *Insurance Neutrality.*

Notwithstanding anything to the contrary in the Confirmation Order, the Plan or any of the Plan Documents, nothing in the Plan, the Plan Documents, the Confirmation Order, any finding of fact and/or conclusion of law with respect to the confirmation of the Plan, or any Final Order or opinion entered on appeal from the Confirmation Order (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing (i) any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect under the Shared Asbestos Insurance Policies or any Insurance Settlement Agreement; or (ii) any policyholder's legal, equitable or contractual rights, if any, in any respect under the Shared Asbestos Insurance Policies or any Insurance Settlement Agreement. The rights and obligations of any Asbestos Insurance Entity shall be determined under the insurance policies, including, but not limited to the Shared Asbestos Insurance Policies, or any Insurance Settlement Agreement.

Notwithstanding anything in Article 10.4 of the Plan to the contrary, nothing in Article 10.4 shall affect or limit, or be construed as affecting or limiting, (i) the binding effect of the Plan and the Confirmation Order on THAN, Reorganized THAN, the Asbestos PI Trust and the beneficiaries of such trust; or (ii) the protection afforded to any Asbestos Insurance Entity.

5. *Terms of Injunction and Automatic Stay.*

All of the injunctions and/or stays in existence immediately prior to the Confirmation Date, whether pursuant to section 105, 362, or any other provision of the Bankruptcy Code, the Bankruptcy Rules or other applicable law, including, but not limited to, the injunction provided for by the Preliminary Injunction Order, shall remain in full force and effect until the injunction set forth in the Plan becomes effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, Reorganized THAN may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the injunctions contained in the Plan or the Confirmation Order will become effective on the Effective Date and will continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order. All actions of the type or nature of those to be enjoined by such injunctions will be enjoined during the period between the Confirmation Date and the Effective Date.

6. *No Liability for Certain Released Claims*

Except as otherwise expressly provided in Article 10.6 of the Plan, neither THAN, Reorganized THAN, the other Asbestos Protected Parties, nor the Asbestos PI Trust (except, as it relates to the Asbestos PI Trust, with respect to the Asbestos PI Claims) does, or shall be deemed to, assume, agree to perform, pay, or indemnify creditors for any liabilities or obligations of THAN relating to or arising out of the operations of or assets of THAN whether arising prior to or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date. Neither Reorganized THAN, nor the Asbestos PI Trust shall be liable for any Derivative Liability Claim, except that Reorganized THAN and the Asbestos PI Trust shall assume their respective obligations specified in the Plan and the Confirmation Order.

Effective automatically on the Effective Date, the Asbestos Protected Parties and their respective Representatives shall unconditionally and irrevocably be fully released from any and all Derivative Liability Asbestos PI Claims.

7.     *Title to Asbestos PI Trust Assets.*

On the Effective Date, title to all of the Asbestos PI Trust Assets shall vest in the Asbestos PI Trust free and clear of all Claims, Equity Interests, Encumbrances and other interests of any Entity.  The Asbestos PI Trust shall be empowered and entitled to process and pay Asbestos PI Claims in accordance with the Asbestos PI Trust Distribution Procedures and the Asbestos PI Trust Agreement.

8.     *Dissolution of Committees; Creation of the Asbestos PI Trust Advisory Committee; Continuation of Future Claimants' Representative.*

Effective on the Effective Date, any statutory committee appointed in the Chapter 11 Case will be dissolved automatically, whereupon its members, Professionals, and agents will be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to applications for compensation by Professionals or reimbursement of expenses incurred as a member of any committee and any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order or pending appeals of any other order entered in the Chapter 11 Case.

As provided in Article 9.4 of the Plan, the Confirmation Order shall provide for the appointment of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative effective as of the Effective Date.  From and after the Effective Date, Professor Issacharoff will continue to serve as provided in the Plan and the Asbestos PI Trust Agreement, to perform the functions specified and required therein.  Professor Issacharoff also may, at his option, participate in any:  (a) appeal of the Confirmation Order; (b) hearing on a Claim for compensation or reimbursement of a Professional; and (c) adversary proceeding pending on the Effective Date in which the Future Claimants' Representative  is a party.

Upon termination of the Asbestos PI Trust:  (a) the members of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative  will be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case; and (b) the Asbestos PI Trust Advisory Committee will be deemed dissolved and Professor Issacharoff's employment shall be deemed terminated.

All reasonable and necessary post-Effective Date fees and expenses of the professionals retained by the Asbestos PI Trust Advisory Committee and Professor Issacharoff will be paid exclusively by the Asbestos PI Trust in accordance with the terms of the Asbestos PI Trust Agreement, and Reorganized THAN will not be liable for any such fees and expenses.  The parties will attempt to resolve any dispute regarding the payment of such fees and expenses in good faith, and if they fail to resolve such dispute, they will submit the dispute to the Bankruptcy Court for resolution.

## D.     **Releases, Injunctions and Discharges.**

1.     *Discharge of THAN.*

Except as otherwise provided in Articles 4.2, 4.3 and 11.8 of the Plan, as of the Effective Date the rights provided in the Plan will be in exchange for and in complete satisfaction, settlement and

discharge of, all Claims or Demands against THAN or Reorganized THAN or any of their respective assets and properties.

Specifically, except as provided in Articles 4.2, 4.3 and 11.8 of the Plan, pursuant to section 1141(d)(1)(A) of the Bankruptcy Code, confirmation of the Plan will discharge THAN and Reorganized THAN from any and all Claims or Demands of any nature whatsoever, including, without limitation, all Claims, Demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, whether or not: (a) a Proof of Claim based on such Claim or Demand was filed under section 501 of the Bankruptcy Code, or such Claim or Demand was listed on any Schedules of THAN; (b) such Claim or Demand is or was allowed under section 502 of the Bankruptcy Code; or (c) the holder of such Claim or Demand has voted on or accepted the Plan.

     2.     *Injunction.*

Except as otherwise provided in Articles 4.2, 4.3 and 11.8 of the Plan, all persons or Entities that have held, hold or may hold Claims or Demands will be permanently enjoined, from and after the Effective Date, from:

     (i)     commencing or continuing in any manner any action or other proceeding of any kind against Reorganized THAN with respect to such Claim or Demand;

     (ii)     enforcing, attaching, collecting, or recovering in any manner or by means of any judgment, award, decree, or order against Reorganized THAN with respect to such Claim or Demand;

     (iii)     creating, perfecting, or enforcing any Encumbrance of any kind against Reorganized THAN or against the property or interests in property of Reorganized THAN with respect to such Claim or Demand;

     (iv)     asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to Reorganized THAN or against the property or interests in property of Reorganized THAN, with respect to such Claim or Demand; and

     (v)     pursuing any Claim or Demand released pursuant to the Plan.

Such injunction will extend to the successors of THAN (including, without limitation, Reorganized THAN) and their respective properties and interests in property.

     3.     **Exculpation.**

**The Released Parties consist of (i) the Asbestos Claimants Group and the present and former members thereof (including ex officio members, if any); (ii) the Future Claimants' Representative and the Future Claimants' Representative Group; (iii) THAN and any THAN Related Party; (iv) PENAC and any PENAC Related Party; (v) Elementis; (vi) any Entity with an Indirect Asbestos PI Claim; (vii) any Settling Asbestos Insurance Entity; (viii) any Post-Confirmation Settling Asbestos Insurance Entity; and (viii) all present or former Representatives (including the officers, directors, employees, agents, attorneys, accountants, financial advisors, other representatives,**

*subsidiaries, affiliates, or any person who controls any of these within the meaning of the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended), of the foregoing.*

*Such Released Parties shall be exculpated under the Plan with regard to any act or omission in connection with, related to, or arising out of: (i) the Chapter 11 Case; (ii) pursuit of confirmation of the Plan; (iii) consummation of the Plan, or administration of the Plan or the property to be distributed under the Plan or the Asbestos PI Trust Distribution Procedures; (iv) the Plan; or (v) the negotiation, formulation and preparation of the Plan, the Plan Documents and any of the terms and/or settlements and compromises reflected in the Plan and the Plan Documents, except such acts or omissions determined to constitute willful misconduct or gross negligence by a Final Order. In all respects, THAN, Reorganized THAN, and each of the other Released Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and the Plan Documents.*

4. *Release of THAN's Officers and Directors.*

*The acceptance of any Distribution by a holder of a Claim or Demand against or Equity Interest in THAN, and, with respect to Asbestos PI Claims, the acceptance of the THAN Contribution by the Asbestos PI Trust, will constitute a waiver and release of any and all Causes of Action that such holder, including the Asbestos PI Trust, any holder of an Asbestos PI Claim or Demand, and the Future Claimants' Representative , did commence or could have commenced against any former or current officer or director of THAN (serving in such capacity) from and after the Commencement Date that is based upon, related to or arising from any acts or omissions of such officer or director occurring prior to the Effective Date, to the fullest extent permitted under section 524(e) of the Bankruptcy Code and applicable law (as now in effect or subsequently extended), except for (a) willful misconduct or gross negligence as determined by a Final Order or (b) any Claim by any federal, state or local authority under the Internal Revenue Code or other tax regulation or any applicable environmental or criminal laws.*

5. *Asbestos PI Channeling Injunction.*

(a) *Parties Covered by the Asbestos PI Channeling Injunction.*

Pursuant to the Asbestos PI Channeling Injunction and the Plan, the following entities will be "Asbestos Protected Parties" protected by the scope of the Asbestos PI Channeling Injunction:

- THAN and any other THAN Related Party;

- PENAC and any other PENAC Related Party;

- Elementis Group B.V. and its Affiliates set forth on Schedule 3 to the Plan;

- any Entity subject to an Indirect Asbestos PI Claim (generally, an Asbestos PI Claim that is based upon a right of contribution, reimbursement, subrogation, indemnity, or virile share);

- any Settling Asbestos Insurance Entity (generally, any Asbestos Insurance Entity that has entered into an Insurance Settlement Agreement prior to the Confirmation Date if (i) such Insurance Settlement Agreement provides that (a) THAN and/or PENAC agreed to seek the protections under section 524(g) of the Bankruptcy Code for such Asbestos Insurance

Entity or (b) THAN and/or PENAC agreed to indemnify such Asbestos Insurance Entity with respect to any Asbestos PI Claim that may be channeled to the Asbestos PI Trust, (ii) the proceeds of such Insurance Settlement Agreement are included in the THAN Contribution and the PENAC Asbestos PI Trust Contribution to be contributed to the Asbestos PI Trust on the Effective Date, and (iii) such Insurance Settlement Agreement is sufficiently comprehensive to warrant that such Asbestos Insurance Entity receive treatment under section 524(g) of the Bankruptcy Code);

- any Post-Confirmation Settling Asbestos Insurance Entity (generally, any Asbestos Insurance Entity that has entered into an insurance settlement agreement after the Confirmation Date that THAN determines is sufficiently comprehensive to warrant that such Entity receive treatment under section 524(g) of the Bankruptcy Code); and

- any Representative of each of the foregoing.

(b)     *Terms of the Asbestos PI Channeling Injunction.*

Pursuant to the Confirmation Order and sections 105(a) and 524(g) of the Bankruptcy Code, and subject to Article 11.6 of the Plan, as more fully described in Section VIII.E.7 below, the sole recourse of any holder of an Asbestos PI Claim on account of such Asbestos PI Claim or part thereof will be against the Asbestos PI Trust.  Each such holder will be enjoined from taking legal action directed against THAN, Reorganized THAN, any PENAC Related Party, Elementis or any other Asbestos Protected Party described above, or their respective property, for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery with respect to such Asbestos PI Claim.

6.     *Limitations of Injunctions.*

Notwithstanding anything to the contrary above, the releases in the Plan and the Asbestos PI Channeling Injunction will not enjoin:

(a)     the rights of Entities to the treatment accorded to them under Articles III and IV of the Plan, as applicable, including the rights of Entities with Asbestos PI Claims to assert such Asbestos PI Claims or Demands against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures;

(b)     the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Asbestos PI Trust Expenses against the Asbestos PI Trust;

(c)     the rights of Reorganized THAN and any PENAC Related Party to take any action with respect to any and all of the Shared Asbestos Insurance Policies, subject to the terms of any applicable insurance settlement agreement and any Asbestos PI Insurer Coverage Defense; and

(d)     the rights of Reorganized THAN and any PENAC Related Party to assert any Claim, debt, obligation, or liability for payment against any Asbestos Insurance Entity to the extent any insurance policies or insurance coverages were not resolved or released in any insurance settlement agreement with that Asbestos Insurance Entity, subject to the terms of

such insurance settlement agreement, if any, and any Asbestos PI Insurer Coverage Defense.

7.    *Release and Indemnification by THAN.*

*As of the Effective Date, THAN and Reorganized THAN will release and are permanently enjoined from prosecuting or attempting to prosecute any Derivative Liability Claims and all Causes of Action against the Released Parties that THAN or Reorganized THAN has, now or in the future, that are property of, assertable on behalf of, or derivative of THAN; provided, however, that the foregoing release shall not serve to release any Asbestos Insurance Entity from its obligations under any applicable Insurance Settlement Agreement, other settlement agreement or Shared Asbestos Insurance Policy.*

*Reorganized THAN also will indemnify, release and hold harmless each of PENAC and the other PENAC Related Parties pursuant to the provisions of, and to the extent set forth in, the Plan.*

E.    **Miscellaneous Provisions.**

The Plan contains provisions relating to corporate actions, delivery of distributions, manner of payment, vesting of assets, binding effect, terms of injunctions or stays, payment of statutory fees, substantial consummation, compliance with tax requirements, severability, revocation and amendment of the Plan, governing law, and timing.  For more information regarding these items, see the Plan attached hereto as Exhibit A.

## IX.

### Financial Information & Projections

A.    **Projections.**

As a condition to confirmation of the Plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Reorganized THAN.  In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this "feasibility" requirement of section 1129(a)(11) of the Bankruptcy Code, THAN's management has analyzed the ability of THAN to meet its obligations under the Plan while retaining sufficient liquidity and capital resources to conduct its business after the Effective Date.

The projected pro forma balance sheets and projected financial performance (the "Projections") for Reorganized THAN, which are attached as Exhibit C to this Disclosure Statement, should be read in conjunction with Section XI below, entitled "Certain Factors to Be Considered," and with the assumptions, qualifications and footnotes to the tables containing the Projections set forth in Exhibit C to the Disclosure Statement, and the historical consolidated financial information (including the notes and schedules thereto) attached as Annex 1 to Exhibit C to the Disclosure Statement.

**The Projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with Generally Accepted Accounting Principles, or the rules and**

regulations of the Securities and Exchange Commission regarding projections. Furthermore, the Projections have not been audited by an independent accountant.

THAN does not, as a matter of course, publish projections of its anticipated financial position, results of operations or cash flows. Accordingly, THAN does not intend, and disclaims any obligation to, (a) furnish updated projections to holders of Claims or membership interests prior to or after the Effective Date, (b) include such updated information in any document that may be required to be filed with the Securities and Exchange Commission, or (c) otherwise make such updated information publicly available.

The Projections are based on, and assume the successful implementation of, the Plan. The Projections have been prepared exclusively by THAN's management. The Projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions that, though considered reasonable by management at the time made, may prove not to be accurate, and are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond THAN's control. THAN cannot make any representations as to Reorganized THAN's ability to achieve the results set forth in the Projections. Some assumptions on which the Projections are based may not materialize, and events and circumstances occurring subsequent to the date on which the Projections were prepared may be different from those assumed or anticipated, and may materially and adversely impact Reorganized THAN's future financial performance. The Projections, therefore, cannot be relied upon as a guarantee or other assurance of Reorganized THAN's actual future financial performance.

B.      **Liquidation Valuation Analysis**.

A liquidation value analysis for THAN (the "Liquidation Analysis") is attached as Exhibit B hereto.

## X.

### Governance of Reorganized THAN

A.      **Parent Trust.**

The initial Trustee(s) of the Parent Trust will be set forth in a Plan Supplement. The Trustee(s) may appoint a membership committee and/or board of managers for Reorganized THAN.

B.      **Senior Management.**

Senior management of Reorganized THAN will be appointed by the Parent Trust or by any membership committee or board of managers that the Trustees of the Parent Trust may appoint.

C.      **Corporate Governance.**

The Amended Limited Liability Agreement and the Amended Certificate of Formation for Reorganized THAN shall be included in a Plan Supplement.

**XI.**

**Certain Factors to Be Considered**

**A.    Certain Bankruptcy Considerations.**

Although THAN believes that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, and/or issuance or acceptance and affirmance by the District Court, there can be no assurance that the Bankruptcy Court and/or the District Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications will not necessitate the re-solicitation of votes.  In addition, although THAN believes that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

For the Plan to be confirmed, at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of the holders of Asbestos PI Claims who vote must vote to accept the Plan.

**B.    Risk Factors.**

**Holders of Claims against and Equity Interests in THAN should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or referred to herein by reference), prior to voting to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.**

1.    *Overall Risks to Recovery by Holders of Claims.*

The ultimate recoveries under the Plan to holders of Claims (other than holders whose entire Distribution is paid in Cash) depend upon a number of factors.  The factors below (other than the factor entitled "Certain Bankruptcy Considerations") assume that the Plan is confirmed and that the Effective Date occurs on or about March 31, 2009.  Prior to voting on the Plan, each holder of a Claim should consider carefully the risk factors specified or referred to below, including the exhibits annexed hereto, as well as all of the information contained in the Plan.

2.    *Certain Bankruptcy Considerations.*

Although THAN believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no guaranty that the Bankruptcy Court will reach the same conclusion, or that the Confirmation Order, if challenged on appeal, will be affirmed.  There also can be no assurance that the Plan as proposed will be accepted by the requisite number of holders or amounts of Claims, that the Plan will not be modified up to and including the Confirmation Date, or that the Bankruptcy Court will enter an order confirming the Plan containing the findings of fact and conclusions of law that are conditions precedent to confirmation of the Plan.  There can also be no assurance that the District Court will accept and affirm or issue the order confirming the Plan, that such acceptance and affirmance or issuance will become a Final Order and that the Asbestos PI Channeling Injunction will therefore become valid and enforceable.

If the Plan is not confirmed or the Chapter 11 Case becomes protracted, there is no assurance that PENAC will make any contribution; thus, THAN believes substantially more assets would be available to pay claimants under the Plan than would be the case if there were no Plan and THAN were

forced to pay Claims solely from its own assets. In addition, if the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to a liquidation, or that any alternative plan of reorganization would be on terms as favorable to the holders of Claims and Equity Interests as the terms of the Plan. If a liquidation or protracted reorganization were to occur, there is a substantial risk that the value of THAN's assets would be substantially eroded to the detriment of all stakeholders.

3. *Projected Financial Information.*

The Projections are dependent upon numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Reorganized THAN, general business and economic conditions, and other matters, many of which are beyond the control of THAN. Accordingly, there can be no assurance that such assumptions will prove to be valid. In addition, unanticipated and unforeseeable events and/or circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of Reorganized THAN. Although THAN believes that the projections are reasonable and attainable, some or all of the estimates will vary, and variations between the actual financial results and those projected may be material.

4. *Appointment of Different Asbestos PI Trustees and/or Different Members of the Asbestos PI Trust Advisory Committee for the Asbestos PI Trust.*

At the Confirmation Hearing, THAN will request that the Bankruptcy Court appoint certain Entities as the initial Asbestos PI Trustees of the Asbestos PI Trust, and certain Entities as the initial members of the Asbestos PI Trust Advisory Committee. The Bankruptcy Court, however, may reject or otherwise decline to appoint one or more of the proposed Asbestos PI Trustees or proposed members of the Asbestos PI Trust Advisory Committee. In that case, one or more alternate Entities would have to be nominated, potentially resulting in significant delays in the occurrence of the Confirmation Date and Effective Date. The selection of different Asbestos PI Trustees or Asbestos PI Trust Advisory Committee members also could materially affect administration of the Asbestos PI Trust.

5. *Distributions under the Asbestos PI Trust Distribution Procedures.*

Payments that will be made on Asbestos PI Claims will be determined under the Asbestos PI Trust Distribution Procedures and will be based, on the one hand, on estimates of the number, types, and amount of current and expected future Asbestos PI Claims and Demands, and on the other hand, on the value of the assets of the Asbestos PI Trust, the liquidity of the Asbestos PI Trust, the Asbestos PI Trust's expected future income and expenses, and other matters that are likely to affect the sufficiency of funds to pay all holders of Asbestos PI Claims. There can be no certainty as to the precise amounts that will be distributed by the Asbestos PI Trust in any particular time period or when Asbestos PI Claims will be paid by the Asbestos PI Trust.

6. *Risk of Post-Consummation Default.*

Although THAN can give no guarantees, it believes that Reorganized THAN will generate sufficient operating cash flow to meet its business obligations and operating requirements and that such cash flow will be sufficient to make the payments required to be made by Reorganized THAN under the Plan. At the Confirmation Hearing, the Bankruptcy Court will be required to make a determination that the Plan is feasible (*i.e.*, not likely to be followed by the liquidation, or the need for further financial reorganization, of Reorganized THAN) in order to confirm the Plan.

7.	*The Asbestos PI Channeling Injunction.*

The Asbestos PI Channeling Injunction, which, among other things, bars the assertion of any Asbestos PI Claims or Demands against THAN and the other Asbestos Protected Parties, is the cornerstone of the Plan.  In 1994, the United States Congress added subsections (g) and (h) to section 524 of the Bankruptcy Code in order to confirm the authority of the Bankruptcy Court, subject to the conditions specified therein, to issue injunctions such as the Asbestos PI Channeling Injunction with respect to present and future asbestos-related personal injury, wrongful death and related Claims and demands.  Although the Plan, the Asbestos PI Trust Agreement, and the Asbestos PI Trust Distribution Procedures all have been drafted with the intention of complying with sections 524(g) and (h) of the Bankruptcy Code, and satisfaction of the conditions imposed by sections 524(g) and (h) is a condition precedent to confirmation of the Plan, there is no guarantee that the validity and enforceability of the Asbestos PI Channeling Injunction or sections 524(g) and (h) or the application of the Asbestos PI Channeling Injunction to Asbestos PI Claims will not be challenged, either before or after confirmation of the Plan.  Although THAN believes adequate bases exist for the courts to uphold sections 524(g) and (h) and the Asbestos PI Channeling Injunction, there can be no assurance that, in the future, courts might not invalidate all or a portion of sections 524(g) and (h) or the Asbestos PI Channeling Injunction.

## XII.

### Voting Procedures and Results

Detailed voting instructions are provided with the Ballot accompanying this Disclosure Statement.  For purposes of the Plan, the following Classes are the only ones entitled to vote:

| Class | Description |
|-------|-------------|
| 4 | Asbestos PI Claims |
| 5 | Intercompany Claims |

For purposes of the Plan, the following Classes are NOT entitled to vote:

| Class | Description |
|-------|-------------|
| 1 | Priority Claims |
| 2 | Secured Claims |
| 3 | General Unsecured Claims |
| 6 | Equity Interests in THAN |

If your Claim is not in Class 4 or Class 5, you are not entitled to vote on the Plan and you will not receive a Ballot with this Disclosure Statement.  If you are a holder of a Claim in Class 4 or Class 5, you should read your Ballot and follow the listed instructions carefully.  Please use only the Ballot that accompanies this Disclosure Statement.

**IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT, YOU MAY CONTACT THE CLAIMS AND BALLOTING AGENT:**

> THAN Ballot Processing Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, CA  90245
> Toll-Free Tel.:  (866) 381-9100
> Outside of the U.S.:  (310) 823-9000
> Facsimile:  (310) 751-1561
> E-mail:  THANinfo@kccllc.com

**A.    Vote Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan by a Class of Claims is determined by calculating the number and the amount of Claims voting to accept, based on the total of Allowed Claims actually voting.  Typically, acceptance requires an affirmative vote of more than one-half (1/2) in number of the total allowed Claims voting and two-thirds (2/3) in amount of the total allowed Claims voting. However, section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code provides that, for a debtor to establish an Asbestos PI Trust and receive the benefit of an injunction that channels liability for asbestos-related Claims to the Asbestos PI Trust, at least seventy-five percent (75%) in number of the holders of Claims that are to be addressed by the Asbestos PI Trust must vote to accept the Plan.  Accordingly, it is a condition to confirmation of the Plan that at least seventy-five percent (75%) of the holders of Asbestos PI Claims who actually vote on the Plan must have voted to accept the Plan and two-thirds (2/3) in amount of the holders of Asbestos PI Claims who actually vote on the Plan must have voted to accept the Plan.

**B.    Classes Deemed to Accept.**

Under the Bankruptcy Code, holders of Claims or Equity Interests that are Unimpaired by the Plan are deemed to accept the Plan and solicitation of such holders is not required.  Because Claims in Class 1 (Priority Claims), Class 2 (Secured Claims) and Class 3 (General Unsecured Claims) are Unimpaired under the Plan, the holders thereof are deemed to accept the Plan, and are not entitled to vote. For a summary of the Classes entitled to vote, see the charts in the Summary of the Disclosure Statement.

**C.    Class Deemed to Reject.**

Under the Bankruptcy Code, holders of Claims or Equity Interests that are Impaired by the Plan and will not receive any distributions under the Plan are deemed to reject the Plan, and solicitation of such holders is not required.  Because Equity Interests in Class 6 are Impaired under the Plan, and will not receive any distribution under the Plan, the holders thereof are deemed to reject the Plan, and are not entitled to vote.  For a summary of the Classes entitled to vote, see the charts in the Summary of the Disclosure Statement.

**D.    Voting.**

In order for your vote to be counted, it must be ***actually received*** by the Claims and Balloting Agent at the following address before the Voting Deadline of 8:00 p.m., Eastern Standard Time, on November 21, 2008:

| Claims and Balloting Agent |
| --- |
| THAN Ballot Processing Center<br>c/o Kurtzman Carson Consultants LLC<br>2335 Alaska Avenue<br>El Segundo, CA  90245 |

If the instructions on your Ballot require you to return the Ballot to your attorneys, you must deliver your Ballot to them in sufficient time for them to process it and return it to the Claims and Balloting Agent before the Voting Deadline.  If a Ballot is damaged or lost, you may contact THAN's Claims and Balloting Agent at the number set forth above.  Any Ballot that is executed and returned but which does not indicate an acceptance or rejection of the Plan will not be counted.

## E.      Cram Down.

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan over the dissent of any class of Claims or Equity Interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the reorganization process.  It assures that no single group (or multiple groups) of Claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Debtor intends to seek confirmation of the Plan, notwithstanding the rejection of the Plan by any Class entitled to vote, and the deemed rejection of Class 6 (Equity Interests).  The Debtor will request the Bankruptcy Court rule that the Plan meets the requirements specified in section 1129(b) of the Bankruptcy Code with respect to such Class.  The Debtor will also seek such a ruling with respect to each Class that is deemed to reject the Plan.

## XIII.

## Confirmation of the Plan

## A.      Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  Upon commencement of the Chapter 11 Case, THAN will move to schedule a hearing on confirmation of the Plan on the earliest possible date which complies with the Bankruptcy Code or the Bankruptcy Court's calendar.

## B.      General Requirements of Section 1129.

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      THAN has complied with the applicable provisions of the Bankruptcy Code.

3.   The Plan has been proposed in good faith and not by any means proscribed by law.

4.   Any payment made or promised by THAN or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.   THAN has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting Asbestos PI Trustee of THAN, affiliates of THAN participating in the Plan with THAN, or a successor to THAN under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy, and THAN has disclosed the identity of any insider that will be employed or retained by THAN, and the nature of any compensation for such insider.

6.   With respect to each Class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if THAN were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test," below.

7.   Each Class of Claims or Equity Interests has either accepted the Plan or is not Impaired under the Plan.

8.   Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and Priority Non-Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims regular installments of Cash payments, over a period not exceeding five years after the date of the order for relief, of a value, as of the Effective Date, equal to the Allowed amount of such Claims, and in a manner no less favorable than the most favored nonpriority unsecured Claim provided for by the plan, and, with respect to a secured Claim which would otherwise meet the description of an unsecured Claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that Claim, the holder of that Claim will receive on account of that Claim, Cash payments, in the same manner as described in this paragraph.

9.   At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

10.  Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of THAN or any successor to THAN under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility," below.

11.  Certain current and former employees of THAN may be entitled to retiree benefits (as defined in section 1114 of the Bankruptcy Code). PENAC shall assume any and all obligations with respect to retiree benefits owed to former employees of THAN or employees of THAN as of the Effective Date.

## C.  Best Interests Test.

As described above, the Bankruptcy Code requires that each holder of an impaired Claim or Equity Interest either (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if THAN was liquidated under chapter 7 of the Bankruptcy Code.

THAN's Liquidation Analysis is attached hereto as Exhibit B. When the results of the liquidation analysis are compared to the distributions expected under the Plan, as set forth in Section VI, it is clear that every creditor and interest holder will receive at least as much under the Plan as such creditor or interest holder would in a chapter 7 liquidation.

## D.  Feasibility.

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the debtor. In connection with the development of the Plan and for the purpose of determining whether the Plan satisfies this feasibility standard, THAN has analyzed its ability to meet its obligations under the Plan. As part of this analysis, THAN has prepared Projections, as described above. Based on such Projections, THAN believes that Reorganized THAN will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## XIV.

## Certain Federal Income Tax Consequences of the Plan

**CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE ("IRS") CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER FEDERAL, STATE, OR LOCAL TAX LAWS, (II) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (III) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO THAN, REORGANIZED THAN, HOLDERS OF ASBESTOS PI CLAIMS, THE ASBESTOS PI TRUST AND THE PARENT TRUST. THE FOLLOWING SUMMARY DOES NOT DISCUSS THE FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS WHOSE CLAIMS ARE ENTITLED TO PAYMENT IN FULL IN CASH OR ARE OTHERWISE UNIMPAIRED UNDER THE PLAN OR TO HOLDERS OF EQUITY INTERESTS OR INTERCOMPANY CLAIMS.

THE FOLLOWING SUMMARY IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE"), TREASURY REGULATIONS PROMULGATED THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES AND PRONOUNCEMENTS OF THE IRS AS IN EFFECT ON THE DATE HEREOF. CHANGES IN SUCH RULES OR NEW INTERPRETATIONS THEREOF MAY HAVE RETROACTIVE EFFECT AND COULD SIGNIFICANTLY AFFECT THE FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES. THAN DOES NOT CURRENTLY INTEND TO SEEK A RULING FROM THE IRS CONCERNING ANY OF THE TAX ASPECTS OF THE PLAN. IN ADDITION, THIS SUMMARY DOES NOT ADDRESS FOREIGN, STATE, OR LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN TAXPAYERS, BROKER-DEALERS, BANKS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, THRIFTS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, REAL ESTATE INVESTMENT COMPANIES, TAX-EXEMPT ORGANIZATIONS, TRADERS IN SECURITIES THAT ELECT TO USE A MARK-TO-MARKET METHOD OF ACCOUNTING FOR THEIR SECURITY HOLDING AND PASS-THROUGH ENTITIES AND INVESTORS IN SUCH ENTITIES).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR EQUITY INTEREST. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE TO THEM UNDER THE PLAN.

A.      Consequences to THAN.

THAN currently is treated as a partnership for federal income tax purposes and thus is not itself subject to federal income taxation. Accordingly, the consummation of the Plan will not produce any federal income tax consequences for THAN. Instead, PENAC and Remediation Services generally should take into account their allocable shares of any taxable income, gain, losses and deductions, including any cancellation of indebtedness income ("COD"), recognized by THAN pursuant to the implementation of the Plan. COD, which is the amount by which discharged indebtedness exceeds the consideration received in exchange therefor, is generally includible in a debtor's gross income, subject to certain exceptions. For example, a debtor generally does not realize COD if the payment of the discharged indebtedness would have given rise to a deduction. In addition, any COD realized by a debtor in a bankruptcy case generally is excluded from the debtor's gross income, and the bankrupt debtor must

reduce certain tax attributes by the amount of the excluded COD (the "Bankruptcy COD Exception"). In the case of a debtor that is treated as a partnership for federal income tax purposes, each partner of the debtor generally must separately determine its eligibility for the Bankruptcy COD Exception. THAN's satisfaction of the Asbestos PI Claims generally should not give rise to COD to the extent payment of such Claims would have given rise to a deduction for THAN, and the settlement of certain unliquidated Asbestos PI Claims may not produce COD. In addition, the Board of Directors of THAN intends to treat any amounts drawn by THAN under the DIP Facility as capital contributions by PENAC, the forgiveness of which should not produce COD.

Because THAN currently is treated as a partnership for federal income tax purposes, the cancellation of PENAC's and Remediation Services' membership interests in THAN and the issuance of one hundred percent (100%) of the membership interests of Reorganized THAN to the Parent Trust generally should constitute a deemed termination of THAN, and the Board of Directors of THAN currently intends to treat these transactions for federal income tax purposes as an acquisition by the Parent Trust of all of Reorganized THAN's assets and liabilities. After these transactions, subject to the discussion below, Reorganized THAN generally should be treated for federal income tax purposes as an entity that is disregarded as separate from the Parent Trust, unless Reorganized THAN files an election to be taxable as a corporation. For a discussion of the federal income tax consequences of THAN's transfer of Cash or other property to the Asbestos PI Trust, see Part B "Treatment of the Asbestos PI Trust and the Parent Trust" below.

**B.      Treatment of the Asbestos PI Trust and the Parent Trust.**

It is currently intended that the Asbestos PI Trust and the Parent Trust will each constitute a "qualified settlement fund" within the meaning of section 468B of the Internal Revenue Code and the Treasury regulations promulgated thereunder. The applicable Treasury regulations provide that to be treated as a qualified settlement fund, a fund, account, or trust must be (i) established pursuant to an order of, or be approved by, a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority, (ii) established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event or a related series of events that has occurred and that has given rise to at least one claim asserting, among other things, liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. 9601 *et seq.*, or liability arising out of, a tort, breach of contract or violation of law, and (iii) a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor. There is no authority directly addressing the qualification of an entity such as the Parent Trust as a qualified settlement fund, and THAN does not currently intend to seek a ruling from the IRS concerning the federal income tax treatment of the Parent Trust or any other aspects of the Plan. Accordingly, all holders of Claims and Equity Interests are urged to consult their own tax advisors regarding the federal income tax treatment of the Parent Trust.

A transferor generally is entitled to a current federal income tax deduction for all transfers of cash and other property (other than its own notes) to a qualified settlement fund to the same extent the transferor would have been entitled to a deduction if such amounts had been paid directly to the holder of a claim that will be discharged upon the establishment of the qualified settlement fund. Assuming the Asbestos PI Trust is treated as a qualified settlement fund, the Board of Directors of THAN intends to cause THAN to claim a current federal income tax deduction for transfers of Cash and other property (other than its own notes) to the Asbestos PI Trust to the same extent THAN would have been entitled to a deduction if such amounts had been paid directly to the holder of an Asbestos PI Claim. In connection therewith, THAN generally will not be entitled to a deduction to the extent that it funds the Asbestos PI Trust with Cash attributable to amounts not included in its income, including insurance

proceeds previously excluded from its income. If an insurance claim settles after THAN makes a Cash transfer to the Asbestos PI Trust with respect to such claim, and takes a deduction with respect to such transfer, then the insurance settlement amount generally will constitute income to the extent of the deduction. Because THAN currently is treated as a partnership for federal income tax purposes, PENAC and Remediation Services generally should be allocated their allocable shares of THAN's taxable income and deductions with respect to THAN's transfers to the Asbestos PI Trust that are treated as occurring before the cancellation of PENAC's and Remediation Services' membership interests in THAN and the issuance of one hundred percent (100%) of Reorganized THAN's membership interests to the Parent Trust under the Plan. The Board of Directors of THAN also understands that PENAC intends to (i) claim a current federal income tax deduction for its contributions to the Asbestos PI Trust, and (ii) treat the cancellation of PENAC's and Remediation Services' membership interests in THAN and the issuance of one hundred percent (100%) of Reorganized THAN's membership interests to the Parent Trust as the contribution by PENAC and Remediation Services of their THAN membership interests to the Parent Trust for federal income tax purposes and claim (and cause Remediation Services to claim) a current federal income tax deduction for such contribution to the Parent Trust, subject to compliance with the requirements of Treasury regulations section 1.468B-3.

Assuming the Asbestos PI Trust and the Parent Trust are treated as qualified settlement funds, the Asbestos PI Trust and the Parent Trust will each generally be subject to a separate entity level tax at the maximum rate applicable to trusts and estates, and, in determining the taxable income of the Asbestos PI Trust, (i) any amounts transferred by PENAC or THAN (or treated for federal income tax purposes as transferred by the Parent Trust after its acquisition of all of Reorganized THAN's membership interests) to the Asbestos PI Trust to resolve or satisfy a liability for which the Asbestos PI Trust is established generally will be excluded from the Asbestos PI Trust's income, (ii) any distributions received by the Asbestos PI Trust as a beneficiary of the Parent Trust, dividends, interest and payments received as compensation for delayed transfers generally will constitute taxable income to the Asbestos PI Trust, including amounts representing interest or compensation for delayed transfers under the Promissory Note, (iii) any sale, exchange or distribution of property by the Asbestos PI Trust generally will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the adjusted tax basis of the Asbestos PI Trust in such property, and (iv) administrative costs (including state and local taxes) incurred by the Asbestos PI Trust generally will be deductible.

In addition, the Board of Directors of THAN understands that the Parent Trust will (i) treat the acquisition of all of Reorganized THAN's membership interests by the Parent Trust as a transfer made to resolve or satisfy a liability for which the Parent Trust is established, and (ii) report the income of Reorganized THAN on the Parent Trust's federal income tax return. The federal income tax consequences to the Parent Trust of amounts payable by Reorganized THAN to the Asbestos PI Trust under the Promissory Note are unclear.

Assuming the Asbestos PI Trust and the Parent Trust are treated as qualified settlement funds, trade or business expenses treated as incurred by either entity generally will not be deductible for federal income tax purposes. In general, the adjusted tax basis of property received (or treated as received for federal income tax purposes) by a qualified settlement fund from a transferor pursuant to the Plan will be the fair market value of such property at the time of receipt.

## C.    Consequences to Holders of Asbestos PI Claims.

Each Asbestos PI Claim will be liquidated and satisfied in cash from the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures. The federal income tax treatment

of the receipt of payments from the Asbestos PI Trust by a holder of such an Asbestos PI Claim generally will depend upon the nature of the Asbestos PI Claim. Because the amounts received by a holder of an Asbestos PI Claim (other than an Indirect Asbestos PI Claim or an Asbestos PI Trust Expense) generally will be attributable to, and compensation for, such holder's personal physical injuries or sickness, within the meaning of section 104 of the Internal Revenue Code, any such amounts received by the holder generally should be nontaxable. However, to the extent payments from the Asbestos PI Trust to a holder of an Asbestos PI Claim are attributable to medical expense deductions allowed under section 213 of the Internal Revenue Code for a prior taxable year, such payments will be taxable as ordinary income to the recipient. To the extent that the payments from the Asbestos PI Trust to holders of Asbestos PI Claims constitute amounts received on account of claims other than personal injury or sickness, such payments generally will be includable in the gross income of such holders.

D.      **Information Reporting and Withholding.**

All distributions to holders of Asbestos PI Claims under the Plan are subject to any applicable information reporting and withholding. Under federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate. Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

# XV.

## Conclusion

THAN believes that the Plan is in the best interests of all of its creditors and equity holders and therefore urges the holders of Asbestos PI Claims in Class 4 and Intercompany Claims in Class 5 to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received by the Claims and Balloting Agent not later than 8:00 p.m.(Eastern Standard Time) on November 21, 2008.

Dated: October 10, 2008

Respectfully submitted,

T H Agriculture & Nutrition, L.L.C.

By: */s/ Steven A. Carlson*
    Name:  Steven A. Carlson
    Title:  Chief Restructuring Officer

**Exhibit A**

**to Disclosure Statement**

**THIS SOLICITATION IS BEING CONDUCTED, PRIOR TO THE FILING OF A VOLUNTARY PETITION UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, IN ORDER TO OBTAIN SUFFICIENT ACCEPTANCES OF A CHAPTER 11 PLAN OF REORGANIZATION TO ENABLE CONFIRMATION OF SUCH PLAN. BECAUSE NO CHAPTER 11 CASE HAS YET BEEN COMMENCED, THE DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING COMMENCEMENT OF ITS CHAPTER 11 CASE, T H AGRICULTURE & NUTRITION, L.L.C. EXPECTS TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THE DISCLOSURE STATEMENT AND THE SOLICITATION OF VOTES AND CONFIRMING THIS PREPACKAGED PLAN OF REORGANIZATION.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------------x

| | |
|---|---|
| **In re:** | **: Chapter 11** |
| **T H AGRICULTURE & NUTRITION, L.L.C.,** | **:** |
| | **: Case No. 08-_____ (_____)** |
| **Debtor.** | **:** |

---------------------------------------------------------------------------x

**PREPACKAGED PLAN OF REORGANIZATION OF T H AGRICULTURE &**
**NUTRITION, L.L.C. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Bruce R. Zirinsky
John H. Bae
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Dated: October 10, 2008

*This Plan of Reorganization provides for an "Asbestos PI Channeling Injunction" pursuant to section 524(g) of the Bankruptcy Code. For a description of the causes of action to be enjoined and the identities of the entities that would be subject to the injunction, see Article XI of this Plan.*

**TABLE OF CONTENTS**

Page

ARTICLE I      DEFINITIONS AND INTERPRETATIONS ...................................................................... 1

1.1     ACE .......................................................................................................................................... 1
1.2     Administrative Expense Claim ................................................................................................ 1
1.3     Affiliate .................................................................................................................................... 1
1.4     Allowed .................................................................................................................................... 2
1.5     Allowed Amount ...................................................................................................................... 2
1.6     Amended Certificate of Formation .......................................................................................... 2
1.7     Amended Charter Documents ................................................................................................... 2
1.8     Amended Limited Liability Agreement ................................................................................... 2
1.9     Asbestos Claimants Group ....................................................................................................... 2
1.10    Asbestos Insurance Action ....................................................................................................... 2
1.11    Asbestos Insurance Entity ........................................................................................................ 2
1.12    Asbestos PI Channeling Injunction .......................................................................................... 3
1.13    Asbestos PI Claim .................................................................................................................... 3
1.14    Asbestos PI Insurer Coverage Defense .................................................................................... 3
1.15    Asbestos PI Trust ..................................................................................................................... 3
1.16    Asbestos PI Trust Advisory Committee ................................................................................... 3
1.17    Asbestos PI Trust Agreement ................................................................................................... 3
1.18    Asbestos PI Trust Assets .......................................................................................................... 3
1.19    Asbestos PI Trust Bylaws ......................................................................................................... 3
1.20    Asbestos PI Trust Contributions .............................................................................................. 3
1.21    Asbestos PI Trust Distribution Procedures .............................................................................. 4
1.22    Asbestos PI Trust Documents ................................................................................................... 4
1.23    Asbestos PI Trust Expense ....................................................................................................... 4
1.24    Asbestos PI Trust Indemnification Agreement ........................................................................ 4
1.25    Asbestos PI Trustees ................................................................................................................ 4
1.26    Asbestos Property Damage Claim ............................................................................................ 4
1.27    Asbestos Protected Party .......................................................................................................... 4
1.28    Asbestos Records ...................................................................................................................... 5
1.29    Asbestos Records Cooperation Agreement .............................................................................. 5
1.30    Asbestos Records Party ............................................................................................................ 5
1.31    Avoidance Action ..................................................................................................................... 5
1.32    Ballot ........................................................................................................................................ 5
1.33    Bankruptcy Code ...................................................................................................................... 5
1.34    Bankruptcy Court ..................................................................................................................... 5
1.35    Bankruptcy Rules ..................................................................................................................... 5
1.36    Business Day ............................................................................................................................. 5
1.37    Cash .......................................................................................................................................... 5
1.38    Cause of Action ........................................................................................................................ 5
1.39    Chapter 11 Case ........................................................................................................................ 6
1.40    Claim ........................................................................................................................................ 6
1.41    Claims and Balloting Agent ..................................................................................................... 6
1.42    Claims Reviewer ...................................................................................................................... 6
1.43    Class ......................................................................................................................................... 6

| 1.44 | Commencement Date | 6 |
|------|-------------------|---|
| 1.45 | Confirmation Date | 6 |
| 1.46 | Confirmation Hearing | 6 |
| 1.47 | Confirmation Order | 6 |
| 1.48 | Control | 6 |
| 1.49 | Cure | 6 |
| 1.50 | Cure Notice | 6 |
| 1.51 | Debtor | 6 |
| 1.52 | Debtor in Possession | 7 |
| 1.53 | Demand | 7 |
| 1.54 | Derivative Liability Asbestos PI Claim | 7 |
| 1.55 | Derivative Liability Claim | 7 |
| 1.56 | DIP Agreement | 8 |
| 1.57 | DIP Claim | 8 |
| 1.58 | Disallowed | 8 |
| 1.59 | Disclosure Statement | 8 |
| 1.60 | Disputed Claim | 8 |
| 1.61 | Distribution Record Date | 8 |
| 1.62 | Distribution | 8 |
| 1.63 | District Court | 8 |
| 1.64 | Effective Date | 8 |
| 1.65 | Elementis | 8 |
| 1.66 | Encumbrance | 9 |
| 1.67 | Entity | 9 |
| 1.68 | Environmental Liability | 9 |
| 1.69 | Equity Interest | 9 |
| 1.70 | Estate | 9 |
| 1.71 | Executory Contract | 9 |
| 1.72 | Final Judgment or Final Order | 9 |
| 1.73 | Future Claimants' Representative | 9 |
| 1.74 | Future Claimants' Representative Group | 9 |
| 1.75 | Future Demand Holder | 10 |
| 1.76 | General Unsecured Claim | 10 |
| 1.77 | Impaired | 10 |
| 1.78 | Indirect Asbestos PI Claim | 10 |
| 1.79 | Insurance Settlement Agreement | 11 |
| 1.80 | Insurance Settlement Proceeds Trust | 11 |
| 1.81 | Insurance Settlement Proceeds Trust Agreement | 11 |
| 1.82 | Insurance Settlement Proceeds Trust Assets | 11 |
| 1.83 | Intercompany Claim | 11 |
| 1.84 | Known Environmental Liabilities | 11 |
| 1.85 | Lien | 11 |
| 1.86 | Parent Trust | 11 |
| 1.87 | Parent Trust Agreement | 11 |
| 1.88 | Parent Trust Documents | 11 |
| 1.89 | Parent Trustee | 11 |
| 1.90 | Payment Percentage | 11 |
| 1.91 | PENAC | 11 |
| 1.92 | PENAC Affiliate | 11 |
| 1.93 | PENAC Asbestos PI Trust Contribution | 12 |
| 1.94 | PENAC Asset | 12 |

1.95 PENAC Cash ..................................................................................................... 12
1.96 PENAC Contribution ......................................................................................... 12
1.97 PENAC Debtor Contribution .............................................................................. 12
1.98 PENAC Related Party ........................................................................................ 12
1.99 Plan ..................................................................................................................... 12
1.100 Plan Contributors ............................................................................................... 13
1.101 Plan Documents .................................................................................................. 13
1.102 Plan Supplement ................................................................................................. 13
1.103 Pledge Agreement .............................................................................................. 13
1.104 Post-Confirmation Settling Asbestos Insurance Entity ..................................... 13
1.105 Pre-Effective Date Claims Review ..................................................................... 13
1.106 Preliminary Injunction Order .............................................................................. 13
1.107 Priority Claim ..................................................................................................... 13
1.108 Priority Tax Claim .............................................................................................. 13
1.109 Products/Completed Operations Coverage ........................................................ 13
1.110 Professional ........................................................................................................ 13
1.111 Promissory Note ................................................................................................. 14
1.112 Proof of Claim .................................................................................................... 14
1.113 Qualified Asbestos PI Claim .............................................................................. 14
1.114 Rejection Claim ................................................................................................... 14
1.115 Released Party ..................................................................................................... 14
1.116 Remediation Services ......................................................................................... 14
1.117 Reorganized THAN ............................................................................................ 14
1.118 Representative ..................................................................................................... 14
1.119 Schedules ............................................................................................................ 14
1.120 Secured Claim ..................................................................................................... 14
1.121 Settling Asbestos Insurance Entity .................................................................... 14
1.122 Shared Asbestos Insurance Policy ..................................................................... 15
1.123 Solicitation Procedures Order ............................................................................ 15
1.124 THAN .................................................................................................................. 15
1.125 THAN Affiliate ................................................................................................... 15
1.126 THAN Asbestos PI Claim ................................................................................... 15
1.127 THAN Cash ......................................................................................................... 16
1.128 THAN Contribution ............................................................................................ 16
1.129 THAN Related Party ........................................................................................... 16
1.130 Unimpaired .......................................................................................................... 16
1.131 United States Trustee .......................................................................................... 16
1.132 Unknown Environmental Liabilities ................................................................... 16
1.133 Unknown Environmental Liability Insurance Policy .......................................... 16

ARTICLE II ADMINISTRATIVE EXPENSE, PRIORITY TAX AND DIP CLAIMS ...................... 16

2.1 Allowed Administrative Expense Claims ........................................................... 16
2.2 Priority Tax Claims ............................................................................................. 17
2.3 DIP Claim ........................................................................................................... 17

ARTICLE III CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................................. 18

3.1 Classification ....................................................................................................... 18

ARTICLE IV     TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS .................... 18

4.1     Class 1 – Priority Claims ........................................................................................ 18
4.2     Class 2 – Secured Claims......................................................................................... 18
4.3     Class 3 – Allowed General Unsecured Claims ....................................................... 19
4.4     Class 4 – Asbestos PI Claims.................................................................................. 19
4.5     Class 5 – Intercompany Claims .............................................................................. 20
4.6     Class 6 – Equity Interests........................................................................................ 20


ARTICLE V     ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF
                REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY
                INTERESTS ......................................................................................................... 20

5.1     Classes Entitled to Vote .......................................................................................... 20
5.2     Class Acceptance Requirement................................................................................ 20
5.3     Issuance of Injunction Pursuant to Section 524(g) of the Bankruptcy Code ................ 20
5.4     Acceptance by Unimpaired Classes ........................................................................ 20
5.5     Rejection by Impaired Class Receiving No Distribution ............................................... 21


ARTICLE VI     DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT
                 OF CLAIMS OTHER THAN ASBESTOS PI CLAIMS ................................ 21

6.1     Distributions............................................................................................................ 21
6.2     Date of Distributions ............................................................................................... 21
6.3     Postpetition Interest on Claims ............................................................................... 21
6.4     Means of Cash Payment........................................................................................... 21
6.5     Delivery of Distributions ........................................................................................ 21
6.6     Time Bar to Cash Payments..................................................................................... 21
6.7     Record Date for Holders of Claims ........................................................................ 22
6.8     Distributions after Effective Date ........................................................................... 22
6.9     Fractional Cents ...................................................................................................... 22
6.10    Setoff....................................................................................................................... 22


ARTICLE VII    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......... 22

7.1     General Treatment ................................................................................................... 22
7.2     Cure of Defaults...................................................................................................... 23
7.3     Bar to Rejection Damages ....................................................................................... 23


ARTICLE VIII   PROCEDURES FOR RESOLVING AND TREATING
                 DISPUTED CLAIMS OTHER THAN ASBESTOS PI CLAIMS .................................. 23

8.1     Disputed Claims....................................................................................................... 23
8.2     Objection to Claims ................................................................................................. 23
8.3     Payments and Distributions with Respect to Disputed Claims ................................... 24
8.4     Preservation of Insurance ........................................................................................ 24
8.5     Estimation of Claims................................................................................................ 24
8.6     Preservation of Rights to Settle Claims .................................................................. 24

ARTICLE IX    MEANS FOR IMPLEMENTATION OF THE PLAN.....................................................24

9.1     Generally.................................................................................................................24
9.2     Transactions on the Effective Date ........................................................................24
9.3     The Parent Trust......................................................................................................25
9.4     The Asbestos PI Trust.............................................................................................25
9.5     Environmental Liabilities........................................................................................27
9.6     PENAC Asset ..........................................................................................................28
9.7     Insurance Assignment .............................................................................................28
9.8     Amended Charter Documents..................................................................................28
9.9     Corporate Governance of Reorganized THAN........................................................28
9.10    Effectuating Documents; Further Transactions .......................................................28


ARTICLE X     EFFECT OF CONFIRMATION ..........................................................................29

10.1    Vesting of Reorganized THAN's Assets .................................................................29
10.2    Preservation of Certain Causes of Action; Defenses ..............................................29
10.3    Institution and Maintenance of Legal and Other Proceedings .................................30
10.4    Insurance Neutrality................................................................................................30
10.5    Terms of Injunction and Automatic Stay ................................................................30
10.6    No Liability for Certain Released Claims.................................................................30
10.7    Title to Asbestos PI Trust Assets ............................................................................31
10.8    Dissolution of Official Committees; Continuation of Future Claimants' Representative;
        Creation of the Asbestos PI Trust Advisory Committee ..........................................31


ARTICLE XI    RELEASES, INJUNCTIONS AND WAIVERS OF CLAIMS ........................32

11.1    Discharge ................................................................................................................32
11.2    Injunction ...............................................................................................................32
11.3    Exculpation .............................................................................................................32
11.4    Release of THAN's Officers and Directors .............................................................32
11.5    Asbestos PI Channeling Injunction.........................................................................33
11.6    Limitations of Injunctions.......................................................................................33
11.7    Releases and Indemnification by THAN..................................................................33
11.8    Indemnification and Reimbursement Obligations ...................................................33


ARTICLE XII   CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
        THE PLAN .....................................................................................................34

12.1    Conditions Precedent to Confirmation of the Plan ..................................................34
12.2    Effective Date of the Plan .......................................................................................39
12.3    Waiver of Conditions Precedent to the Confirmation Order ....................................39
12.4    Effect of Failure of the Effective Date of the Plan ..................................................39


ARTICLE XIII JURISDICTION OF BANKRUPTCY COURT................................................39

13.1    Retention of Jurisdiction.........................................................................................39
13.2    Modification of Plan ...............................................................................................41
13.3    Compromises of Controversies................................................................................42

13.4    Revocation or Withdrawal of the Plan ............................................................................. 42

ARTICLE XIV MISCELLANEOUS PROVISIONS ................................................................... 42

14.1    Governing Law .............................................................................................................. 42
14.2    Notices .......................................................................................................................... 42
14.3    Plan Supplement ........................................................................................................... 44
14.4    Inconsistencies .............................................................................................................. 44
14.5    Reservation of Rights .................................................................................................... 44
14.6    Tax Reporting and Compliance ..................................................................................... 44
14.7    Exemption from Transfer Taxes .................................................................................... 44
14.8    Binding Effect ............................................................................................................... 44
14.9    Severability ................................................................................................................... 45
14.10   Further Authorizations .................................................................................................. 45
14.11   Payment of Statutory Fees ............................................................................................ 45
14.12   Prepayment ................................................................................................................... 45
14.13   Effective Date Actions Simultaneous ........................................................................... 45
14.14   General Statements ....................................................................................................... 45

<u>**SCHEDULES**</u>

Schedule 1      PENAC Affiliates

Schedule 2      THAN Affiliates

Schedule 3      Elementis Affiliates

<u>**EXHIBITS**</u>

Exhibit A       Asbestos PI Trust Agreement

Exhibit B       Asbestos PI Trust Bylaws

Exhibit C       Asbestos PI Trust Distribution Procedures

Exhibit D       Promissory Note

Exhibit E       Pledge Agreement

Exhibit F       Schedule of Shared Asbestos Insurance Policies

Exhibit G       Schedule of Insurance Settlement Agreements and Settling Asbestos Insurance Entities

Exhibit H       Insurance Settlement Proceeds Trust Agreement

Exhibit I       Known Environmental Liabilities

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

In re:                                                    :    **Chapter 11**

**T H AGRICULTURE & NUTRITION, L.L.C.,**                  :    **Case No. 08-_____ (_____)**

                                    **Debtor.**           :

-------------------------------------------------------------------x

## PREPACKAGED PLAN OF REORGANIZATION OF T H AGRICULTURE & NUTRITION, L.L.C. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

T H Agriculture & Nutrition, L.L.C., the debtor, proposes the following plan of reorganization pursuant to section 1121(a) of title 11 of the United States Code:

## ARTICLE I

### DEFINITIONS AND INTERPRETATIONS

In the Plan, the definitions provided in this Article I shall apply. Unless otherwise specified, all Article, schedule or exhibit references in the Plan are to the respective Article of or schedule or exhibit to the Plan or the Plan Supplement, as the same may be amended or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular Article, subsection or clause. A term used but not defined herein shall have the meaning ascribed to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

**1.1**      **ACE** means ACE American Insurance Company.

**1.2**      **Administrative Expense Claim** means any right to payment constituting a cost or expense of administration of the Chapter 11 Case Allowed under sections 503(b), 507(a)(1), and 507(b) of the Bankruptcy Code, including, without limitation: (a) any actual and necessary costs and expenses of preserving THAN's Estate; (b) any actual and necessary costs and expenses of operating THAN's business; (c) any indebtedness or obligations incurred or assumed by THAN as Debtor in Possession during the Chapter 11 Case; and (d) any compensation for Professional services rendered and reimbursement of expenses incurred, to the extent Allowed by Final Order under section 330 or 503 of the Bankruptcy Code.

**1.3**      **Affiliate** means, with respect to a specified Entity: (a) an Entity that directly or indirectly owns, controls or holds with power to vote twenty percent (20%) or more of the outstanding voting securities of such specified Entity; (b) an Entity, twenty percent (20%) or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote by such specified Entity, or by an Entity described in subclause (a); or (c) any other Entity that, directly or indirectly, through one or more intermediaries or otherwise, Controls or is Controlled by, or is under common Control with the specified Entity; *provided*, *however*, that without limiting the generality of the

foregoing, with respect to an Affiliate of THAN or an Entity Affiliated with THAN, the term Affiliate shall include the meaning ascribed thereto in section 101(2) of the Bankruptcy Code.

1.4 **Allowed** means, when used with respect to any Claim against THAN, including Administrative Expense Claims but excluding Asbestos PI Claims, such Claim or portion thereof: (a) as to which no objection or request for estimation has been filed, no litigation has commenced, and THAN otherwise has assented to the validity thereof (and as to which proof of such Claim has been properly and timely filed to the extent required by the Plan or any order of the Bankruptcy Court); (b) as to which any objection or request for estimation that has been filed has been settled, waived, withdrawn or denied by a Final Order; or (c) that is allowed (i) pursuant to the terms of a Final Order, (ii) pursuant to the terms of an agreement by and among the holder(s) of such Claim and THAN (or Reorganized THAN, as the case may be), or (iii) under the terms of the Plan.

1.5 **Allowed Amount** means, with respect to any Claim (excluding Asbestos PI Claims), the lesser of: (a) the dollar amount of such Claim as Allowed; (b) the estimated amount of such Claim; and (c) the dollar amount agreed to by THAN. Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court or the District Court, the Allowed Amount of an Allowed Claim, except for the Allowed Amount of the DIP Claim, shall not include interest or penalties accruing on such Allowed Claim from and after the Commencement Date. In addition, unless a Final Order of the Bankruptcy Court provides otherwise, the Allowed Amount of an Allowed Claim shall not, for any purpose under the Plan, include interest at any default rate of interest.

1.6 **Amended Certificate of Formation** means the amended and restated certificate of formation of Reorganized THAN, substantially in the form as will be set forth in a Plan Supplement.

1.7 **Amended Charter Documents** means, collectively, the Amended Certificate of Formation and the Amended Limited Liability Agreement.

1.8 **Amended Limited Liability Agreement** means the amended and restated limited liability agreement of Reorganized THAN, substantially in the form as will be set forth in a Plan Supplement.

1.9 **Asbestos Claimants Group** means the group of law firms that represent certain current asbestos personal injury claimants, as constituted from time to time.

1.10 **Asbestos Insurance Action** means any Claim, Cause of Action, or right of THAN against any Asbestos Insurance Entity related to any Shared Asbestos Insurance Policy, any Insurance Settlement Agreement or any other settlement agreement with any Asbestos Insurance Entity, including but not limited to, any Claim, Cause of Action, or right arising from, under or related to: (a) any such Asbestos Insurance Entity's failure to provide coverage or pay amounts billed to it for Asbestos PI Claims, whether prior to or after the Commencement Date, under an Insurance Settlement Agreement; (b) the refusal of any Asbestos Insurance Entity to pay any obligations on, or compromise and settle, any Asbestos PI Claim under or pursuant to any Shared Asbestos Insurance Policy; or (c) the interpretation or enforcement of the terms of any Shared Asbestos Insurance Policy with respect to any Asbestos PI Claim.

1.11 **Asbestos Insurance Entity** means any Entity, including any insurance company, broker, or guaranty association, that has issued, or that has any actual or potential liabilities, duties or obligations under or with respect to, any Shared Asbestos Insurance Policy or any other insurance policy that provides coverage to THAN for Asbestos PI Claims.

**1.12** **Asbestos PI Channeling Injunction** means the injunction pursuant to section 524(g) of the Bankruptcy Code described more fully in Article 11.5 below.

**1.13** **Asbestos PI Claim** means each of the following: (a) a THAN Asbestos PI Claim; (b) a Derivative Liability Asbestos PI Claim; (c) an Indirect Asbestos PI Claim; (d) a Qualified Asbestos PI Claim and (e) an Asbestos PI Trust Expense. Asbestos PI Claim shall not include an Asbestos Property Damage Claim.

**1.14** **Asbestos PI Insurer Coverage Defense** means any defense at law or in equity that any Asbestos Insurance Entity may have under applicable non-bankruptcy law to providing insurance coverage for or on account of any Asbestos PI Claim that has been channeled to or has been or will be assumed or incurred by the Asbestos PI Trust pursuant to the Plan, except for any defense that has been released, waived, altered or otherwise resolved, in full or in part, in any Insurance Settlement Agreement, any other settlement agreement with such Asbestos Insurance Entity or by binding adjudication.

**1.15** **Asbestos PI Trust** means the asbestos personal injury trust that is to be established pursuant to section 524(g) of the Bankruptcy Code and in accordance with the Plan, the Confirmation Order and the Asbestos PI Trust Agreement, which trust shall be treated as a "qualified settlement fund" under section 468B of the Internal Revenue Code.

**1.16** **Asbestos PI Trust Advisory Committee** means the Asbestos PI Trust advisory committee established pursuant to the terms of the Plan and the Asbestos PI Trust Agreement.

**1.17** **Asbestos PI Trust Agreement** means the agreement, to be dated as of the Effective Date, by and among Reorganized THAN, the Asbestos PI Trustees, the Future Claimants' Representative and the Asbestos PI Trust Advisory Committee, governing the creation and terms of the Asbestos PI Trust, in substantially the form annexed hereto as Exhibit A and specifically including terms providing that during a period of five years following the Effective Date, except as otherwise authorized by prior written consent of each of the Asbestos PI Trustees, the Asbestos PI Trust Advisory Committee, the Future Claimants' Representative and PENAC, funds not immediately necessary for distribution to claimants shall be invested in money market funds (a) the managers of which are rated at least Aa3 or AA-, respectively, by Moody's Investor Services and Standard & Poor's; and (b) that invest exclusively in securities that (i) are issued by the United States Treasury or are directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof; (ii) have maturities of not more than three (3) years from the date of acquisition, and (iii) are rated Aaa and AAA, respectively, by Moody's Investor Services and Standard & Poor's; and, after such five-year period, such funds shall be managed in a manner to be determined by the Asbestos PI Trustees, the Asbestos PI Trust Advisory Committee, and the Future Claimants' Representative.

**1.18** **Asbestos PI Trust Assets** means, collectively: (a) the PENAC Asbestos PI Trust Contribution; (b) the THAN Contribution; and (c) all proceeds of the foregoing.

**1.19** **Asbestos PI Trust Bylaws** means the Asbestos PI Trust Bylaws, effective as of the Effective Date, substantially in the form annexed as Exhibit B, as such bylaws may be amended or modified from time to time in accordance with the terms of the Asbestos PI Trust Agreement.

**1.20** **Asbestos PI Trust Contributions** means, collectively, the THAN Contribution and the PENAC Asbestos PI Trust Contribution, which, together, shall not exceed $900 million as of the Effective Date; provided, however, that, should any element of the THAN Contribution or of the PENAC Asbestos PI Trust Contribution cause the Asbestos PI Trust Contributions to exceed $900 million as of the Effective Date, the excess amounts shall be returned to PENAC in Cash.

**1.21    Asbestos PI Trust Distribution Procedures** means the trust distribution procedures for the Asbestos PI Trust, in substantially the form annexed hereto as Exhibit C, and such additional procedures as subsequently may be adopted by the Asbestos PI Trust, which provide for the liquidation and satisfaction of Asbestos PI Claims.

**1.22    Asbestos PI Trust Documents** means, collectively: (a) the Asbestos PI Trust Agreement; (b) the Asbestos PI Trust Distribution Procedures; (c) the Asbestos PI Trust Bylaws; (d) the Asbestos PI Trust Indemnification Agreement; (e) the Asbestos Records Cooperation Agreement; and (f) the other agreements, instruments and documents governing the establishment and administration of the Asbestos PI Trust, as the same may be amended or modified from time to time, in accordance with the terms thereof.

**1.23    Asbestos PI Trust Expense** means any of the liabilities, costs, or expenses incurred by the Asbestos PI Trust (other than liabilities to holders of THAN Asbestos PI Claims, Derivative Liability Asbestos PI Claims, Indirect Asbestos PI Claims and Qualified Asbestos PI Claims in respect of Asbestos PI Claims), in carrying out the terms of the Asbestos PI Trust Agreement.

**1.24    Asbestos PI Trust Indemnification Agreement** means the Indemnification Agreement entered into by and among THAN or Reorganized THAN, as the case may be, PENAC, on behalf of itself and for the benefit of the other Protected Parties (as defined therein), and the Asbestos PI Trust, substantially in the form annexed as Exhibit B to the Asbestos PI Trust Agreement.

**1.25    Asbestos PI Trustees** means the individuals set forth in a Plan Supplement and appointed pursuant to the Confirmation Order to serve as the trustees for the Asbestos PI Trust in accordance with the terms of the Plan and the Asbestos PI Trust Agreement or any successors thereof.

**1.26    Asbestos Property Damage Claim** means any Claim, Demand, or allegation against, or any debt, liability, or obligation of, THAN or any other Asbestos Protected Party, whether now existing or hereafter arising, whether in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty for, arising out of, or resulting from, asbestos property damage, including the cost of inspecting, maintaining, encapsulating, repairing, decontaminating, removing, replacing or disposing of asbestos or asbestos-containing products in buildings, other structures or other property arising from the installation in, presence in or removal from buildings or other structures of asbestos or asbestos-containing products that was or were installed, manufactured, sold, supplied, produced, distributed, released or marketed by the Debtor prior to the Commencement Date, or for which the Debtor is allegedly liable, including any such Claims, remedies and liabilities for compensatory damages (such as proximate, consequential, general and special damages) and punitive damages, and any cross-claims, contribution claims, subrogation claims, reimbursement claims, indemnity claims, and other similar derivative Claims, Demands, or allegations against THAN.  Asbestos Property Damage Claims shall not include Asbestos PI Claims.

**1.27    Asbestos Protected Party** means each of the following:

(a)    any THAN Related Party;

(b)    any PENAC Related Party;

(c)    Elementis;

(d)    any Entity subject to an Indirect Asbestos PI Claim;

(e)     any Settling Asbestos Insurance Entity;

(f)     any Post-Confirmation Settling Asbestos Insurance Entity; and

(g)     any current or former Representative of any of the above.

**1.28     Asbestos Records** shall have the meaning ascribed to it in the Asbestos Records Cooperation Agreement.

**1.29     Asbestos Records Cooperation Agreement** means the cooperation agreement with respect to Asbestos Records entered into as of the Effective Date, substantially in the form as will be set forth in a Plan Supplement.

**1.30     Asbestos Records Party** means each Entity whose books and records, or any portion thereof, are Asbestos Records.

**1.31     Avoidance Action** means any avoidance or recovery action under any of sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, whether or not litigation has been commenced with respect to such cause of action as of the Effective Date.

**1.32     Ballot** means each of the ballots and/or master ballots distributed with the Disclosure Statement to holders of Impaired Claims against or Equity Interests in THAN on which ballot such holder of a Claim or Equity Interest may, among other things, vote to accept or reject the Plan.

**1.33     Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C.§§ 101 et seq., as in effect on the Commencement Date, together with all amendments, modifications and replacements of the foregoing, as the same may exist on any relevant date to the extent applicable to the Chapter 11 Case.

**1.34     Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Case.

**1.35     Bankruptcy Rules** means, collectively: (a) the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code; (b) the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Case or any proceedings therein; and (c) the local rules of the Bankruptcy Court, all as amended from time to time and applicable to the Chapter 11 Case.

**1.36     Business Day** means any day except: (a) Saturday; (b) Sunday; (c) any other day on which banking institutions in New York, New York are required or authorized to be closed by law or executive order; and (d) the Friday immediately after Thanksgiving.

**1.37     Cash** means legal tender of the United States of America.

**1.38     Cause of Action** means any action, including any cause of action, liability, obligation, account, controversy, right to legal remedy, right to equitable remedy, right to payment, suit, debt, sum of money, damage, judgment, Claim or Demand whatsoever, whether known or unknown, now or in the future, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, whether asserted or assertable directly or derivatively, in law, equity or otherwise, which may be brought by or on behalf of THAN and/or the

Estate, arising under any provision of the Bankruptcy Code or other applicable law or regulation or similar governmental pronouncement.

**1.39**    **Chapter 11 Case** means THAN's case under chapter 11 of the Bankruptcy Code, captioned *In re T H Agriculture & Nutrition, L.L.C.*, Case No. 0_-____ (____), to be commenced in the Bankruptcy Court.

**1.40**    **Claim** means: (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such right gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**1.41**    **Claims and Balloting Agent** means the claims, noticing and balloting agent in the Chapter 11 Case, Kurtzman Carson Consultants LLC.

**1.42**    **Claims Reviewer** means Verus Claims Services, LLC.

**1.43**    **Class** means a category of holders of Claims or Equity Interests described in Article IV below.

**1.44**    **Commencement Date** means the date on which a petition is filed by THAN pursuant to section 301 of the Bankruptcy Code to commence the Chapter 11 Case.

**1.45**    **Confirmation Date** means the date on which the Confirmation Order is entered by the District Court or the Bankruptcy Court, as applicable, with respect to the Chapter 11 Case.

**1.46**    **Confirmation Hearing** means the hearing to be held by the Bankruptcy Court and/or District Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.47**    **Confirmation Order** means, as the context requires, the order or orders of the District Court confirming the Plan under section 1129 of the Bankruptcy Code or affirming an order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code, which shall contain, among other things, the Asbestos PI Channeling Injunction.

**1.48**    **Control** means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies, or activities of an Entity, whether through ownership of voting securities, by contract, or otherwise.

**1.49**    **Cure** means the payment of Cash by THAN, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to: (a) cure a default by THAN under an Executory Contract; and (b) permit THAN to assume such Executory Contract under section 365 of the Bankruptcy Code.

**1.50**    **Cure Notice** means the pleading that the Reorganized Debtor shall file and serve within thirty (30) days after the Effective Date listing the amount of the proposed Cure for each assumed, or assumed and assigned, Executory Contract.

**1.51**    **Debtor** means T H Agriculture & Nutrition, L.L.C. in the Chapter 11 Case.

1.52    **Debtor in Possession** means T H Agriculture & Nutrition, L.L.C., as debtor in possession in the Chapter 11 Case pursuant to section 1101(1) of the Bankruptcy Code.

1.53    **Demand** means any demand for payment, present or future, within the meaning of section 524(g)(5) of the Bankruptcy Code, that: (a) was not a Claim during the Chapter 11 Case; (b) arises out of the same or similar conduct or events that gave rise to the Asbestos PI Claims; and (c) pursuant to the Plan, is to be paid by the Asbestos PI Trust.

1.54    **Derivative Liability Asbestos PI Claim** means any claim based upon a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, fraudulent transfer, or conspiracy, upon which a PENAC Related Party or Elementis is liable, or is allegedly liable, arising out of, resulting from, or relating to directly or indirectly, death, bodily injury, sickness, disease, or other personal injury, physical, emotional or otherwise, to persons, caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, asbestos or asbestos-containing products, to the extent arising, directly or indirectly, from acts, omissions, business, or operations of THAN (including the acts, omissions, business, or operations of any other Entity for whose product or operations THAN has liability, to the extent of THAN's liability for such acts, omissions, business, or operations) (including any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of THAN or any other Entity for whose products or operations THAN has liability or is alleged to have liability, or any conduct for which THAN, or any other Entity for whose products or operations THAN has liability or is alleged to have liability, may be deemed to have strict liability under any applicable law) including all related claims, debts, obligations, or liabilities for compensatory damages (such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages).  For purposes of this definition, "veil piercing, alter ego, successor liability, fraudulent transfer, or conspiracy" claims shall include, but not be limited to, fraudulent transfer or fraudulent conveyance claims under applicable state or federal law, denuding the corporation claims, single business enterprise claims, claims that THAN was the predecessor, mere instrumentality, agent or alter ego of a PENAC Related Party or of Elementis, trust fund claims, claims that a PENAC Related Party or Elementis conspired with THAN, and any causes of action against a PENAC Related Party or Elementis that belong to the Debtor or Debtor in Possession, whether or not included in the foregoing list, including any such claim or cause of action against an Entity entitled to protection under section 524(g)(4)(A)(ii).

1.55    **Derivative Liability Claim** means any claim, other than a Derivative Liability Asbestos PI Claim, whether in existence or arising now or in the future, based upon a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, fraudulent transfer, or conspiracy, upon which a PENAC Related Party or Elementis is liable, or is allegedly liable, arising out of, resulting from, or relating to directly or indirectly, death, bodily injury, sickness, disease, or other personal injury, physical, emotional or otherwise, to persons, caused, or allegedly caused, directly or indirectly, by acts, omissions, business, operations, or products of THAN (including the acts, omissions, business, or operations of any other Entity for whose product or operations THAN has actual or alleged liability, to the extent of THAN's actual or alleged liability for such acts, omissions, business, or operations, and any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of THAN or any other Entity for whose products or operations THAN has liability or is alleged to have liability, or any conduct for which THAN, or any other Entity for whose products or operations THAN has liability or is alleged to have liability, may be deemed to have strict liability under any applicable law) and all related claims, debts, obligations, or liabilities for compensatory damages (such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages).  For purposes of this definition, "veil piercing, alter ego, successor liability, fraudulent transfer, or conspiracy" claims shall include, but not be limited to, (a) fraudulent transfer or fraudulent conveyance claims under

applicable state or federal law, (b) denuding the corporation claims, (c) continuation of business enterprise claims, (d) single business enterprise claims, (e) claims that THAN was the predecessor, (f) mere instrumentality, agent or alter ego of a PENAC Related Party or of Elementis, (g) trust fund claims, (h) claims that a PENAC Related Party or Elementis conspired with THAN, and (i) any causes of action against a PENAC Related Party or Elementis that belong to the Debtor or Debtor in Possession, whether or not included in the foregoing list.

1.56 **DIP Agreement** means the credit agreement to be entered into after the Commencement Date by and between THAN and PENAC, as may be modified or amended by the parties or order of the Bankruptcy Court.

1.57 **DIP Claim** means any claim of PENAC or any other lender arising out of the DIP Agreement.

1.58 **Disallowed** means, when used with respect to a Claim against THAN, other than an Asbestos PI Claim, a Claim that: (a) is disallowed in whole or in part (but solely to the extent of such disallowance) by an order of the Bankruptcy Court or other court of competent jurisdiction; or (b) has been withdrawn, in whole or in part, by the holder thereof.

1.59 **Disclosure Statement** means the written disclosure statement that relates to the Plan, including the exhibits and schedules thereto, as approved by the Bankruptcy Court after the Commencement Date as containing adequate information pursuant to section 1125 of the Bankruptcy Code and Rule 3017 of the Bankruptcy Rules, as such disclosure statement may be amended, modified, or supplemented from time to time.

1.60 **Disputed Claim** means a Claim against THAN, other than an Asbestos PI Claim, or any portion thereof, that is neither Allowed nor Disallowed or is contingent, disputed or unliquidated.

1.61 **Distribution Record Date** means the record date for determining an entitlement to receive Distributions under the Plan on account of Allowed Claims, which shall be the Confirmation Date.

1.62 **Distribution** means any: (a) Cash; (b) property; or (c) interest in property to be paid or distributed hereunder to the holders of Allowed Claims or Equity Interests, not including the Asbestos PI Claims.

1.63 **District Court** means the United States District Court for the Southern District of New York.

1.64 **Effective Date** means the date that is thirty-five (35) days after the date that the Confirmation Order, containing the Asbestos PI Channeling Injunction, shall have been either entered by the Bankruptcy Court and accepted and affirmed by the District Court or issued by the District Court, on which date the PENAC Asbestos PI Trust Contribution and THAN Contribution shall be made to the Asbestos PI Trust and the Asbestos PI Trust shall begin to pay Asbestos PI Claims, including the Qualified Asbestos PI Claims.

1.65 **Elementis** means Elementis Group B.V., and its predecessors and Affiliates, as set forth on Schedule 3 attached hereto, as may be amended at any time prior to the Effective Date with the consent of Elementis, PENAC, the Asbestos Claimants Group, and the Future Claimants' Representative, with such consent not to be unreasonably withheld.

**1.66** **Encumbrance** means, with respect to any property (whether real or personal, or tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

**1.67** **Entity** means any person or organization created by law, including, without limitation, any individual, company, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof.

**1.68** **Environmental Liability** means any liability of THAN or Reorganized THAN (contingent or otherwise, arising under statute or common law, at law or in equity, and including liability for response costs or natural resource damages, fines or penalties) or any investigatory, remedial, or corrective obligation arising under any applicable federal, state, local or foreign statute, or regulation or similar requirement having the force and effect of law, or judicial or administrative order or determination, or common law, concerning public health or safety, workplace health and safety, or pollution or protection of the environment (including all those pertaining to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, polychlorinated biphenyls, noise or radiation).

**1.69** **Equity Interest** means any right, title and interest of PENAC or Remediation Services in THAN.

**1.70** **Estate** means the estate created under section 541 of the Bankruptcy Code in the Chapter 11 Case.

**1.71** **Executory Contract** means any unexpired lease or executory contract of THAN that is subject to treatment under section 365 of the Bankruptcy Code.

**1.72** **Final Judgment** or **Final Order** means a judgment or an order, as the case may be, as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; provided, however, that if an appeal, writ of certiorari, reargument or rehearing thereof has been filed or sought: (a)(i) such judgment or order shall have been affirmed by the highest court to which such judgment or order was appealed; or (ii) certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; or (b) such appeal, writ of certiorari, or request for reargument or rehearing shall have been dismissed with prejudice by the filing or seeking party.

**1.73** **Future Claimants' Representative** means Professor Samuel Issacharoff (or any court-appointed alternative or successor), in his capacity as the court-appointed legal representative for all Future Demand Holders pursuant to section 524(g) of the Bankruptcy Code for the purpose of protecting their interests.

**1.74** **Future Claimants' Representative Group** means the Future Claimants' Representative and all of his Representatives, including, but not limited to, Stutzman, Bromberg,

Esserman & Plifka, A Professional Corporation, Brune & Richard LLP, The Claro Group, LLC, Duff & Phelps LLC, and Hamilton, Rabinovitz & Alschuler, Inc.

**1.75** **Future Demand Holder** means a holder of a Demand, whether now known or hereafter discovered.

**1.76** **General Unsecured Claim** means a Claim, including an Asbestos Property Damage Claim, against THAN that is not secured by a valid and enforceable Lien against property of THAN and that is not an Administrative Expense Claim, a Priority Claim, a DIP Claim, a Priority Tax Claim, an Intercompany Claim or an Asbestos PI Claim.

**1.77** **Impaired** means, when used with respect to a Claim or an Equity Interest, a Claim or Equity Interest as to which the Plan: (a) alters the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) does not cure any such default that occurred before or after the Commencement Date, (ii) does not reinstate the maturity of such claim or interest as such maturity existed before such default; (iii) does not compensate the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), does not compensate the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; or (v) otherwise alters the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

**1.78** **Indirect Asbestos PI Claim** means those cross-claims, contribution claims, subrogation claims, reimbursement claims, indemnity claims, and other similar derivative Claims, Demands, or allegations against THAN, whether or not any such Claim, Demand, debt, liability or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether or not the facts of or legal bases therefore are known or unknown, and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement, or indemnity, or any other theory of law, equity, or admiralty for, arising out of, resulting from, or relating to directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, asbestos – including asbestos-containing products, equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any way used by THAN or any Entity for whose products or operations THAN has liability or is alleged to have liability – to the extent arising, directly or indirectly from acts, omissions, business or operations of THAN (including the acts, omissions, business or operations of any other Entity for whose products or operations THAN has liability, to the extent of THAN's liability for such acts, omissions, business, or operations) (including any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of THAN or any other Entity for whose products or operations THAN has liability or is alleged to have liability or any conduct for which THAN, or any other Entity for whose products or operations THAN has liability or is alleged to have liability, may be deemed to have strict liability under any applicable law) including claims, debts, obligations, or liabilities for compensatory damages (such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages).

**1.79    Insurance Settlement Agreement** means any of the agreements listed on the annexed Exhibit G, as such exhibit may be amended, supplemented, or otherwise modified by THAN from time to time prior to the Confirmation Date.

**1.80    Insurance Settlement Proceeds Trust** means the THAN/PENAC Joint Insurance Settlement Proceeds Trust established by THAN and PENAC pursuant to the Insurance Settlement Proceeds Trust Agreement.

**1.81    Insurance Settlement Proceeds Trust Agreement** means the THAN/PENAC Joint Insurance Settlement Proceeds Trust Agreement, dated as of March 7, 2008, by and among THAN, PENAC, and Citibank, N.A., as trustee, a copy of which is annexed as Exhibit H to the Plan.

**1.82    Insurance Settlement Proceeds Trust Assets** means the Cash remaining in the Insurance Settlement Proceeds Trust as of the Effective Date.

**1.83    Intercompany Claim** means any general unsecured Claim held by an Affiliate of THAN against THAN or by THAN against an Affiliate of THAN.

**1.84    Known Environmental Liabilities** means solely those Environmental Liabilities listed on Exhibit I to the Plan, existing at or related to the sites identified on such exhibit, and not including any other Environmental Liabilities (even if existing at or related to such sites).

**1.85    Lien** means any charge against or interest in property to secure payment of a debt or performance of an obligation.

**1.86    Parent Trust** means the trust to be established in accordance with the Plan, the Confirmation Order and the Parent Trust Agreement.

**1.87    Parent Trust Agreement** means the agreement, to be dated as of the Effective Date, governing the creation and terms of the Parent Trust, by and among Reorganized THAN and the Parent Trust, in substantially the form as will be set forth in a Plan Supplement.

**1.88    Parent Trust Documents** means, collectively, the Parent Trust Agreement and the other agreements, instruments and documents governing the establishment and administration of the Parent Trust, as the same may be amended or modified from time to time, in accordance with the terms thereof.

**1.89    Parent Trustee** means the individual set forth in a Plan Supplement and appointed pursuant to the Confirmation Order to serve as the trustee for the Parent Trust in accordance with the terms of the Plan and the Parent Trust Agreement or any successor thereof.

**1.90    Payment Percentage** means the percentage of the liquidated value that holders of Asbestos PI Claims will be entitled to receive from the Asbestos PI Trust pursuant to the Asbestos PI Trust Distribution Procedures.

**1.91    PENAC** means Philips Electronics North America Corporation, a Delaware corporation.

**1.92    PENAC Affiliate** means each of the Entities listed on Schedule 1 hereto, as may be amended at any time prior to the Effective Date with the consent of PENAC, the Asbestos Claimants Group, and the Future Claimants' Representative, with such consent not to be unreasonably withheld.

**1.93    PENAC Asbestos PI Trust Contribution** means, collectively, the contributions by PENAC, on behalf of itself and the other PENAC Related Parties, to the Asbestos PI Trust, including the following:

(a)    the PENAC Cash;

(b)    residual Cash as of the Effective Date, if any, whether (i) drawn under the DIP Agreement and not used by THAN or (ii) remaining under any pre-Commencement Date advance made to THAN by PENAC, to the extent such residual Cash will not be necessary for distributions under the Plan on account of Allowed General Unsecured Claims; and

(c)    with THAN, the Insurance Settlement Proceeds Trust Assets;

provided, however, that the sum of (a) the PENAC Cash; (b) the residual Cash as of the Effective Date, if any, whether (i) drawn under the DIP Agreement and not used by THAN or (ii) remaining under any pre-Commencement Date advance made to THAN by PENAC, to the extent such residual Cash will not be necessary for distributions under the Plan on account of Allowed General Unsecured Claims; (c) the Insurance Settlement Proceeds Trust Assets; and (d) the THAN Contribution, shall not exceed $900 million as of the Effective Date; and if the total amount of the Asbestos PI Trust Contributions is greater than $900 million as of the Effective Date, the excess shall be returned to PENAC in Cash.

**1.94    PENAC Asset** means a certain revenue-generating real property that is to be contributed to Reorganized THAN on the Effective Date.

**1.95    PENAC Cash** means the contribution of Cash by PENAC to the Asbestos PI Trust on the Effective Date in an amount such that the Asbestos PI Trust Contributions shall equal $900 million as of the Effective Date.

**1.96    PENAC Contribution** means, collectively, the PENAC Asbestos PI Trust Contribution and the PENAC Debtor Contribution.

**1.97    PENAC Debtor Contribution** means: (a) the agreement by PENAC, on behalf of itself and the other PENAC Related Parties, to assume the Known Environmental Liabilities of THAN and Reorganized THAN; (b) the PENAC Asset; (c) the forgiveness of any amounts THAN may have drawn and used from the DIP Agreement and release of any and all Liens, Claims, Encumbrances and any other interests of PENAC on THAN's or Reorganized THAN's assets that served as security for the DIP Agreement; (d) costs, if any, associated with providing insurance coverage for Reorganized THAN under the Unknown Environmental Liability Insurance Policy; (e) the contribution of a one-time Cash payment in the amount of $1,000,000 by PENAC to Reorganized THAN on the Effective Date; and (f) the assumption by PENAC of any and all obligations with respect to retiree benefits owed to former employees of THAN and employees of THAN as of the Effective Date.

**1.98    PENAC Related Party** means: (a) PENAC; (b) any PENAC Affiliate; (c) any predecessor in interest to PENAC or a PENAC Affiliate; and (d) any Entity that owned or owns a financial interest in PENAC, a PENAC Affiliate or their predecessors.

**1.99    Plan** means this plan of reorganization of THAN under chapter 11 of the Bankruptcy Code, including any supplements, schedules and exhibits hereto, either in its present form or as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof.

**1.100    Plan Contributors** means, collectively, (a) PENAC, on behalf of itself and the other PENAC Related Parties, and (b) THAN.

**1.101    Plan Documents** means, collectively, (a) the Disclosure Statement, (b) the Asbestos PI Trust Agreement, (c) the Asbestos PI Trust Indemnification Agreement and the other Asbestos PI Trust Documents, (d) the Asbestos PI Trust Distribution Procedures, (e) the Parent Trust Agreement and the other Parent Trust Documents, (f) the Promissory Note, (g) the Pledge Agreement, (h) any document contained in the Plan Supplement, (i) all of the exhibits and schedules attached to any of the foregoing, and (j) any other document necessary to implement the Plan.

**1.102    Plan Supplement** means the compilation of documents or forms of documents specified in the Plan, including, but not limited to, the documents specified in Article 14.3 below and any exhibits to the Plan not included herewith, each in form and substance acceptable to THAN and PENAC, which THAN shall file with the Bankruptcy Court on or before the date that is five (5) Business Days prior to the deadline for the filing and service of objections to the Plan, all of which are incorporated herein by reference.

**1.103    Pledge Agreement** means the pledge agreement substantially in the form attached as Exhibit E to the Plan, entered into as of the Effective Date between the Parent Trust, Reorganized THAN, and the Asbestos PI Trust to memorialize and effectuate the granting of the security interest in 100% of the outstanding membership interests of Reorganized THAN to the Asbestos PI Trust.

**1.104    Post-Confirmation Settling Asbestos Insurance Entity** means any Asbestos Insurance Entity that enters into an insurance settlement agreement after the Confirmation Date that Reorganized THAN determines, in its sole and absolute discretion, in writing, is sufficiently comprehensive to warrant that such Asbestos Insurance Entity receive the protections provided under section 524(g) of the Bankruptcy Code.

**1.105    Pre-Effective Date Claims Review** means the process pursuant to which the Claims Reviewer reviewed and approved Asbestos PI Claims prior to the Effective Date.

**1.106    Preliminary Injunction Order** means an order granting an injunction pursuant to sections 105(a) and 362(a) of the Bankruptcy Code and Rule 7065 of the Bankruptcy Rules enjoining all asbestos-related Derivative Liability Asbestos PI Claims against a PENAC Related Party or Elementis.

**1.107    Priority Claim** means any Claim entitled to priority pursuant to section 507 of the Bankruptcy Code other than an Administrative Expense Claim, DIP Claim, or a Priority Tax Claim.

**1.108    Priority Tax Claim** means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.109    Products/Completed Operations Coverage** means the provisions of an insurance policy relating to coverage with respect to the "products hazard," the "completed operations hazard" and/or "products-completed operations liability," as well as any other coverages that, in words or in substance, are comparable as set forth in such insurance policy and/or the underlying insurance policies to which such insurance policy either follows form or from which terms, conditions and exclusions are incorporated by such insurance policy.

**1.110    Professional** means any person retained or to be compensated pursuant to section 327, 328, 330, 503(b), 506(b), 524(g) or 1103 of the Bankruptcy Code, including the Future Claimants' Representative  and any Entity retained thereby.

**1.111  Promissory Note** means the promissory note, secured by all of Reorganized THAN's membership interests, to be entered into as of the Effective Date between Reorganized THAN and the Asbestos PI Trust, in substantially the form annexed hereto as Exhibit D, for the payment of a principal amount of $1,000,000, with interest, in equal quarterly installments, and the other agreements, instruments or documents relating thereto, including any such memorializing or effecting the security therefor.

**1.112  Proof of Claim** means any proof of claim or interest filed with the Bankruptcy Court or the Claims and Balloting Agent pursuant to Bankruptcy Code section 501 and Rule 3001 or 3002 of the Bankruptcy Rules that asserts a Claim against or Equity Interest in THAN.

**1.113  Qualified Asbestos PI Claim** means an Asbestos PI Claim approved by the Claims Reviewer in the Pre-Effective Date Claims Review process. Prior to the Effective Date, THAN will maintain a list of Qualified Asbestos PI Claims, and on the Effective Date shall transfer such list to the Asbestos PI Trust once such Asbestos PI Trust is established.

**1.114  Rejection Claim** means any Claim for damages under section 502(g) of the Bankruptcy Code resulting from the rejection of an executory contract or unexpired lease by THAN or Reorganized THAN.

**1.115  Released Party** means each of the following: (a) the Asbestos Claimants Group; (b) THAN; (c) Reorganized THAN; (d) the Future Claimants' Representative Group; (e) the Asbestos Protected Parties; or (f) any current or former Representative of the foregoing.

**1.116  Remediation Services** means Remediation Services, Inc., a holder of Equity Interests in THAN.

**1.117  Reorganized THAN** means THAN, or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date.

**1.118  Representative** means, with respect to any specified Entity, any current or former officer, director, employee, agent, attorney, accountant, financial advisor, other representative or any person who controls any of these within the meaning of the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended.

**1.119  Schedules** means, unless such requirement is waived by the Bankruptcy Court, the schedules of assets and liabilities and the statements of financial affairs of THAN as filed with the Bankruptcy Court by THAN after commencement of the Chapter 11 Case in accordance with section 521 of the Bankruptcy Code, as such schedules and statements may be amended or supplemented from time to time.

**1.120  Secured Claim** means a Claim that is: (a) secured by a valid, duly perfected, non-avoidable security interest in the interest of THAN in property, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such Claimholder's interest in THAN's interest in such property, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or as otherwise agreed in writing by THAN and the Claimholder; or (b) secured by the amount of any valid, non-avoidable rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

**1.121  Settling Asbestos Insurance Entity** means any Asbestos Insurance Entity that has entered into an Insurance Settlement Agreement prior to the Confirmation Date if: (a) such Insurance

Settlement Agreement provides that (i) THAN and/or PENAC agreed to seek the protections under section 524(g) of the Bankruptcy Code for such Asbestos Insurance Entity or (ii) THAN and/or PENAC agreed to indemnify such Asbestos Insurance Entity with respect to any Asbestos PI Claim that may be channeled to the Asbestos PI Trust; (b) the proceeds of such Insurance Settlement Agreement are included in the THAN Contribution and the PENAC Asbestos PI Trust Contribution to be contributed to the Asbestos PI Trust on the Effective Date; and (c) such Insurance Settlement Agreement is sufficiently comprehensive to warrant that such Asbestos Insurance Entity receive treatment under section 524(g) of the Bankruptcy Code. THAN shall recommend to the Bankruptcy Court that any such Asbestos Insurance Entity should be entitled to treatment under section 524(g) of the Bankruptcy Code, solely with respect to the policy or policies that are the subject of the Insurance Settlement Agreement, by identifying such Asbestos Insurance Entity as a Settling Asbestos Insurance Entity and setting forth the corresponding policies on Exhibit G to the Plan, as such exhibit may be amended by THAN from time to time prior to the Confirmation Date. Nothing herein, however, shall prevent any Asbestos Insurance Entity that enters into an Insurance Settlement Agreement prior to the Confirmation Date, after first seeking THAN's recommendation prior to the Confirmation Date, from petitioning the Bankruptcy Court for treatment under section 524(g) of the Bankruptcy Code and the Plan as a Settling Asbestos Insurance Entity.

**1.122   Shared Asbestos Insurance Policy** means any of the general liability policies listed on Exhibit F to the Plan, as such exhibit may be amended by THAN from time to time prior to the Effective Date.

**1.123   Solicitation Procedures Order** means the portion of the Confirmation Order, which, among other things, approves the prepetition procedures employed by THAN for soliciting and tabulating the votes to accept or reject the Plan cast by holders of Impaired Claims against THAN.

**1.124   THAN** means T H Agriculture & Nutrition, L.L.C., a Delaware limited liability company, debtor and debtor in possession, and its predecessors.

**1.125   THAN Affiliate** means each of the Entities listed on Schedule 2 hereto, as may be amended from time to time prior to the Effective Date with the consent of PENAC, the Asbestos Claimants Group, and the Future Claimants' Representative, with such consent not to be unreasonably withheld.

**1.126   THAN Asbestos PI Claim** means any Claim, Demand, or allegation or portion thereof against, or any debt, liability, or obligation of, THAN or any other Asbestos Protected Party, whether now existing or hereafter arising, whether in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty for, arising out of, resulting from, or relating to directly or indirectly, death, bodily injury, sickness, disease, or any other actual or alleged personal injury, physical, emotional or otherwise, to persons, caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to asbestos—including, without limitation, asbestos-containing products, equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any other way used by THAN or any other Entity for whose products or operations THAN has liability or is alleged to have liability – to the extent arising, directly or indirectly, from acts, omissions, business, or operations of THAN (including the acts, omissions, business, or operations of any other Entity for whose products or operations THAN has liability, to the extent of THAN's liability for such acts, omissions, business, or operations) (including any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of THAN or any other Entity for whose products or operations THAN has liability or is alleged to have liability, or any conduct for which THAN, or any other Entity for whose

products or operations THAN has liability or is alleged to have liability, may be deemed to have strict liability under any applicable law) including all related claims, debts, obligations, or liabilities for compensatory damages (such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages). Notwithstanding the foregoing, a Claim, Demand, allegation, debt, liability or obligation shall only be a THAN Asbestos PI Claim to the extent of THAN's liability for that Claim, Demand, allegation, debt, liability or obligation.

      **1.127**    **THAN Cash** means the contribution of Cash by THAN to the Asbestos PI Trust on the Effective Date in an amount such that the Asbestos PI Trust Contributions shall equal $900 million as of the Effective Date.

      **1.128**    **THAN Contribution** means, collectively, contributions by and on behalf of THAN or Reorganized THAN, as the case may be, to the Asbestos PI Trust, on account of Asbestos PI Claims, including the following:

      (a)      THAN Cash; and

      (b)      with PENAC, the Insurance Settlement Proceeds Trust Assets,

all of which, together with the PENAC Asbestos PI Trust Contribution, shall not exceed $900 million as of the Effective Date; provided, however, that, should any element hereof or of the PENAC Asbestos PI Trust Contribution cause the Asbestos PI Trust Contributions to exceed $900 million as of the Effective Date, the excess amounts shall be returned to PENAC in Cash.

      **1.129**    **THAN Related Party** means: (a) THAN or Reorganized THAN; (b) any THAN Affiliate; (c) any predecessor in interest to THAN, Reorganized THAN or a THAN Affiliate; and (d) any Entity that owned or owns a financial interest in THAN, Reorganized THAN, a THAN Affiliate or the predecessors in interest of each.

      **1.130**    **Unimpaired** means a Claim or Equity Interest, or a Class of Claims or Equity Interests, as appropriate, that is not Impaired under the Plan.

      **1.131**    **United States Trustee** means the United States Trustee appointed under section 591 of title 28 of the United States Code to serve in the Southern District of New York.

      **1.132**    **Unknown Environmental Liabilities** means all Environmental Liabilities that are not Known Environmental Liabilities.

      **1.133**    **Unknown Environmental Liability Insurance Policy** means the insurance policy entered into between THAN and ACE American Insurance Company dated as of September 1, 2008 covering Unknown Environmental Liabilities.

## ARTICLE II

## ADMINISTRATIVE EXPENSE, PRIORITY TAX AND DIP CLAIMS

      **2.1**    **Allowed Administrative Expense Claims.** Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise provided for in the Plan, in full satisfaction, settlement and discharge of and in exchange for such Claims, THAN or Reorganized THAN shall pay each Allowed Administrative Expense Claim in full and in Cash on, or as

soon thereafter as is reasonably practicable, the latest of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date the Administrative Expense Claim becomes an Allowed Administrative Expense Claim; and (c) the date the Allowed Administrative Expense Claim becomes due and payable according to its terms; provided, however, that the Allowed Administrative Expense Claims representing liabilities incurred by the Debtor in Possession in the ordinary course of business or liabilities under loans or advances to or other obligations incurred by the Debtor in Possession may be paid by THAN in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Reorganized THAN, in its sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval. THAN or Reorganized THAN shall have the right to object to any Administrative Expense Claim by the later of: (a) 180 days after the Effective Date, subject to such extensions as may be granted from time to time by the Bankruptcy Court; and (b) 30 days after the date such Administrative Expense Claim is filed. Unless THAN or Reorganized THAN objects to an Administrative Expense Claim, such Claim shall be deemed allowed in the amount requested. In the event that THAN or Reorganized THAN timely objects to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330 or 503 of the Bankruptcy Code shall (a) file, on or before the deadline specified in the Confirmation Order, their respective applications for final allowance of compensation for services rendered and reimbursement of expenses incurred; and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; or (ii) upon such other terms as may be mutually agreed upon by such holder and Reorganized THAN. Reorganized THAN is authorized to pay compensation for Professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course of business and without the need for Bankruptcy Court approval.

**2.2     Priority Tax Claims.** Except to the extent that the holder of an Allowed Priority Tax Claim has been paid by THAN prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim, if any, shall, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, receive in full satisfaction, settlement and discharge of and in exchange for such Allowed Priority Tax Claim, either of the following, at the sole and absolute discretion of Reorganized THAN: (a) Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, on the latest of: (i) the Effective Date; (ii) the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is practicable; and (iii) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law; or (b) regular installment payments in Cash (i) of a total value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claim; (ii) over a period ending not later than five (5) years after the Effective Date; and (iii) in a manner not less favorable than the most favored nonpriority General Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors under section 1122(b)).

**2.3     DIP Claim.** On the Effective Date, the DIP Agreement shall terminate, and PENAC shall forgive any amounts THAN may have drawn upon and used from the DIP Agreement. Residual Cash as of the Effective Date, if any, whether (i) drawn under the DIP Agreement and not used by THAN or (ii) remaining under any pre-Commencement Date advance made to THAN by PENAC, to

the extent such residual Cash will not be necessary for distributions under the Plan on account of Allowed General Unsecured Claims, shall be contributed to the Asbestos PI Trust as part of the PENAC Asbestos PI Trust Contribution. PENAC shall also agree to release any and all Liens, Claims, Encumbrances and any other interests of PENAC on THAN's or Reorganized THAN's assets that served as security for the DIP Agreement.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Equity Interests in THAN.

**3.1     Classification.** The categories of Claims and Equity Interests listed below, other than Administrative Expense Claims and Priority Tax Claims, are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 2 | Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 3 | General Unsecured Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 4 | Asbestos PI Claims | Impaired | Yes |
| Class 5 | Intercompany Claims | Impaired | Yes |
| Class 6 | Equity Interests in THAN | Impaired | No (conclusively presumed to reject) |

# ARTICLE IV

## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

**4.1     Class 1 – Priority Claims.** Except to the extent a holder of an Allowed Priority Claim has been paid prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Claim shall receive in full satisfaction, settlement and discharge of and in exchange for such Priority Claim, Cash in an amount equal to the unpaid portion of such Allowed Priority Claim on or before the later of: (a) the Effective Date; and (b) the date the Priority Claim becomes an Allowed Priority Claim, or as soon thereafter as practicable. All Allowed Priority Claims not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

Class 1 is Unimpaired under the Plan. Each holder of a Priority Claim is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

**4.2     Class 2 – Secured Claims.** Except to the extent a holder of a Secured Claim agrees to different treatment of that Claim, each holder of an Allowed Secured Claim shall have such Claim reinstated pursuant to section 1124(2) of the Bankruptcy Code such that the Claim is rendered Unimpaired. The failure of THAN or any other party in interest to file an objection, prior to the Effective

Date, with respect to any Secured Claim that is reinstated hereunder shall be without prejudice to the rights of Reorganized THAN or any other party in interest to contest or otherwise defend against such Secured Claim in an appropriate forum when and if such Secured Claim is sought to be enforced. Any amount that THAN may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Allowed Secured Claim shall be paid in full, in Cash, on, or as soon as practicable after, the latest of (a) the Effective Date; (b) the date on which such Secured Claim becomes Allowed; (c) the date such Secured Claim becomes due and payable according to its terms; or (d) such other date as mutually may be agreed to by and among the holder of such Secured Claim and THAN or Reorganized THAN.

Class 2 is Unimpaired under the Plan. Each holder of a Secured Claim is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

**4.3     Class 3 – Allowed General Unsecured Claims.**  Except to the extent a holder of an Allowed General Unsecured Claim agrees to different treatment of that General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall have such General Unsecured Claim reinstated pursuant to section 1124(2) of the Bankruptcy Code such that the General Unsecured Claim is rendered Unimpaired. The failure of THAN or any other party in interest to file an objection, prior to the Effective Date, with respect to any General Unsecured Claim that is reinstated hereunder shall be without prejudice to the rights of Reorganized THAN or any other party in interest to contest or otherwise defend against such General Unsecured Claim in an appropriate forum when and if such General Unsecured Claim is sought to be enforced. Any amount that THAN may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Allowed General Unsecured Claim shall be paid in full, in Cash, on, or as soon as practicable after, the latest of: (a) the Effective Date; (b) the date on which such General Unsecured Claim becomes Allowed; (c) the date such General Unsecured Claim becomes due and payable according to its terms; or (d) such other date as mutually may be agreed to by and among the holder of such General Unsecured Claim and THAN or Reorganized THAN.

Class 3 is Unimpaired under the Plan. Each holder of a General Unsecured Claim is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

**4.4     Class 4 – Asbestos PI Claims.**  As of the Effective Date, liability for all Asbestos PI Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Asbestos PI Trust in accordance with, and to the extent set forth in, Articles IX and XI below, the applicable Plan Documents and the Confirmation Order. Each Asbestos PI Claim shall be determined and paid in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures. The Asbestos PI Trust shall be funded in accordance with the provisions of Article 9.4 below. The sole recourse of the holder of an Asbestos PI Claim on account of such Asbestos PI Claim shall be to the Asbestos PI Trust and each such holder shall have no right whatsoever at any time to assert its Asbestos PI Claim against any Asbestos Protected Party.

The Asbestos PI Trust shall pay Qualified Asbestos PI Claims on the Effective Date or as soon thereafter as is practicable in accordance with the standards set forth in the Asbestos PI Trust Distribution Procedures.

Class 4 is Impaired under the Plan. Each holder of an Asbestos PI Claim shall be entitled to vote to accept or reject the Plan to the extent and in the manner provided in Article V below and in the Solicitation Procedures Order.

**4.5** **Class 5 – Intercompany Claims.** In full settlement, satisfaction, release and discharge of any and all Intercompany Claims, all Intercompany Claims shall be eliminated and discharged as of the Effective Date, by either offset, distribution, cancellation, or contribution of such Intercompany Claims, or otherwise (as determined by the Debtor in its sole and absolute discretion).

Class 5 is Impaired under the Plan. Each holder of an Intercompany Claim shall be entitled to vote to accept or reject the Plan to the extent and in the manner provided in Article V below and in the Solicitation Procedures Order.

**4.6** **Class 6 – Equity Interests.** All Equity Interests in THAN shall be cancelled as of the Effective Date, after the transfer of the PENAC Asbestos PI Trust Contribution to the Asbestos PI Trust, and each holder of an Equity Interest in THAN shall neither receive nor retain any property on account of such Equity Interests in THAN under the Plan. On the Effective Date, or as soon thereafter as is reasonably practicable, all membership interests in Reorganized THAN shall be issued to the Parent Trust as set forth in Article 9.3(a) below.

Class 6 is Impaired under the Plan. Each holder of an Equity Interest is deemed to have rejected the Plan and is therefore not entitled to vote to accept or reject the Plan.

**ARTICLE V**

**ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF
REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS**

**5.1** **Classes Entitled to Vote.** Except as set forth below, each holder of an Allowed Claim or Allowed Equity Interest, and each holder of a Claim or Equity Interest that has been temporarily allowed for voting purposes, including each holder of an Asbestos PI Claim, in each Impaired Class of Claims or Equity Interests shall be entitled to vote separately to accept or reject the Plan unless such Impaired Class shall receive no distribution under the Plan, in which case, such Impaired Class shall be deemed to reject the Plan and shall not be entitled to vote to accept or reject the Plan.

Any holder of a Claim or Equity Interest in an Unimpaired Class of Claims or Equity Interests shall not be entitled to vote to accept or reject the Plan.

**5.2** **Class Acceptance Requirement.** Acceptance of the Plan by any Impaired Class of Claims or Equity Interests shall be determined in accordance with section 1126 of the Bankruptcy Code and the terms of the Solicitation Procedures Order. With respect to Class 4, acceptance of the Plan shall also be determined in accordance with section 524(g) of the Bankruptcy Code.

**5.3** **Issuance of Injunction Pursuant to Section 524(g) of the Bankruptcy Code.** The Bankruptcy Court shall be asked to issue the Asbestos PI Channeling Injunction if the Plan has been accepted by at least two-thirds (2/3) in amount of those holders of Class 4 Claims actually voting on the Plan, in accordance with section 1126(c) of the Bankruptcy Code, and seventy-five percent (75%) in number of those holders of Class 4 Claims actually voting on the Plan, in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

**5.4** **Acceptance by Unimpaired Classes.** Class 1 (Priority Claims), Class 2 (Secured Claims) and Class 3 (General Unsecured Claims) are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, solicitation of votes of holders of Claims in Class 1, Class 2 and Class 3 is not required.

**5.5     Rejection by Impaired Class Receiving No Distribution.**  Class 6 (Equity Interests) will receive no Distribution under the Plan, and is conclusively presumed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, solicitation of votes of holders of Equity Interests in Class 6 is not required.

**ARTICLE VI**

**DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT
OF CLAIMS OTHER THAN ASBESTOS PI CLAIMS**

**6.1     Distributions.**  Other than with respect to distributions to be made to Asbestos PI Claims from the Asbestos PI Trust, Reorganized THAN shall make all Distributions required to be made under the Plan as provided under this Article VI.  All distributions to be made on account of Asbestos PI Claims shall be made in accordance with the terms of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.

**6.2     Date of Distributions.**  Except as otherwise provided herein, any Distributions and deliveries to be made hereunder on account of Allowed Claims or Equity Interests (other than Asbestos PI Claims) shall be made on the Effective Date or as soon thereafter as is practicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**6.3     Postpetition Interest on Claims.**  Unless expressly provided for in the Plan, the Plan Documents and the Confirmation Order, or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or unless required by applicable bankruptcy law (including the fair and equitable rule), interest shall not accrue on or after the Commencement Date on account of any Claim.

**6.4     Means of Cash Payment.**  At the option of the Debtor, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in any applicable agreement.

**6.5     Delivery of Distributions.**  Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim or Equity Interest shall be made at the address of such holder as set forth on the Schedules filed, as may be required, with the Bankruptcy Court, or on the books and records of THAN or its agents, or in a letter of transmittal, unless THAN has been notified in writing of a change of address.

If any holder's Distribution is returned as undeliverable, then no further Distributions to such holder shall be made unless and until Reorganized THAN is notified of such holder's then-current address, at which time all missed Distributions shall be made to such holder without interest.  A Cash Distribution that is not claimed by the expiration of six (6) months from the date that such Distribution was made shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in Reorganized THAN, and the Claim of any holder to such Distributions shall be discharged and forever barred.  Nothing contained in the Plan shall require THAN or Reorganized THAN to attempt to locate any holder of an Allowed Claim.

**6.6     Time Bar to Cash Payments.**  Checks issued by Reorganized THAN in respect of Distributions on Allowed Claims shall be null and void if not presented for payment within sixty (60)

days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing to Reorganized THAN by the holder of the Allowed Claim to whom such check originally was issued on or before thirty (30) days after the expiration of the sixty (60) day period following the date of issuance of such check. After expiration of the thirty (30) day period, all funds held on account of such void check shall, in the discretion of Reorganized THAN, be used to satisfy the costs of administering and fully consummating the Plan or to become property of Reorganized THAN, and the Claim of any holder to such Distributions shall be discharged and forever barred.

**6.7** **Record Date for Holders of Claims.** Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Rule 3001 of the Bankruptcy Rules on or prior to the Distribution Record Date shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

**6.8** **Distributions after Effective Date.** Distributions made after the Effective Date shall be deemed to have been made on the Effective Date. No interest shall accrue or be payable on such Distributions.

**6.9** **Fractional Cents.** Notwithstanding any other provision in the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with fractions of more than half a penny being rounded up and fractions of half of a penny or less being rounded down.

**6.10** **Setoff.** THAN or Reorganized THAN may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed Amount of such Claim on which Distribution shall be made), any claims of any nature whatsoever that THAN or Reorganized THAN may have against the holder of such Claim, and the failure to do so shall not constitute a waiver or release by THAN or Reorganized THAN of any such Claims that THAN or Reorganized THAN may have against the holder of such Claim.

# ARTICLE VII

# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.1** **General Treatment.** THAN shall assume, as of the Effective Date, all Executory Contracts to which THAN is a party, except for: (a) the Executory Contracts specifically listed in certain Schedules to the Plan Supplement, which shall either be rejected or assumed and assigned, respectively, as described therein; and (b) the Executory Contracts specifically addressed herein or pursuant to a Final Order of the Bankruptcy Court entered on or before the Effective Date. THAN may, at any time on or before the Effective Date, amend the Schedules to the Plan Supplement to delete therefrom, or add thereto, any Executory Contract. THAN shall provide notice of any such amendment to the parties to the Executory Contract(s) affected thereby and to parties on any master service list established by the Bankruptcy Court in the Chapter 11 Case. The fact that any contract or lease is listed in the Schedules to the Plan Supplement shall not constitute or be construed to constitute an admission that such contract or lease is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or that THAN or any successor in interest to THAN (including Reorganized THAN) has any liability thereunder.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such: (a) rejections; (b) assumptions; or (c) assumptions and assignments, as the case may be, pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

**7.2    Cure of Defaults.**    Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract to be assumed (including any Executory Contract to be assumed and assigned) pursuant to Articles 7.1 above, Reorganized THAN shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within thirty (30) days after the Effective Date, file and serve a pleading with the Bankruptcy Court listing the amount of the proposed Cure for each such Executory Contract.  The non-Debtor party or parties to each such Executory Contract shall have fifteen (15) days from service of the Cure Notice to object to the proposed Cure with respect to that Executory Contract.  Within thirty (30) days after service of any objection to the proposed Cure for an Executory Contract, THAN shall: (a) resolve such objection, which resolution shall not require approval of the Bankruptcy Court; (b) schedule a hearing before the Bankruptcy Court to determine the proper Cure for the Executory Contract; or (c) determine to reject the Executory Contract, and provide notice thereof to the applicable non-Debtor party or parties.

**7.3    Bar to Rejection Damages.**    In the event that the rejection of an Executory Contract by THAN pursuant to the Plan results in damages to the non-Debtor party or parties to such Executory Contract, a claim for such damages shall be forever barred and shall not be enforceable against THAN, Reorganized THAN, or their respective properties or interests in property, unless a Proof of Claim with respect to such damages is filed with the Bankruptcy Court and served upon counsel for THAN on or before (a) if such Executory Contract is rejected pursuant to Articles 7.1 and 7.2 above, the later of: (i) thirty (30) days after entry of the Confirmation Order; and (ii) thirty (30) days after the non-Debtor party receives notice of the rejection of such Executory Contract pursuant to Article 7.2 above; and (b) if such Executory Contract is rejected pursuant to a Final Order of the Bankruptcy Court granting a motion filed by THAN to reject that Executory Contract, thirty (30) days after entry of such order.

## ARTICLE VIII

## PROCEDURES FOR RESOLVING AND TREATING
## DISPUTED CLAIMS OTHER THAN ASBESTOS PI CLAIMS

**8.1    Disputed Claims.**    All Disputed Claims against THAN shall be subject to the provisions of this Article VIII.  All Asbestos PI Claims shall be determined and paid by the Asbestos PI Trust in accordance with Article 9.4 below, the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.  Only the Asbestos PI Trust will have the right to object to and/or resolve Asbestos PI Claims.  All Asbestos PI Claims must be submitted solely to the Asbestos PI Trust for payment, which shall be in accordance with the Asbestos PI Trust Distribution Procedures, and only the Asbestos PI Trust will have the right to object to and/or resolve Asbestos PI Claims.

**8.2    Objection to Claims.**    THAN or Reorganized THAN, as the case may be, shall be entitled to file objections to Claims that have been or properly should have been brought in the Bankruptcy Court (other than Asbestos PI Claims), on or before the first (1st) anniversary of the Effective Date (unless such day is not a Business Day, in which case such deadline shall be the next Business Day thereafter), as the same may be extended from time to time by the Bankruptcy Court, and shall be authorized to settle, compromise, withdraw or litigate to judgment such objections without further approval of the Bankruptcy Court.

**8.3** **Payments and Distributions with Respect to Disputed Claims.** Notwithstanding any other provision hereof, if any portion of a Claim (other than an Asbestos PI Claim) is a Disputed Claim, no payment or Distribution provided for herein shall be made on account of such Claim, unless and until such Claim becomes an Allowed Claim.

**8.4** **Preservation of Insurance.** Nothing in the Plan, the Plan Documents or the Confirmation Order, including the discharge and release of THAN and the Asbestos PI Channeling Injunction, shall diminish or impair the enforceability of any insurance policy or settlement agreement with any Asbestos Insurance Entity that may be obligated to provide, or has settled the issue of, coverage for Claims or Demands against THAN.

**8.5** **Estimation of Claims.** THAN or Reorganized THAN, as the case may be, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim (not including any Asbestos PI Claims) for any reason pursuant to section 502(c) of the Bankruptcy Code, regardless of whether THAN previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate such Claim at any time, including, without limitation, during the pendency of litigation concerning any objection to any Claim or of any appeal relating thereto. Claims may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism approved by the Bankruptcy Court.

**8.6** **Preservation of Rights to Settle Claims.** In accordance with section 1123(b) of the Bankruptcy Code, THAN and Reorganized THAN shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims (other than Asbestos PI Claims), rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that THAN or its estate may hold against any Entity, without the necessity for Bankruptcy Court approval under Bankruptcy Rule 9019.

## ARTICLE IX

## MEANS FOR IMPLEMENTATION OF THE PLAN

**9.1** **Generally.** On the Confirmation Date, THAN shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable it to implement the provisions of the Plan, including, without limitation, the creation of the Asbestos PI Trust and the creation of the Parent Trust. From and after the Effective Date, Reorganized THAN shall be governed pursuant to the Amended Charter Documents.

**9.2** **Transactions on the Effective Date.**

(a) Immediately on the Effective Date, the following shall be deemed for all purposes to have occurred simultaneously:

(i) the making of the PENAC Asbestos PI Trust Contribution and the THAN Contribution to the Asbestos PI Trust;

(ii) the establishment of the Asbestos PI Trust;

(iii) the vesting in the Asbestos PI Trust of the Asbestos PI Trust Assets, as more fully described in Article 9.4 below; and

(iv) the making of the PENAC Debtor Contribution.

(b)     Also on the Effective Date, but solely immediately after the occurrence of each of Article 9.2(a)(i) through (iv) herein, the Parent Trust shall be established.

(c)     Also on the Effective Date, but solely immediately after the occurrence of Article 9.2(a) and (b) herein, the Equity Interests of PENAC and Remediation Services in THAN shall be cancelled, and 100% of the membership interests of Reorganized THAN shall be issued to, and vest in, the Parent Trust, as more fully described in Article 9.3 below.

(d)     Also on the Effective Date, but solely immediately after the occurrence of each of Article 9.2(a) through (c) herein, the following events shall be deemed for all purposes to have occurred, simultaneously:

(i)     the effectiveness of the Pledge Agreement;

(ii)     the effectiveness of the Promissory Note;

(iii)     the effectiveness of the Amended Charter Documents of Reorganized THAN;

(iv)     any Distributions required to be made on the Effective Date (or as soon thereafter as is reasonably practicable); and

(v)     the payment of the Qualified Asbestos PI Claims by the Asbestos PI Trust (on the Effective Date or as soon thereafter as is reasonably practicable).

### 9.3     The Parent Trust.

On the Effective Date, immediately after the establishment of the Asbestos PI Trust, the Parent Trust shall be created in accordance with the Plan Documents and the Parent Trust Documents. The Parent Trust shall hold legal title to the membership interests of Reorganized THAN and is currently intended to constitute a "qualified settlement fund" within the meaning of section 468B of the Internal Revenue Code and the regulations issued thereunder.

(a)     <u>Issuance of Equity Interests</u>.  Automatically on the Effective Date, immediately after the occurrence of each of Article 9.2(a) and (b), one-hundred percent (100%) of the membership interests of Reorganized THAN shall be issued to the Parent Trust.

(b)     <u>Appointment of Parent Trustee</u>.  The initial Trustee(s) of the Parent Trust shall be set forth in a Plan Supplement.

(c)     <u>Pledge of Equity Interest</u>.  In connection with the execution of the Promissory Note, after the issuance to and vesting in the Parent Trust of one-hundred percent (100%) of the membership interests of Reorganized THAN, the Parent Trust shall execute the Pledge Agreement granting to the Asbestos PI Trust a security interest in one-hundred percent (100%) of the outstanding membership interests of Reorganized THAN to secure payment of the Promissory Note.

### 9.4     The Asbestos PI Trust.

(a)     <u>Creation of the Asbestos PI Trust</u>.  On the Effective Date, the Asbestos PI Trust shall be created in accordance with the Plan Documents, the Asbestos PI Trust Documents and section 524(g) of the Bankruptcy Code.  The Asbestos PI Trust is intended to constitute a "qualified settlement fund" within the meaning of section 468B of the Internal Revenue Code and the regulations

issued thereunder. The purpose of the Asbestos PI Trust shall be to assume, liquidate and satisfy all liabilities determined to arise from, or relate to, the Asbestos PI Claims (whether existing as of the Effective Date or arising at any time thereafter) and to use the Asbestos PI Trust Assets to pay holders of Asbestos PI Claims in accordance with the terms of the Asbestos PI Trust Agreement, the Asbestos PI Trust Distribution Procedures, the Plan and the Confirmation Order, and in such a way as to provide reasonable assurance that the Asbestos PI Trust will value, and be in a financial position to pay, present Asbestos PI Claims and future Demands that involve similar claims in substantially the same manner, and to otherwise comply in all respects with the requirements of section 524(g)(2)(B) of the Bankruptcy Code. The Asbestos PI Trust shall have no liability for any Claim other than an Asbestos PI Claim, which shall be determined and paid in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures. On the Effective Date, all right, title and interest in and to the Asbestos PI Trust Assets, and any proceeds thereof, will be transferred to, and vested in, the Asbestos PI Trust, free and clear of all Claims, Demands, Equity Interests, Encumbrances and other interests of any Entity without any further action of the Bankruptcy Court or any Entity.

(b)     Appointment of Asbestos PI Trustees.  The initial Trustees of the Asbestos PI Trust shall be set forth in a Plan Supplement.

(c)     Appointment of Future Claimants' Representative.  Professor Samuel Issacharoff shall serve as the Future Claimants' Representative.

(d)     Appointment of Asbestos PI Trust Advisory Committee Members.  The initial members of the Asbestos PI Trust Advisory Committee shall be those persons designated in the Confirmation Order.

(e)     Claims Review.  The Claims Reviewer has been reviewing Asbestos PI Claims during the Pre-Effective Date Claims Review period using the standards set forth in the Asbestos PI Trust Distribution Procedures.  Prior to the Effective Date, any alteration of these review standards must be approved by the putative Asbestos PI Trustees, with the consent of the Asbestos Claimants Group and the Future Claimants' Representative.  All Asbestos PI Claims approved by the Claims Reviewer shall be designated as Qualified Asbestos PI Claims and treated in accordance with Article 4.4 of the Plan.  To the extent an Asbestos PI Claim submitted during the Pre-Effective Date Claims Review period is not approved by the Claims Reviewer, such Asbestos PI Claim may be re-submitted to the Asbestos PI Trust and considered in accordance with the standards set forth in the Asbestos PI Trust Distribution Procedures.  From and after the Effective Date, the Asbestos PI Trust may retain the Claims Reviewer or such other third-party claims reviewer as the Asbestos PI Trustees and the Future Claimants' Representative deem appropriate to review and liquidate all Asbestos PI Claims submitted to the Asbestos PI Trust in accordance with the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.

(f)     Contributions to the Asbestos PI Trust.  On the Effective Date, Reorganized THAN and PENAC shall make the THAN Contribution and PENAC Asbestos PI Trust Contribution, respectively, to the Asbestos PI Trust; provided, however, that, prior to the Effective Date, as part of the Asbestos PI Trust Contributions, THAN or PENAC shall pay to the putative Asbestos PI Trustees an amount not to exceed $500,000 for the preliminary expenses to be incurred by the Asbestos PI Trust.  To the extent any contribution thereof causes the Asbestos PI Trust Contributions to exceed $900 million as of the Effective Date, the excess amount shall be returned to PENAC in Cash.

(g)     Promissory Note.  On the Effective Date, Reorganized THAN shall execute and deliver to the Asbestos PI Trust the Promissory Note in substantially the form attached hereto as Exhibit D.

(h) <u>Transfer of Claims and Demands to the Asbestos PI Trust</u>. On the Effective Date, all liabilities, obligations, and responsibilities relating to all Asbestos PI Claims and Demands shall be transferred and channeled to the Asbestos PI Trust and shall be satisfied solely by the assets held by the Asbestos PI Trust. The Asbestos PI Trust shall have no liability for any Claims other than Asbestos PI Claims, and no Claims other than Asbestos PI Claims shall be transferred and channeled to the Asbestos PI Trust.

(i) <u>Discharge of Liabilities to Holders of Asbestos PI Claims</u>. The transfer to, vesting in, and assumption by the Asbestos PI Trust of the Asbestos PI Trust Assets, on or after the Effective Date, as contemplated by the Plan, shall, among other things, discharge all obligations and liabilities of all Asbestos Protected Parties for and in respect of all Asbestos PI Claims.

(j) <u>Indemnification by the Asbestos PI Trust</u>. As and to the extent provided in the Asbestos PI Trust Indemnification Agreement, the Asbestos PI Trust shall indemnify and hold harmless each of the following Entities for any liability, or alleged liability, arising out of, or resulting from, an Asbestos PI Claim: (i) THAN and Reorganized THAN; (ii) PENAC and any PENAC Related Party; (iii) Elementis; and (iv) any current or former Representative of any of the above, in their capacities as such.

(k) <u>Parent Trust Distributions</u>. The Asbestos PI Trust shall be the sole beneficiary of the Parent Trust, and any distribution therefrom shall be paid to the Asbestos PI Trust in accordance with the Parent Trust Documents; <u>provided</u>, that the Parent Trust shall make distributions only upon receipt of dividends from Reorganized THAN, and such dividends shall be paid only under applicable law and only if funds are available after meeting Reorganized THAN's operating expenses, financing obligations, and certain reserve requirements.

(l) <u>Books and Records</u>. On the Effective Date, the Asbestos Records Cooperation Agreement shall become effective and the Asbestos Records shall be treated in accordance therewith.

**9.5 Environmental Liabilities.** As part of the PENAC Debtor Contribution, PENAC shall assume all Known Environmental Liabilities. In addition, THAN has purchased the Unknown Environmental Liability Insurance Policy identifying THAN as a named insured and providing coverage with respect to Unknown Environmental Liabilities in order to enhance or supplement existing insurance related to Unknown Environmental Liabilities, which policy shall be a five-year policy providing coverage only for such Unknown Environmental Liabilities, in excess of a self-insured retention of $250,000 per pollution condition, $2,000,000 aggregate, $100,000 maintenance, up to $10,000,000 per claim and an aggregate limit of $30,000,000. At the end of its initial term, the policy may be automatically extended for an equal term (with any associated costs to be borne by Reorganized THAN).

The Unknown Environmental Liability Insurance Policy shall be deemed and treated as an executory contract pursuant to the Plan and shall be automatically assumed on the Effective Date by THAN and Reorganized THAN and shall continue in full force and effect. On the Effective Date, the Unknown Environmental Liability Insurance Policy shall vest in Reorganized THAN. On the Effective Date, or, as soon as reasonably practicable thereafter, THAN or Reorganized THAN, as the case may be, shall assume such Unknown Environmental Liability Insurance Policy and Reorganized THAN shall be insured under such Unknown Environmental Liability Insurance Policy. Any and all costs of providing such insurance coverage for Reorganized THAN under such Unknown Environmental Liability Insurance Policy shall be borne by PENAC.

On the Effective Date, Reorganized THAN shall seek to have the Unknown Environmental Liability Insurance Policy amended to add the Parent Trust as an additional named insured; provided, however, that the costs of such amendment are determined to be reasonable to both Reorganized THAN and the Future Claimants' Representative, with such costs to be borne by Reorganized THAN.

Pursuant to the Plan, PENAC has agreed to assume all Known Environmental Liabilities, and THAN will not incur any costs or expenses in relation to those liabilities.  In the event that THAN is notified of new or additional environmental claims or conditions in connection with the Known Environmental Liabilities ("New Claims") and PENAC believes that such New Claims are not included within the Known Environmental Liabilities assumed by PENAC at the time the Unknown Environmental Liability Insurance Policy was bound with ACE, and provided that PENAC has no independent contractual obligation to indemnify the party asserting any New Claims, THAN will seek coverage from ACE for any New Claims.  To the extent ACE contends that the condition was included in the Known Environmental Liabilities and denies coverage, PENAC will either assume the condition as a Known Environmental Liability or, if PENAC does not agree to assume the New Claims, THAN will in good faith take all legal and equitable action, at the sole cost of PENAC, against ACE to compel ACE to provide coverage for such New Claims.  In the event of a final order by a court of competent jurisdiction upholding ACE's denial of coverage, PENAC will assume such New Claim as a Known Environmental Liability.  Nothing in this paragraph shall impact the rights and obligations provided in this Plan with respect to claims arising at any site other than sites included in Known Environmental Liabilities.

**9.6    PENAC Asset.**  As part of the PENAC Debtor Contribution, PENAC shall contribute a certain revenue-generating real property to Reorganized THAN on the Effective Date.

**9.7    Insurance Assignment.**  On the Effective Date, THAN shall assign its rights to receive insurance proceeds from any Shared Asbestos Insurance Policy, Insurance Settlement Agreement and the Insurance Settlement Proceeds Trust to PENAC.

**9.8    Amended Charter Documents.**  The Amended Charter Documents shall contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent necessary, to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the Amended Charter Documents after the Effective Date as permitted by applicable law.  Except as otherwise provided herein, such Amended Charter Documents shall contain indemnification provisions applicable to the officers and employees of Reorganized THAN and such other Entities as may be deemed appropriate in the discretion of the Parent Trust.

**9.9    Corporate Governance of Reorganized THAN.**  On the Effective Date, the Parent Trust may appoint a membership committee for Reorganized THAN and/or a board of managers, in which event the identities of the members thereof shall be disclosed in a Plan Supplement filed with the Bankruptcy Court.

**9.10    Effectuating Documents; Further Transactions.**  Any officer, member or manager of or director of THAN or Reorganized THAN, as the case may be, shall be, and hereby is, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Secretary of THAN is hereby authorized to certify or attest to any of the foregoing, if necessary.

THAN and Reorganized THAN, and all other parties, including all holders of Claims entitled to receive Distributions under the Plan, shall execute any and all documents and instruments that

must be executed under or in connection with the Plan in order to implement the terms of the Plan or to effectuate the Distributions under the Plan, _provided_, that such documents and instruments are reasonably acceptable to such party or parties.

## ARTICLE X

## EFFECT OF CONFIRMATION

      **10.1    Vesting of Reorganized THAN's Assets.**  Pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Documents or the Confirmation Order, the property of the Estate of THAN (except for the THAN Contribution and subject to Article 2.3 hereof regarding unused Cash drawn under the DIP Agreement that will not be necessary for distributions on account of Allowed General Unsecured Claims in Class 3) shall vest in Reorganized THAN on the Effective Date free and clear of any and all Liens, Claims, Encumbrances and other interests of any Entity.  From and after the Effective Date, Reorganized THAN may operate its business and may use, acquire, and dispose of property free of any restrictions imposed under the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.  Without limiting the generality of the foregoing, Reorganized THAN may, without application to, or approval by, the Bankruptcy Court, pay Professional fees and expenses that Reorganized THAN incurs after the Effective Date.

      **10.2    Preservation of Certain Causes of Action; Defenses.**  Except as provided in Article 10.6 below, in accordance with section 1123(b) of the Bankruptcy Code, Reorganized THAN, as successor in interest to THAN and its Estate, shall retain and may enforce any and all rights, Claims, and Causes of Action accruing to or that are property of THAN or its Estate pursuant to the Bankruptcy Code or any statute or legal theory, including any Avoidance Action, any rights to, Claims or Causes of Action for recovery under any policies of insurance issued to or on behalf of THAN, and any rights, Claims, and Causes of Action against third parties related to or arising out of Allowed Claims, and Reorganized THAN shall retain and may enforce all defenses and counterclaims to all Claims asserted against THAN or its Estate, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.  Reorganized THAN may pursue such Claims, rights, or Causes of Action, as appropriate, in accordance with its best interests, as determined by the trustee of the Parent Trust or a membership committee or board of managers appointed thereby for Reorganized THAN. Notwithstanding anything in Article 10.2 of the Plan to the contrary, neither THAN nor Reorganized THAN shall have any rights to pursue any Derivative Liability Claims against a PENAC Related Party or Elementis or any of their Representatives.

      Notwithstanding anything in this Article 10.2 to the contrary, on the Effective Date all Claims, defenses, rights and Causes of Action of THAN and Reorganized THAN relating to Asbestos PI Claims, other than any rights or Causes of Action for recovery under any policies of insurance issued to or on behalf of THAN, shall be transferred and assigned to the Asbestos PI Trust.  Except as otherwise provided in Article 10.2 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Asbestos PI Trust shall retain and may enforce such Claims, defenses, rights and Causes of Action and shall retain and may enforce all defenses and counterclaims to all Claims or Demands asserted against the Asbestos PI Trust with respect to such Asbestos PI Claims, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code; _provided, however_, that no such defenses, Causes of Action, or counterclaims may be asserted against any Asbestos Protected Party.  The Asbestos PI Trust shall be deemed to be the appointed representative to, and may, pursue, litigate, compromise and settle any rights, Claims, or Causes of Action transferred to it, as appropriate, in accordance with its and its beneficiaries' best interests.  Nothing in this Article 10.2, however, shall be deemed to be a transfer by THAN or Reorganized THAN of any Claims, rights, Causes of Action, or

defenses relating to assumed Executory Contracts or which otherwise are required by Reorganized THAN to conduct its business in the ordinary course subsequent to the Effective Date.

**10.3    Institution and Maintenance of Legal and Other Proceedings.**  From and after the Effective Date, Reorganized THAN shall be empowered and entitled, in its sole and absolute discretion, to pursue, compromise or settle THAN's or Reorganized THAN's interests in any and all Asbestos Insurance Actions.  The duties, obligations and liabilities of any Asbestos Insurance Entity under all insurance policies, including, but not limited to, the Shared Asbestos Insurance Policies, all Insurance Settlement Agreements, and all other settlement agreements are not enlarged or diminished, reduced or eliminated by any aspect of the Chapter 11 Case, provided, that all Asbestos PI Insurer Coverage Defenses are preserved in accordance with Article 10.4 of the Plan.

**10.4    Insurance Neutrality.**  Notwithstanding anything to the contrary in the Confirmation Order, the Plan or any of the Plan Documents, nothing in the Plan, the Plan Documents, the Confirmation Order, any finding of fact and/or conclusion of law with respect to the confirmation of the Plan, or any Final Order or opinion entered on appeal from the Confirmation Order (including any other provision that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, impairing: (a) any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect under the Shared Asbestos Insurance Policies or any Insurance Settlement Agreement; or (b) any policyholder's legal, equitable or contractual rights, if any, in any respect under the Shared Asbestos Insurance Policies or any Insurance Settlement Agreement.  The rights and obligations of any Asbestos Insurance Entity shall be determined under the insurance policies, including, but not limited to the Shared Asbestos Insurance Policies, or any Insurance Settlement Agreement. Notwithstanding anything in this Article 10.4 to the contrary, nothing in this Article 10.4 shall affect or limit, or be construed as affecting or limiting: (a) the binding effect of the Plan and the Confirmation Order on THAN, Reorganized THAN, the Asbestos PI Trust and the beneficiaries of such trust; or (b) the protection afforded to any Asbestos Insurance Entity.

**10.5    Terms of Injunction and Automatic Stay.**  All of the injunctions and/or stays in existence immediately prior to the Confirmation Date provided for in or in connection with the Chapter 11 Case, whether pursuant to section 105, 362, or any other provision of the Bankruptcy Code, the Bankruptcy Rules or other applicable law, including, but not limited to, the injunction provided for by the Preliminary Injunction Order shall remain in full force and effect until the injunctions set forth in the Plan become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after the Confirmation Date, Reorganized THAN may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.  All actions of the type or nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

**10.6    No Liability for Certain Released Claims.**  Neither THAN, Reorganized THAN, the other Asbestos Protected Parties, nor the Asbestos PI Trust (except, as it relates to the Asbestos PI Trust, with respect to the Asbestos PI Claims) does, or shall be deemed to, assume, agree to perform, pay, or indemnify creditors for any liabilities or obligations of THAN relating to or arising out of the operations of, or assets of, THAN whether arising prior to or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date.  Neither Reorganized THAN,

nor the Asbestos PI Trust shall be liable for any Derivative Liability Claim, except that Reorganized THAN and the Asbestos PI Trust shall assume their respective obligations specified in the Plan and the Confirmation Order.

Effective automatically on the Effective Date, the Asbestos Protected Parties and their respective Representatives shall unconditionally and irrevocably be fully released from any and all Derivative Liability Asbestos PI Claims.

**10.7    Title to Asbestos PI Trust Assets.**  On the Effective Date, title to all of the Asbestos PI Trust Assets shall vest in the Asbestos PI Trust free and clear of all Claims, Equity Interests, Encumbrances and other interests of any Entity.  The Asbestos PI Trust shall be empowered and entitled to process and pay Asbestos PI Claims in accordance with the Asbestos PI Trust Distribution Procedures and the Asbestos PI Trust Agreement.

**10.8    Dissolution of Official Committees; Continuation of Future Claimants' Representative; Creation of the Asbestos PI Trust Advisory Committee.**  Effective on the Effective Date, any committee appointed in the Chapter 11 Case shall be dissolved automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to applications for compensation by Professionals or reimbursement of expenses incurred as a member of an official committee and any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order or pending appeals of any other order entered in the Chapter 11 Case.

As provided in Article 9.4(b) and (d) above, the Confirmation Order shall provide for the appointment of the Asbestos PI Trust Advisory Committee effective as of the Effective Date.  The Confirmation Order shall also provide that, from and after the Effective Date, the Future Claimants' Representative  shall continue to serve as provided in the Plan and the Asbestos PI Trust Agreement, to perform the functions specified and required therein.  The Future Claimants' Representative  also may, at his option, participate in any: (a) appeal of the Confirmation Order; (b) hearing on a claim for compensation or reimbursement of a Professional; or (c) adversary proceeding pending on the Effective Date in which the Future Claimants' Representative  is a party.

Upon termination of the Asbestos PI Trust: (a) the members of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative  shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case; and (b) the Asbestos PI Trust Advisory Committee shall be deemed dissolved and the Future Claimants' Representative 's employment shall be deemed terminated.

All reasonable and necessary post-Effective Date fees and expenses of the professionals retained by the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative  shall be paid exclusively by the Asbestos PI Trust in accordance with the terms of the Asbestos PI Trust Agreement, and Reorganized THAN shall not be liable for any such fees and expenses.  The parties shall attempt to resolve any dispute regarding the payment of such fees and expenses in good faith, and if they shall fail to resolve such dispute, they shall submit the dispute to the Bankruptcy Court for resolution.

# ARTICLE XI

## RELEASES, INJUNCTIONS AND WAIVERS OF CLAIMS

**11.1     Discharge.**  Except as specifically provided for in Articles 4.2, 4.3 and 11.8 of the Plan, pursuant to section 1141(d)(1)(A) of the Bankruptcy Code, confirmation of the Plan shall discharge THAN and Reorganized THAN from any and all Claims or Demands of any nature whatsoever, including, without limitation, all Claims, Demands and liabilities that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, whether or not: (a) a Proof of Claim based on such Claim or Demand was filed under section 501 of the Bankruptcy Code, or such Claim or Demand was listed on any Schedules of THAN; (b) such  Claim or Demand is or was allowed under section 502 of the Bankruptcy Code; or (c) the holder of such  Claim or Demand has voted on or accepted the Plan.  Except as specifically provided for in Articles 4.2, 4.3 and 11.8 of the Plan, as of the Effective Date the rights provided in the Plan shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims or Demands against THAN or Reorganized THAN or any of their respective assets and properties.

**11.2     Injunction.**  Except as specifically provided for in Articles 4.2, 4.3 and 11.8 of the Plan, all persons or Entities who have held, hold or may hold Claims or Demands are permanently enjoined, from and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind against Reorganized THAN with respect to such Claim or Demand; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against Reorganized THAN with respect to such Claim or Demand; (c) creating, perfecting, or enforcing any Encumbrance of any kind against Reorganized THAN or against the property or interests in property of Reorganized THAN with respect to such Claim or Demand; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to Reorganized THAN or against the property or interests in property of Reorganized THAN, with respect to such Claim or Demand; and (e) pursuing any Claim or Demand released pursuant to this Article XI of the Plan.

**11.3     Exculpation.**  None of the Released Parties shall have or incur any liability to any holder of a Claim or Equity Interest, including, without limitation, the Asbestos PI Claims, for any act or omission in connection with, related to, or arising out of: (a) the Chapter 11 Case; (b) pursuit of confirmation of the Plan; (c) consummation of the Plan, or administration of the Plan or the property to be distributed under the Plan or the Asbestos PI Trust Distribution Procedures; (d) the Plan; or (e) the negotiation, formulation and preparation of the Plan, the Plan Documents, and any of the terms and/or settlements and compromises reflected in the Plan and the Plan Documents, except for willful misconduct or gross negligence as determined by a Final Order, and, in all respects, THAN, Reorganized THAN, and each of the other Released Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and the Plan Documents.

**11.4     Release of THAN's Officers and Directors.**  The acceptance by a holder of a Claim or Demand against, or Equity Interest in, THAN, of any Distribution, and, with respect to Asbestos PI Claims, the THAN Contribution by the Asbestos PI Trust, shall constitute a waiver and release of any and all Causes of Action that such holder, including the Asbestos PI Trust, any holder of an Asbestos PI Claim, and  the Future Claimants' Representative  did commence or could have commenced against any officer or director of THAN (serving in such capacity) from and after the Commencement Date, that is based upon, related to or arising from any acts or omissions of such officer or director occurring prior to the Effective Date, to the fullest extent permitted under section 524(e) of the Bankruptcy Code and applicable law (as now in effect or subsequently extended), except for: (a) willful misconduct or gross negligence as determined by a Final Order; or (b) any claim by any federal, state or local authority under the Internal Revenue Code or other tax regulation or any applicable environmental or criminal laws.

**11.5    Asbestos PI Channeling Injunction.**  Pursuant to the Confirmation Order and sections 105(a) and 524(g) of the Bankruptcy Code, and subject to Article 11.6 below, the sole recourse of any holder of an Asbestos PI Claim on account of such Asbestos PI Claim shall be against the Asbestos PI Trust.  Each such holder shall be enjoined from taking legal action directed against THAN, Reorganized THAN, any PENAC Related Party, Elementis or any other Asbestos Protected Party, or their respective property, for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery relating to such Asbestos PI Claim.

**11.6    Limitations of Injunctions.**  The releases set forth in the Plan and the injunction set forth in Article 11.5 above shall not enjoin:

(a)    the rights of Entities to the treatment accorded to them under Articles III and IV above, as applicable, including the rights of Entities with Asbestos PI Claims to assert such Claims or Demands against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures;

(b)    the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Asbestos PI Trust Expenses against the Asbestos PI Trust;

(c)    the rights of the Reorganized THAN and any PENAC Related Party to take any action with respect to any and all of the Shared Asbestos Insurance Policies, subject to the terms of any applicable Insurance Settlement Agreement and any Asbestos PI Insurer Coverage Defense; and

(d)    the rights of Reorganized THAN and any PENAC Related Party to assert any Claim, debt, obligation, or liability for payment against any Asbestos Insurance Entity to the extent any insurance policies or insurance coverages were not resolved or released in any Insurance Settlement Agreement with that Asbestos Insurance Entity, subject to the terms of such Insurance Settlement Agreement, if any, and any Asbestos PI Insurer Coverage Defense.

**11.7    Releases and Indemnification by THAN.**  As of the Effective Date, THAN and Reorganized THAN hereby release and are permanently enjoined from prosecuting or attempting to prosecute any Derivative Liability Claims and any and all Causes of Action against the Released Parties that THAN or Reorganized THAN have, may have or claim to have, now or in the future, that are property of, assertable on behalf of, or derivative of THAN; provided, however, that the foregoing release shall not serve to release any Asbestos Insurance Entity from its obligations under any applicable Insurance Settlement Agreement, other settlement agreement or Shared Asbestos Insurance Policy. Reorganized THAN also will indemnify, release and hold harmless each of PENAC and the other PENAC Related Parties pursuant to the provisions of, and to the extent set forth in, the Plan.

**11.8    Indemnification and Reimbursement Obligations.**  For purposes of the Plan, the obligations of THAN to indemnify and reimburse persons who are or were directors, officers, or employees of THAN on the Commencement Date or at any time thereafter against and for any obligations as provided in THAN's certificate of formation, codes of regulations, limited liability agreement, applicable state law, or other agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Commencement Date.  Such obligations shall be assumed by Reorganized THAN on the Effective Date.  In furtherance of the foregoing, Reorganized THAN shall use its commercially reasonable efforts to maintain or procure insurance for the benefit of such directors, officers, or employees at levels satisfactory to Reorganized THAN and the Asbestos PI Trust.

# ARTICLE XII

## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**12.1     Conditions Precedent to Confirmation of the Plan.**  The following are conditions precedent to confirmation of the Plan that must be satisfied, unless waived in accordance with Article 12.3 below:

(a)     The Confirmation Order shall be acceptable in form and substance to THAN and PENAC, after consultation with the Asbestos Claimants Group and the Future Claimants' Representative.

(b)     At least two-thirds (2/3) in amount and seventy-five percent (75%) in number of those holders of Class 4 Asbestos PI Claims actually voting on the Plan shall have voted to accept the Plan.

(c)     The Confirmation Order shall, among other things:

(i)     order that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

(ii)     provide that, except with respect to obligations specifically preserved in the Plan, including without limitation, Article 11.8 above, THAN is discharged effective on the Effective Date (in accordance with the Plan) from any Claims and Demands, and THAN's liability in respect thereof, whether reduced to judgment or contingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, or known or unknown, that arose from any agreement of THAN entered into or obligation of THAN incurred before the Effective Date, or from any conduct of THAN prior to the Effective Date, or whether such interest accrued before or after the Commencement Date, is extinguished completely;

(iii)     provide for the Asbestos PI Channeling Injunction;

(iv)     provide that, as part of the THAN Contribution to the Asbestos PI Trust, THAN or Reorganized THAN is obligated to contribute (or cause to be contributed) the THAN Cash, and, with PENAC, the Insurance Settlement Proceeds Trust Assets, all of which, together with the PENAC Asbestos PI Trust Contribution, shall not exceed $900 million as of the Effective Date;

(v)     provide that, as part of the PENAC Asbestos PI Trust Contribution to the Asbestos PI Trust, PENAC is obligated to contribute (or cause to be contributed) the following, all of which, together with the THAN Contribution shall not exceed $900 million as of the Effective Date: PENAC Cash, residual Cash as of the Effective Date, if any, whether (A) drawn under the DIP Agreement and not used by THAN or (B) remaining under any pre-Commencement Date advance made to THAN by PENAC, to the extent such residual Cash will not be necessary for distributions under the Plan on account of Allowed General Unsecured Claims, and with THAN, the Insurance Settlement Proceeds Trust Assets;

(vi)     provide that Reorganized THAN and the Asbestos PI Trust shall execute the Promissory Note;

(vii)     provide that Reorganized THAN, the Asbestos PI Trust and the Parent Trust shall enter into the Pledge Agreement;

(viii)    provide that the Qualified Asbestos PI Claims shall be paid in accordance with Article 4.4 of the Plan;

(ix)    provide that one hundred percent (100%) of the membership interests of post-Effective Date Reorganized THAN shall be issued to the Parent Trust;

(x)    provide that, as a part of the PENAC Debtor Contribution to Reorganized THAN, PENAC shall assume the Known Environmental Liabilities as provided in Article 9.5 herein;

(xi)    provide that, as a part of the PENAC Debtor Contribution to Reorganized THAN, PENAC shall contribute the PENAC Asset;

(xii)    provide that, as a part of the PENAC Debtor Contribution to Reorganized THAN, PENAC shall forgive any amounts THAN may have drawn and used from the DIP Agreement and release any and all Liens, Claims, Encumbrances or other interests of PENAC on THAN's or Reorganized THAN's assets that served as security for the DIP Agreement;

(xiii)    provide that, as a part of the PENAC Debtor Contribution to Reorganized THAN, PENAC shall contribute a one-time Cash payment in the amount of $1,000,000 to Reorganized THAN on the Effective Date;

(xiv)    provide that, as a part of the PENAC Debtor Contribution to Reorganized THAN, PENAC shall assume any and all obligations with respect to retiree benefits owed to former employees of THAN or employees of THAN as of the Effective Date;

(xv)    provide that THAN has procured the Unknown Environmental Liability Insurance Policy as set forth in Article 9.5 herein;

(xvi)    provide that, on the Effective Date: (A) the Unknown Environmental Liability Insurance Policy shall vest in Reorganized THAN; (B) on the Effective Date, or as soon as reasonably practicable thereafter, THAN or Reorganized THAN, as the case may be, shall assume the Unknown Environmental Liability Insurance Policy and Reorganized THAN shall be insured under the Unknown Environmental Liability Insurance Policy; and (C) any and all costs associated with providing such coverage for Reorganized THAN under such Unknown Environmental Liability Insurance Policy shall be borne by PENAC;

(xvii)    provide that, subject to the limitations expressly set forth in Article 10.4 above all transfers of assets of THAN contemplated under the Plan shall be free and clear of all Claims and Encumbrances against or on such assets;

(xviii)    authorize the implementation of the Plan in accordance with its terms and provide that, on the Effective Date, all of the transactions listed in Article 9.2 shall have occurred, as set forth therein;

(xix)    provide that any transfers effected or entered into, or to be effected or entered into, under the Plan shall be and are exempt under section 1146(a) of the Bankruptcy Code from any state, city or other municipality transfer taxes, mortgage recording taxes and any other stamp or similar tax;

(xx)    approve in all respects the other settlements, transactions and agreements to be effected pursuant to the Plan, including, without limitation, the Asbestos PI Trust Agreement, the

Asbestos PI Trust Distribution Procedures, the Promissory Note, the Pledge Agreement, the Asbestos PI Trust Indemnification Agreement and the other Asbestos PI Trust Documents, the Parent Trust documents, and the release of PENAC Related Parties with respect to Derivative Liability Asbestos PI Claims in exchange for the PENAC Contribution;

(xxi)     provide that all Executory Contracts assumed or assumed and assigned by THAN during the Chapter 11 Case or under the Plan shall remain in full force and effect for the benefit of Reorganized THAN or the assignee thereof notwithstanding any provision in such contract or lease (including those provisions described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

(xxii)     provide that the transfers of property by THAN (except for the THAN Contribution and subject to Article 2.3 hereof regarding unused Cash drawn under the DIP Agreement that will not be necessary for distributions on account of Allowed General Unsecured Claims in Class 3) to Reorganized THAN (A) are or will be legal, valid, and effective transfers of property; (B) vest or will vest Reorganized THAN with good title to such property, except as expressly provided in Article 10.2 of the Plan; (C) do not and will not constitute avoidable transfers under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law; and (D) do not and will not subject Reorganized THAN to any liability by reason of such transfer under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, any laws affecting or effecting successor or transferee liability; and

(xxiii)     provide that any attorney-client, work product or other privilege that applies to the Asbestos Records shall be subject to the terms of the Asbestos Records Cooperation Agreement.

(d)     In addition to the foregoing, the Confirmation Order shall contain the following findings of fact and conclusions of law, among others:

(i)     The Asbestos PI Channeling Injunction is to be implemented in accordance with the Plan and the Asbestos PI Trust;

(ii)     The Plan does not provide for the liquidation of all or substantially all of the property of THAN, that Reorganized THAN will continue in business as an ongoing reorganized debtor, and that confirmation of the Plan is not likely to be followed by the liquidation of Reorganized THAN or the need for further financial reorganization;

(iii)     The Plan complies with all applicable provisions of the Bankruptcy Code, including, without limitation, those requiring that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud;

(iv)     As of the Commencement Date, THAN had been named as a defendant in personal injury and wrongful death actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(v)     The Asbestos PI Trust is to be funded by the THAN Contribution, the PENAC Asbestos PI Trust Contribution, and distributions from the Parent Trust resulting from the payment of dividends thereto by Reorganized THAN;

(vi)     The Asbestos PI Trust, on the Effective Date, by the exercise of contingent rights granted under the Plan, and pursuant to the Promissory Note and the Pledge Agreement, would be entitled to own the majority of voting membership interests of Reorganized THAN;

(vii)     The Asbestos PI Trust is to use its assets and income to pay Asbestos PI Claims;

(viii)     THAN is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos PI Claims, and all such Demands are subject to the Asbestos PI Channeling Injunction;

(ix)     The actual amounts, numbers, and timing of Demands cannot be determined;

(x)     Pursuit of Demands outside the procedures prescribed by the Plan and the Asbestos PI Trust Distribution Procedures is likely to threaten the Plan's purpose to deal equitably with Asbestos PI Claims;

(xi)     The terms of the Asbestos PI Channeling Injunction, including any provisions barring actions against third parties, are set forth in the Plan and the Disclosure Statement;

(xii)     The Plan separately classifies Class 4 Asbestos PI Claims, and at least two-thirds (2/3) in amount and seventy-five percent (75%) of the members in such Class that voted on the Plan have voted to accept the Plan;

(xiii)     Pursuant to: (A) the Asbestos PI Trust Distribution Procedures; (B) court order; or (C) otherwise, the Asbestos PI Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos PI Claims or other comparable mechanisms, that provide reasonable assurance that the Asbestos PI Trust will value, and be in a financial position to pay, similar Asbestos PI Claims in substantially the same manner;

(xiv)     The Asbestos PI Trust will make payments to Asbestos PI Claims pursuant to the Asbestos PI Trust Distribution Procedures as funds become available and as Asbestos PI Claims are liquidated, while maintaining sufficient resources to pay future valid Asbestos PI Claims on a substantially equivalent basis;

(xv)     The Future Claimants' Representative  was appointed by the Bankruptcy Court pursuant to section 524(g) of the Bankruptcy Code as part of the proceedings leading to the issuance of the Asbestos PI Channeling Injunction for the purpose of protecting the interests of Future Demand Holders who do not currently hold asbestos-related Claims arising out of the conduct or products of THAN;

(xvi)     In light of the benefits provided, or to be provided, to the Asbestos PI Trust and/or Reorganized THAN by or on behalf of each current and future Asbestos Protected Party, the Asbestos PI Channeling Injunction is fair and equitable to all creditors and Future Demand Holders;

(xvii)     The Plan and its acceptance otherwise comply with sections 524(g) and 1126 of the Bankruptcy Code, and confirmation of the Plan is in the best interests of all creditors;

(xviii)     The Asbestos PI Trust will have the sole and exclusive authority as of the Effective Date to satisfy or defend against all Asbestos PI Claims;

(xix)     The Plan has not been accepted by all Impaired Classes of Claims and Equity Interests because the holders of Equity Interests in Class 6 (Equity Interests in THAN) are deemed to reject the Plan.  Nevertheless, the Plan is confirmable because it satisfies section 1129(b)(1) of the Bankruptcy Code because no holder of any interest that is junior to the interests of Class 6 will receive or retain any property under the Plan on account of such junior interest;

(xx)     The duties, obligations and liabilities of any Asbestos Insurance Entity under all insurance policies, all Shared Asbestos Insurance Policies, all Insurance Settlement Agreements, and all other settlement agreements, are not enlarged or diminished, reduced or eliminated by any aspect of this Chapter 11 Case; provided, however, that all Asbestos PI Insurer Coverage Defenses are preserved in accordance with Article 10.4 above;

(xxi)     THAN is, and was at all times prior to the Effective Date, a valid legal Entity separate and distinct from PENAC, and PENAC is not and may not in the future be held liable for any liability of THAN based upon any legal or equitable theory, including those consisting of or relating to veil piercing, alter ego, successor liability, fraudulent transfer, or conspiracy, including but not limited to fraudulent transfer or fraudulent conveyance claims under applicable state or federal law, denuding the corporation claims, single business enterprise claims, claims that THAN was the predecessor, mere instrumentality, agent or alter ego of a PENAC Related Party or of Elementis, trust fund claims, claims that a PENAC Related Party or Elementis conspired with THAN, and any causes of action against a PENAC Related Party or Elementis that belong to the Debtor or Debtor in Possession, whether or not included in the foregoing list;

(xxii)     The Asbestos PI Channeling Injunction is essential to the Plan and THAN's reorganization efforts;

(xxiii)     The PENAC Contribution, including:  (A) the PENAC Asbestos PI Trust Contribution (consisting of the PENAC Cash, residual Cash as of the Effective Date, if any, whether (1) drawn under the DIP Agreement and not used by THAN or (2) remaining under any pre-Commencement Date advance made to THAN by PENAC, to the extent such residual Cash will not be necessary for distributions under the Plan on account of Allowed General Unsecured Claims, and with THAN, the Insurance Settlement Proceeds Trust Assets); and (B) the PENAC Debtor Contribution (consisting of the assumption of the Known Environmental Liabilities and the PENAC Assets, the forgiveness of any amounts THAN may have drawn and used from the DIP Agreement and release of any and all Liens, Claims, Encumbrances or other interests of PENAC on THAN's or Reorganized THAN's assets that served as security for the DIP Agreement, any costs associated with providing insurance coverage for Reorganized THAN under the Unknown Environmental Liability Insurance Policy, contribution of a one-time Cash payment in the amount of $1,000,000 by PENAC to Reorganized THAN on the Effective Date, and the assumption by PENAC of any and all obligations with respect to retiree benefits owed to former employees of THAN or employees of THAN as of the Effective Date), constitute substantial assets of the Plan and the reorganization, are essential to the feasibility of the Plan and the successful reorganization of the Debtor; and constitute a sufficient basis upon which to provide the PENAC Related Parties and Elementis with the protections afforded to them under the Plan, Plan Documents and Confirmation Order;

(xxiv)     The release received by the PENAC Related Parties in exchange for the PENAC Contribution is essential to the global settlement of Asbestos PI Claims arising from the conduct or products of THAN reflected in this Plan;

(xxv)     The terms and conditions of the Promissory Note, the Pledge Agreement and any related documents are essential to the success and feasibility of the Plan. All such documents shall constitute legal, valid, binding and authorized obligations of the parties obligated thereunder, enforceable in accordance with their terms. On the Effective Date, all of the liens and security interests granted in accordance with such documents shall be deemed approved and shall be legal, valid, binding and enforceable liens on the collateral in accordance with the terms of each agreement; and

(xxvi)     Reorganized THAN, and the Parent Trust and the Asbestos PI Trust to be established pursuant to the Plan, are valid legal Entities separate and distinct from one another and each of Reorganized THAN, the Parent Trust and the Asbestos PI Trust are not and may not in the future be held liable for any liability of the other entities based upon any legal or equitable theory, including those consisting of or relating to veil piercing, alter ego, successor liability, fraudulent transfer, or conspiracy, including but not limited to fraudulent transfer or fraudulent conveyance claims under applicable state or federal law.

**12.2     Effective Date of the Plan.** The Effective Date shall not occur and the Plan shall not become effective until the date that is thirty-five (35) days after the date that the Confirmation Order, containing the Asbestos PI Channeling Injunction, shall have been either entered by the Bankruptcy Court and accepted and affirmed by the District Court or issued by the District Court, on which date the PENAC Asbestos PI Trust Contribution and THAN Contribution shall have been made to the Asbestos PI Trust, and the Asbestos PI Trust shall begin to pay Asbestos PI Claims, including the Qualified Asbestos PI Claims.

**12.3     Waiver of Conditions Precedent to the Confirmation Order.** To the fullest extent permitted by law, any of the conditions precedent set forth in Article 12.1 above may be waived or modified, in whole or in part, by THAN, after consultation with and consent by PENAC, the Future Claimants' Representative and the Asbestos Claimants Group. Any such waiver or modification may be effected at any time without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

**12.4     Effect of Failure of the Effective Date of the Plan.** In the event that THAN determines it is appropriate, after consultation with and consent by PENAC, the Future Claimants' Representative and the Asbestos Claimants Group, prior to the Effective Date, upon notification submitted by THAN to the Bankruptcy Court: (A) the Confirmation Order shall be vacated; (B) no Distributions under the Plan shall be made; and (C) THAN and all holders of Claims against and Equity Interests in THAN shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred. If the Confirmation Order is vacated pursuant to this Article 12.4, nothing contained in the Plan shall: (A) constitute or be deemed a waiver or release of any Claims or Equity Interests by, against, or in THAN or any other Entity; or (B) prejudice in any manner the rights of THAN or any other Entity in the Chapter 11 Case or any other or further proceedings involving THAN.

**ARTICLE XIII**

**JURISDICTION OF BANKRUPTCY COURT**

**13.1     Retention of Jurisdiction.** Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall, to the fullest extent permitted by law, retain and have exclusive jurisdiction over all matters arising out of and related to the Chapter 11 Case and the Plan, including, among other things, jurisdiction to:

(a)     hear and determine any and all objections to and proceedings involving the allowance, estimation, classification, and subordination of Claims that have been or properly should have been brought in the Bankruptcy Court (other than Asbestos PI Claims) or Equity Interests;

(b)     hear and determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Asbestos PI Trust after the Effective Date, including any proceedings with respect to any Avoidance Actions (except to the extent that any such Avoidance Actions has been released under the Plan or the Confirmation Order) or otherwise to recover assets for the benefit of the Estate or the Asbestos PI Trust;

(c)     hear and determine all objections to the termination of the Asbestos PI Trust;

(d)     hear and determine such other matters that may be set forth in or arise in connection with the Plan, the Confirmation Order, the Asbestos PI Channeling Injunction, or the Asbestos PI Trust Agreement;

(e)     hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Asbestos PI Channeling Injunction;

(f)     hear and determine any conflict or other issues that may arise in the Chapter 11 Case and the administration of the Asbestos PI Trust;

(g)     enter such orders as are necessary to implement and enforce the injunctions described herein, including, if necessary, in connection with application of the protections afforded by section 524(g) of the Bankruptcy Code to the Asbestos Protected Parties;

(h)     hear and determine any and all applications pursuant to section 330 or 503 of the Bankruptcy Code for allowance of any compensation for Professional services rendered and reimbursement of expenses incurred in connection therewith any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

(i)     enter such orders authorizing non-material modifications to the Plan as may be necessary to comply with section 468B of the Internal Revenue Code;

(j)     hear and determine any applications pending on the Effective Date for the assumption, assumption and assignment, or rejection, as the case may be, of Executory Contracts to which THAN is a party, and to hear and determine and, if necessary, liquidate any and all Claims arising therefrom;

(k)     hear and determine any and all applications, Claims, causes of action, adversary proceedings, and contested or litigated matters that may be pending on the Effective Date or commenced by Reorganized THAN or any other party in interest subsequent to the Effective Date;

(l)     consider any technical modifications of the Plan, and remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order, to the extent authorized by the Bankruptcy Code; provided, that there shall be no modification made at any time that would reduce or eliminate any of the protections provided herein to the Asbestos Protected Parties or releases provided with respect to the Derivative Liability Asbestos PI Claims;

(m)  issue orders in aid of confirmation, consummation and execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code, including but not limited to compelling the conveyance of property and other performance contemplated under the Plan and documents executed in connection herewith;

(n)  hear and determine any proposed compromise and settlement of any Claim against or cause of action by or against THAN that has been or properly should have been brought in the Bankruptcy Court;

(o)  hear and determine any timely objections to Administrative Expense Claims asserted or to Proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to Allow or Disallow any Disputed Claim, in whole or in part;

(p)  hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(q)  hear and determine such other matters as may be set forth in the Confirmation Order or other orders of the Bankruptcy Court, or which may arise in connection with the Plan, the Confirmation Order, or the Effective Date, as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(r)  hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of the Plan or any Entity's obligations hereunder, including, but not limited to, performance of THAN's duties under the Plan;

(s)  enforce remedies upon any default under the Plan;

(t)  hear and determine any other matter not inconsistent with the Bankruptcy Code;

(u)  hear and determine any claim that in any way challenges or is related to any provision in the Confirmation Order, including, without limitation, the provision of the Confirmation Order set forth in Article 12.1(d)(xxi); and

(v)  enter a final decree closing the Chapter 11 Case.

If and to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction over any of the matters specified above, the reference to the "Bankruptcy Court" in the preamble to this Article 13.1 shall be deemed to be a reference to the "District Court." Notwithstanding the terms of this Article 13.1, the Bankruptcy Court shall retain continuing but not exclusive jurisdiction over Asbestos Insurance Actions; provided, however, that this Article 13.1 shall not confer or grant jurisdiction to the Bankruptcy Court when the Asbestos Insurance Action is governed by an otherwise applicable arbitration provision.  Notwithstanding anything in this Article 13.1 to the contrary, the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures shall govern the satisfaction of Asbestos PI Claims and the forum in which Asbestos PI Claims shall be determined.

**13.2  Modification of Plan.**  THAN, with the consent of PENAC, any official committee, and the Future Claimants' Representative, may alter, amend, or modify the Plan or any Schedules or Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date and may include any such amended Schedules or Exhibits in the Plan or the Plan Supplement, provided, that the Plan, as modified, meets the requirements of sections 1122 and 1123 of

the Bankruptcy Code, and THAN shall have complied with section 1125 of the Bankruptcy Code, to the extent necessary. Further, THAN, with the consent of PENAC, any official committee, and the Future Claimants' Representative may alter, amend, or modify the Plan or any Schedules or Exhibits thereto at any time after entry of the Confirmation Order and before the Plan's substantial consummation; provided, that: (a) the Plan, as modified, altered, or amended, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code; and (b) the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and finds that the circumstances warrant such modification. A holder of a Claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, if any, such holder changes its previous acceptance or rejection.

Notwithstanding anything in this Article 13.2, there shall be no modification to the Plan made at any time that would reduce or eliminate any of the protections provided herein to the Asbestos Protected Parties or releases provided with respect to the Derivative Liability Asbestos PI Claims.

**13.3** **Compromises of Controversies.** From and after the Effective Date, Reorganized THAN shall be authorized to compromise controversies not involving the Asbestos PI Trust, or Asbestos PI Claims, on such terms as Reorganized THAN may determine, in its sole discretion, to be appropriate.

**13.4** **Revocation or Withdrawal of the Plan.** THAN reserves the right to revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If THAN revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then the Plan shall be null and void in all respects; any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Equity Interest or Class of Claims or Equity Interests), any assumption or rejection of Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall: (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Equity Interests in, THAN or any other Entity; (b) prejudice in any manner the rights of THAN or any Entity in any further proceedings involving THAN; or (c) constitute an admission of any sort by THAN or any other Entity.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

**14.1** **Governing Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or a Schedule or Exhibit hereto or instrument, agreement or other document executed under the Plan provides otherwise, the rights, duties and obligations arising under the Plan, and the instruments, agreements and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York without giving effect to the principles of conflicts of law thereof.

**14.2** **Notices.** To be effective, all notices, requests and demands to or upon THAN, or, as applicable, upon PENAC, the Future Claimants' Representative and the Asbestos Claimants Group, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, and addressed as follows:

If to THAN:

>T H Agriculture & Nutrition, L.L.C.
>250 West 57th Street, Suite 901
>New York, New York  10107-0001
>Attention:  Joseph L. Wolf, Jr., President
>          Steven L. Carter, Secretary

with a copy (which alone will not constitute notice) to:

>Cadwalader, Wickersham & Taft LLP
>One World Financial Center
>New York, New York  10281
>Attention:  Bruce R. Zirinsky, Esq.
>          John H. Bae, Esq.

If to PENAC or its Affiliates:

>Philips Electronics North America Corp.
>3000 Minuteman Road, Bldg. 1
>Andover, Massachusetts  01810
>Attention:  Joseph E. Innamorati, Esq.

with a copy (which alone will not constitute notice) to:

>Sullivan & Cromwell LLP
>125 Broad Street
>New York, New York  10004-2498
>Attention:  Garrard R. Beeney, Esq.

If to the Future Claimants' Representative :

>Professor Samuel Issacharoff
>New York University School of Law
>40 Washington Square South
>New York, New York  10012-1099

with a copy (which alone will not constitute notice) to:

>Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation
>2323 Bryan Street
>Suite 2200
>Dallas, TX  75201-2689
>Attn:    Sander L. Esserman, Esq.

If to the Asbestos Claimants Group:

>Frank / Gecker LLP
>325 N. LaSalle St., Suite 625
>Chicago, Illinois  60610
>Attn:    Frances Gecker, Esq.

**14.3    Plan Supplement.**  Any and all Exhibits, lists, or Schedules referred to herein or in the Disclosure Statement but not filed with the Plan shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court at least five (5) Business Days prior to the deadline established by the Bankruptcy Court for the filing and service of objections to the Plan.  Thereafter, the Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours and at an internet site maintained for THAN by the Claims and Balloting Agent, with the web address set forth in the Disclosure Statement.  Claimants also may obtain a copy of the Plan Supplement, once filed, from THAN by written request sent to the following address:

>   THAN Ballot Processing Center
>   c/o Kurtzman Carson Consultants LLC
>   2335 Alaska Avenue
>   El Segundo, CA  90245

**14.4    Inconsistencies.**  To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan shall be controlling.  To the extent the Plan is inconsistent with the Confirmation Order, the provisions of the Confirmation Order shall be controlling.

**14.5    Reservation of Rights.**  If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Chapter 11 Case are and shall be reserved in full.  Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Chapter 11 Case shall be bound or deemed prejudiced by any such concession or settlement.  Moreover, if the Plan does not become effective no party in interest in the Chapter 11 Case shall be bound or prejudiced by any representation, written or oral, made by any party in connection with the Plan or the negotiation or prosecution of the Plan, including without limitation the representations made in the Plan, the Disclosure Statement or the Confirmation Order.

**14.6    Tax Reporting and Compliance.**  In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, THAN, and Reorganized THAN, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  No holder of an Allowed Claim against THAN shall effectuate any withholding with respect to the cancellation or satisfaction of such Allowed Claim under the Plan.  Reorganized THAN is hereby authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all taxable periods of THAN ending after the Commencement Date through, and including, the Effective Date of the Plan.

**14.7    Exemption from Transfer Taxes.**  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall be exempt from all taxes as provided in such section 1146(a).

**14.8    Binding Effect.**  The rights, benefits and obligations of any Entity named or referred to in the Plan, or whose actions may be required to effectuate the terms of the Plan, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity (including, but not limited to, any trustee appointed for THAN under chapters 7 or 11 of the Bankruptcy Code).  The Confirmation Order shall provide that the terms and provisions of the Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, and the terms and

provisions of the Plan shall continue to be effective in this or any superseding case under the Bankruptcy Code.

14.9 **Severability.** Upon the unanimous agreement of THAN or Reorganized THAN, as the case may be, PENAC, any official committee, unless such committee has been dissolved, and the Future Claimants' Representative, any provision of the Plan, the Confirmation Order, the Asbestos PI Channeling Injunction, or any of the Exhibits to the Plan that is determined to be prohibited, unenforceable, or invalid by a court of competent jurisdiction or any other governmental Entity with appropriate jurisdiction may be deemed ineffective as to any jurisdiction in which such provision is prohibited, unenforceable, or invalidated to the extent of such prohibition, unenforceability, or invalidation, without invalidating the effectiveness of the remaining provisions of the Plan, the Plan Documents, the Confirmation Order, the Asbestos PI Channeling Injunction and the Exhibits to the Plan or affecting the validity or enforceability of such provision and such remaining provisions in any other jurisdiction.

14.10 **Further Authorizations.** THAN and Reorganized THAN, as applicable, and, after the Effective Date, the Asbestos PI Trust, if and to the extent necessary, may seek such orders, judgments, injunctions, and rulings as each deems necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, the Plan.

14.11 **Payment of Statutory Fees.** All fees due and owing under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, as pro-rated to the Effective Date, shall be paid on or before the Effective Date. Reorganized THAN shall pay all such fees that arise after the Effective Date but before the closing of the Chapter 11 Case, as pro-rated to the closing of the Chapter 11 Case.

14.12 **Prepayment.** Except as otherwise provided in the Plan, the Plan Documents, or the Confirmation Order, Reorganized THAN shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; <u>provided</u>, that any such prepayment shall not violate or otherwise prejudice the relative priorities and parities among the Classes of Claims.

14.13 **Effective Date Actions Simultaneous.** Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. Actions required to be taken after the Effective Date or as soon as thereafter as is reasonably practicable shall be deemed to have been made on the Effective Date.

14.14 **General Statements.** Statements of a general nature set forth in this Plan shall not be construed to limit or restrict the specific provisions herein.

**IN WITNESS WHEREOF**, the undersigned has duly executed the Plan as of the date first above written.

Respectfully submitted,

**T H Agriculture & Nutrition, L.L.C.**

By: *//s/ Steven A. Carlson* _____
    Name:  Steven A. Carlson
    Title:  Chief Restructuring Officer

New York, New York
October 10, 2008

**SCHEDULE 1**

---

**PENAC AFFILIATES**

| | |
|---|---|
| 210 East Tarrant Street Realty Co. | 370 West Trimble Road Corporation |
| ADAC Capital, LLC | ADAC Iberia S.A. |
| ADAC Laboratories Canada Limited | ADAC Laboratories Europe B.V. |
| ADAC Laboratories Inc. | ADAC Laboratories Pacific Inc. |
| Adamind Ltd. | Advance Transformer Co. |
| Advance Transformer Co., S.A. de C.V. | Advanced Metrology Systems LLC |
| Advanced Metrology Systems Holdings LLC | Advanced Technology Laboratories Argentina S.A. |
| Advanced Technology Laboratories, Inc. | Advanced Technology Laboratories, Inc. (Delaware) |
| A-Life Medical, Inc. | Alkrode B.V. |
| Alltronics, LLC | American Color & Chemical, L.L.C. |
| Anoro B.V. | APMCQ Automotive Playback Modules Portugal, Unipessoal, LDA |
| Apollo Light Systems Inc. | Artemis Holdings |
| Assembléon America, Inc. | Assembléon B.V. |
| Assembléon China B.V. | Assembléon Denmark A/S I Likvidation |
| Assembléon Denmark A/S | Assembléon Deutschland GmbH |
| Assembléon Hong Kong Limited | Assembléon Italia S.R.L. |
| Assembléon Mexicana, S.A. de C.V. | Assembléon Netherlands B.V. |
| Assembléon Philippines, Inc. | Assembléon Singapore PTE LTD |
| Assembléon Taiwan Ltd. | Assembléon Technology (Suzhou) Co., Ltd. |
| Assembléon United Kingdom Ltd | Associated Electronic Products (Nigeria) Limited |

| | |
|---|---|
| ATL International LLC | ATL Ultrasound, Inc. |
| Atlas Diagnostics International, Inc. | Automated Response Center LLC |
| Avelingen Licht Holding B.V. | Avent Babycare Ltd |
| Avent Development Ltd | Avent Enterprises Ltd |
| Avent Finance Ltd | Avent Future Mothers Limited |
| Avent Group Ltd | Avent Holdings Ltd |
| Avent International Limited | Avent Limited |
| Avent Services Ltd | B.V. Expeditiekantoor voorheen A. Wouters & Co. |
| B.V. Woningbouw Exenkaf | Beijing Dtvia Condition Receiving System Co., Ltd. |
| Binafon Telecommunications Sdn. Berhad | Birlesik Aydinlatma Sanayi ve Ticaret Anonim Sirketi |
| Bouw- en Exploitatie Maatschappij "De Burgh" B.V. | BruxTec B.V. |
| Canlyte Inc. | Cannon Avent (S) PTE Ltd |
| Cannon Avent (Singapore) Pte Limited | Cannon Babysafe Limited |
| Cardiac Evaluation Services, Inc. | Carsonite Composites LLC |
| Care Technologies, Inc. | Cedova B.V. |
| Cellularvision Technology & Telecommunications, L.P. | Central Inkomensadministratie Nederland "CIAN" B.V. |
| Changshu Philips Ferrite Co., Ltd. | Chicago Magnet Wire Corp. |
| Children's Medical Ventures, LLC | CIV Comércio e Importação Vitória Ltda. |
| Coding Concepts LLC | Coding Concepts, Inc. |
| Color Kinetics Europe Limited | Color Kinetics Incorporated |
| Color Kinetics Netherlands B.V. | Color Kinetics Security Corporation |
| Compagnie Française Philips | Compañía de Vidrio Industrial, S.A. de C.V. |
| Componentes Eléctricos de Lámparas, S.A. de C.V. | Consort Investments B.V. |

| | |
|---|---|
| Construlita de Queretaro, S.A. de C.V. | Croxton Investments Ltd |
| CVL Componentes de Vidro Ltda. | DAM Central Management (D.C.M.) B.V. |
| DCF International Limited | De Vitrite Fabriek (The Vitrite Works) B.V. |
| Decolux Leuchtenvertriebs-GmbH | Digital Voice, Inc. |
| Dixtal Biomédica Indústria e Comércio Ltda. | Dixtal Tecnologia Indústria e Comércio Ltda. |
| DLO Asia Limited | DLO Holdings, Inc. |
| Dongyang Tospo Lighting Co., Ltd. | Dordtse Metaalindustrie "Johan de Witt" B.V. |
| DTVIA Conditional Access System (ChinaCrypt) Co., Ltd. | DutchAero B.V. |
| EBT Technology, Inc. | ECS Lighting Controls Ltd |
| Ekogaisma SIA | Ekolamp s.r.o. |
| Ekosij d.o.o. | Elecktrorama Holding B.V. |
| Electrical Lamp Manufacturers Thailand Limited | Electris Finance SA |
| Electrologica B.V. | Electronic Devices Limited |
| Elektro Holding S.A. | ElektroEko Organizacja Odzysku Sprzetu Elektrycznego i Elektronicznego S.A. |
| Elektrorama B.V. | Elektrorama Holding B.V. |
| Elevite AG | Emergin, Inc. |
| Emergency Response Systems, Inc. | EMGO |
| Enhanced CT Technology, LLC | Exenkaf Holding B.V. |
| F.I.M.I. S.R.L. | Fabrica Austral de Productos Eléctricos S.A. |
| Feidong Lighting Co., Ltd. | Feixin Lighting Co., Ltd. |
| Fiberoptic Medical Products, Inc. | Flash Acquisition Sub, Inc. |
| Framas Lightings Limited | Fuji Respironics Kabushiki Kaisha |
| General Lighting Pont-á-Mousson | Genlyte Canadian Holdings LLC |
| Genlyte DISC, Inc. | Genlyte Intangible Inc. |

| | |
|---|---|
| Genlyte Thomas Group LLC | Genlyte Thomas Group Nova Scotia ULC |
| Global Re B.V. | GT Mexican Holding Corp. |
| GTG Intangible Holdings LLP | GTG Intangible Inc. |
| GTG International Acquisitions LP | H.J. von Burg B.V. |
| Hanover Lantern Inc. | Hasrode B.V. |
| Hazlett Ireland Ltd. | Health Watch Holdings, Inc. |
| Health Watch, Inc. | Helfont Produtos Elétricos Ltda. |
| Helicor, Inc. | High Tech Campus Property Fund C.V. |
| Hilvarenbeek Training Services B.V. | Hoffmeister Leuchten GmbH |
| Hoffmeister-Leuchten Gesellschaft m.b.H. | HTCE General Partner B.V. |
| HTCE Limited Partner B.V. | IGC-Superpower, LLC |
| Illuminacion Tecnica I.L.T.E.C. S.A. de C.V. | Inbraphil - Indústrias Brasileiras Philips Ltda. |
| Industrias Venezolanas Philips, S.A. | Industriegrundstücks-Verwaltungsgesellschaft m.b.H. |
| Industriële Ontwikkelings-Maatschappij B.V. | Industrie-Spedition Gesellschaft mit beschränkter Haftung |
| Insurebase Enterprises Ltd. | Internationaal Octrooibureau B.V. |
| InterTrust Technologies Corporation | Invivo Corp. |
| Invivo Germany GmbH | Invivo Research UK Ltd |
| Invivo UK Ltd | Jilin NXP Semiconductors Ltd. |
| JJI Lighting Group GmbH Europe | JJI Lighting Group Inc. |
| Kayers A.S. | Kegler Lichttechnik GmbH |
| Kel Corporation | Kempston (1987) Limited |
| Koninklijke Philips Electronics N.V. | Kuhlmann-Informations-Systeme GmbH |
| Lampen-Recycling und Service GmbH | Lanier Healthcare, LLC |
| Larestine Ireland Ltd | Latin-American Holdings Corp |

| | |
|---|---|
| Lavington Investments Ltd | Ledalite Architectural Products LP |
| Leto Holdings | Leuchten Direkt GmbH |
| LG.Philips Displays Holding B.V. | LG.Philips LCD Co., Ltd. |
| LHC Australia, Inc. | LHC Canada, Inc. |
| Lifeline Systems Canada, Inc. | Lifeline Systems Company |
| Lifeline Systems Securities Corporation | Lifeline Systems, Inc. |
| Lightcycle Retourlogistik und Service GmbH | Lighthouse Consulting Group B.V. |
| Lighting de Colombia S.A. | Lighting Group Massive NV |
| Lighting Group Massive | Lighting Group PLI Holding |
| Lighting.Com., Inc. | Lightolier de Mexico, S.A. de C.V. |
| Limited Liability Company "Philips Ukraine" | Limited Liability Company "Philips" |
| Limited Liability Company "PHILPS LATVIA" | Linear Laboratories Corporation |
| Lite-tech Industries L.L.C. | Ljusgruppen Aktibolag |
| Lumec Holding Corp. | Lumec Inc. |
| Lumileds Lighting (Korea), Inc. - IN LIQUIDATION | LumiLeds Lighting Deutschland GmbH |
| LumiLeds Lighting Italia S.r.l. | Lumisistemas De México, S.A. de C.V. |
| Luxram Electric Ltd | Maatschappij voor Onroerend Goed "De Nieuwe Erven" B.V. |
| Magyar Hangszoro Rendszerek Ipari es Kereskedelmi Korlatolt Felelossegu Tarsasag | Malaysian Lamps SDN BHD |
| Manufactures Services Poland Sp.z.o.o. | Marconi Medical Systems Netherlands B.V. |
| Marconi Medizintechnik Deutschland GmbH | Marlin Developer Community LLC |
| Marlin Trust Management Organization LLC | Massive |
| Massive AG | Massive Asia Pacific Ltd. |
| Massive Aydinlatma Ürünleri Ticaret Limited | Massive Belysning A/S |

| Sirketi | |
|---|---|
| Massive Belysning AS | Massive Belysning Norge AS |
| Massive Belysning Sverige AB | Massive China Limited |
| MASSIVE d.o.o. | Massive Estonia Oscülingu |
| Massive Export | Massive Finland Oy |
| Massive France | Massive Holding UK Ltd |
| MASSIVE Hungária Villamospari Termelö Kft. | Massive Iluminacion, S.A. |
| Massive Ireland Limited | Massive Italia SpA |
| Massive Leuchten Gesellschaft m.b.H. | Massive Leuchten GmbH |
| "Massive Lighting" d.o.o. Zemun | Massive Nederland B.V. |
| Massive NV | Massive Polska Sp.z.o.o. |
| Massive Production Ningbo Ltd. | Massive Produktie Nederland B.V. |
| Massive Romania Impex S.R.L. | Massive Slovakia, spol. s.r.o. |
| Massive Svetila d.o.o. | Massive Svetila trgovina na debelo s svetili d.o.o. |
| Massive Svitidla s.r.o. | Massive UK Ltd |
| Massiveport - Comércio de Artigos de Iluminação, Lda | Matevu Import Export B.V. |
| Medi-Call Inc | Medith Oy |
| MedQuist Canada Company | MedQuist CM Corporation |
| Medquist Inc. | MedQuist IP Corporation |
| MedQuist of Delaware, Inc. | MedQuist Transcriptions, Ltd. |
| Mepco/Centralab, Inc. | Metaaldraadlampenfabriek "Volt" B.V. |
| Micro Scope B.V. | Microvision Medical Holding B.V. |
| Mini-Mitter Company, Inc. | Modular Lighting Instruments |
| Modular Lighting Instruments NV | Modular Lighting Nederland B.V. |
| Modular Lighting Paris | MRI Devices Corporation |

| | |
|---|---|
| Mullard Ltd. | NARVA Speziallampen GmbH |
| NARVA Speziallampen GmbH Plauen | Navpart II B.V. |
| NEC Philips Unified Solutions B.V. | NEC Philips Unified Solutions FR SAS |
| NEC Philips Unified Solutions Italia SPA | Necesse B.V. |
| Neglin Lamp B.V. | Netalog, Inc. |
| New Oxford Aluminum LLC | Noble Europe B.V. |
| Nolam 20 S.A.S. | Nolam 23 S.A.S. |
| Norlux S.A.R.L. | Normed AS |
| Omnium de Participation et de Gestion Maghrébin "O.P.G.M." | Open Invention Network LLC |
| Optical Manufacturing and Holding Company B.V. | Optiva Nevada Corporation |
| Organization for Enhanced Capability, Incorporated | P.T. Philips Industries Batam |
| Paco Adviseurs voor Informatiesystemen B.V. | Partners in Lighting International NV |
| Pavad Medical Inc. | PB North America Limited |
| PCW Beheermaatschappij B.V. | PD Magnetics B.V. |
| PDO Professional Digital Optical Media B.V. | PENAC World Sales Inc. |
| P-F Services Center (Thailand) Ltd. | Philip (M) SDN BHD |
| Philips & BenQ Digital Storage USA, Inc. | Philips & Lite-on Digital Solutions (Shanghai) Co., Ltd. |
| Philips & Lite-on Digital Solutions Corporation | Philips & LiteOn Digital Solutions Korea Ltd. |
| Philips & Lite-on Digital Solutions Korea Ltd. | Philips & Yaming Lighting Co., Ltd. |
| Philips (China) Investment Co., Ltd. | Philips (I) Limited |
| Philips AB | Philips Accessories & Computers Peripherals Inc. |
| Philips Accounting Services Ltd | Philips Advanced Metrology Systems, Inc. |
| Philips Aerospace B.V. | Philips AG |
| Philips Aktiebolag | Philips Algérie |

| | |
|---|---|
| Philips Analytical Technology GmbH | Philips and Elba Street Lighting S.R.L. |
| Philips and Neusoft Medical Systems Co., Ltd. | Philips Antillana N.V. |
| Philips Apeldoorn B.V. | Philips Appliances Ltd. |
| Philips Argentina S.A. | Philips Austria GmbH |
| Philips Automotive Lighting Hubei Co., Ltd. | Philips Bangladesh Limited |
| Philips Belgium | Philips Belgium NV |
| Philips Beteiligungs AG | Philips Bulgaria EOOD |
| Philips Business Communications - Soluções Empresariais Ltda. | Philips Business Communications China B.V. |
| Philips Business Electronics International B.V. | Philips Canada Ltd. |
| Philips Caribbean Panáma, Inc. | Philips Ceská republika s.r.o. |
| Philips Chilena S.A. | Philips Colombiana de Comercializacion S.A. |
| Philips Communication Systems B.V. | Philips Components B.V. |
| Philips Components International B.V. | Philips Components Ltd |
| Philips Consumer Communication | Philips Consumer Communications B.V. |
| Philips Consumer Communications International B.V. | Philips Consumer Communications UK Ltd |
| Philips Consumer Electronic Company | Philips Consumer Electronic Services B.V. |
| Philips Consumer Electronics B.V. | Philips Consumer Electronics Export B.V. |
| Philips Consumer Electronics International B.V. | Philips Consumer Products |
| Philips Consumer Lifestyle B.V. | Philips Consumer Lifestyle International B.V. |
| Philips Consumer Lighting (Ningbo) Co., Ltd. | Philips Consumer Lighting (Shenzhen) Co.. Ltd. |
| Philips Consumer Luminaires Czech Republic s.r.o. | Philips Consumer Luminaires Denmark A/S |
| Philips Consumer Luminaires Estonia OU | Philips Consumer Luminaires Export |
| Philips Consumer Luminaires Finland Oy | Philips Consumer Luminaires Italy SpA |
| Philips Consumer Luminaires Norway AS | Philips Consumer Luminaires Poland Sp.z.o.o. |

| | |
|---|---|
| Philips Consumer Luminaires Portugal, Lda | Philips Consumer Luminaires Slovakia s.r.o. |
| Philips Consumer Luminaires Spain, S.A. | Philips Consumer Luminaires Sweden AB |
| Philips Consumer Luminaires the Netherlands B.V. | Philips Consumer Luminaires UK Limited |
| Philips Consumer Products | Philips Consumer Products SA |
| Philips Consumer Relations B.V. | Philips Consumer-Service GmbH |
| Philips Consumption Electronics (Shanghai) Co., Ltd. | Philips Credit Corporation |
| Philips Crypto B.V. | Philips CSI Inc. |
| Philips D.O.O. Sarajevo | Philips da Amazônia Indústria Eletrônica Ltda. |
| Philips Danmark A/S | Philips DAP Export GmbH |
| Philips DAP Industries Poland Sp ZOO | Philips DAP Suzhou Holding B.V. |
| Philips DAP Zhuhai Holding B.V. | Philips Data Systems Ireland Ltd |
| Philips del Paraguay S.A. | Philips Design Limited |
| Philips Digital Networks B.V. | Philips Digital Video Systems (Breda) B.V. |
| Philips do Brasil Ltda. | Philips Domestic Appliances And Personal Care B.V. |
| Philips Domestic Appliances and Personal Care Co. of Suzhou Ltd. | Philips Domestic Appliances And Personal Care Company of Zhuhai SEZ, Ltd. |
| Philips Domestic Appliances and Personal Care International B.V. | Philips Dominicana S.A. |
| Philips Ecuador C.A. | Philips Egypt |
| Philips Egypt (Limited Liability Company) | Philips Electrical Company of Pakistan (Private) Limited |
| Philips Electrical Industries of Pakistan Ltd | Philips Electrical Zambia Ltd |
| Philips Electronic Components (Shanghai) | Philips Electronic Components (Shanghai) Co., Ltd. |
| Philips Electronic Equipment Ltd. | Philips Electronic Supplies (Malaysia) Sdn. Bhd. |
| Philips Electronics & Lighting, Inc. | Philips Electronics (Israel) Ltd. |

| | |
|---|---|
| Philips Electronics (Shanghai) Co., Ltd. | Philips Electronics (Shenzhen) Co., Ltd. |
| Philips Electronics (Thailand) Limited | Philips Electronics (Zhuhai) Co., Ltd. |
| Philips Electronics Asia Pacific Pte Ltd. | Philips Electronics Australia Limited |
| Philips Electronics China B.V. | Philips Electronics Employment Services B.V. |
| Philips Electronics Hong Kong Limited | Philips Electronics India Limited |
| Philips Electronics Industries (Taiwan) Ltd. | Philips Electronics Industries (Taiwan) Ltd. Chu Pei Plant |
| Philips Electronics Ireland Ltd | Philips Electronics Japan, Ltd. |
| Philips Electronics Korea Ltd | Philips Electronics Ltd. |
| Philips Electronics Malaysia Sdn. Bhd. | Philips Electronics Middle East & Africa B.V. |
| Philips Electronics Nederland B.V. | Philips Electronics North America Corporation |
| Philips Electronics Realty Corporation | Philips Electronics Representative Offices B.V. |
| Philips Electronics Singapore Pte Ltd | Philips Electronics Systems S.A. |
| Philips Electronics Technology (Shanghai) Co., Ltd. | Philips Electronics Technology Shanghai Holding B.V. |
| Philips Electronics Trading & Services (Shanghai) Co., Ltd. | Philips Electronics UK Limited |
| Philips Electronics Vietnam Limited | Philips Electronique Maroc |
| Philips Eletrônica da Amazônia Ltda. | Philips Eletrônica do Nordeste S.A. |
| Philips Employee Share Plan Pty. Limited | Philips Enabling Technolgies Group (Belgium) NV |
| Philips Enabling Technologies Group (Belgium) | Philips Enabling Technologies Group B.V. |
| Philips Enabling Technologies Group Nederland B.V. | Philips Estate |
| Philips Estate SA | Philips Export B.V. |
| Philips Extreme UV GmbH | Philips France |
| Philips GmbH | Philips GmbH Automotive Playback Modules |
| Philips Healthcare Informatics, Inc. | Philips Healthcare Informatics, Limited |

| | |
|---|---|
| Philips Healthcare Ltd | Philips Hearing Implants |
| Philips Hearing Technologies B.V. | Philips Hellas S.A. Commercial and Industrial Co. for Electrotechnical Products, Lighting and Medical Systems |
| Philips Hengdian Lighting (HK) Holding Limited | Philips High Tech Plastics B.V. |
| Philips High Tech Plastics Suzhou Ltd. | Philips Holding Mexico. S.A. de C.V. |
| Philips Holding U.S.A., Inc. | Philips Holdings Ltd |
| Philips Hong Kong Limited | Philips Ibérica, S.A. |
| Philips Impex Ltd | Philips India |
| Philips India Limited | Philips India Limited |
| Philips India Limited (Semiconductor & components division) | Philips Industrial Development, Inc. |
| Philips Industrial Electronics Nederland B.V. | Philips Industriepark Rothe Erde GmbH |
| PHILIPS INDUSTRIES Hungary Electronical Mechanical Manufacturing and Trading Limited Liability Company | Philips Industries Magyarorszag Elektronikai Mechanikal Gyarto es Kereskedelmi Korlatolt F |
| Philips Innov. Techno. Solutions NV | Philips Innovative Applications |
| Philips Innovative Applications SA | Philips Innovative Technology Solutions |
| Philips Intellectual Property & Standards GmbH | Philips Interactive Media Benelux |
| Philips Interactive Media Benelux B.V. | Philips International B.V. |
| Philips International Finance SA | Philips Iran (Private Joint Stock Company) |
| Philips Kommunikations Industrie AG | Philips Lamps & Luminaires Ltd |
| Philips Latvia LLC | Philips Lighting |
| Philips Lighting Alpignano S.R.L. | Philips Lighting B.V. |
| Philips Lighting Bielsko Sp.z.o.o. | Philips Lighting Central America, S.A. de C.V. |
| Philips Lighting Electronics (Shanghai) Co., Ltd. | Philips Lighting Electronics (Xiamen) Co., Ltd. |
| Philips Lighting Electronics Company | Philips Lighting Electronics Mexico, S.A. de C.V. |
| Philips Lighting Electronics Shanghai Holding | Philips Lighting Export Eastern Europe Ltd |

| B.V. | Sp.z.o.o. |
|---|---|
| Philips Lighting Holding B.V. | Philips Lighting Ltd |
| Philips Lighting Luminaires (Shanghai) Co., Ltd. | Philips Lighting Luminaires Shanghai Holding B.V. |
| Philips Lighting Malaysia Sdn. Bhd. | Philips Lighting Pabianice SA |
| Philips Lighting Poland S.A. | Philips Lite-On Digital Solutions Corporation |
| Philips Lübeckertordamm 5 Dritte Verwaltungs-GmbH | Philips Lübeckertordamm 5 Vierte Verwaltungs-GmbH |
| Philips Lübeckertordamm 5 Vierte Verwaltungs-GmbH | Philips Lübeckertordamm 5 Zweite Verwaltungs-GmbH |
| Philips Lübeckertordamm 5 Zweite Verwaltungs-GmbH | Philips Lumileds Holding B.V. |
| Philips Lumileds Lighting Company (Holding) B.V. | Philips Lumileds Lighting Company B.V. |
| Philips LumiLeds Lighting Company LLC | Philips LumiLeds Lighting Company Sdn. Bhd. |
| Philips Lumileds Lighting LLC | Philips Luminaires Ltd |
| Philips Luxembourg | Philips Luxembourg SA |
| Philips Magyarorszag Kereskedelmi Korlatolt Felelossegu Tarsasag | Philips Malaysia Sdn. Berhad |
| Philips Marketing Services, Inc. | Philips Maroc |
| Philips Media B.V. | Philips Media Systems B.V. |
| Philips Medical Capital France | Philips Medical Capital GmbH |
| Philips Medical Capital S.p.A. | Philips Medical Capital, LLC |
| Philips Medical Customer Support (Pty) Limited | Philips Medical Financial Services, Inc. |
| Philips Medical Refurbished Systems B.V. | Philips Medical System India Limited |
| Philips Medical System Service Private Joint Stock Company | Philips Medical Systems |
| Philips Medical Systems (Cleveland), Inc. | Philips Medical Systems (East Africa) Limited |
| Philips Medical Systems (pmms Puerto Rico), Inc. | Philips Medical Systems (PMMS Sales) |

| | Corporation |
|---|---|
| Philips Medical Systems (Proprietary) Limited | Philips Medical Systems DMC GmbH |
| Philips Medical Systems Export, Inc. | Philips Medical Systems Holding B.V. |
| Philips Medical Systems International | Philips Medical Systems International B.V. |
| Philips Medical Systems Ltda. | Philips Medical Systems MR, Inc |
| Philips Medical Systems Nederland B.V. | Philips Medical Systems North America Inc. |
| Philips Medical Systems NV | Philips Medical Systems Puerto Rico, Inc. |
| Philips Medical Systems S.p.a. | Philips Medical Systems s.r.o. |
| "Philips Medical Systems Services Polska" Sp.z.o.o. w likwidacji | Philips Medical Systems Technologies Ltd. |
| Philips Medical Systems UK Ltd | Philips Medical Systems, L.L.C. |
| Philips Medizin Systeme Boblingen GmbH | Philips Medizin Systeme GmbH |
| Philips Medizin Systeme Hofheim-Wallau GmbH. | Philips Medizinische Systeme Gesellschaft m.b.H. |
| Philips Medizinsysteme Hofheim-Wallau GmbH | Philips Mexicana. S.A. de C.V. |
| Philips MPEG Inc. | Philips Nederland B.V. |
| Philips Nederland Financieringsmaatschapptij B.V. | Philips New Zealand Limited |
| Philips Norge AS | Philips Nuclear Medicine, Inc. |
| Philips' Ontwikkelings-Maatschappij B.V. | Philips OOO |
| Philips Oral Healthcare, Inc. | Philips Outdoor Lighting Romania S.R.L. |
| Philips Overseas Holdings Corporation | Philips Oy |
| Philips Participations B.V. | Philips Patient Monitoring Systems China Holding B.V. |
| Philips Pension (Property Trustee) Ltd | Philips Pension Trustees Ltd |
| Philips Pensionskasse Aktiengesellschaft in Liquidation | Philips Peruana S.A. |
| Philips PMF International B.V. | Philips PMF Nederland B.V. |
| Philips Polska Sp.z.o.o. | Philips Portuguesa, S.A. |

| | |
|---|---|
| Philips Projects B.V. | Philips Properties |
| Philips Properties SA | Philips Radio B.V. |
| Philips Radio Communication Systems Ireland Ltd | Philips Radio Manufacturing Co. Ltd. |
| Philips Real Estate Investment Management B.V. | Philips Real Estates (Taiwan) Ltd. |
| Philips Recordable Media Unternehmensbereich der Philips GmbH | Philips Romania S.R.L |
| Philips S Ventures LP Incorporated | Philips SC Unterstützungskasse GmbH |
| Philips Semiconductor Manufacturing Inc. | Philips Semiconductors GmbH |
| Philips Semiconductors Inc. | Philips Semiconductors Marketing and Sales Unternehmensbereich der Philips GmbH |
| Philips Services | Philips Services SA |
| Philips Singapore Private Limited | Philips Slovakia s.r.o. |
| Philips Slovenija trgovina, d.o.o. | Philips Societa per Azioni |
| Philips Software Centre Limited | Philips Software Centre Private Limited |
| Philips Solid-State Lighting Solutions, Inc. | Philips South Africa (Proprietary) Limited |
| Philips SPA | Philips Speech Recognition Systems GmbH |
| Philips Speech Solutions, S.A. | Philips Systemes Medicaux Algerie |
| Philips Systèmes Médicaux Maroc | Philips Taiwan Ltd. |
| Philips Technologie GmbH | Philips Technologies GmbH |
| Philips Telecommunicatie en Data Systemen Nederland B.V. | Philips Telecommunication and Data Systems Limited |
| Philips Telecommunication Industries Limited | Philips TMC Ltd |
| Philips Trading House B.V. | Philips Trans-America Holdings Corporation |
| Philips Tunisienne d' Eclairage S.A. | Philips U.K. Ltd |
| Philips Ukraine LLC | Philips Ultrasound, Inc. |
| Philips UQE Holding Company, Inc. | Philips Uruguay S.A. |
| Philips Venture Capital Fund B.V. | Philips Ventures II Incorporated |

| | |
|---|---|
| Philips Ventures Incorporated | Philips Video International Beteiligungs Gesellschaft m.b.H. |
| Philips Warehouse & Services B.V. | Philips' Ontwikkelings-Maatschappij B.V. |
| Phillips Autopartes, S.A. de C.V. | Phillips Consumer Communications International B.V. |
| Phillips Dominicana, S.A. | Phillips Electrical Company of Pakistan PVT LTD |
| PHIT Philips Healthcare Information Technology GmbH | PhSiTh LLC |
| PHTP High Tech Plastics Holding B.V. | Picker International Del Caribe, Inc. |
| Pioneer Medical Systems Corp. | PKV Vermögensverwaltung AG |
| PKV Vermögensverwaltung Aktiengesellschaft | PLDS Germany GmbH |
| PLDS Netherlands B.V. | PLI Information Technology |
| PLI Information Technology NV | Podium |
| Podium NV | Polymer Vision B.V. |
| Polymer Vision Limited | PPC Limited |
| Premium Sound Solutions (Shenzhen) Co., Ltd. | PrimeDisc Technologies GmbH |
| Productos de Consumo Electronico Philips, S.A. de C.V. | Profile Pharma Limited |
| Project Realty LLC | Pro-Tech Services Inc. |
| Protect Emergency Response Systems, Inc. | PSS Belgium NV |
| PT. Pesona Gemilang Raya | PT. Philips Indonesia |
| Pye (Electronic Products) Ltd. | Pye Ltd. |
| Pyecam Company Ltd | R.T.V. Electro Export B.V. |
| Radio Finance S.A. | Rainbow Displays, Incorporated - DISSOLVED |
| Raytel Cardiac Services, Inc. | Raytel Imaging Network, Inc. |
| Raytel USA, Inc. | RCM Manufacturing |

| | |
|---|---|
| RCS - Sistemas de Controlo Remoto, S.A. | Reality Leuchten GmbH |
| Recylum | Reda Service B.V. |
| Remediation Services, Inc. | Respironics (HK) Limited |
| Respironics (Ireland) Limited | Respironics Sweden AB |
| Respironics (UK) Limited | Respironics AG |
| Respironics Australia Holdings Pty. Ltd. | Respironics Australia Pty. Ltd. |
| Respironics Bermuda Ltd. | Respironics California, Inc. |
| Respironics Charitable Foundation | Respironics Colorado, Inc. |
| Respironics Deutschland GmbH & Co. KG | Respironics Deutschland Verwaltungsgesellschaft mbH |
| Respironics do Brasil Representação de Produtos Médicos Ltda. | Respironics France |
| Respironics France S.A.R.L. | Respironics International Global Enterprises, Inc. |
| Respironics International, Inc. | Respironics In-X, Inc. |
| Respironics Italy S.r.l. | Respironics Ltd. |
| Respironics Medical Products (Shenzhen) Ltd. | Respironics Medith Oy |
| Respironics Netherlands B.V. | Respironics New Jersey, Inc. |
| Respironics Novametric, LLC | Respironics Novametrix, LLC |
| Respironics Overseas, Inc. | Respironics OxyTec, Inc. |
| Respironics Profile, Inc. | Respironics Respiratory Drug Delivery (UK) Ltd. |
| Respironics Sleep & Respiratory Research Foundation | Respironics Sweden AB |
| Respironics Switzerland GmbH | Respironics Technotrend Limited |
| Respironics UK Holding Company Limited | Respironics, Inc. |
| Response Ability Systems, Inc. | RI Assurance, Inc. |
| RI Finance, Inc. | RI Licensing, Inc. |
| RI Trading, LLC | RIC Investments, LLC |

| | |
|---|---|
| Ring Station II | S.C.I. Opéra-Sèvres |
| S3 Holdings Ltd | SAFINA S.A. de Capitalización y Ahorro |
| Saftel | SCBO - Sociedade de Componentes Bobinados de Ovar, S.A. |
| Scientific Medical Systems International, Inc. | SEDS - Sociedade de Electronica, Desenvolvimento e Serviços, S.A, |
| Shakespeare Composite Structures LLC | Shanghai Yaming Illuminative Co., Ltd. |
| Shanxi Jinpu Philips Electric Appliance Sales Co., Ltd. | Shenzhen Goldway Industrial Inc. |
| SIA Ekogaisma | Side-Lite, LLC |
| Siera Electronics B.V. | Sigma Manufacturing Limited |
| Sigor Glühlampen GmbH | Silicon & Software Systems Cesk republika s.r.o. |
| Silicon & Software Systems US | Silicon & Software Systems Polska SP ZOO |
| Silicon B203 Ltd | Silicon Hive B.V. |
| Silicon Manufacturing Itzehoe SMI GmbH | Silicon MEMS Itzehoe GmbH |
| Sleep HealthCenters, LLC. | Smit Röntgen B.V. |
| Société Service de Propriété Industrielle et de Documentation | Sonoma Lighting Ltd. |
| Sound International B.V. | SpeechMagic Holding GmbH |
| Speech Machines Inc | Speech Machines Ltd |
| Speech Machines Ltd. | Speziallampenfabrik Dr. Fischer GmbH |
| Spiropharma | Spiropharma A/S |
| Splendor Gloeilampenfabrieken B.V. | SSI • Sociedade de Serviços Industriais, S.A. |
| Sportlite, Inc. | Stadion Amsterdam C.V. |
| Ste Civile Spid | Stella Lamp Company Ltd |
| Strand Lighting Asia Limited | Strand Lighting Europe Limited |
| Strand Lighting Inc. | Super Club International B.V. |

| | |
|---|---|
| Super Club Nederland B.V. | Superclub Retail Nederland B.V. |
| Superclub Trading | Superlight Trading |
| SuperLight Trading Limited | Superlight Trading NV |
| SuperPower Inc. | Superpower, LLC |
| Suzhou Philips Telecommunication System Co., Ltd. | T H Agriculture & Nutrition, L.L.C. |
| T3G Technology Co., Ltd. | Telcare Systems Inc |
| The Addison Company Inc. | The Bodine Company, LLC |
| The Bodine Group Holding Company | The Foreign Private Consulting-Trading Unitary Enterprise "Philips-Belorussia" of Company Philips' Radio B.V. |
| The Foreign Private Consulting-Trading Unitary Enterprise Philips Belorussia Of Company PH | The Genlyte Group Incorporated |
| The Irish Development Company Ltd | Thomas Lighting de Mexico, S.A. de C.V. |
| Tijm Holding B.V. | Tineney Ireland Ltd |
| TIR Technology LP | TPO Displays Germany GmbH |
| TPV Immobilienentwicklungs GmbH | Tradeplace B.V. |
| Translite Limited | Translite Sonoma, LLC |
| Traxtal Inc. | Trio Leuchten GmbH |
| Trixell | TTX (US) LLC |
| TTX Limited | Tubemaster, Inc |
| Turk Philips Ticaret AS | U G M Laboratory, Inc. |
| U.S. Philips Corporation | U-L-M Photonics GmbH |
| UQE, LLC | Uranus Elektronik-Beteiligungs GmbH |
| USS Manufacturing Inc. | Van der Heem B.V. |
| Van Der Heem B.V. SOS | Verwaltungsgesellschaft Philips Medizin Systeme mbH |
| VISICU, Inc. | Vision Robotics Corporation |

| | |
|---|---|
| VLSI Technology (UK) Holdings Ltd | VLSI Technology Ltd |
| VMI Indústria e Comércio Ltda. | W.J. Addison Ltd. |
| WCLP L.P. | Wegot Investment Limited |
| Western Biomedical Technologies Limited | Westpoort |
| Witt Biomedical Corporation | XIMIS Peru S.A.C. |
| Yort Inc. | ZAO Idman MOW |
| Zhejiang Yankon Lighting Co., Ltd. | Zymed Puerto Rico, Inc. |

# SCHEDULE 2

## THAN AFFILIATES

| | |
|---|---|
| Agricultural Chemicals, Inc. | Commerce Industrial Chemicals |
| Consolidated Electronics Industries Company | DePeseter Western, Inc. |
| Independent Petrochemical Corporation, Inc. | Koninklijke Philips Electronics NV |
| Leeds Investment Company | N.V. Philips Gloeilampenfabrieken |
| North American Philips Corp. | Ok-Tex Chemicals, Inc. |
| PEPI Inc. | Peter Hand Co |
| Philips Electronics and Pharmaceutical Industries Corporation | Philips Electronics North America Corp. |
| Philips Holdings, USA | Philips-Roxane, Inc. (International Division) |
| Planter's Chemical Corp. | Remediation Services, Inc |
| Sep-Ko Chemicals | Speare Company Laundry Supply |
| Specifide, Inc. | Tesco Chemicals, Inc. (Industrial Chemicals Division) |
| Thompson-Hayward Chemical Company (1925) | Thompson-Hayward Chemical Company (1961) |
| Thompson Hayward & Schlueter, Inc. | Thompson-Munro-Robbins Chemical Company |
| Wittichen Chemical Compay | 383 Beechmont Drive Corp. |
| Duphar Nutrition, Inc. | Uniroyal, Inc. |
| 210 East Tarrant Street Realty Corp | Elementis Group B.V. |

## SCHEDULE 3

## ELEMENTIS AFFILIATES

| | |
|---|---|
| Abbey Chemicals Limited | Elementis London Limited |
| Agrichrome Limited | Elementis LTP Holdings Inc. |
| American Chrome & Chemicals Holdings Inc | Elementis LTP Inc. |
| American Chrome & Chemicals Inc | Elementis LTP LP |
| American Chrome & Chemicals LP | Elementis Malaysia Sdn Bhd |
| Deuchem (HK) Trading Co Ltd | Elementis Nederland B.V. |
| Deuchem (Shanghai) Chemical Co Ltd | Elementis New Zealand Limited |
| Deuchem Co Ltd | Elementis NZ Limited |
| Deuchem Holding Inc | Elementis Pigments Inc |
| Deuchem International Inc | Elementis PLC |
| Deuchem Trading International Ltd | Elementis Securities Limited |
| Elementis America Shared Services Inc. | Elementis Service Centre NV |
| Elementis Australia Limited | Elementis Services Limited |
| Elementis Australia Pty Limited (in liquidation) | Elementis Specialties (Anji) Ltd |
| Elementis Benelux SA / NV | Elementis Specialties Changxing Limited |
| Elementis Benelux Unlimited | Elementis Specialties Inc |
| Elementis BV | Elementis Specialties Netherlands BV |
| Elementis Catalysts Inc | Elementis UK Limited |
| Elementis Chemicals Inc | Elementis Worldwide Inc. |
| Elementis Chromium America Inc | H & C Lumber Inc |
| Elementis Chromium GP Inc | H.& C. Acquisitions Limited |

| | |
|---|---|
| Elementis Chromium Limited Liability Partnership | Harcros Chemicals Canada Inc |
| Elementis Chromium LP | Harcros Coffee Plantations Limited |
| Elementis Chromium LPI Inc | Harrisons & Crosfield (PNG) Limited |
| Elementis Dormants Limited | Iron Oxides sa de CV, Mexico |
| Elementis Finance (Australia) Limited | Kamarl Limited |
| Elementis Finance (Germany) Limited | Linatex Asia Sdn Bhd |
| Elementis Germany GmbH | Malzfabrik Schragmalz Vermoegensverwaltungs GmbH |
| Elementis Germany Limited | NB Chrome Ltd. |
| Elementis GmbH | Rheox Limited |
| Elementis Group BV | Servo USA BV |
| Elementis Group Limited | Shanghai Deuchem Chemical Technology and Development Co Ltd |
| Elementis Holdings Limited | Shanghai Winchem Trading Co Ltd |
| ELEMENTIS JAPAN KK | Wismo Chemical Corp |

**EXHIBIT A**

---

**ASBESTOS PI TRUST AGREEMENT**

**T H AGRICULTURE & NUTRITION, L.L.C.**
**ASBESTOS PERSONAL INJURY TRUST AGREEMENT**

**dated as of**

**_____, 2008**

**by and among**

**T H Agriculture & Nutrition, L.L.C.**

**and**

**the persons listed on the signature pages attached hereto**

**TABLE OF CONTENTS**

Article I.    Agreement of Trust ................................................................... 2

1.1    Creation and Name ................................................................. 2

1.2    Purpose.................................................................................... 2

1.3    Transfer of Assets .................................................................. 2

1.4    Assumption of Liabilities and Certain Obligations ............. 3

1.5    Counsel and Asbestos Records .............................................. 4

1.6    Beneficial Owners .................................................................. 4

Article II.    Powers and Trust Administration ......................................... 4

2.1    Powers...................................................................................... 4

2.2    General Administration........................................................... 7

2.3    Claims Administration .......................................................... 10

Article III.    Qualified Settlement Fund ................................................... 10

3.1    Tax Treatment ....................................................................... 10

3.2    No Right to Reversion with Respect to Asbestos PI Trust Assets...................... 10

3.3    Obligations of the Asbestos PI Trustees .............................. 10

3.4    Obligations of the Company and PENAC ............................ 11

3.5    No Contravention of Requirements ...................................... 11

Article IV.    Accounts, Investments and Payments................................... 11

4.1    Accounts ................................................................................ 11

4.2    Investments ........................................................................... 12

4.3    Source of Payments............................................................... 13

Article V.    Asbestos PI Trustees; Delaware Trustee............................... 13

5.1    Initial Asbestos PI Trustees ................................................. 13

5.2    Term of Service...................................................................... 14

5.3    Successor Asbestos PI Trustees ........................................... 14

5.4    Liability of Asbestos PI Trustees, Delaware Trustee and Others ....................... 15

5.5    Compensation and Expenses of Asbestos PI Trustees and Delaware Trustee................................................................ 16

5.6    Indemnification of Asbestos PI Trustees, the Delaware Trustee and Additional Indemnitees............................................ 16

5.7    Asbestos PI Trustees' Lien ................................................... 17

| | | | |
|---|---|---|---|
| | 5.8 | Asbestos PI Trustees' Employment of Experts; Delaware Trustee's Employment of Counsel | 17 |
| | 5.9 | Asbestos PI Trustees' Independence | 17 |
| | 5.10 | Bond | 18 |
| | 5.11 | Delaware Trustee | 18 |
| Article VI. | | Trust Advisory Committee | 19 |
| | 6.1 | Initial Members of the Asbestos PI Trust Advisory Committee | 19 |
| | 6.2 | Duties | 19 |
| | 6.3 | Term of Office | 19 |
| | 6.4 | Successor Members of the Asbestos PI Trust Advisory Committee | 20 |
| | 6.5 | TAC's Employment of Professionals | 20 |
| | 6.6 | Compensation and Expenses of the Asbestos PI Trust Advisory Committee | 21 |
| | 6.7 | Procedures for Consultation with and Obtaining the Consent of the Asbestos PI Trust Advisory Committee | 21 |
| | | (a) Consultation Process | 21 |
| | | (b) Consent Process | 21 |
| Article VII. | | The Future Claimants' Representative | 23 |
| | 7.1 | Appointment of Initial Future Claimants' Representative | 23 |
| | 7.2 | Duties | 23 |
| | 7.3 | Term of Office | 23 |
| | 7.4 | Appointment of Successor | 24 |
| | 7.5 | Future Claimants' Representative's Employment of Professionals | 24 |
| | 7.6 | Compensation and Expenses of the Future Claimants' Representative | 25 |
| | 7.7 | Procedures for Consultation with and Obtaining the Consent of the Future Claimants' Representative | 25 |
| | | (a) Consultation Process | 21 |
| | | (b) Consent Process | 21 |
| Article VIII. | | General Provisions | 27 |
| | 8.1 | Irrevocability | 27 |
| | 8.2 | Term and Termination | 27 |

8.3 Amendments ................................................................................................ 28

8.4 Severability ............................................................................................... 29

8.5 Notices ...................................................................................................... 29

8.6 Successors and Assigns.............................................................................. 32

8.7 Limitation on Claim Interests for Securities Laws Purposes............................. 32

8.8 Entire Agreement; No Waiver ..................................................................... 32

8.9 Headings .................................................................................................... 32

8.10 Governing Law .......................................................................................... 32

8.11 Settlor Representative and Cooperation........................................................ 33

8.12 Dispute Resolution ..................................................................................... 33

8.13 Enforcement and Administration................................................................. 33

8.14 Effectiveness .............................................................................................. 33

8.15 Counterpart Signatures................................................................................ 33

# ASBESTOS PERSONAL INJURY TRUST AGREEMENT

This ASBESTOS PERSONAL INJURY TRUST AGREEMENT (this "Agreement"), dated as of _____, 2008, is made by and among T H Agriculture & Nutrition, L.L.C. ("THAN" or the "Company"), a Delaware limited liability company and a debtor-in-possession in Case No. _____ (___) in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and Philips Electronics North America Corporation, a Delaware corporation ("PENAC"), as the settlors of the trust established pursuant to this Agreement (the "Asbestos PI Trust") in accordance with the Prepackaged Plan of Reorganization of T H Agriculture & Nutrition, L.L.C. Under Chapter 11 of the Bankruptcy Code, filed pursuant to section 1121(a) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and confirmed by an order of the Bankruptcy Court entered on _____, 2008, which confirmation was affirmed by an order of the United States District Court for the Southern District of New York entered on _____, 2008 (the "Plan"), the trustees of the Asbestos PI Trust appointed as contemplated by Section 5.1 below (the "Asbestos PI Trustees"), Wilmington Trust Company ("Wilmington Trust"), as the initial "Delaware Trustee" (as defined in Section 5.11), the members of the Asbestos PI Trust Advisory Committee established pursuant to this Agreement and the Plan appointed as contemplated by Section 6.1 below, and the legal representative for the holders of future Asbestos PI Claims appointed as contemplated by Section 7.1 below (the "Future Claimants' Representative").

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan. All terms used but not defined herein or in the Plan but defined in the Bankruptcy Code or Bankruptcy Rules shall have the meanings ascribed to them in the Bankruptcy Code and Bankruptcy Rules, as the case may be. For purposes of this Agreement and the Asbestos PI Trust Distribution Procedures, "Asbestos PI Claims" shall not include Asbestos PI Trust Expenses.

WHEREAS, the Company has reorganized under the provisions of chapter 11 of the Bankruptcy Code in a case pending in the Bankruptcy Court known as In re T H Agriculture & Nutrition, L.L.C., Debtor, Case No. _____ (___); and

WHEREAS, the Plan has been confirmed by the Bankruptcy Court; and

WHEREAS, the Plan provides, *inter alia*, for the creation of the Asbestos PI Trust in accordance with this Agreement; and

WHEREAS, pursuant to the Plan, the Asbestos PI Trust is to use its assets and income to satisfy all Asbestos PI Claims; and

WHEREAS, it is the intent of each of the Company, the Asbestos PI Trustees, the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative that the Asbestos PI Trust be administered, maintained and operated at all times through mechanisms that provide reasonable assurance that the Asbestos PI Trust will satisfy all Asbestos PI Claims paid in accordance with the Asbestos PI Trust Distribution Procedures in substantially the same manner and in strict compliance with this Agreement; and

WHEREAS, pursuant to the Plan, the Asbestos PI Trust is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the United States Internal Revenue Code (the "IRC"); and

WHEREAS, the Bankruptcy Court has determined that the Asbestos PI Trust and the Plan satisfy all the prerequisites for an injunction pursuant to section 524(g) of the Bankruptcy Code, and the Asbestos PI Channeling Injunction has been entered in connection with the Confirmation Order;

NOW, THEREFORE, it is hereby agreed as follows:

Article I.        Agreement of Trust

1.1        Creation and Name. The Company and PENAC, as the settlors of the Asbestos PI Trust, hereby create a trust known as the "T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust," which is the Asbestos PI Trust provided for and referred to in the Plan. The Asbestos PI Trustees may transact the business and affairs of the Asbestos PI Trust in the name of the Asbestos PI Trust. It is the intention of the parties hereto that the trust created hereby constitute a statutory trust under the Delaware Statutory Trust Act, Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the "Act") and that this document, together with the bylaws described in Section 2.2, constitute the governing instruments of the Asbestos PI Trust. The Asbestos PI Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit A.

1.2        Purpose. The purpose of the Asbestos PI Trust is to (a) assume all liabilities and responsibility for Asbestos PI Claims (whether existing as of the Effective Date or arising at any time thereafter), (b) direct the processing, liquidation and payment of all Asbestos PI Claims in accordance with the Asbestos PI Trust Distribution Procedures, (c) preserve, hold, manage and maximize the Asbestos PI Trust Assets for use in paying and otherwise satisfying Asbestos PI Claims and paying Asbestos PI Trust Expenses, and (d) otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code, all in accordance with the Plan and this Agreement.

1.3        Transfer of Assets. Pursuant to the Plan, THAN and its parent company, PENAC, have made contributions equaling $900 million to the Asbestos PI Trust. As provided in the Plan, any funds contributed by THAN and PENAC in excess of the $900 million contribution provided for in the Plan will be returned to PENAC. In addition, pursuant to the Plan, the Asbestos PI Trust is the sole beneficiary of the Parent Trust, which holds all of the membership interests in Reorganized THAN. Finally, also pursuant to the Plan, Reorganized THAN has made the Promissory Note in the principal amount of $1,000,000 in favor of the Asbestos PI Trust, and the Parent Trust has entered into the Pledge Agreement granting the Asbestos PI Trust a security interest in 100% of the membership interests in Reorganized THAN to secure payment of the Promissory Note. In furtherance of the purpose of the Asbestos PI Trust, the Asbestos PI Trust hereby expressly accepts these assets. For purposes of this Agreement, "Asbestos PI Trust Assets" shall mean the assets described in this section, all of which have been transferred or

granted to the Asbestos PI Trust free and clear of any liens, security interests and other claims or causes of action, and any other assets which may from time to time be held by the Asbestos PI Trust.

     1.4    <u>Assumption of Liabilities and Certain Obligations</u>.

     (a)    In furtherance of the purpose of the Asbestos PI Trust, the Asbestos PI Trust hereby expressly assumes all liability and responsibility for (i) all Asbestos PI Claims and (ii) Asbestos PI Trust Expenses.

     (b)    Except as otherwise provided in this Agreement and the Asbestos PI Trust Distribution Procedures, the Asbestos PI Trust shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights, regarding Asbestos PI Claims that the Company has or would have under applicable law. Regardless of the foregoing, however, except as otherwise provided in Section 5.1(a)(2) of the Asbestos PI Trust Distribution Procedures, a claimant must meet otherwise applicable federal, state and foreign statutes of limitations and repose.

     (c)    Pursuant to the Plan, the Asbestos PI Trust has entered into, and agreed to provide the indemnification relating to Asbestos PI Claims provided for in, the Asbestos PI Trust Indemnification Agreement in the form attached hereto as Exhibit B.

     (d)    Nothing in this Agreement shall be construed in any way to limit the scope, enforceability or effectiveness of the Asbestos PI Channeling Injunction issued in connection with the Plan or the Asbestos PI Trust's assumption of all liability for Asbestos PI Claims, subject to the provisions of Section 1.4(b) above.

     1.5    <u>Counsel and Asbestos Records</u>.  THAN and PENAC shall not withhold consent to the Asbestos PI Trust's retention of the professional services of the counsel retained by THAN and/or PENAC in connection with matters pertaining to Asbestos PI Claims.  The Asbestos PI Trust and the Asbestos Records Parties have entered into the Asbestos Records Cooperation Agreement in the form attached hereto as Exhibit C.

     1.6    <u>Beneficial Owners</u>.  To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the Asbestos PI Trust shall be deemed to be the holders of Asbestos PI Claims (the "<u>Beneficial Owners</u>"); provided that (i) the holders of Asbestos PI Claims, as such Beneficial Owners, shall have only such rights with respect to the Asbestos PI Trust and its assets as are set forth in the Asbestos PI Trust Distribution Procedures, and (ii) no greater or other rights, including upon dissolution, liquidation or winding up of the Asbestos PI Trust, shall be deemed to apply to the holders of Asbestos PI Claims in their capacity as Beneficial Owners.

Article II.    <u>Powers and Trust Administration</u>

     2.1    <u>Powers</u>.

     (a)    The Asbestos PI Trustees are, and shall act as, the fiduciaries to the Asbestos PI Trust in accordance with the provisions of this Agreement, the Asbestos PI Trust

Distribution Procedures, the Plan and the Act. The Asbestos PI Trustees shall at all times administer the Asbestos PI Trust and the Asbestos PI Trust Assets in accordance with the purpose set forth in Section 1.2 above. Subject to the Plan and this Agreement, the Asbestos PI Trustees shall have the power to take any and all actions that they may consider necessary, appropriate or desirable to fulfill the purpose of the Asbestos PI Trust, including without limitation each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any statutory trust power now or hereafter permitted under the laws of the State of Delaware.

(b) Except as required by applicable law, the Plan or this Agreement, the Asbestos PI Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c) Subject to and without limiting the generality of Section 2.1(a) above, and except as limited below, the Asbestos PI Trustees shall have the power to:

(i) receive and hold the Asbestos PI Trust Assets and exercise all rights and powers with respect thereto, including, without limitation, rights as sole beneficiary of the Parent Trust, rights under the Promissory Note and the Pledge Agreement, and rights to vote and dispose of any securities that are included in the Asbestos PI Trust Assets;

(ii) invest the monies held from time to time by the Asbestos PI Trust;

(iii) sell, transfer or exchange any or all of the Asbestos PI Trust Assets at such prices and upon such terms as the Asbestos PI Trustees may consider necessary, appropriate or desirable in fulfilling the purpose of the Asbestos PI Trust;

(iv) enter into such leasing and financing agreements with third parties as the Asbestos PI Trustees may consider necessary, appropriate or desirable in fulfilling the purpose of the Asbestos PI Trust;

(v) pay liabilities and expenses of the Asbestos PI Trust, including without limitation Asbestos PI Trust Expenses;

(vi) establish such funds, reserves and accounts within the Asbestos PI Trust estate as the Asbestos PI Trustees may consider necessary, appropriate or desirable in fulfilling the purpose of the Asbestos PI Trust;

(vii) sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative or other proceeding;

(viii) establish, supervise and administer the Asbestos PI Trust in accordance with this Agreement and the Asbestos PI Trust Distribution Procedures;

(ix) appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing and forecasting and other advisors, consultants, independent contractors and agents and, to the extent permitted by the fiduciary duties of the Asbestos PI Trustees, delegate to such persons such powers and authorities, in each case as the

Asbestos PI Trustees may consider necessary, appropriate or desirable in fulfilling the purpose of the Asbestos PI Trust;

(x)     pay any officers, employees, legal, financial, accounting, investment, auditing and forecasting and other advisors, consultants, independent contractors and agents engaged by the Asbestos PI Trust, including without limitation those engaged by the Asbestos PI Trust in connection with its alternative dispute resolution activities, reasonable compensation;

(xi)     compensate the Asbestos PI Trustees, the Delaware Trustee, the members of the Asbestos PI Trust Advisory Committee, the Future Claimants' Representative and their respective officers, employees, legal, financial, accounting, investment, auditing, forecasting and other advisors, consultants, independent contractors and agents, and reimburse the Asbestos PI Trustees, the Delaware Trustee, the members of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative any reasonable out-of-pocket fees and expenses incurred by or on behalf of it, him or her in connection with the performance of its, his or her duties hereunder, all as provided below;

(xii)     execute and deliver such instruments as the Asbestos PI Trustees may consider necessary, appropriate or desirable in administering the Asbestos PI Trust;

(xiii)     enter into such other arrangements with third parties as the Asbestos PI Trustees may consider necessary, appropriate or desirable in fulfilling the purpose of the Asbestos PI Trust, provided such arrangements do not conflict with any other provision of this Agreement;

(xiv)     in accordance with Section 5.6 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) (A) the Asbestos PI Trustees, (B) the Delaware Trustee and (C) the members of the Asbestos PI Trust Advisory Committee, the Future Claimants' Representative, the officers and employees of the Asbestos PI Trust and any advisors, attorneys, consultants and agents of the Asbestos PI Trust, the Asbestos PI Trustees, the Delaware Trustee, the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative (collectively, the "Additional Indemnitees"), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and/or insure its directors, trustees, officers, employees, advisors, attorneys, consultants and agents;

(xv)     delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Asbestos PI Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.4 below; and

(xvi)     consult with the Company, the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative at such times and with respect to such issues relating to the conduct of the Asbestos PI Trust as the Asbestos PI Trustees may consider necessary, appropriate or desirable.

(xvii)   make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the Asbestos PI Trust, any claim, right, action, or cause of action included in the Asbestos PI Trust Assets.

(d)      Notwithstanding anything to the contrary contained herein, the Asbestos PI Trustees shall not have the power to guarantee any debt of other persons.

(e)      The Asbestos PI Trustees shall give the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative prompt notice of any act performed or taken pursuant to Section 2.1(c)(i), (iii), (vii) or (xv) above and any act proposed to be performed or taken of the type described in Section 2.2(e) below.

2.2      <u>General Administration</u>.

(a)      The Asbestos PI Trustees shall act in accordance with this Agreement. The Asbestos PI Trustees shall adopt and act in accordance with written bylaws (the "<u>Trust Bylaws</u>").  To the extent not inconsistent with this Agreement, the Trust Bylaws shall govern the affairs of the Asbestos PI Trust.  In the event of an inconsistency between the Trust Bylaws and this Agreement, this Agreement shall govern.

(b)      The Asbestos PI Trustees shall timely account to the Bankruptcy Court as follows:

(i)      The Asbestos PI Trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available and in any event within one hundred twenty (120) days following the end of each fiscal year of the Asbestos PI Trust, an annual report (the "<u>Annual Report</u>") containing financial statements of the Asbestos PI Trust (including without limitation a balance sheet of the Asbestos PI Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Asbestos PI Trustees and accompanied by an opinion of such firm as to the fairness of the financial statements' presentation of the cash and investments available for the payment of Asbestos PI Claims and as to the conformity of the financial statements with generally accepted accounting principles.  The Asbestos PI Trustees shall provide a copy of the Annual Report to the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative when such reports are filed with the Bankruptcy Court.

(ii)      Simultaneously with the filing of the Annual Report, the Asbestos PI Trustees shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of Asbestos PI Claims disposed of during the period covered by the financial statements.  The Asbestos PI Trustees shall provide a copy of such report to the Asbestos PI Trust Advisory Committee and the Future Claimants' Representatives when such report is filed.

(iii)      All materials required to be filed with the Bankruptcy Court by this Section 2.2(b) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court and shall be submitted to the US Trustee.

(c)     The Asbestos PI Trustees shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year of the Asbestos PI Trust a budget and cash flow projections covering such fiscal year and the succeeding four fiscal years.  The budget and cash flow projections shall include a proposed "Maximum Annual Payment" pursuant to Section 2.4 of the Asbestos PI Trust Distribution Procedures and the "Claims Payment Ratio" pursuant to Section 2.5 of the Asbestos PI Trust Distribution Procedures.  The Asbestos PI Trustees shall provide a copy of the budget and cash flow projections to the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative.

(d)     The Asbestos PI Trustees shall consult with both the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative (i) on the general implementation and administration of the Asbestos PI Trust, (ii) on the general implementation and administration of the Asbestos PI Trust Distribution Procedures, and (iii) on such other matters as may be required under this Agreement or the Asbestos PI Trust Distribution Procedures.

(e)     The Asbestos PI Trustees shall be required to obtain the consent of both the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative pursuant to the consent process set forth in Section 6.7(b) and 7.7(b) below, as the case may be, in addition to any other instances elsewhere enumerated herein, in order:

(i)     to change the "Claims Payment Ratio" described in Section 2.5 of the Asbestos PI Trust Distribution Procedures in the event that the requirements for such a change set forth in such provision have been met;

(ii)     to change the "Disease Levels," "Scheduled Values" and/or "Medical/Exposure Criteria" set forth in Section 5.3(a)(3) of the Asbestos PI Trust Distribution Procedures and/or the "Average Values" and/or "Maximum Values" set forth in Section 5.3(b)(3) and/or the extraordinary maximum value set forth in Section 5.4 of the Asbestos PI Trust Distribution Procedures;

(iii)     to change the "Payment Percentage" described in Section 2.3 of the Asbestos PI Trust Distribution Procedures as provided in Section 4.2 of the Asbestos PI Trust Distribution Procedures;

(iv)     to establish and/or to change the "Claims Materials" to be provided holders of Asbestos PI Claims under Section 6.1 of the Asbestos PI Trust Distribution Procedures;

(v)     to require that claimants provide additional kinds of medical and/or exposure evidence pursuant to Section 5.7 of the Asbestos PI Trust Distribution Procedures;

(vi)     to change the form of release to be provided pursuant to Section 7.8 of the Asbestos PI Trust Distribution Procedures;

(vii)     to terminate the Asbestos PI Trust pursuant to Section 8.2(a)(i) or (ii) below;

(viii)   to change the compensation of the Asbestos PI Trustees, the Delaware Trustee, the members of the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative, other than to reflect reasonable cost-of-living increases or changes approved by the Bankruptcy Court as otherwise provided herein; provided that a change in the compensation of the Delaware Trustee shall also require the consent of the Delaware Trustee;

(ix)   to take structural or other actions to minimize any tax on the Asbestos PI Trust Assets;

(x)   to amend any provision of this Agreement in accordance with the terms hereof (and the consent of the Delaware Trustee solely to the extent any such amendment adversely affects the rights, duties and obligations of the Delaware Trustee hereunder);

(xi)   to amend any provision of the Asbestos PI Trust Distribution Procedures in accordance with the terms thereof;

(xii)   to adopt the Trust Bylaws in accordance with Section 2.2(a) above or thereafter to amend the Trust Bylaws in accordance with the terms thereof;

(xiii)   to become the holder of a membership interest in Reorganized THAN by exercise of the Asbestos PI Trust's rights under the Pledge Agreement or otherwise, to accept any distribution from the Parent Trust of an asset other than cash, or to transfer, surrender, exchange, or otherwise dispose of the Asbestos PI Trust's interest in the Parent Trust; and

(xiv)   to merge any asbestos claims resolution organization formed by the Asbestos PI Trust with another asbestos claims resolution organization that is not specifically created by this Agreement or the Asbestos PI Trust Distribution Procedures, acquire an interest in any asbestos claims resolution organization that is not specifically created by this Agreement or the Asbestos PI Trust Distribution Procedures, contract with another asbestos claims resolution organization or any other entity that is not specifically created by this Agreement or the Asbestos PI Trust Distribution Procedures or permit any other party to join in any asbestos claims resolution organization that is formed by the Asbestos PI Trust pursuant to this Agreement or the Asbestos PI Trust Distribution Procedures; provided that any such merger, acquisition, contract or joinder shall not (a) subject the Company to any risk of having any Asbestos PI Claim asserted against it or (b) otherwise jeopardize the validity or enforceability of the Asbestos PI Channeling Injunction; and provided, further, that the terms of any such merger will require the surviving organization to make decisions about the allowability and value of Asbestos PI Claims in accordance with Section V of the Asbestos PI Trust Distribution Procedures.

(f)   For all purposes of this Agreement and the Act, the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative shall be deemed the consent of the Beneficial Owners.

(g)   The Asbestos PI Trustees shall meet with the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative no less often than quarterly. The Asbestos PI Trustees shall meet with the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative between such quarterly meetings at mutually convenient times and

locations when so requested by either the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative. The Delaware Trustee shall not be required or permitted to attend meetings.

(h) The Asbestos PI Trustees, upon notice from either the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative, if practicable in view of pending business, shall, at their next meeting with the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative, as the case may be, consider issues submitted by either of them.

(i) Periodically, but not less often than once a year, the Asbestos PI Trustees shall make available to holders of Asbestos PI Claims and other interested parties the number of Asbestos PI Claims by disease levels that have been resolved both by individual review and by arbitration, as well as by trial, indicating the amounts of the awards and the averages of the awards by jurisdiction pursuant to Section 7.10 of the Asbestos PI Trust Distribution Procedures.

2.3    Claims Administration. The Asbestos PI Trustees shall promptly proceed to implement the Asbestos PI Trust Distribution Procedures.

Article III.    Qualified Settlement Fund

3.1    Tax Treatment. The Asbestos PI Trust is intended to be treated for U.S. federal income tax purposes as a "qualified settlement fund" as described within section 1.468B-1 *et seq.* of the Treasury Regulations. Accordingly, for all U.S. federal income tax purposes the transfer of assets to the Asbestos PI Trust will be treated as a transfer to a trust satisfying the requirements of section 1.468B-1(c) of the Treasury Regulations by the Company and PENAC, as transferors, for distribution to holders of Asbestos PI Claims and in complete settlement of such Asbestos PI Claims. Any income on the assets of the Asbestos PI Trust will be treated as subject to tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for taxes and subject to the withholding and reporting requirements set forth in the Plan and this Agreement.

3.2    No Right to Reversion with Respect to Asbestos PI Trust Assets. The Company and PENAC will have no rights to any refunds or reversion with respect to any Asbestos PI Trust Assets or any earnings thereon. As provided in the Plan, any funds contributed on the Effective Date by THAN and PENAC in excess of the $900 million contribution provided for in the Plan will be returned to PENAC. Such return of excess funds shall not be a refund or reversion of Asbestos PI Trust Assets.

3.3    Obligations of the Asbestos PI Trustees. The Asbestos PI Trustees shall be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the Asbestos PI Trust and shall (a) timely file such income tax and other returns and statements and timely pay all taxes required to be paid from the assets in the Asbestos PI Trust as required by law and in accordance with the provisions of the Plan and this Agreement, (b) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (c) meet all other requirements necessary to qualify and maintain qualification of the Asbestos PI Trust as a "qualified settlement fund" within the

meaning of section 1.468B-1 *et seq.* of the Treasury Regulations, and (d) take no action that could cause the Asbestos PI Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations.

3.4    Obligations of the Company and PENAC.  Following the funding of the Asbestos PI Trust (and in no event later than February 15th of the calendar year following the date of this Agreement), the Company and PENAC shall provide, or cause to be provided, to the Asbestos PI Trust "§ 1.468B-3 Statements" in accordance with section 1.468B-3 of the Treasury Regulations. Following any subsequent transfers of cash or other property to the Asbestos PI Trust, the transferor (or the entity treated as the transferor for U.S. federal income tax purposes) shall provide, or cause to be provided, to the Asbestos PI Trustees a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

3.5    No Contravention of Requirements.  No provision in this Agreement or the Asbestos PI Trust Distribution Procedures shall be construed to mandate any distribution on any claim or other action that would contravene the Asbestos PI Trust's compliance with the requirements of a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the IRC.

Article IV.    Accounts, Investments and Payments

4.1    Accounts.

(a)    The Asbestos PI Trustees may from time to time create such accounts and reserves within the Asbestos PI Trust as they may consider necessary, appropriate or desirable in order to provide for payment, or to make provisions for future payment, of Asbestos PI Claims in accordance with the Asbestos PI Trust Distribution Procedures or to provide for payment, or to make provisions for future payment, of Asbestos PI Trust Expenses in accordance with this Agreement and may, with respect to any such account or reserve, restrict the use of monies therein.

(b)    The Asbestos PI Trustees shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 4.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account and the payments from each such account in the Annual Report.

4.2    Investments.  Investment of monies held in the Asbestos PI Trust shall be administered in the manner consistent with the standards set forth in the Uniform Prudent Investor Act drafted by the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995, subject to the following limitations and provisions:

(a)    Until the fifth anniversary of the Effective Date, except as otherwise authorized by prior written consent of each of the Asbestos PI Trustees, the Asbestos PI Trust Advisory Committee, the Future Claimants' Representative and PENAC, funds not immediately necessary for distribution to claimants shall be invested in money market funds (a) the managers of which are rated at least Aa3 or AA-, respectively, by Moody's Investor Services and Standard & Poor's, and (b) that invest exclusively in securities that (i) are issued by the United States

Treasury or are directly and fully guaranteed or insured by the United States Government or any agency or instrumentality thereof, (ii) have maturities of not more than three (3) years from the date of acquisition, and (iii) are rated Aaa and AAA, respectively, by Moody's Investor Services and Standard & Poor's.

(b)     The Asbestos PI Trust shall not acquire, directly or indirectly, equity in any entity  or business enterprise if, immediately following such acquisition, the Asbestos PI Trust would hold more than 5% of the equity in such entity or business enterprise.  The Asbestos PI Trust shall not hold, directly or indirectly, more than 10% of the equity in any entity or business enterprise.

(c)     The Asbestos PI Trust shall not acquire or hold any long-term debt securities unless such securities (i) are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's ("S&P") or have been given an equivalent investment grade rating by another nationally recognized credit rating agency or (ii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(d)     The Asbestos PI Trust shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "Prime-1" or higher by Moody's or "A-1" or higher by S&P or has been given an equivalent rating by another nationally recognized credit rating agency.

(e)     The Asbestos PI Trust shall not acquire or hold any preferred stock or securities convertible into common stock unless such preferred stock or convertible securities are rated "A" or higher by Moody's or S&P or have been given an equivalent investment grade rating by another nationally recognized credit rating agency.

(f)     The Asbestos PI Trust shall not hold any debt securities or other debt instruments issued by any entity (other than debt securities or other debt instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) to the extent that the aggregate market value of all such securities and instruments issued by such entity held by the Asbestos PI Trust would exceed 5% of the then-current aggregate value of the Asbestos PI Trust Assets.

(g)     The Asbestos PI Trust shall not acquire or hold any certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 4.2(c) above.

(h)     The Asbestos PI Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Asbestos PI Trustees, they are adequately collateralized.

(i)     The Asbestos PI Trust shall not acquire or hold any rights, warrants, options or similar securities.

(j)     The Asbestos PI Trust may, without regard to the limitations set forth in Subsections (a) - (i) above, acquire and hold (i) the interest as beneficiary of the Parent Trust granted to the Asbestos PI Trust pursuant to the Plan, (ii) the Promissory Note, (iii) the rights

11

under the Pledge Agreement, (iv) the membership interests in Reorganized THAN and (v) any securities or instruments obtained by it from any entity or business enterprise as proceeds of litigation or otherwise to resolve disputes.

4.3     Source of Payments.

(a)     All payments to be made by the Asbestos PI Trust, including without limitation payments in respect of Asbestos PI Claims and Asbestos PI Trust Expenses, shall be payable solely by the Asbestos PI Trust out of the Asbestos PI Trust Assets.  None of the Company, PENAC, any PENAC Related Party, any THAN Related Party, Elementis, their subsidiaries or the present or former directors, officers, employees, advisors, consultants, agents or Representatives of any of them, or the Asbestos PI Trustees, the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative or the present or former officers, employees, advisors, consultants, agents or Representatives of any of them, shall be liable for the payment of any Asbestos PI Claim or any Asbestos PI Trust Expense or other liability of the Asbestos PI Trust.

(b)     The Asbestos PI Trustees shall include a reasonably detailed description of any payments made in accordance with this Section 4.3 in the Annual Report.

Article V.     Asbestos PI Trustees; Delaware Trustee

5.1     Initial Asbestos PI Trustees.

(a)     In addition to the Delaware Trustee appointed pursuant to Section 5.11 hereof, there shall be three (3) Asbestos PI Trustees.  The initial Asbestos PI Trustees are those persons named on the signature page hereto.

(b)     Each initial Asbestos PI Trustee shall serve until the earliest of (i) the end of his or her term pursuant to Section 5.2(a) below, (ii) his or her death, (iii) his or her resignation pursuant to Section 5.2(b) below, (iv) his or her removal pursuant to Section 5.2(c) below, or (v) the termination of the Asbestos PI Trust pursuant to Section 8.2 below.

5.2     Term of Service.

(a)     Subject to the other provisions of this Article V, (i) each Asbestos PI Trustee appointed in accordance with Section 5.1 above shall serve for an initial term expiring on the date indicated on the signature page hereof as the expiration date of such Trustee's initial term and (ii) except with respect to such initial terms, each Asbestos PI Trustee shall serve for a term expiring five (5) years from the date on which the preceding term expired.

(b)     An Asbestos PI Trustee may resign at any time by written notice to the remaining Asbestos PI Trustees, the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     An Asbestos PI Trustee may be removed by unanimous vote of the other Asbestos PI Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident or physical or mental deterioration or for other good cause.  Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Asbestos PI Trustees hereunder, or repeated non-attendance at scheduled meetings.  Such removal shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

5.3     Successor Asbestos PI Trustees.

(a)     Upon the termination of service of a Trustee, whether as a result of the expiration of his or her term or his or her death, resignation or removal, the remaining Asbestos PI Trustees shall consult with both the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative concerning appointment of a successor Trustee.  Unless a majority of the members of the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative vetoes the appointment, the vacancy shall be filled by the unanimous vote of the remaining Asbestos PI Trustees.  If the remaining Asbestos PI Trustees cannot agree on a successor Asbestos PI Trustee or a majority of the members of the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative vetoes the appointment of a successor Trustee, the Bankruptcy Court shall make the appointment.  Nothing in this Agreement shall prevent the reappointment of an individual serving as an Asbestos PI Trustee for an additional term or terms.

(b)     Immediately upon the appointment of any successor Asbestos PI Trustee, all rights, titles, duties, powers and authority of the predecessor Asbestos PI Trustee hereunder shall be vested in, and undertaken by, the successor Asbestos PI Trustee without any further act.  No successor Asbestos PI Trustee shall be liable personally for any act or omission of his or her predecessor Asbestos PI Trustees.

(c)     Each successor Asbestos PI Trustee shall serve until the earliest of (i) the end of a full term of five (5) years for which he or she was appointed if his or her immediate predecessor Asbestos PI Trustee completed his or her term pursuant to Section 5.2(a) above, (ii) the end of the term of the Asbestos PI Trustee whom he or she replaced if his or her predecessor Asbestos PI Trustee did not complete such term, (iii) his or her death, (iv) his or her resignation pursuant to Section 5.2(b) above, (v) his or her removal pursuant to Section 5.2(c) above, or (vi) the termination of the Asbestos PI Trust pursuant to Section 8.2 below.

5.4     Liability of Asbestos PI Trustees, Delaware Trustee and Others.

(a)     The Asbestos PI Trustees, the Delaware Trustee and the Additional Indemnitees shall not be liable to the Asbestos PI Trust, to any Beneficial Owner or to any other Person (as defined in the Act), except for a Trustee's, Delaware Trustee's or Additional Indemnitee's own breach of trust committed in bad faith or willful misappropriation.  In addition, no Trustee, Delaware Trustee or Additional Indemnitee shall be liable for any act or omission of any other Trustee, Delaware Trustee or Additional Indemnitee unless such Person (as defined in

13

the Act) acted with bad faith in the selection or retention of such other Trustee, Delaware Trustee or Additional Indemnitee.

(b)     To the extent that, at law or in equity, the Asbestos PI Trustees, the Delaware Trustee and the Additional Indemnitees have duties (including fiduciary duties) and liabilities relating thereto to the Asbestos PI Trust, any Beneficial Owner, or to any other Person (as defined in the Act), the Asbestos PI Trustees, the Delaware Trustee and the Additional Indemnitees acting under this Agreement shall not be liable to the Asbestos PI Trust, any Beneficial Owner or to any other Person (as defined in the Act) for their good faith reliance on the provisions of this Agreement except as provided in Section 5.4(a). The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of the Asbestos PI Trustees, the Delaware Trustee and the Additional Indemnitees otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of the Asbestos PI Trustees, the Delaware Trustee and the Additional Indemnitees.

(c)     Notwithstanding any other provision of this Agreement or otherwise applicable law, whenever in this Agreement the Asbestos PI Trustees, the Delaware Trustee and the Additional Indemnitees are permitted or required to make a decision in their "*good faith*" or under another express standard, the Asbestos PI Trustees', the Delaware Trustee's and the Additional Indemnitees' actions shall be evaluated under such express standard and shall not be subject to any other or different standard.

(d)     The liability of the Asbestos PI Trustees, the Delaware Trustee and the Additional Indemnitees to any Person (as defined in the Act) other than the Asbestos PI Trust and the Beneficial Owners shall be further limited (*i.e.*, to the extent such limitation is greater than the limitation provided in the other subsections of this Section 5.4) to the fullest extent allowed by Section 3803 of the Act.

5.5     <u>Compensation and Expenses of Asbestos PI Trustees and Delaware Trustee</u>.

(a)     Each Asbestos PI Trustee shall receive compensation from the Asbestos PI Trust for his or her services as an Asbestos PI Trustee in the amount of $_____ per annum, payable in a lump sum at the beginning of each year of service. Each Asbestos PI Trustee shall also receive compensation at the rate of $_____ per hour for all time expended in meetings, in preparation for meetings, and on other business of the Asbestos PI Trust, with the time computed on a quarter-hour basis. Each Asbestos PI Trustee shall maintain hourly time records for such time. The per annum compensation does not function as a retainer and the hourly items are not charged against the per annum compensation. The compensation payable to the Asbestos PI Trustees hereunder shall be reviewed every three (3) years and appropriately adjusted with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representatives. The Delaware Trustee shall be paid such compensation as is agreed pursuant to a separate fee agreement.

(b)     The Asbestos PI Trust shall promptly reimburse each Asbestos PI Trustee and the Delaware Trustee for any reasonable out-of-pocket fees and expenses incurred by it, him or her in connection with the performance of its, his or her duties as an Asbestos PI Trustee or Delaware Trustee.

(c)     The Asbestos PI Trust shall include a reasonably detailed description of the amounts paid under this Section 5.5 in the Annual Report.

5.6     <u>Indemnification of Asbestos PI Trustees, the Delaware Trustee and Additional Indemnitees</u>.

(a)     The Asbestos PI Trust shall indemnify and defend each Trustee, the Delaware Trustee and each Additional Indemnitee in the performance of its, his or her duties hereunder to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend such Person (as defined in the Act) against any and all liabilities, expenses, claims, damages or losses incurred by or on behalf of it, him or her in the performance of its, his or her duties.  Notwithstanding the foregoing, no Trustee, Delaware Trustee or Additional Indemnitee shall be indemnified or defended in any way for any liability, expense, claim, damage or loss for which it, he or she is ultimately liable under Section 5.4 above.

(b)     Any reasonable fees and expenses incurred by or on behalf of a Trustee, the Delaware Trustee or an Additional Indemnitee in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which it, he or she is indemnified by the Asbestos PI Trust pursuant to Section 5.6(a) above, including without limitation out-of-pocket fees and expenses and attorneys' fees and expenses, shall be paid by the Asbestos PI Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee, Delaware Trustee or Additional Indemnitee, as the case may be, to repay such amount in the event that it shall be determined by a Final Order that such Trustee, Delaware Trustee or Additional Indemnitee is not entitled to be indemnified by the Asbestos PI Trust.

(c)     The Asbestos PI Trustees (i) may purchase and maintain reasonable amounts and types of insurance on behalf of any Person (as defined in the Act) who is or was an Asbestos PI Trustee or an Additional Indemnitee, and, (ii) if requested by the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative, shall purchase and maintain reasonable amounts and types of insurance on behalf of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, including, in either case, for liability asserted against or incurred by such Person (as defined in the Act) in that capacity or arising from its, his or her status with regard to the Asbestos PI Trust.  To the extent the Asbestos PI Trust Advisory Committee and/or the Future Claimants' Representative requests insurance coverage pursuant to the preceding sentence, such Person (as defined in the Act) shall cooperate with the Asbestos PI Trust and the Asbestos PI Trustees in seeking the requested insurance coverage.  The obligation of the Asbestos PI Trustees to provide insurance requested by the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative shall be subject to the cooperation required in the preceding sentence and further subject to the determination of the Asbestos PI Trustees that the requested amounts and types of insurance are reasonable. Insurance coverage may, with agreement among the Asbestos PI Trustees, the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, be provided through self-insurance arrangements.

5.7    Asbestos PI Trustees' Lien.  The Asbestos PI Trustees, the Delaware Trustee and the Additional Indemnitees shall have a first priority lien upon the Asbestos PI Trust Assets to secure the payment of any amounts payable to them pursuant to Section 5.6 above.

5.8    Asbestos PI Trustees' Employment of Experts; Delaware Trustee's Employment of Counsel.

(a)    The Asbestos PI Trustees may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors and such other parties deemed by the Asbestos PI Trustees to be qualified as experts ("Trust Professionals") on any matter submitted to them, and, in the absence of gross negligence, the written opinion of or information provided by any such party deemed by the Asbestos PI Trustees to be an expert on the particular matter submitted to him or her by the Asbestos PI Trustees shall be full and complete authorization and protection in respect of any action taken or not taken by the Asbestos PI Trustees hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

(b)    The Delaware Trustee shall only be permitted to retain counsel and only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

5.9    Asbestos PI Trustees' Independence.  No Asbestos PI Trustee shall, during the term of his or her service, (a) hold a financial interest in, or act as attorney or agent or serve as any other professional for, the Company, PENAC or any PENAC Affiliate, or (b) act as an attorney for any Person (as defined in the Act) who holds a Asbestos PI Claim.  For the avoidance of doubt, this Section 5.9 shall not be applicable to the Delaware Trustee.

5.10    Bond.  The Asbestos PI Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

5.11    Delaware Trustee.

(a)    There shall at all times be a Delaware Trustee. The "Delaware Trustee" shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and acts through one or more persons authorized to bind such entity.  The initial Delaware Trustee shall be Wilmington Trust. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.11(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Asbestos PI Trustees set forth herein. The Delaware Trustee shall be one of the trustees of the Trust for the

sole and limited purpose of fulfilling the requirements of Section 3807 of the Act and for taking such actions as are required to be taken by a Delaware trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Asbestos PI Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.

(c)     The Delaware Trustee shall serve until such time as the Asbestos PI Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Asbestos PI Trustees in accordance with the terms of Section 5.11(d) below. The Delaware Trustee may resign at any time upon the giving of at least 60 days' advance written notice to the Asbestos PI Trustees; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Asbestos PI Trustees in accordance with Section 5.11(d) below. If the Asbestos PI Trustees do not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Asbestos PI Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Asbestos PI Trustees and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Agreement.

Article VI.     Trust Advisory Committee

6.1     Initial Members of the Asbestos PI Trust Advisory Committee.

(a)     The Asbestos PI Trust Advisory Committee shall consist of five (5) members, who shall initially be the persons named on the signature page hereof.

(b)     Each initial member of the Asbestos PI Trust Advisory Committee shall serve until the earliest of (i) the end of his or her term pursuant to Section 6.3(a) below, (ii) his or her death, (iii) his or her resignation pursuant to Section 6.3(b) below, (iv) his or her removal pursuant to Section 6.3(c) below, or (v) the termination of the Asbestos PI Trust pursuant to Section 8.2 below.

6.2     Duties.  The members of the Asbestos PI Trust Advisory Committee shall serve in a fiduciary capacity, representing all of the holders of present Asbestos PI Claims for the purpose

of protecting the rights of such persons. The Asbestos PI Trustees must consult with the Asbestos PI Trust Advisory Committee on matters identified in Section 2.2(d) above and in other provisions herein and must obtain the consent of the Asbestos PI Trust Advisory Committee on matters identified in Section 2.2(e) above. Where provided in the Asbestos PI Trust Distribution Procedures, certain other actions of the Asbestos PI Trustees are also subject to the consent of the Asbestos PI Trust Advisory Committee.

6.3     Term of Office.

(a)     The initial members of the Asbestos PI Trust Advisory Committee appointed in accordance with Section 6.1(a) above shall serve the staggered three-, four-, or five-year terms shown on the signatures pages hereof. Thereafter, each term of service shall be five (5) years. Each member of the Asbestos PI Trust Advisory Committee shall serve until the earliest of (i) the end of his or her first full term of office, (ii) his or her death, (iii) his or her resignation pursuant to Section 6.3(b) below, (iv) his or her removal pursuant to Section 6.3(c) below, or (v) the termination of the Asbestos PI Trust pursuant to Section 8.2 below, in each case as specified in 6.1(b) or 6.4(b), as applicable.

(b)     A member of the Asbestos PI Trust Advisory Committee may resign at any time by written notice to the other members of the Asbestos PI Trust Advisory Committee, the Asbestos PI Trustees and the Future Claimants' Representative. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     A member of the Asbestos PI Trust Advisory Committee may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member (such as repeated nonattendance of scheduled meetings) or for other good cause. Such removal shall be made at the recommendation of the other members of the Asbestos PI Trust Advisory Committee with the approval of the Bankruptcy Court.

6.4     Successor Members of the Asbestos PI Trust Advisory Committee.

(a)     If, prior to the termination of service of a member of the Asbestos PI Trust Advisory Committee other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the Asbestos PI Trust Advisory Committee, such individual shall be his or her successor. If such member of the Asbestos PI Trust Advisory Committee did not designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's law firm may designate his or her successor. If (i) a member of the Asbestos PI Trust Advisory Committee did not designate an individual to succeed him or her prior to the termination of his or her service and such member's law firm does not designate his or her successor as contemplated above or (ii) he or she is removed pursuant to Section 6.3(c) above, his or her successor shall be appointed by a majority of the remaining members of the Asbestos PI Trust Advisory Committee or, if such members cannot agree on a successor, the Bankruptcy Court. Nothing in this Agreement shall prevent the reappointment of an individual serving as a member of the Asbestos PI Trust Advisory

Committee for an additional term or terms and there shall be no limit on the number of terms that an Asbestos PI Trust Advisory Committee member may serve.

(b)     Each successor member of the Asbestos PI Trust Advisory Committee shall serve until the earliest of (i) the end of a full term of five (5) years for which he or she was appointed if his or her immediate predecessor member of the Asbestos PI Trust Advisory Committee completed his or her term pursuant to Section 6.3(a) above, (ii) the end of the term of the member of the Asbestos PI Trust Advisory Committee whom he or she replaced if his or her predecessor member did not complete such term, (iii) his or her death, (iv) his or her resignation pursuant to Section 6.3(b) above, (v) his or her removal pursuant to Section 6.3(c) above, or (vi) the termination of the Asbestos PI Trust pursuant to Section 8.2 below.

6.5     TAC's Employment of Professionals.

(a)     The Asbestos PI Trust Advisory Committee may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors and such other parties deemed by the Asbestos PI Trust Advisory Committee to be qualified as experts on any matter submitted to the Asbestos PI Trust Advisory Committee (the "Asbestos PI Trust Advisory Committee Professionals").  The Asbestos PI Trust Advisory Committee and the Asbestos PI Trust Advisory Committee Professionals shall at all times have complete access to the Asbestos PI Trust's officers, employees and agents, as well as to any Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the Asbestos PI Trust or the Asbestos PI Trustees; provided that in no event shall the Asbestos PI Trust Advisory Committee, its members or the Asbestos PI Trust Advisory Committee Professionals have any right to consult with counsel to the Asbestos PI Trust or obtain any information in such a manner as would result in the waiver of attorney-client or other applicable privilege belonging to the Asbestos PI Trust.  In the absence of gross negligence, the written opinion of or information provided by any Asbestos PI Trust Advisory Committee Professional or Trust Professional deemed by the Asbestos PI Trust Advisory Committee to be qualified as an expert on the particular matter submitted to the Asbestos PI Trust Advisory Committee shall be full and complete authorization and protection in support of any action taken or not taken by the Asbestos PI Trust Advisory Committee in good faith and in accordance with the written opinion of or information provided by such Asbestos PI Trust Advisory Committee Professional or Trust Professional.

(b)     The Asbestos PI Trust shall promptly reimburse, or pay directly if so instructed, the Asbestos PI Trust Advisory Committee for any reasonable fees and expenses associated with the Asbestos PI Trust Advisory Committee's employment of legal counsel pursuant to this provision in connection with the Asbestos PI Trust Advisory Committee's performance of its duties hereunder.  The Asbestos PI Trust shall also promptly reimburse, or pay directly if so instructed, the Asbestos PI Trust Advisory Committee for any reasonable fees and expenses associated with the Asbestos PI Trust Advisory Committee's employment of any other Asbestos PI Trust Advisory Committee Professional pursuant to this provision in connection with the Asbestos PI Trust Advisory Committee's performance of its duties hereunder; provided, however, that (i) the Asbestos PI Trust Advisory Committee has first submitted to the Asbestos PI Trust a written request for such reimbursement setting forth the reasons (A) why the Asbestos PI Trust Advisory Committee desires to employ such Asbestos PI

Trust Advisory Committee Professional and (B) why the Asbestos PI Trust Advisory Committee cannot rely on Trust Professionals to meet the needs of the Asbestos PI Trust Advisory Committee for such expertise or advice and (ii) the Asbestos PI Trust has approved the Asbestos PI Trust Advisory Committee's request for reimbursement in writing. If the Asbestos PI Trust agrees to pay for the Asbestos PI Trust Advisory Committee Professional, such reimbursement shall be treated as an Asbestos PI Trust Expense. If the Asbestos PI Trust declines to pay for the Asbestos PI Trust Advisory Committee Professional, it must set forth its reasons in writing. If the Asbestos PI Trust Advisory Committee still desires to employ such Asbestos PI Trust Advisory Committee Professional at the expense of the Asbestos PI Trust, the Asbestos PI Trust Advisory Committee and/or the Asbestos PI Trustees shall resolve their dispute in accordance with Section 8.12 below.

6.6     <u>Compensation and Expenses of the Asbestos PI Trust Advisory Committee</u>. Each member of the Asbestos PI Trust Advisory Committee shall receive compensation from the Asbestos PI Trust for attendance at meetings or other Asbestos PI Trust business performed in the form of a reasonable hourly rate set by the Asbestos PI Trustees. In addition, the Asbestos PI Trust shall promptly reimburse each member of the Asbestos PI Trust Advisory Committee for any reasonable out-of-pocket fees and expenses incurred by him or her in connection with the performance of his or her duties as a member of the Asbestos PI Trust Advisory Committee. Such compensation or reimbursement shall be deemed an Asbestos PI Trust Expense. The Asbestos PI Trust shall include a reasonably detailed description of the amounts paid under this Section 6.6 in the Annual Report.

6.7     <u>Procedures for Consultation with and Obtaining the Consent of the Asbestos PI Trust Advisory Committee</u>.

(a)     <u>Consultation Process</u>.

(i)     In the event the Asbestos PI Trustees are required to consult with the Asbestos PI Trust Advisory Committee pursuant to Section 2.2(d) above or on other matters as provided herein, the Asbestos PI Trustees shall provide the Asbestos PI Trust Advisory Committee with written advance notice of the matter under consideration and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Asbestos PI Trustees shall also provide the Asbestos PI Trust Advisory Committee with such reasonable access to any counsel, accountants, appraisers, auditors, forecasters, experts or financial or investment advisors retained by the Asbestos PI Trust and its staff (if any) as the Asbestos PI Trust Advisory Committee may reasonably request during the time that the Asbestos PI Trustees are considering such matter and shall also provide the Asbestos PI Trust Advisory Committee the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Asbestos PI Trustees; <u>provided</u> that in no event shall the Asbestos PI Trust Advisory Committee or its members have any right to consult with counsel to the Asbestos PI Trust or obtain any information in such a manner as would result in the waiver of attorney-client or other applicable privilege belonging to the Asbestos PI Trust.

(ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 6.7(a), the Asbestos PI Trustees shall take into consideration the time required for the Asbestos PI Trust Advisory Committee, if its members so

wish, to engage and consult with its own independent financial or investment advisors as to such matter. In any event, the Asbestos PI Trustees shall not take definitive action on any such matter until at least thirty (30) days after providing the Asbestos PI Trust Advisory Committee with the initial written notice that such matter is under consideration by the Asbestos PI Trustees, unless such time period is waived by the Asbestos PI Trust Advisory Committee.

   (b)   <u>Consent Process</u>.

     (i)   In the event the Asbestos PI Trustees are required to obtain the consent of the Asbestos PI Trust Advisory Committee pursuant to Section 2.2(e) above, the Asbestos PI Trustees shall provide the Asbestos PI Trust Advisory Committee with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Asbestos PI Trustees propose to take and explaining in detail the reasons why the Asbestos PI Trustees desire to take such action. The Asbestos PI Trustees shall provide the Asbestos PI Trust Advisory Committee as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Asbestos PI Trustees shall also provide the Asbestos PI Trust Advisory Committee with such reasonable access to any counsel, accountants, appraisers, auditors, forecasters, experts or financial or investment advisors retained by the Asbestos PI Trust and its staff (if any) as the Asbestos PI Trust Advisory Committee may reasonably request during the time that the Asbestos PI Trustees are considering such action, and shall also provide the Asbestos PI Trust Advisory Committee the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Asbestos PI Trustees; <u>provided</u> that in no event shall the Asbestos PI Trust Advisory Committee or its members have any right to consult with counsel to the Asbestos PI Trust or obtain any information in such a manner as would result in the waiver of attorney-client or other applicable privilege belonging to the Asbestos PI Trust.

     (ii)   The Asbestos PI Trust Advisory Committee must consider in good faith and in a timely fashion any request for its consent by the Asbestos PI Trustees and must in any event advise the Asbestos PI Trustees in writing of its consent or its objection to the proposed action within thirty (30) days of receiving the original request for consent from the Asbestos PI Trustees. The Asbestos PI Trust Advisory Committee may not withhold its consent unreasonably. If the Asbestos PI Trust Advisory Committee decides to withhold its consent, it must explain in detail its objections to the proposed action. If the Asbestos PI Trust Advisory Committee does not advise the Asbestos PI Trustees in writing of its consent or its objections to the action within thirty (30) days of receiving notice regarding such request, the Asbestos PI Trust Advisory Committee's consent to the proposed actions shall be deemed to have been affirmatively granted.

     (iii)   If, after following the procedures specified in this Section 6.7(b), the Asbestos PI Trust Advisory Committee continues to object to the proposed action and to withhold its consent to the proposed action, the Asbestos PI Trustees and/or the Asbestos PI Trust Advisory Committee shall resolve their dispute in accordance with Section 8.12 below. However, the burden of proof with respect to the validity of the Asbestos PI Trust Advisory Committee's objection and withholding of its consent shall be on the Asbestos PI Trust Advisory Committee.

Article VII.    The Future Claimants' Representative

7.1    Appointment of Initial Future Claimants' Representative.  The initial Future Claimants' Representative shall be the individual named on the signature page hereto.

7.2    Duties.  The Future Claimants' Representative shall serve in a fiduciary capacity, representing the interests of the holders of future Asbestos PI Claims for the purpose of protecting the rights of such persons.  The Asbestos PI Trustees must consult with the Future Claimants' Representative on matters identified in Section 2.2(d) above and on certain other matters provided herein and must obtain the consent of the Future Claimants' Representative on matters identified in Section 2.2(e) above.  Where provided in the Asbestos PI Trust Distribution Procedures, certain other actions by the Asbestos PI Trustees are also subject to the consent of the Future Claimants' Representative.

7.3    Term of Office.

(a)    Each Future Claimants' Representative shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 7.3(b) below, (iii) his or her removal pursuant to Section 7.3(c) below, or (iv) the termination of the Asbestos PI Trust pursuant to Section 8.2 below.

(b)    The Future Claimants' Representative may resign at any time by written notice to the Asbestos PI Trustees.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    At the request of the Asbestos PI Trustees or the Asbestos PI Trust Advisory Committee, the Future Claimants' Representative may be removed pursuant to an order of the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, a consistent pattern of neglect and failure to perform, or to participate in performing, his or her duties hereunder (such as repeated nonattendance at scheduled meetings) or for other good cause.

7.4    Appointment of Successor.  A vacancy caused by death or resignation shall be filled with an individual nominated prior to the effective date of the resignation or the death by the resigning or deceased Future Claimants' Representative, and a vacancy caused by removal of the Future Claimants' Representative shall be filled with an individual nominated by the Asbestos PI Trustees in consultation with the Asbestos PI Trust Advisory Committee, subject, in each case, to the approval of the Bankruptcy Court.  In the event a majority of the Asbestos PI Trustees cannot agree, or a nominee has not been pre-selected, the successor shall be chosen by the Bankruptcy Court.

7.5    Future Claimants' Representative's Employment of Professionals.

(a)    The Future Claimants' Representative may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts,  financial and investment advisors and such other parties deemed by the Future Claimants' Representative to be qualified as experts on any matter submitted to the Future Claimants' Representative (the

"Future Representative Professionals"). The Future Claimants' Representative and the Future Representative Professionals shall at all times have complete access to the Asbestos PI Trust's officers, employees and agents, as well as to Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the Asbestos PI Trust or the Asbestos PI Trustees; provided that in no event shall the Future Claimants' Representative or the Future Representative Professionals have any right to consult with counsel to the Asbestos PI Trust or obtain any information in such a manner as would result in the waiver of attorney-client or other applicable privilege belonging to the Asbestos PI Trust. In the absence of gross negligence, the written opinion of or information provided by any Future Representative Professional or Trust Professional deemed by the Future Claimants' Representative to be qualified as an expert on the particular matter submitted to the Future Claimants' Representative shall be full and complete authorization and protection in support of any action taken or not taken by the Future Claimants' Representative in good faith and in accordance with the written opinion of or information provided by such Future Representative Professional or Trust Professional.

(b)     The Asbestos PI Trust shall promptly reimburse, or pay directly if so instructed, the Future Claimants' Representative for any reasonable fees and expenses associated with the Future Claimants' Representative's employment of legal counsel pursuant to this provision in connection with the Future Claimants' Representative's performance of his or her duties hereunder. The Asbestos PI Trust shall also promptly reimburse, or pay directly if so instructed, the Future Claimants' Representative for any reasonable fees and expenses associated with the Future Claimants' Representative's employment of any other Future Representative Professional pursuant to this provision in connection with the Future Claimants' Representative's performance of his or her duties hereunder; provided, however, that (i) the Future Claimants' Representative has first submitted to the Asbestos PI Trust a written request for such reimbursement setting forth the reasons (A) why the Future Claimants' Representative desires to employ such Future Representative Professional and (B) why the Future Claimants' Representative cannot rely on Trust Professionals to meet the needs of the Future Claimants' Representative for such expertise or advice and (ii) the Asbestos PI Trust has approved the Future Claimants' Representative's request for reimbursement in writing. If the Asbestos PI Trust agrees to pay for the Future Representative Professional, such reimbursement shall be treated as an Asbestos PI Trust Expense. If the Asbestos PI Trust declines to pay for the Future Representative Professional, it must set forth its reasons in writing. If the Future Claimants' Representative still desires to employ such Future Representative Professional at the expense of the Asbestos PI Trust, the Future Claimants' Representative and/or the Asbestos PI Trustees shall resolve their dispute pursuant to Section 8.12 below.

7.6     Compensation and Expenses of the Future Claimants' Representative. The Future Claimants' Representative shall receive compensation from the Asbestos PI Trust at the rate of $_____ per hour for attendance at meetings or other Asbestos PI Trust business performed. The compensation payable to the Future Claimants' Representative hereunder shall be reviewed every three (3) years and appropriately adjusted by the Asbestos PI Trustees. In addition, the Asbestos PI Trust shall promptly reimburse the Future Claimants' Representative for any reasonable out-of-pocket fees and expenses incurred by him or her in connection with the performance of his or her duties as the Future Claimants' Representative. Such compensation or reimbursement shall be deemed an Asbestos PI Trust Expense. The Asbestos PI Trust shall

include a reasonably detailed description of the amounts paid under this Section 7.6 in the Annual Report.

7.7    Procedures for Consultation with and Obtaining the Consent of the Future Claimants' Representative.

(a)    Consultation Process.

(i)    In the event the Asbestos PI Trustees are required to consult with the Future Claimants' Representative pursuant to Section 2.2(d) above or on any other matters specified herein, the Asbestos PI Trustees shall provide the Future Claimants' Representative with written advance notice of the matter under consideration and with all relevant information concerning the matter as is reasonably practicable under the circumstances.  The Asbestos PI Trustees shall also provide the Future Claimants' Representative with such reasonable access to any counsel, accountants, appraisers, auditors, forecasters, experts or financial or investment advisor retained by the Asbestos PI Trust and its staff (if any) as the Future Claimants' Representative may reasonably request during the time that the Asbestos PI Trustees are considering such matter, and shall also provide the Future Claimants' Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Asbestos PI Trustees; provided that in no event shall the Future Claimants' Representative have any right to consult with counsel to the Asbestos PI Trust or obtain any information in such a manner as would result in the waiver of attorney-client or other applicable privilege belonging to the Asbestos PI Trust.

(ii)    In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 7.7(a), the Asbestos PI Trustees shall take into consideration the time required for the Future Claimants' Representative, if he or she so wishes, to engage and consult with his or her own independent financial or investment advisors as to such matter.  In any event, the Asbestos PI Trustees shall not take definitive action on any such matter until at least thirty (30) days after providing the Future Claimants' Representative with the initial written notice that such matter is under consideration by the Asbestos PI Trustees, unless such time period is waived by the Future Claimants' Representative.

(b)    Consent Process.

(i)    In the event the Asbestos PI Trustees are required to obtain the consent of the Future Claimants' Representative pursuant to Section 2.2(e) above, the Asbestos PI Trustees shall provide the Future Claimants' Representative with a written notice stating that his or her consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Asbestos PI Trustees propose to take and explaining in detail the reasons why the Asbestos PI Trustees desire to take such action.  The Asbestos PI Trustees shall provide the Future Claimants' Representative as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances.  The Asbestos PI Trustees shall also provide the Future Claimants' Representative with such reasonable access to any counsel, accountants, appraisers, auditors, forecasters, experts or financial or investment advisors retained by the Asbestos PI Trust and its staff (if any) as the Future Claimants' Representative may reasonably request during the time that the Asbestos PI Trustees are considering such

action, and shall also provide the Future Claimants' Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Asbestos PI Trustees; provided that in no event shall the Future Claimants' Representative have any right to consult with counsel to the Asbestos PI Trust or obtain any information in such a manner as would result in the waiver of attorney-client or other applicable privilege belonging to the Asbestos PI Trust.

(ii)     The Future Claimants' Representative must consider in good faith and in a timely fashion any request for his or her consent by the Asbestos PI Trustees and must in any event advise the Asbestos PI Trustees in writing of his or her consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Asbestos PI Trustees. The Future Claimants' Representative may not withhold his or her consent unreasonably. If the Future Claimants' Representative decides to withhold consent, he or she must explain in detail his or her objections to the proposed action. If the Future Claimants' Representative does not advise the Asbestos PI Trustees in writing of his or her consent or objections to the proposed action within thirty (30) days of receiving the notice from the Asbestos PI Trustees regarding such consent, the Future Claimants' Representative's consent shall be deemed to have been affirmatively granted.

(iii)     If, after following the procedures specified in this Section 7.7(b), the Future Claimants' Representative continues to object to the proposed action and to withhold his or her consent to the proposed action, the Asbestos PI Trustees and/or the Future Claimants' Representative shall resolve their dispute in accordance with Section 8.12 below. However, the burden of proof with respect to the validity of the Future Claimants' Representative's objection and withholding of his or her consent shall be on the Future Claimants' Representative.

## Article VIII.   General Provisions

8.1     Irrevocability. The Asbestos PI Trust is irrevocable.

8.2     Term and Termination.

(a)     The term for which the Asbestos PI Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 8.2 below.

(b)     The Asbestos PI Trust shall automatically dissolve on the date (the "Dissolution Date") ninety (90) days after the first to occur of the following:

(i)     the date on which the Asbestos PI Trustees decide to dissolve the Asbestos PI Trust because (A) the Asbestos PI Trustees deem it unlikely that any new Asbestos PI Claim will be filed against the Asbestos PI Trust, (B) all Asbestos PI Claims duly filed with the Asbestos PI Trust have been liquidated and, to the extent possible based upon the funds available to the Asbestos PI Trust through the Plan, paid to the extent provided in this Agreement and the Asbestos PI Trust Distribution Procedures or disallowed by a final, non-appealable order, and (C) twelve (12) consecutive months have elapsed during which no new Asbestos PI Claim has been filed with the Asbestos PI Trust;

(ii)     if the Asbestos PI Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses (including without limitation Asbestos PI Trust Expenses) of the Asbestos PI Trust in a manner consistent with this Agreement and the Asbestos PI Trust Distribution Procedures, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order; or

(iii)    to the extent that any rule against perpetuities shall be deemed applicable to the Asbestos PI Trust, that date which is twenty-one (21) years less ninety-one (91) days after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.

(c)     On the Dissolution Date or as soon as reasonably practicable, after the wind-up of the Asbestos PI Trust's affairs by the Asbestos PI Trustees and payment of all the Asbestos PI Trust's liabilities (including without limitation Asbestos PI Trust Expenses) has been provided for as required by applicable law including Section 3808 of the Act, all assets remaining in the Asbestos PI Trust estate shall be given to such organization(s) exempt from federal income tax under section 501(c)(3) of the IRC, which tax-exempt organization(s) shall be selected by the Asbestos PI Trustees using their reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on or the relief of suffering of individuals suffering from asbestos-related lung diseases or disorders and (ii) the tax-exempt organization(s) shall not bear any relationship to the Company or PENAC within the meaning of section 468B(d)(3) of the IRC. Notwithstanding any contrary provision of the Plan and related documents, this Section 8.2(c) cannot be modified or amended.

(d)     Following the dissolution and distribution of the assets of the Asbestos PI Trust, the Asbestos PI Trust shall terminate and the Asbestos PI Trustees, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the Asbestos PI Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Agreement, the existence of the Asbestos PI Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

8.3     Amendments.  The Asbestos PI Trustees may modify or amend this Agreement by a writing signed by each Trustee; provided, however, that any such amendment shall require the consent of each member of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative in accordance with Section 2.2(e) above; and provided, further, that no such modification or amendment, unless the modification or amendment is signed by the Delaware Trustee, may adversely affect the rights, duties or obligations of the Delaware Trustee. The Asbestos PI Trustees may modify or amend the Asbestos PI Trust Distribution Procedures by a writing signed by each Asbestos PI Trustee with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative as provided in the Asbestos PI Trust Distribution Procedures; provided, however, that no amendment to such procedures shall be inconsistent with the provisions limiting amendments to such procedures provided therein and, in particular, the provisions limiting amendment of the "Claims Payment Ratio" set forth in Section 2.5 of the Asbestos PI Trust Distribution Procedures and of the "Payment Percentage"

set forth in Section 4.2 of the Asbestos PI Trust Distribution Procedures. Notwithstanding anything contained in this Agreement to the contrary, none of this Agreement, the Asbestos PI Trust Distribution Procedures or the Trust Bylaws, or any document annexed to the foregoing, shall be modified or amended in any way that could jeopardize, impair or modify the applicability of section 524(g) of the Bankruptcy Code, the efficacy or enforceability of the Asbestos PI Channeling Injunction or the Asbestos PI Trust's qualified settlement fund status under section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the IRC.

8.4     Severability. Should any provision in this Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Agreement.

8.5     Notices.

(a)     Any notices or other communications required or permitted hereunder to any person asserting a Asbestos PI Claim shall be in writing and delivered at the address for such person or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the Asbestos PI Trust with respect to his or her claim, or mailed by first class mail, postage prepaid, addressed to such address.

(b)     Any notices or other communications required or permitted hereunder to any of the following parties shall be in writing and delivered at the address, email address or facsimile number for such party designated below, or in accordance with such other instructions as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To THAN:

     T H Agriculture & Nutrition, L.L.C.
     250 West 57th Street, Suite 901
     New York, New York  10107-0001
     Attention: Joseph L. Wolf, Jr. President
              Steven L. Carter, Secretary

     Facsimile:  _____
     Email:  _____

with a copy to:

     _____
     _____
     _____
     Attention: _____
             _____

Facsimile: _____

Email: _____

To PENAC:

       Philips Electronics North America Corp.
       3000 Minuteman Road, Bldg. 1
       Andover, Massachusetts 01810
       Attention:  Joseph E. Innamorati, Esq.

       Facsimile: _____

       Email: _____

with a copy to:

       Sullivan & Cromwell LLP
       125 Broad Street
       New York, New York  10004-2498
       Attention:  Garrard R. Beeney, Esq.

       Facsimile: _____

       Email: _____

To the Asbestos PI Trust through the Asbestos PI Trustees:

       _____
       _____
       _____
       _____
       _____
       Facsimile: _____

       Email: _____

       _____
       _____
       _____
       _____
       _____
       Facsimile: _____

       Email: _____

_____
_____
_____
_____
_____
Facsimile: _____
Email: _____

with a copy to:

_____
_____
_____
Facsimile: _____
Attention: _____
Email: _____

To the Delaware Trustee:

Wilmington Trust Company
1100 N. Market Street
Wilmington, Delaware 19890-1625
Attention: Joseph B. Feil
Email: jfeil@wilmingtontrust.com

To the Asbestos PI Trust Advisory Committee:

_____
_____
_____
_____
_____
Facsimile: _____
Email: _____

_____
_____
_____
_____
_____
Facsimile: _____
Email: _____

_____

_____

_____

_____

_____

Facsimile: _____

Email: _____

_____

_____

_____

_____

_____

Facsimile: _____

Email: _____

_____

_____

_____

_____

_____

Facsimile: _____

Email: _____

with a copy to:

_____

_____

_____

_____

_____

Facsimile: _____

Email: _____

To the Future Claimants' Representative:

Professor Samuel Issacharoff
New York University School of Law
40 Washington Square South
New York, New York  10012-1099

Facsimile: _____

Email: _____

with a copy to:

> Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation
> 2323 Bryan Street
> Suite 2200
> Dallas, TX 75201-2689
> Attn: Sander L. Esserman, Esq.
>
> Facsimile: 214-969-4999
> Email: Esserman@sbep-law.com

    (c)    All notices and communications in accordance with this Section 8.5 shall be deemed given (i) when delivered personally, (ii) when sent by email or facsimile before 5:00 p.m., prevailing Eastern time, on a Business Day with a copy of such email or facsimile sent on the same day to the recipient by reputable overnight courier service (charges prepaid), (iii) five days after deposit in the U.S. mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or (iv) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid).

    8.6    <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the Company, the Asbestos PI Trust, the Asbestos PI Trustees, the Delaware Trustee, the members of the Asbestos PI Trust Advisory Committee, the Future Claimants' Representative and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its rights or obligations under this Agreement except, in the case of the Asbestos PI Trust and the Asbestos PI Trustees, as contemplated by Section 2.1 above.

    8.7    <u>Limitation on Claim Interests for Securities Laws Purposes</u>. Asbestos PI Claims and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution, (b) shall not be evidenced by a certificate or other instrument, (c) shall not possess any voting rights, or (d) shall not be entitled to receive any dividends or interest; <u>provided</u>, <u>however</u>, that clause (a) of this Section 8.7 shall not apply to the holder of a claim that is subrogated to a Asbestos PI Claim as a result of its satisfaction of such claim.

    8.8    <u>Entire Agreement; No Waiver</u>. The entire agreement of the parties relating to the subject matter of this Agreement is contained herein and in the documents referred to herein, and this Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

8.9    Headings.  The headings used in this Agreement are inserted for convenience only and do not constitute a portion of this Agreement, nor in any manner affect the construction of the provisions of this Agreement.

8.10    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to Delaware conflict of laws principles; provided, however, that there shall not be applicable to the parties hereunder or this Agreement any provision of the laws (common or statutory) of the state of Delaware pertaining to trusts that relate to or regulate, in a manner inconsistent with the terms hereof, (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding or investing trust assets or (g) the establishment of fiduciary or other standards of responsibility or limitations on the acts or powers of trustees that are inconsistent with the limitations or authorities and powers of the Asbestos PI Trustees and Delaware Trustee hereunder as set forth or referenced in this Agreement.  Section 3540 of title 12 of the Delaware Code shall not apply to the Asbestos PI Trust.

8.11    Settlors Representative and Cooperation.  The Company and PENAC are hereby irrevocably designated as the settlors of the Asbestos PI Trust, and they are hereby authorized to take any action required as such in connection with this Agreement.  The Company and PENAC agree to cooperate in implementing the goals and objectives of the Asbestos PI Trust.

8.12    Dispute Resolution.  Any disputes that arise under this Agreement or under the Asbestos PI Trust Distribution Procedures shall be resolved by submission of the matter to an alternative dispute resolution ("ADR") process mutually agreeable to the parties involved.  Should any party to the ADR process be dissatisfied with the decision of the arbitrator(s), that party may apply to the Bankruptcy Court for a judicial determination of the matter.  Any review conducted by the Bankruptcy Court shall be de novo.  In any case, if the dispute arose pursuant to the consent provision set forth in Section 6.7(b) above or Section 7.7(b) above, the burden of proof shall be on the party or parties who withheld consent to show that the objection was valid.  Should the dispute not be resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.  If the Asbestos PI Trustees determine that the matter in dispute is exigent and cannot await the completion of the ADR process, the Asbestos PI Trustees shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

8.13    Enforcement and Administration.  The provisions of this Agreement and the Asbestos PI Trust Distribution Procedures attached hereto shall be enforced by the Bankruptcy Court pursuant to the Plan.  The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Asbestos PI Trust and over any disputes hereunder not resolved by ADR in accordance with

Section 8.12 above. Notwithstanding anything else herein contained, to the extent any provision of this Agreement is inconsistent with any provision of the Asbestos PI Trust Distribution Procedures or the Plan, the Asbestos PI Trust Distribution Procedures or the Plan, as the case may be, shall control.

8.14    Effectiveness.  This Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

8.15    Counterpart Signatures.  This Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**SETTLORS**

T H AGRICULTURE & NUTRITION, L.L.C.

By: _____
Name: _____
Title: _____


PHILIPS ELECTRONICS NORTH AMERICA CORPORATION

By: _____
Name: _____
Title: _____


**TRUSTEES**

_____
Name: _____
Expiration Date of Initial Term: _____ anniversary of the date of this Agreement


_____
Name: _____
Expiration Date of Initial Term: _____ anniversary of the date of this Agreement


_____
Name: _____
Expiration Date of Initial Term: _____ anniversary of the date of this Agreement


**DELAWARE TRUSTEE**

WILMINGTON TRUST  COMPANY

By: _____
Name: _____
Title: _____

**MEMBERS OF THE ASBESTOS PI TRUST ADVISORY COMMITTEE**

_____
Name: _____
Expiration Date of Initial Term:  _____
anniversary of the date of this Agreement

_____
Name: _____
Expiration Date of Initial Term:  _____
anniversary of the date of this Agreement

_____
Name: _____
Expiration Date of Initial Term:  _____
anniversary of the date of this Agreement

_____
Name: _____
Expiration Date of Initial Term:  _____
anniversary of the date of this Agreement

_____
Name: _____
Expiration Date of Initial Term:  _____
anniversary of the date of this Agreement

**FUTURE CLAIMANTS' REPRESENTATIVE**

_____
Name:  Samuel Issacharoff_____

## EXHIBIT A

CERTIFICATE OF TRUST

OF

T H AGRICULTURE & NUTRITION, L.L.C.

ASBESTOS PERSONAL INJURY TRUST

THIS Certificate of Trust of the T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust (the "Trust") is being duly executed and filed by the undersigned, as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code, § 3801 et seq.) (the "Act").

1.      Name.  The name of the statutory trust formed hereby is T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust.

2.      Delaware Trustee.  The name and business address of the trustee of the Trust in the State of Delaware are Wilmington Trust Company, 1100 N. Market Street, Wilmington, Delaware 19890-1625, Attention:  Corporate Trust Administration.

3.      Effective Date.  This Certificate of Trust shall be effective upon filing.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Delaware Trustee

By:_____

Name:_____

Title:_____

_____

_____, not in his individual capacity but solely as Trustee

_____

_____, not in his individual capacity but solely as Trustee

_____

_____, not in his individual capacity but solely as Trustee

# **EXHIBIT B**

Asbestos PI Trust Indemnification Agreement

Exhibit B
to T H Agriculture & Nutrition, L.L.C.
Asbestos Personal Injury Trust Agreement


INDEMNIFICATION AGREEMENT


by and among


T H Agriculture & Nutrition, L.L.C.,


and


Philips Electronics North America Corporation,


and


T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust,




Dated as of _____, 2008

# INDEMNIFICATION AGREEMENT

This Indemnification Agreement (this "<u>Agreement</u>") is effective as of _____, 2008, by and among (i) T H Agriculture & Nutrition, L.L.C. (the "<u>Debtor</u>" or "<u>THAN</u>"), a debtor and debtor in possession in Case No. __-_____(___) before the United States Bankruptcy Court for the Southern District of New York, (ii) Philips Electronics North America Corporation, a Delaware corporation ("<u>PENAC</u>") and (iii) T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust (the "<u>Asbestos PI Trust</u>").

## RECITALS

**WHEREAS**, at the time of the entry of the order for relief in the Chapter 11 Case, personal-injury and wrongful-death claims based on the presence of, or exposure to, asbestos or asbestos-containing products had been asserted against the Debtor, PENAC, and certain other Protected Parties; and

**WHEREAS**, the Debtor has reorganized under the provisions of chapter 11 of the Bankruptcy Code in a case known as *In re T H Agriculture and Nutrition, L.L.C.*, Case No. __-_____ (___), pending before the Bankruptcy Court; and

**WHEREAS**, the Plan provides for, among other things, the creation of the Asbestos PI Trust; and

**WHEREAS**, all Asbestos PI Claims are channeled to the Asbestos PI Trust pursuant to the Asbestos PI Channeling Injunction;

**WHEREAS**, notwithstanding the Asbestos PI Channeling Injunction, to the extent any Asbestos PI Claim is asserted against the Debtor, the Reorganized Debtor, PENAC or any other Protected Party, the Asbestos PI Trust will indemnify such Entities pursuant to this Agreement; and

**WHEREAS**, the Debtor, the Trustees, members of the Trust Advisory Committee and the Future Claimants' Representative have entered into the T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust Agreement (the "<u>Asbestos PI Trust Agreement</u>"); and

**WHEREAS**, pursuant to the Plan and the Asbestos PI Trust Agreement, the Asbestos PI Trust is to use its assets and income to pay Asbestos PI Claims; and

**WHEREAS**, the Plan provides for, among other things, the complete treatment of all liabilities and obligations of the Debtor, the Reorganized Debtor, PENAC and the other Protected Parties with respect to Asbestos PI Claims; and

**WHEREAS**, the Plan provides for, among other things, PENAC, on behalf of itself and the other Protected Parties, to make the PENAC Contribution to the Asbestos PI Trust and Reorganized THAN; and

**WHEREAS**, the Asbestos PI Trust Agreement requires that the Asbestos PI Trust indemnify THAN, Reorganized THAN, PENAC and the other Protected Parties for Asbestos PI Claims.

**NOW, THEREFORE**, in consideration of the foregoing and the covenants and agreements set forth below and such other valuable consideration, the Parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    (a)    <u>Interpretation</u>.  All capitalized terms used herein but not otherwise defined shall have the respective meanings given to such terms in the Prepackaged Plan of Reorganization of T H Agriculture & Nutrition, L.L.C. Under Chapter 11 of the Bankruptcy Code (the "<u>Plan</u>"), and such definitions are incorporated herein by reference.  All capitalized terms not defined herein or in the Plan, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings given to them in such code and rules, and such definitions are incorporated herein by reference.  When a reference is made in this Agreement to an Article or a Section, such reference shall be to an article or section of this Agreement unless otherwise indicated.

(b)    <u>Definitions</u>.

"<u>Asbestos PI Claim</u>" means each of the following (i) a THAN Asbestos PI Claim, (ii) a Derivative Liability Asbestos PI Claim, (iii) an Indirect Asbestos PI Claim, (iv) a Qualified Asbestos PI Claim, and (v) an Asbestos PI Trust Expense.  Asbestos PI Claim shall not include an Asbestos Property Damage Claim.

"<u>Indemnified Claims</u>" means any claims against any of the Indemnitees arising out of an Asbestos PI Claim.

"<u>Indemnitees</u>" means THAN, Reorganized THAN and each Protected Party.

"<u>Liabilities</u>" means any and all costs, expenses, actions, causes of action, suits, controversies, damages, claims, demands, debts, liabilities or obligations of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or unliquidated, matured or not matured, contingent or direct, whether arising at common law, in equity, or under any statute.

"<u>Party</u>" means each of the signatories hereto.

"Protected Parties" means: (a) THAN and Reorganized THAN; (b) PENAC and any PENAC Related Party; (c) Elementis; and (d) any current or former Representative of any of the above, in their capacities as such.

"Representatives" means, with respect to any specified Entity, all current or former officers, directors, employees, agents, attorneys, accountants, financial advisors, other representatives, or any person who controls any of these within the meaning of the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended.

# ARTICLE II

# INDEMNIFICATION

Section 2.1    Indemnification by the Asbestos PI Trust.  Except as otherwise provided in this Agreement, the Asbestos PI Trust shall indemnify, defend, pay the defense costs for, and hold harmless the Indemnitees from and against any and all Liabilities associated with the Indemnified Claims that any third party seeks to impose upon the Indemnitees, or that are imposed upon the Indemnitees, including, without limitation, Indirect Asbestos PI Claims.

In the event that the Asbestos PI Trust makes a payment to any of the Indemnitees hereunder, and any Liabilities on account of which such payment was made are subsequently reduced, either directly or through a third-party recovery, the applicable Indemnitees will promptly repay the Asbestos PI Trust the amount by which the payment made by the Asbestos PI Trust exceeds the associated indemnified Liabilities after taking into account such reduction.

Section 2.2    Procedures for Defense, Settlement, and Indemnification of Trust Claims.

(a)    Notice of Claims.  If an Indemnitee shall receive notice or otherwise learn of the assertion or commencement by an Entity of any Indemnified Claim with respect to which the Asbestos PI Trust may be obligated to provide indemnification to such Indemnitee pursuant to Section 2.1, the Indemnitee shall give the Asbestos PI Trust written notice thereof within thirty (30) days after becoming aware of such Indemnified Claim.  Any such notice shall describe the Indemnified Claim in reasonable detail.  Notwithstanding the foregoing, the delay or failure of any Indemnitee to give notice as provided in this Section 2.2(a) shall not relieve the Asbestos PI Trust of its obligations under this Article II, except to the extent that the Asbestos PI Trust is actually prejudiced by such delay or failure to give notice.

(b)    Defense by Asbestos PI Trust.  The Asbestos PI Trust shall have the sole right to manage the defense of any Indemnified Claim for which the Asbestos PI Trust may be obligated to provide indemnification to an Indemnitee pursuant to Section 2.1.  Within thirty (30) days after the receipt of notice from an Indemnitee in accordance with Section 2.2(a) (or sooner, if the nature of such Indemnified Claim so requires), the Asbestos PI Trust shall notify the Indemnitee that the Asbestos PI Trust will assume responsibility for managing the defense of such Indemnified Claim, which notice shall specify any reservations or exceptions.

(c)     Defense by Indemnitee.    If the Asbestos PI Trust fails to assume responsibility for managing the defense of an Indemnified Claim for which the Asbestos PI Trust may be obligated to provide indemnification to an Indemnitee pursuant to Section 2.1, or fails to notify an Indemnitee that it will assume responsibility as provided in Section 2.2(b), such Indemnitee may manage the defense of such Indemnified Claim; provided, however, that the Asbestos PI Trust shall reimburse all such costs and expenses in the event it is ultimately determined that the Asbestos PI Trust is obligated to indemnify the Indemnitee with respect to such Indemnified Claim.

(d)     No Consent to Certain Judgments or Settlements Without Consent. Notwithstanding any provision of this Section 2.2, no Party shall consent to entry of any judgment or enter into any settlement of an Indemnified Claim for which the Asbestos PI Trust may be obligated to provide indemnification to an Indemnitee pursuant to Section 2.1 without the consent of the other Party (such consent not to be unreasonably withheld), if the effect of such judgment or settlement is to permit any injunction, declaratory judgment, other order, or other nonmonetary relief to be entered, directly or indirectly, against the other Party.

(e)     Subrogation.    In the event of payment by or on behalf of the Asbestos PI Trust to or on behalf of any Indemnitee in connection with any Indemnified Claim, the Asbestos PI Trust shall be subrogated to and shall stand in the place of such Indemnitee, in whole or in part based upon whether the Asbestos PI Trust has paid all or only part of the Indemnitee's Liability, as to any events or circumstances in respect of which such Indemnitee may have any right, defense, or claim relating to such Indemnified Claim against any claimant or plaintiff asserting such Indemnified Claim or against any other Entity.  Such Indemnitee shall cooperate with the Asbestos PI Trust in a reasonable manner, and at the cost and expense of the Asbestos PI Trust, in prosecuting any subrogated right, defense, or claim.

## ARTICLE III

## MISCELLANEOUS

Section 3.1     Entire Agreement.    Except as provided otherwise in the Plan Documents or the Confirmation Order, this Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and shall supersede all prior written and oral and all contemporaneous oral agreements and understandings with respect to the subject matter hereof; provided, however, that, in the event of an inconsistency between this Agreement and the Plan, the Plan shall govern.

Section 3.2     Governing Law.    This Agreement shall be governed by, and construed in accordance with, and all disputes hereunder shall be governed by, the laws of the State of New York, without regard to its conflicts of law principles.

Section 3.3     Descriptive Headings.    The headings contained in this Agreement and in the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 3.4  Notices.  Any notice, statement, or other report required or permitted by this Agreement must be:  (i) in writing and is deemed given when (a) delivered personally to the recipient, (b) sent by facsimile before 5:00 p.m. Prevailing Eastern Time on a Business Day with a copy of such facsimile sent to the recipient by reputable overnight courier service (charges prepaid) on the same day, (c) five (5) days after deposit in the United States mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); and (ii) addressed to the parties to whom such notice, statement or report is directed (and, if required, its counsel) at the addresses set forth below, or at such other address as such party may designate from time to time in writing in accordance with this Section 3.4.

If to the Asbestos PI Trust through the Trustees:

      _____
      _____
      _____
      _____
      _____

With copies to:

      _____
      _____
      _____
      _____
      _____

If to the Debtor:

      T H Agriculture & Nutrition, L.L.C.
      250 West 57th Street, Suite 901
      New York, New York  10107-0001
      Attention:  Joseph L. Wolf, Jr., President
      Telephone:  (212) 536-0592
      Facsimile:  (212) 536-0629

With copies to:

      Cadwalader, Wickersham and Taft LLP
      One World Financial Center
      New York, New York  10281
      Attention:  Bruce R. Zirinsky, Esq. and John H. Bae, Esq.
      Telephone:  (212) 504-6000
      Facsimile:  (212) 504-6999

If to PENAC or any other Protected Party:

> Philips Electronics North America Corporation
> 3000 Minuteman Road, Bldg. 1
> Andover, Massachusetts  01810
> Attention: Joseph E. Innamorati, Esq.
> Telephone:  (212) 536-0617
> Facsimile:  (212) 536-0598

With copies to:

> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, New York  10004-2498
> Attention:  Garrard R. Beeney, Esq.
> Telephone:  (212) 558-3737
> Facsimile:  (212) 558-3588

Section 3.5     Third-Party Beneficiaries.  This Agreement shall inure to the benefit of the Parties and each of their respective heirs, successors, and assigns.  Except for THAN, Reorganized THAN, PENAC, the Protected Parties and the Asbestos PI Trust, nothing in this Agreement, express or implied, is intended to confer upon any other Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 3.6     Other Agreements Evidencing Indemnification Obligations.  The Asbestos PI Trust hereby agrees to execute, for the benefit of any Indemnitee, such documents as may be reasonably requested by such Indemnitee, evidencing the Asbestos PI Trust's agreement that the indemnification obligations of the Asbestos PI Trust set forth in this Agreement inure to the benefit of, and are enforceable by, such Indemnitee.

Section 3.7     Counterparts.  This Agreement and the other documents referred to herein may be executed in counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

Section 3.8     Binding Effect; Assignment.  No Party may assign or transfer this Agreement, directly or indirectly, in whole or in part, whether by operation of law or otherwise, without the other Parties' prior written consents, and any attempted assignment, transfer, or delegation without such prior written consents shall be voidable at the sole option of such other Parties.  Notwithstanding the foregoing, each Party (or its permitted successive assignees or transferees hereunder) may assign or transfer this Agreement as a whole without consent to an entity that succeeds to all or substantially all of the business or assets of such Party.  Without limiting the foregoing, this Agreement will be binding upon, and inure to the benefit of, the Parties and their permitted successors and assigns.  This Agreement may be enforced separately by the Asbestos PI Trust and each Indemnitee.

Section 3.9     Severability.  If any term or other provision of this Agreement is determined by a court, administrative agency, or arbitrator to be invalid, illegal, or incapable of

being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the fullest extent possible.

Section 3.10 <u>Failure or Indulgence Not Waiver; Remedies Cumulative</u>. No failure or delay on the part of any Party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty, or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

Section 3.11 <u>Amendment</u>. No change or amendment will be made to this Agreement except by an instrument in writing signed on behalf of each of the Parties to this Agreement.

**IN WITNESS WHEREOF**, each of the Parties has caused this Indemnification to be executed on its behalf by its duly authorized officers thereunto on the day and year first above written.

**T H Agriculture & Nutrition, L.L.C.:**

By:_____
    Name: Joseph L. Wolf, Jr.
    Title:  President

**Philips Electronics North America
    Corporation:**

**On behalf of itself and the Protected Parties**

By:_____
    Name:  Joseph E. Innamorati, Esq.
    Title:  Senior Vice President & Chief Legal
    Officer

**ASBESTOS PI TRUST:**

By:_____
    Name:
    Title:

# **EXHIBIT C**

Asbestos Records Cooperation Agreement

[TO BE INCLUDED IN A PLAN SUPPLEMENT]

**EXHIBIT B**

**ASBESTOS PI TRUST BYLAWS**

# T H AGRICULTURE & NUTRITION, L.L.C.
## ASBESTOS PERSONAL INJURY TRUST
## BYLAWS

## ARTICLE I

## OFFICES

**SECTION 1: Principal Office:** The initial principal office of the T H Agriculture & Nutrition, L.L.C. ("THAN") Asbestos Personal Injury Trust[1] (the "Asbestos PI Trust") shall be at Wilmington Trust Company, 1100 N. Market Street, Wilmington, Delaware 19890-1625, or in any other place as the Asbestos PI Trustees shall from time to time select.

**SECTION 2: Other Offices:** The Asbestos PI Trust may have other offices at other places as the Asbestos PI Trustees may from time to time determine to be necessary for the efficient and cost-effective administration of the Asbestos PI Trust.

## ARTICLE II

## ASBESTOS PI TRUSTEES

**SECTION 1: Control of Property, Business and Affairs:** The property, business and affairs of the Asbestos PI Trust shall be managed by or under the direction of the Asbestos PI Trustees, provided that certain decisions of the Asbestos PI Trustees shall require the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, as provided in the Asbestos PI Trust Agreement.

**SECTION 2: Number, Resignation and Removal:** The number of Asbestos PI Trustees and the provisions governing the resignation and removal of a Asbestos PI Trustee and the appointment of a successor Asbestos PI Trustee shall be governed by the provisions of Article V of the Asbestos PI Trust Agreement.

**SECTION 3: Delaware Trustee:** To constitute a Delaware statutory trust as required by the Asbestos PI Trust Agreement, the Asbestos PI Trust Agreement designates the Wilmington Trust Company as the Delaware Trustee. The Delaware Trustee shall be a Trustee for the sole and limited purpose of fulfilling the requirements of section 3807 of the Delaware Statutory Trust Act, and shall not be entitled to exercise any prerogatives or powers of, nor have any of the duties and responsibilities of, the Asbestos PI Trustees set forth in the Asbestos PI Trust Agreement, the Plan or these Asbestos PI Trust Bylaws,

---

[1] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the THAN Asbestos Personal Injury Trust Agreement or the Prepackaged Plan of Reorganization of T H Agriculture & Nutrition, L.L.C. Under Chapter 11 of the Bankruptcy Code (the "Plan"). All capitalized terms not defined therein, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meaning ascribed to them by the Bankruptcy Code or Bankruptcy Rules, and such definitions are incorporated herein by reference.

and the position of Delaware Trustee shall not be counted in the calculation of a quorum or a majority of Asbestos PI Trustees for any purpose.

SECTION 4:  **Quorum and Manner of Acting:**  A majority of the Asbestos PI Trustees shall constitute a quorum. In the absence of a quorum, the Asbestos PI Trustees present may adjourn the meeting from time to time until a quorum shall be present.  At a meeting at which a quorum is present, the vote of a majority of Asbestos PI Trustees present shall be an act of the Asbestos PI Trustees.

SECTION 5:  **Consultation with Future Claimants' Representative and Asbestos PI Trust Advisory Committee:**  When the Asbestos PI Trustees are required or have the discretion, pursuant to the terms of the Asbestos PI Trust Agreement or these Asbestos PI Trust Bylaws, to consult with the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative, the Asbestos PI Trustees may do so at a regular meeting, special meeting or by written communication, *provided that*:  As required by Section 2.2(f) of the Asbestos PI Trust Agreement, the Asbestos PI Trustees shall meet with the Future Claimants' Representative and the Asbestos PI Trust Advisory Committee no less often than quarterly, which shall be at a regular or special meeting of the Asbestos PI Trustees as mutually agreed to by the Asbestos PI Trustees, the Future Claimants' Representative and the Asbestos PI Trust Advisory Committee, to discuss general matters regarding the administration of the Asbestos PI Trust, the review, determination, liquidation, and payment of Asbestos PI Claims, the Asbestos Trust Distribution Procedures, and the condition of the Asbestos PI Trust Assets.

The attendance of at least a majority of the Asbestos PI Trust Advisory Committee at a meeting constitutes the attendance of the Asbestos PI Trust Advisory Committee at that meeting.  Each Asbestos PI Trust Advisory Committee member may designate in writing any person to attend and participate on his or her behalf at any meeting at which the attendance of the Asbestos PI Trust Advisory Committee is required or permitted.  The Asbestos PI Trustees shall be deemed to have complied with the requirement of Section 2.2(f) of the Asbestos PI Trust Agreement to meet with the Asbestos PI Trust Advisory Committee if each member of the Asbestos PI Trust Advisory Committee has been provided notice of a regular meeting of the Asbestos PI Trustees and the member of the Asbestos PI Trust Advisory Committee does not attend the meeting.  The Future Claimants' Representative may designate in writing any person to attend and participate on his or her behalf at any meeting at which the attendance of the Future Claimants' Representative is required or permitted.  Electronic transmission (e-mail) to the Asbestos PI Trustees may be used by each Asbestos PI Trust Advisory Committee member and the Future Claimants' Representative for the written designation.

In the event the consent of the Future Claimants' Representative or the Asbestos PI Trust Advisory Committee on any matter is required pursuant to the terms of the Asbestos PI Trust Agreement, the Asbestos PI Trust Distribution Procedures or these Asbestos PI Trust Bylaws, notice of the matter in question shall be provided to the Future Claimants' Representative and the Asbestos PI Trust Advisory Committee and their respective counsel as provided in sections 6.7 and 7.7 of the Asbestos PI Trust

Agreement. The consent of a majority of the members of the Asbestos PI Trust Advisory Committee on a matter, whether by actual voting or by the implied consent of a Asbestos PI Trust Advisory Committee member who fails to vote within the time prescribed under the Asbestos PI Trust Agreement, constitutes the consent of the Asbestos PI Trust Advisory Committee on that matter. Each Asbestos PI Trust Advisory Committee member may designate in writing any person to vote as his or her proxy on any matter on which the consent of the Asbestos PI Trust Advisory Committee is required or permitted. Electronic transmission (e-mail) to the Asbestos PI Trustees may be used for the written designation.

SECTION 6: **Regular Meetings**: Regular meetings of the Asbestos PI Trustees may be held at a time and place as shall from time to time be determined by the Asbestos PI Trustees, provided that the Asbestos PI Trustees shall meet at least once per calendar quarter. For each calendar year, the Asbestos PI Trustees shall schedule the year's regular meetings, and deliver the schedule to those entitled to receive notice, as soon as practicable after the Effective Date or each anniversary of the Effective Date, as the case may be.

Notice of a regular meeting shall be in writing and delivered to the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative as provided by Section 8.5 of the Asbestos PI Trust Agreement, and to any other person entitled to receive notice, addressed to him or her at the place designated by him or her for receipt of notice, or failing a designation, at his or her residence or usual place of business, by (i) U.S. mail, registered or certified, return receipt requested, postage prepaid, at least fifteen days before the date on which the meeting is to be held; (ii) reputable overnight courier, charges prepaid, at least eleven days before the date on which the meeting is to be held; or (iii) hand delivery, facsimile or e-mail transmission by 5:00 p.m. prevailing Eastern time (with a copy of any facsimile or e-mail sent on the same day to the recipient by reputable overnight courier, charges prepaid) at least ten days before the date on which the meeting is to be held. In lieu of the notice to be given as set forth above, a waiver thereof in writing signed by the person entitled to receive the notice, whether signed before or after the meeting, shall be deemed equivalent to adequate notice for purposes of this Section 6. No notice or waiver by any Asbestos PI Trustee, the Future Claimants' Representative, or any member of the Asbestos PI Trust Advisory Committee with respect to any regular meeting shall be required if that person attends the meeting.

SECTION 7: **Special Meetings:** Special meetings of the Asbestos PI Trustees shall be held whenever called by one or more of the Asbestos PI Trustees. Notice of a special meeting shall be in writing and delivered to the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative as provided by Section 8.5 of the Asbestos PI Trust Agreement, and to any other person entitled to receive notice, addressed to him or her at the place designated by him or her for receipt of notice, or failing a designation, at his or her residence or usual place of business, by (i) reputable overnight courier, charges prepaid, at least three days before the date on which the meeting is to be held; (ii) hand delivery, facsimile or e-mail transmission by 5:00 p.m. prevailing Eastern time (with a

copy of any facsimile or e-mail sent on the same day to the recipient by reputable overnight courier, charges prepaid) at least two days before the day on which the meeting is to be held. The notice shall state the place, date, and hour of the meeting and the purposes for which it is called. In lieu of the notice to be given as set forth above, a waiver thereof in writing signed by the person entitled to receive the notice, whether signed before or after the meeting, shall be deemed equivalent to adequate notice for purposes of this Section 7. No notice or waiver by any Asbestos PI Trustee, the Future Claimants' Representative, or any member of the Asbestos PI Trust Advisory Committee with respect to any special meeting shall be required if that person attends the meeting.

SECTION 8: **Conduct of Business:** To the extent not inconsistent with the terms of the Asbestos PI Trust Agreement, these Asbestos PI Trust Bylaws shall govern the affairs of the Asbestos PI Trust and each Asbestos PI Trustee shall act in accordance with these Asbestos PI Trust Bylaws. In the event of an inconsistency between these Asbestos PI Trust Bylaws and the Asbestos PI Trust Agreement, the Asbestos PI Trust Agreement shall govern.

At meetings of the Asbestos PI Trustees, matters pertaining to the Asbestos PI Trust's purposes shall be considered. At all meetings of the Asbestos PI Trustees, the Managing Trustee shall preside as chair, and in the absence of the Managing Trustee, a chair shall be chosen by the Asbestos PI Trustees present. If the Asbestos PI Trustees have appointed a Secretary of the Asbestos PI Trust, the Secretary shall act as secretary of all meetings of the Asbestos PI Trustees. In the absence of a Secretary, the chair may appoint any person to act as secretary of the meeting.

SECTION 9: **Action Without a Meeting**: Any action required or permitted to be taken at any special meeting of the Asbestos PI Trustees may be taken without a meeting if all Asbestos PI Trustees, after notice to the Future Claimants' Representative and the Asbestos PI Trust Advisory Committee where required by the Asbestos PI Trust Agreement, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Asbestos PI Trustees. Electronic transmission (e-mail) may be used by the Asbestos PI Trustees for the notice and consent provided in this Section 9.

SECTION 10: **Participation by Telephone:** The Asbestos PI Trustees at their sole discretion may take any action required or permitted to be taken at any meeting by means of conference by telephone, or similar communication equipment, among all attendees. Any Asbestos PI Trustee, the Future Claimants' Representative and any member of the Asbestos PI Trust Advisory Committee may participate by telephone in any meeting they are required or permitted to attend. Participation in a meeting pursuant to this section shall constitute attendance in person at the meeting.

ARTICLE III

OFFICERS

SECTION 1:  **Officers:**  The Asbestos PI Trustees shall choose from among themselves a Managing Trustee, who will serve as principal officer of the Asbestos PI Trust. The office of Managing Trustee shall rotate among the three Asbestos PI Trustees, with the Asbestos PI Trustee with the shortest term serving first and the Asbestos PI Trustee with the longest term serving third.  Each Managing Trustee shall serve for a term of one year. Counsel to the Asbestos PI Trust shall serve as Secretary. The Asbestos PI Trust may also appoint other officers as the Asbestos PI Trustees determine in their discretion are advisable or necessary in order to carry out the terms of, or promote the efficient and cost-effective administration of, the Asbestos PI Trust.

SECTION 2:  **Election and Term of Office:**  Each officer of the Asbestos PI Trust shall hold office until his or her successor shall have been duly chosen and qualified or until the earlier of his or her death, resignation, retirement, or removal.

SECTION 3:  **Removal:**  The Managing Trustee or any other Asbestos PI Trust officer may be removed from his or her Asbestos PI Trust office with or without cause, at any time, by resolution adopted by the Asbestos PI Trustees at any regular meeting of the Asbestos PI Trustees, or at any special meeting of the Asbestos PI Trustees called for that purpose.

SECTION 4:  **Resignation:**  Any Asbestos PI Trust officer may resign from his or her Asbestos PI Trust office at any time by giving written notice to the Asbestos PI Trustees. The resignation of any officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in the notice and unless otherwise specified therein, the acceptance of the resignation shall not be necessary to make it effective.

SECTION 5:  **Powers and Duties:**  The officers of the Asbestos PI Trust shall have the powers and perform the duties as may be conferred upon or assigned to them by the Asbestos PI Trustees.

SECTION 6:  **Managing Trustee:**  Notwithstanding anything contained herein, any person, firm or corporation dealing with the Asbestos PI Trust shall be entitled to rely upon the signature of the Managing Trustee or the Asbestos PI Trustee acting as the Managing Trustee designee, on behalf of the Asbestos PI Trust, to any document or instrument as having been validly authorized by the Asbestos PI Trust.

SECTION 7:  **Agents and Employees:**  In addition to the officers enumerated in Section 1 of this Article III, the Asbestos PI Trust may have other agents and employees as the Asbestos PI Trustees, in their discretion, may deem advisable or necessary to carry out the terms of, or for the efficient and cost-effective administration of, the Asbestos PI Trust, each of whom shall hold his or her position or office for such period, have such authority, and perform such duties as the Asbestos PI Trustees may from time to time determine.  The Asbestos PI Trustees may delegate to any officer the power to appoint and to remove any agents or employees.

## ARTICLE IV

## AMENDMENTS

SECTION 1:  **Amendments:**  These Asbestos PI Trust Bylaws of the Asbestos PI Trust may be amended by the Asbestos PI Trustees at any meeting of the Asbestos PI Trustees, provided that notice of the proposed amendment is contained in the notice of the meeting, and with notice to and consent of the Asbestos PI Trust Advisory Committee and Future Claimants' Representative.

## ARTICLE V

## EFFECTIVENESS

SECTION 1:  **Effectiveness**: These Bylaws shall become effective upon the execution by all parties hereto.  These Bylaws may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

**EXHIBIT C**

---

**ASBESTOS PI TRUST DISTRIBUTION PROCEDURES**

.

**ALL PROVISIONS IN THESE ASBESTOS PI TRUST DISTRIBUTION PROCEDURES, INCLUDING THE VALUES ESTABLISHED FOR ASBESTOS PI CLAIMS IN EACH DISEASE LEVEL, WERE AGREED TO FOR SETTLEMENT PURPOSES ONLY. TO THE EXTENT THE PLAN IS NOT CONFIRMED, OR IS CONFIRMED AND SUBSEQUENTLY REVERSED, THE PARTIES RESERVE ALL RIGHTS WITH RESPECT TO CLAIM VALUES AND OTHER MATTERS DEALT WITH IN THESE ASBESTOS PI TRUST DISTRIBUTION PROCEDURES.**

**<u>T H AGRICULTURE & NUTRITION, L.L.C.</u>**

**FORM OF ASBESTOS PERSONAL INJURY**
**TRUST DISTRIBUTION PROCEDURES**

**T H AGRICULTURE & NUTRITION, L.L.C. INDUSTRIES**
**ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES**
**TABLE OF CONTENTS**

Section I        Introduction........................................................................................2
1.1.             Purpose..............................................................................................2
1.2.             Interpretation.....................................................................................2
1.3.             Effective Date ...................................................................................2
Section II       Overview............................................................................................2
2.1.             Asbestos PI Trust Goals....................................................................2
2.2.             Claims Liquidation Procedures.........................................................3
2.3.             Application of the Payment Percentage ............................................5
2.4.             Determination of the Maximum Annual Payment and Maximum Available
                 Payment..............................................................................................7
2.5.             Claims Payment Ratio........................................................................8
2.6.             Indirect Asbestos PI Claims ...........................................................11
Section III      Asbestos PI Trust Distribution Procedures Administration.......................11
3.1.             Asbestos PI Trust Advisory Committee and Future Claimants'
                 Representative..................................................................................11
3.2.             Consent and Consultation Procedures ............................................11
Section IV       Payment Percentage; Periodic Estimates.........................................12
4.1.             Uncertainty of THAN's Personal Injury Asbestos Liabilities.................12
4.2.             Computation of Payment Percentage................................................12
4.3.             Applicability of the Payment Percentage.........................................14
Section V        Resolution of Asbestos PI Claims...................................................16
5.1.             Ordering, Processing and Payment of Claims. ................................16
        (a)      Ordering of Claims. ........................................................................16
                 (1)    Establishment of FIFO Processing Queues.....................16
                 (2)    Effect of Statutes of Limitations and Repose .................17
        (b)      Processing of Claims.......................................................................18
        (c)      Payment of Claims ..........................................................................18
5.2.             Payment of Qualified Asbestos PI Claims.......................................19
5.3.             Resolution of Unliquidated Asbestos PI Claims...............................20
        (a)      Expedited Review Process................................................................21
                 (1)    In General.........................................................................21
                 (2)    Claims Processing under Expedited Review .................22
                 (3)    Disease Levels, Scheduled Values and Medical/Exposure Criteria22
        (b)      Individual Review Process...............................................................26
                 (1)    In General.........................................................................26
                        (A)    Review of Medical/Exposure Criteria .............................28
                        (B)    Review of Liquidated Value ............................................28
                 (2)    Valuation Factors to Be Considered in Individual Review ..........29
                 (3)    Scheduled, Average and Maximum Values....................................31
                 (4)    Claims Processing Under Individual Review ................................31

5.4.          Categorizing Claims as Extraordinary and/or Exigent Hardship.............33
    (a)       Extraordinary Claims .........................................................................33
    (b)       Exigent Claims ...................................................................................34
        (1)    Exigent Health Claims ...............................................................31
        (2)    Exigent Hardship Claims ...........................................................31
5.5.          Secondary Exposure Claims .....................................................................35
5.6.          Indirect Asbestos PI Claims .....................................................................35
5.7.          Evidentiary Requirements.........................................................................38
    (a)       Medical Evidence................................................................................38
        (1)    In General..................................................................................38
            (A)     Disease Levels I – IV ......................................................38
            (B)     Disease Levels V – VIII....................................................39
            (C)     Exception to the Exception for Certain Pre-Petition
                    Asbestos PI Claims ..........................................................40
        (2)    Credibility of Medical Evidence..................................................40
    (b)       Exposure Evidence..............................................................................41
        (1)    In General..................................................................................41
        (2)    Significant Occupational Exposure.............................................42
        (3)    THAN Exposure .........................................................................42
5.8.          Claims Audit Program ..............................................................................43
5.9.          Second Disease (Malignancy) Claims ......................................................44
5.10.        Arbitration.................................................................................................44
    (a)       Establishment of ADR Procedures .....................................................44
    (b)       Claims Eligible for Arbitration ...........................................................46
    (c)       Claims Arbitration ..............................................................................46
    (d)       Limitations on and Payment of Arbitration Awards...................................46
5.11.        Litigation..................................................................................................47
Section VI     Claims Materials .......................................................................................47
6.1.          Claims Materials .......................................................................................47
6.2.          Content of Claims Materials ......................................................................48
6.3.          Withdrawal or Deferral of Claims .............................................................48
6.4.          Filing Requirements and Fees....................................................................49
6.5.          Confidentiality of Claimants' Submissions ...............................................49
Section VII    General Guidelines for Liquidating and Paying Claims ............................50
7.1.          Showing Required......................................................................................50
7.2.          Costs Considered ......................................................................................50
7.3.          Discretion to Vary the Order and Amounts of Payments in Event of
          Limited Liquidity .....................................................................................51
7.4.          Punitive Damages .....................................................................................52
7.5.          Sequencing Adjustments...........................................................................53
    (a)       In General............................................................................................53
    (b)       Unliquidated Asbestos PI Claims .......................................................54(b)
    (c)       Qualified Asbestos PI Claims .............................................................54
7.6.          Suits in the Tort System.............................................................................54
7.7.          Payment of Judgments for Money Damages .............................................55
7.8.          Releases.....................................................................................................56

| 7.9. | Third-Party Services | .......................................................................................56 |
|------|---------------------|----------------------------------------------------------------------|
| 7.10. | Asbestos PI Trust Disclosure of Information | ..........................................57 |
| Section VIII | Miscellaneous | ...............................................................................57 |
| 8.1. | Amendments | ....................................................................................57 |
| 8.2. | Severability | .......................................................................................58 |
| 8.3. | Governing Law | ................................................................................58 |

# T H AGRICULTURE & NUTRITION, L.L.C.

## ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

The T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust Distribution Procedures (these "Asbestos PI Trust Distribution Procedures") contained herein provide for resolving all "Asbestos PI Claims" as defined in the Prepackaged Plan of Reorganization of T H Agriculture & Nutrition, L.L.C. Under Chapter 11 of the Bankruptcy Code dated _____ (as it may be amended or modified, the "Plan"), including all asbestos-related personal injury and death claims caused by exposure to asbestos-containing products (for purposes of these Asbestos PI Trust Distribution Procedures, asbestos-containing products shall include, without limitation, (i) raw asbestos, (ii) asbestos fibers, (iii) materials, including, without limitation, talc, vermiculite and tremolite, containing raw asbestos or asbestos fibers and (iv) products containing raw asbestos, asbestos fibers or materials containing raw asbestos or asbestos fibers), or to conduct that exposed the claimant to an asbestos-containing product, for which T H Agriculture & Nutrition, L.L.C. or any of its predecessors, successors, and assigns (collectively, "THAN") have alleged legal responsibility as provided in and required by the Plan and the T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust Agreement (the "Asbestos PI Trust Agreement"). The Plan and the Asbestos PI Trust Agreement establish the T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust (the "Asbestos PI Trust"). The Asbestos PI Trustees shall implement and administer these Asbestos PI Trust Distribution Procedures in accordance with the Asbestos PI Trust Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and the Asbestos PI Trust Agreement. For purposes of these Asbestos PI Trust Distribution Procedures, "Asbestos PI Claims" shall not include Asbestos PI Trust Expenses.

**SECTION I**
Introduction

1.1.    Purpose.  These Asbestos PI Trust Distribution Procedures have been adopted pursuant to the Asbestos PI Trust Agreement.  It is designed to provide fair, equitable, and substantially similar treatment for all Asbestos PI Claims that may presently exist or may arise in the future.

1.2.    Interpretation.  Except as may otherwise be provided below, nothing in these Asbestos PI Trust Distribution Procedures shall be deemed to create a substantive right for any claimant.  The rights and benefits provided herein to holders of Asbestos PI Claims shall vest in such holders as of the Effective Date.

**SECTION II**
Overview

2.1.    Asbestos PI Trust Goals.  The goal of the Asbestos PI Trust is to treat all claimants similarly and equitably and in accordance with the requirements of Section 524(g) of the Bankruptcy Code.  These Asbestos PI Trust Distribution Procedures further that goal by setting forth procedures for processing and paying THAN's several share of the unpaid portion of the liquidated value of Asbestos PI Claims generally on an impartial, first-in-first-out ("FIFO") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.[1]  To this end, these Asbestos PI Trust Distribution Procedures establish a schedule of eight asbestos-related diseases ("Disease Levels"), seven of which have presumptive medical and exposure requirements ("Medical/Exposure Criteria"), and specific liquidated values

---

[1]    As used in these Asbestos PI Trust Distribution Procedures, the phrase "in the tort system" shall not include claims asserted against a trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) and/or section 105 of the Bankruptcy Code or any other applicable law.

("Scheduled Values"), and five of which have both anticipated average values ("Average Values"), and caps on their liquidated values ("Maximum Values"). The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values, which are set forth in Sections 5.3 and 5.4 below, have all been selected and derived with the intention of achieving a fair allocation of the Asbestos PI Trust funds as among claimants suffering from different diseases in light of the best available information considering the settlement history of THAN and the rights claimants would have in the tort system absent the bankruptcy.

2.2.    Claims Liquidation Procedures.  Except for Qualified Asbestos PI Claims, which will be paid by the Asbestos PI Trust without further review or processing, Asbestos PI Claims shall be processed based on their place in the FIFO Processing Queue to be established pursuant to Section 5.1(a) below.  The Asbestos PI Trust shall take all reasonable steps to resolve Asbestos PI Claims as efficiently and expeditiously as possible at each stage of claims processing, including mediation and arbitration, which steps may include, in the Asbestos PI Trust's sole discretion, conducting settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained, and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.3(b)(2) below.  The Asbestos PI Trust shall also make every reasonable effort to resolve each year at least that number of Asbestos PI Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment for Category A and Category B claims, as those terms are defined below.

The Asbestos PI Trust shall, except as otherwise provided below, liquidate all Asbestos PI Claims except Foreign Claims (as defined in Section 5.3(b)(1) below) that meet the presumptive Medical/Exposure Criteria of Disease Levels I – V, VII and VIII under the

Expedited Review Process described in Section 5.3(a) below.  Asbestos PI Claims involving Disease Levels I – V, VII and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the Asbestos PI Trust's Individual Review Process described in Section 5.3(b) below.  In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the Asbestos PI Trust may offer the claimant an amount up to the Scheduled Value of that Disease Level if the Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

Asbestos PI Claims involving Disease Levels IV-VIII tend to raise more complex valuation issues than the Asbestos PI Claims involving Disease Levels I-III.  Accordingly, in lieu of liquidating each such claim under the Expedited Review Process, a claimant holding an Asbestos PI Claim involving Disease Level IV, V, VII or VIII may alternatively seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the Asbestos PI Trust's Individual Review Process pursuant to Section 5.3(b) below.  However, the liquidated value of an Asbestos PI Claim that undergoes the Individual Review Process for valuation purposes may be determined to be less than the Scheduled Value for the applicable Disease Level, and in any event shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.4(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value specified in Section 5.4(a) for such claims.  Claims involving Disease Level VI (Lung Cancer 2) and all Foreign Claims may be liquidated only pursuant to the Asbestos PI Trust's Individual Review Process.

The Scheduled Values and Maximum Values set forth in Section 5.3(b)(3) have been established for claims involving Disease Levels IV through VIII, which are eligible for Individual Review of their liquidated values, with the expectation that the combination of settlements at the Scheduled Values and those resulting from the Individual Review Process should result in the Average Values also set forth in that provision.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of the claim shall be subject to mediation and then to binding or non-binding arbitration as set forth in Section 5.10 below, at the election of the claimant, under the alternative dispute resolution procedures (the "ADR Procedures") to be adopted by the Asbestos PI Trust as provided in Section 5.10 below. Asbestos PI Claims that are the subject of a dispute with the Asbestos PI Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.11 and 7.6 below. However, if and when a claimant obtains a judgment in the tort system, the judgment shall be payable (subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below) as provided in Section 7.7 below.

2.3.    Application of the Payment Percentage.  After the liquidated value of an Asbestos PI Claim, other than a claim involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) as defined in Section 5.3(a)(3) below, is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, mediation, arbitration, or litigation in the tort system, the claimant shall ultimately receive a pro-rata share of that value based on the Payment Percentage described in Section 4.2 below. The Payment Percentage shall also apply to all sequencing adjustments paid pursuant to Section 7.5 below.

The initial Payment Percentage (the "Initial Payment Percentage") has been set at one hundred percent (100%) and shall apply to all Asbestos PI Trust Voting Claims accepted as valid by the Asbestos PI Trust, unless adjusted by the Asbestos PI Trust with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative pursuant to Section 4.2 below, and except as provided in Section 4.3 below with respect to supplemental payments in the event the Initial Payment Percentage is changed. The term "Asbestos PI Trust Voting Claims" means (i) Qualified Asbestos PI Claims; (ii) claims filed against THAN in the tort system, actually submitted to THAN pursuant to an administrative settlement agreement prior to the Commencement Date of _____, 2008 or actually submitted to the Claims Reviewer in the Pre-Effective Date Claims Review process; and (iii) all asbestos claims filed against another defendant in the tort system prior to the date the Plan was filed with the Bankruptcy Court (_____, 2008 (the "Plan Filing Date")), provided, however, that (1) the holder of a claim described in subsection (i), (ii) or (iii) above, or his or her authorized agent, actually voted to accept or reject the Plan pursuant to the voting procedures approved by the Bankruptcy Court, unless such holder certifies to the satisfaction of the Asbestos PI Trustees that he or she was prevented from voting in this proceeding as a result of circumstances resulting in a state of emergency affecting, as the case may be, the holder's residence, principal place of business or legal representative's place of business at which the holder or his or her legal representative receives notice and/or maintains material records relating to the claim; and provided further that (2) the claim was subsequently filed with the Asbestos PI Trust pursuant to Section 6.1 below by the Initial Claims Filing Date defined in Section 5.1(a) below. The Initial Payment Percentage has been calculated based upon (i) the Scheduled Values set forth in Section 5.3(b)(3) below with respect to existing present claims and projected future claims involving

Disease Levels I-III, and (ii) the assumption that the Average Values set forth in Section 5.3(b)(3) below will be achieved with respect to existing present claims and projected future claims involving Disease Levels IV – VIII.

The Payment Percentage may thereafter be adjusted upwards or downwards from time to time by the Asbestos PI Trust with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative to reflect then-current estimates of the Asbestos PI Trust's assets and liabilities, as well as the then-estimated value of then-pending and future claims. Any adjustment to the Initial Payment Percentage shall be made only pursuant to Section 4.2 below. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under these Asbestos PI Trust Distribution Procedures shall receive additional payments only as provided in Section 4.3 below. Because there is uncertainty in the prediction of both the number and severity of future Asbestos PI Claims, and the amount of the Asbestos PI Trust's assets, no guarantee can be made of any Payment Percentage that will be applied to an Asbestos PI Claim's liquidated value.

2.4.    <u>Determination of the Maximum Annual Payment and Maximum Available Payment</u>.  The Asbestos PI Trust shall estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds shall be available to treat all present and future holders of Asbestos PI Claims as similarly as possible.  In each year, the Asbestos PI Trust shall be empowered to pay out all of the income earned during the year (net of taxes payable with respect thereto), together with a portion of its principal, calculated so that the application of the Asbestos PI Trust's funds over its life shall correspond with the needs created by the estimated initial backlog of claims and the estimated anticipated future flow of claims (the "<u>Maximum Annual Payment</u>"), taking into account the Payment Percentage provisions set forth

in Section 2.3 above and Sections 4.2 and 4.3 below. The Maximum Annual Payment shall be determined annually by the Asbestos PI Trustees with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative. The Asbestos PI Trust's distributions to all claimants for that year shall not exceed the Maximum Annual Payment determined for that year plus any amounts rolled over from earlier years as provided in Section 2.5 below.

Notwithstanding any provision to the contrary, the Maximum Annual Payment shall not apply to Qualified Asbestos PI Claims, and Qualified Asbestos PI Claims shall be paid as provided in the Plan.

In distributing the Maximum Annual Payment, the Asbestos PI Trust shall first allocate the amount in question to Asbestos PI Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) that have been liquidated by the Asbestos PI Trust. Should the Maximum Annual Payment be insufficient to pay all such claims in full, the available funds shall be paid to the maximum extent to claimants based on their place in the FIFO Payment Queue. Claims for which there are insufficient funds shall maintain their place in the FIFO Payment Queue and shall be carried over to the next year. The remaining portion of the Maximum Annual Payment (the "Maximum Available Payment"), if any, shall then be allocated and used to satisfy all other liquidated Asbestos PI Claims, subject to the Claims Payment Ratio set forth in Section 2.5 below. Asbestos PI Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) shall not be subject to the Claims Payment Ratio.

2.5. Claims Payment Ratio. Based upon THAN's claims settlement history and analysis of present and future claims, a Claims Payment Ratio has been determined, which, as of the Effective Date, has been set at 90% for Category A claims, which consist of Asbestos PI

Claims involving severe asbestosis and malignancies (Disease Levels IV – VIII) that were unliquidated as of the Commencement Date, and at 10% for Category B claims, which are Asbestos PI Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels II and III) that were similarly unliquidated as of the Commencement Date. The Claims Payment Ratio shall not apply to any Qualified Asbestos PI Claims or to any claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment).

In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, 90% of that amount will be available to pay Category A claims and 10% will be available to pay Category B claims placed in the FIFO Payment Queue described in Section 5.1(c) below. In the event there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue. Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue. If there are excess funds in either or both Categories, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, then the excess funds for either or both Categories shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.

The 90%/10% Claims Payment Ratio and its rollover provision shall apply to all Asbestos PI Trust Voting Claims (except claims that, pursuant to Section 2.5 above, are not subject to the Claims Payment Ratio) and shall not be amended until the second anniversary of the date the Asbestos PI Trust first accepts for processing proof of claim forms and other materials required to file a claim with the Asbestos PI Trust. Thereafter, both the Claims

Payment Ratio and its rollover provision shall be continued or recalibrated to 95%/5% or 92.5%/7.5% in order to approximately reflect the actual number of Asbestos PI Claims, including Qualified Asbestos PI Claims, that have been paid pursuant to these Trust Distribution Procedures.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Asbestos PI Trustees shall consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement history that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Asbestos PI Trustees should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants.

In any event, no amendment to the Claims Payment Ratio (i) to reduce the percentage allocated to Category A claims may be made without the unanimous consent of the Asbestos PI Trust Advisory Committee members and the consent of the Future Claimants' Representative and (ii) to increase the percentage allocated to Category A claims may be made without the consent of the Asbestos PI Trust Advisory Committee and the consent of the Future Claimants' Representative. In the case of any amendments to the Claims Payment Ratio, the consent process set forth in Sections 5.7(b) and 6.6(b) of the Asbestos PI Trust Agreement shall apply. The Asbestos PI Trustees, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B in return for prompter payment (the "Reduced Payment Option").

2.6.    Indirect Asbestos PI Claims.  As set forth in Section 5.6 below, Indirect Asbestos PI Claims, if any, shall be subject to the same categorization, evaluation, and payment provisions of these Asbestos PI Trust Distribution Procedures as all other Asbestos PI Claims.

## SECTION III
### Asbestos PI Trust Distribution Procedures Administration

3.1.    Asbestos PI Trust Advisory Committee and Future Claimants' Representative.  Pursuant to the Plan and the Asbestos PI Trust Agreement, the Asbestos PI Trust and these Asbestos PI Trust Distribution Procedures shall be administered by the Asbestos PI Trustees in consultation with the Asbestos PI Trust Advisory Committee, which represents the interests of holders of present Asbestos PI Claims, and the Future Claimants' Representative, who represents the interests of holders of Asbestos PI Claims that will be asserted in the future.  The Asbestos PI Trustees shall obtain the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative on any amendments to these Asbestos PI Trust Distribution Procedures pursuant to Section 8.1 below, and on such other matters as are otherwise required below and in Section 2.2(e) of the Asbestos PI Trust Agreement.  The Asbestos PI Trustees shall also consult with the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative on such matters as are provided below and in Section 2.2(d) of the Asbestos PI Trust Agreement.  The initial Asbestos PI Trustees, the initial members of the Asbestos PI Trust Advisory Committee and the initial Future Claimants' Representative are identified in the Asbestos PI Trust Agreement.

3.2.    Consent and Consultation Procedures.  In those circumstances in which consultation or consent is required, the Asbestos PI Trustees shall provide written notice to the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative of the specific amendment or other action that is proposed.  The Asbestos PI Trustees shall not implement such

amendment nor take such action unless and until the parties have engaged in the Consultation Process described in Sections 5.7(a) and 6.6(a), or the Consent Process described in Sections 5.7(b) and 6.6(b), of the Asbestos PI Trust Agreement, respectively.

## SECTION IV
### Payment Percentage; Periodic Estimates

4.1.    <u>Uncertainty of THAN's Personal Injury Asbestos Liabilities</u>.  As discussed above, there is inherent uncertainty regarding THAN's total asbestos-related tort liabilities, as well as the total value of the assets available to the Asbestos PI Trust to pay Asbestos PI Claims. Consequently, there is inherent uncertainty regarding the amounts that holders of Asbestos PI Claims shall receive.  To seek to ensure substantially equivalent treatment of all present and future Asbestos PI Claims, the Asbestos PI Trustees must determine from time to time the percentage of full liquidated value that holders of present and future Asbestos PI Claims shall be likely to receive, *i.e.*, the "Payment Percentage" described in Section 2.3 above and Section 4.2 below.

4.2.    <u>Computation of Payment Percentage</u>.  As provided in Section 2.3 above, the Initial Payment Percentage shall be 100% and shall apply to all Asbestos PI Trust Voting Claims as defined in Section 2.3 above, unless the Asbestos PI Trustees, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, determine that the Initial Payment Percentage should be changed to assure that the Asbestos PI Trust shall be in a financial position to pay present and future holders of Asbestos PI Claims in substantially the same manner.

In making any such adjustment, the Asbestos PI Trustees, the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative shall take into account the fact that the holders of Asbestos PI Trust Voting Claims voted on the Plan relying on the findings of experts

that the Initial Payment Percentage represented a reasonably reliable estimate of the PI Trust's total assets and liabilities over its life based on the best information available at the time, and shall thus give due consideration to the expectations of holders of Asbestos PI Trust Voting Claims that the Initial Payment Percentage would be applied to their Asbestos PI Trust Voting Claims.

Except with respect to Asbestos PI Trust Voting Claims to which the Initial Payment Percentage applies, the Payment Percentage shall be subject to change pursuant to the terms of these Asbestos PI Trust Distribution Procedures and the Asbestos PI Trust Agreement if the Asbestos PI Trustees, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, determine that an adjustment is required. No less frequently than once every three (3) years, commencing with the first day of January occurring after the Effective Date, the Asbestos PI Trustees shall reconsider the then-applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage if necessary with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative. The Asbestos PI Trustees shall also reconsider the then-applicable Payment Percentage at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative.

The Asbestos PI Trustees must base their determination of the Payment Percentage on current estimates of the number, types, and values of present and future Asbestos PI Claims, the value of the assets then available to the Asbestos PI Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all present and

future holders of Asbestos PI Claims.  When making these determinations, the Asbestos PI Trustees shall exercise common sense and flexibly evaluate all relevant factors.  The Payment Percentage applicable to Category A or Category B claims may not be reduced to alleviate delays in payments of claims in the other Category; both Categories of claims shall receive the same Payment Percentage, but the payment may be deferred as needed pursuant to Section 7.3 below, and a Reduced Payment Option may be instituted as described in Section 2.5 above.

4.3.    <u>Applicability of the Payment Percentage</u>.  Except as otherwise provided in Section <u>5.1(c)</u> below for Asbestos PI Claims involving deceased or incompetent claimants for which approval of the Asbestos PI Trust's offer by a court or through a probate process is required, no holder of any Asbestos PI Claims, other than an Asbestos PI Claim for Other Asbestos Disease (Disease Level I - Cash Discount Payment), shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment.  Asbestos PI Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) shall not be subject to the Payment Percentage, but shall instead be paid the full amount of their Scheduled Value as set forth in Section 5.3(a)(3) below.

If a redetermination of the Payment Percentage has been proposed in writing by the Asbestos PI Trustees to the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage.  However, if the proposed Payment Percentage was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed Payment Percentage was the higher amount and was subsequently

adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

There is uncertainty surrounding the amount of the PI Trust's future assets. There is also uncertainty surrounding the totality of the Asbestos PI Claims to be paid over time, as well as the extent to which changes in existing federal and state law could affect the PI Trust's liabilities under these Asbestos PI Trust Distribution Procedures. If the value of the PI Trust's future assets increases significantly and/or if the value or volume of PI Trust claims actually filed with the PI Trust is significantly lower than originally estimated, the PI Trust shall use those proceeds and/or claims savings, as the case may be, first to maintain the Payment Percentage then in effect.

If the Asbestos PI Trustees, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, make a determination to increase the Payment Percentage due to a material change in the estimates of the Asbestos PI Trust's future assets and/or liabilities, the Asbestos PI Trustees shall also make supplemental payments to all claimants who previously liquidated their claims against the Asbestos PI Trust and received payments based on a lower Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below).

The Asbestos PI Trustees' obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than

15

$100.00.  However, the Asbestos PI Trustees' obligation shall resume and the Asbestos PI Trustees shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $100.00.

**SECTION V**
Resolution of Asbestos PI Claims

5.1.    Ordering, Processing and Payment of Claims.

(a)    Ordering of Claims.

(1)    Establishment of FIFO Processing Queues.  The Asbestos PI Trust shall order all claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "FIFO Processing Queue").  Qualified Asbestos PI Claims do not require processing by the Asbestos PI Trust and thus shall not be placed in the FIFO Processing Queue.  For all claims filed on or before the date six (6) months after the date that the Asbestos PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the Asbestos PI Trust (the "Initial Claims Filing Date"), a claimant's position in the FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to the Commencement Date that the specific claim was either filed against THAN in the tort system or was actually submitted to THAN pursuant to an administrative settlement agreement; (ii) the date before the Commencement Date that the asbestos claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with THAN; (iii) the date after the Commencement Date but before the date that the Asbestos PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the Asbestos PI Trust that the asbestos claim was filed against another defendant in the tort system; (iv) the date after the Commencement Date but before the Effective Date that a proof of claim was filed by the claimant against THAN in THAN's Chapter 11 case; or (v) the

16

date a ballot was submitted on behalf of the claimant for purposes of voting to accept or reject the Plan pursuant to voting procedures approved by the Bankruptcy Court.

Following the Initial Claims Filing Date, the claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the Asbestos PI Trust, provided such claim is sufficiently complete, as defined in the Asbestos PI Trust's claim filing instructions. If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the asbestos-related disease. If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

(2)     Effect of Statutes of Limitations and Repose. All unliquidated Asbestos PI Claims must meet either: (i) for claims first filed in the tort system against THAN prior to the Commencement Date, the applicable federal, state and foreign statute of limitations and repose that was in effect at the time of the filing of the claim in the tort system; or (ii) for claims not filed against THAN in the tort system prior to the Commencement Date, the applicable federal, state or foreign statute of limitations that was in effect at the time of the filing with the Asbestos PI Trust. However, the running of the relevant statute of limitations shall be tolled as of the earliest of: (A) the actual filing of the claim against THAN prior to the Commencement Date, whether in the tort system or by submission of the claim to THAN pursuant to an administrative settlement agreement; (B) the tolling of the claim against THAN prior to the Commencement Date by an agreement or otherwise, provided such tolling was still in effect on the Commencement Date; or (C) the Commencement Date.

If an Asbestos PI Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable federal, state or foreign statute of limitations at the time of the tolling event, it shall be treated as timely filed if it is actually filed with the Asbestos PI Trust within three (3) years after the Initial Claims Filing Date. In addition, any claims that were first diagnosed after the Commencement Date, irrespective of the application of any relevant federal, state or foreign statute of limitations or repose, may be filed with the Asbestos PI Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later. However, the processing of any Asbestos PI Claim by the Asbestos PI Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

(b)     <u>Processing of Claims</u>. As a general practice, the Asbestos PI Trust shall review its claims files on a regular basis and notify all claimants whose claims are likely to come up in the FIFO Processing Queue in the near future.

(c)     <u>Payment of Claims</u>. Asbestos PI Claims that have been liquidated by the Expedited Review Process as provided in Section 5.3(a) below, by the Individual Review Process as provided in Section 5.3(b) below, by mediation or arbitration as provided in Section 5.10 below, or by litigation in the tort system as provided in Section 5.11 below, shall be paid in FIFO order based on the date their liquidation became final (the "<u>FIFO Payment Queue</u>"), all such payments being subject to the applicable Payment Percentage, the Maximum Annual Payment, the Maximum Available Payment, the Claims Payment Ratio and the sequencing adjustment provided for in Section 7.5 below, except as otherwise provided herein. Qualified Asbestos PI Claims shall be paid by the Asbestos PI Trust as provided in the Plan and shall not be placed in the FIFO Payment Queue.

Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the Asbestos PI Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Asbestos PI Trust has been furnished with evidence that the settlement offer has been submitted to such court or in that probate process for approval. If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Asbestos PI Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease. If any claims are liquidated on the same date and the respective claimants' asbestos-related diseases were diagnosed on the same date, the position of those claimants' in the FIFO Payment Queue shall be determined by the Asbestos PI Trust based on the dates of the claimants' births, with older claimants given priority over younger claimants.

5.2. Payment of Qualified Asbestos PI Claims. In accordance with the Plan, (i) THAN shall transfer a list of Qualified Asbestos PI Claims to the Asbestos PI Trust on the Effective Date and (ii) the Asbestos PI Trust shall pay Qualified Asbestos PI Claims on the Effective Date or as soon thereafter as reasonably practicable. The list of Qualified Asbestos PI Claims shall include the claimant's name, date of birth, social security number, law firm, payment instruction, Disease Level and liquidated value. Qualified Asbestos PI Claims do not require additional review or processing by the Asbestos PI Trust because such claims were

reviewed and approved by the Claims Reviewer during the Pre-Effective Date Claims Review process using the Medical/Exposure Criteria set forth in these Asbestos PI Trust Distribution Procedures. The Claims Reviewer assigned liquidated values to such Qualified Asbestos PI Claims based upon the claim values provided for in these Asbestos PI Trust Distribution Procedures. Qualified Asbestos PI Claims shall be subject to the Payment Percentage but shall not be subject to the Maximum Annual Payment or Claims Payment Ratio.

5.3. <u>Resolution of Unliquidated Asbestos PI Claims</u>. Within six (6) months after the establishment of the Asbestos PI Trust, the Asbestos PI Trustees, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, shall adopt procedures for reviewing and liquidating all unliquidated Asbestos PI Claims, which shall include deadlines for processing such claims. Such procedures shall also require that claimants seeking resolution of unliquidated Asbestos PI Claims must first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below. It is anticipated that the Asbestos PI Trust shall provide an initial response to the claimant within six (6) months of receiving the proof of claim form.

The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing. Irrespective of the Disease Level alleged on the proof of claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes. The proof of claim form also shall require the claimant to elect the Expedited Review Process, as described in Section 5.3(a) below, or the Individual Review Process, as described in Section 5.3(b) below,

if such election is available under these Asbestos PI Trust Distribution Procedures for the Disease Level alleged by the claimant.

Upon filing of a valid proof of claim form with the required supporting documentation, the claim shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above.

(a)     Expedited Review Process.

(1)     In General.  The Asbestos PI Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all Asbestos PI Claims (except those involving Lung Cancer 2 – Disease Level VI and all Foreign Claims (as defined below), which shall only be liquidated pursuant to the Asbestos PI Trust's Individual Review Process) where the claim can easily be verified by the Asbestos PI Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level.  Expedited Review thus provides claimants with a substantially less burdensome process for pursuing Asbestos PI Claims than does the Individual Review Process described in Section 5.3(b) below. Expedited Review is also intended to provide qualifying claimants a fixed and certain claim value.

Thus, claims that undergo Expedited Review and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value for such Disease Level set forth in Section 5.3(a)(3) below.  However, except for claims involving Other Asbestos Disease (Disease Level I), all claims liquidated by Expedited Review shall be subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio limitations set forth herein.  Claimants holding claims that cannot be liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure Criteria for

the relevant Disease Level may elect the Asbestos PI Trust's Individual Review Process set forth in Section 5.3(b) below.

Subject to the provisions of Section 5.8, the claimant's eligibility to receive the Scheduled Value for his or her Asbestos PI Claim pursuant to the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below for each of the Disease Levels eligible for Expedited Review.

(2)  Claims Processing Under Expedited Review.  All claimants seeking liquidation of an Asbestos PI Claim pursuant to Expedited Review shall file the Asbestos PI Trust's proof of claim form.  As a proof of claim form is reached in the FIFO Processing Queue, the Asbestos PI Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review, and shall advise the claimant of its determination.  If the Medical/Exposure Criteria for a Disease Level are determined to have been met, the Asbestos PI Trust shall tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage, together with a form of release approved by the Asbestos PI Trust.  If the claimant accepts the Scheduled Value and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Asbestos PI Trust shall disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

(3)  Disease Levels, Scheduled Values and Medical/Exposure Criteria.  The eight Disease Levels covered by these Asbestos PI Trust Distribution Procedures, together with the Medical/Exposure Criteria for each, and the Scheduled Values for the seven Disease Levels eligible for Expedited Review, are set forth below.  These Disease Levels, Scheduled Values,

and Medical/Exposure Criteria shall apply to all Asbestos PI Trust Voting Claims filed with the

Asbestos PI Trust on or before the Initial Claims Filing Date provided in Section 5.1 above for

which the claimant elects the Expedited Review Process.  Thereafter, for purposes of

administering the Expedited Review Process and, with the consent of the Asbestos PI Trust

Advisory Committee and the Future Claimants' Representative, the Asbestos PI Trustees may:

add to, change or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria;

develop subcategories of Disease Levels, Scheduled Values or Medical/Exposure Criteria; or

determine that a novel or exceptional Asbestos PI Claim is compensable even though it does not

meet the Medical/Exposure Criteria for any of the then current Disease Levels.  Because

claimants seeking to recover from the Asbestos PI Trust who fall within Disease Level VI may

not undergo Expedited Review and must undergo Individual Review, no Scheduled Value is

provided.

| Disease Level | THAN Scheduled Values | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level VIII) | $150,000 | (1) Diagnosis[2] of mesothelioma; and (2)  THAN Exposure as defined in Section 5.7(b)(3) below |
| Lung Cancer 1 (Level VII) | $65,000 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos |

---

[2]     The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of these Asbestos PI Trust Distribution Procedures are set forth in Section 5.7 below.

[3]     Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the criteria for establishing Disease Levels I, II, III, V, and VII, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest x-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification.  Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (e.g., an ILO report, a written radiology report or a pathology report).  Solely for asbestos claims filed against THAN or another defendant in the tort system prior to the Commencement Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease Levels I, II, III, V and VII.  Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine,

| | | |
|---|---|---|
| | | Related Nonmalignant Disease,[3] (2) six months THAN Exposure prior to December 31, 1982, (3) Significant Occupational Exposure[4] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| Lung Cancer 2 (Level VI) | None | (1) Diagnosis of a primary lung cancer; (2) THAN Exposure prior to December 31, 1982, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. Lung Cancer 2 (Level VI) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer (Level VII) claims. All claims in this Disease Level shall be individually evaluated. The estimated likely average of the individual evaluation awards for this category is $20,000, with such awards capped at $75,000 , unless the claim qualifies for Extraordinary Claim treatment (discussed in Section 5.4 below). Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Non-malignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims shall be treated as having any |

---

"Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982). For all purposes of these Asbestos PI Trust Distribution Procedures, a "Qualified Physician" is a physician who is board certified (or in the case of Canadian Claims or Foreign Claims, a physician who is certified or qualified under comparable medical standards or criteria of the jurisdiction in question) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, subject to the provisions of Section 5.8, that the requirement for board certification in this provision shall not apply to otherwise qualified physicians whose x-rays and/or CT scan readings are submitted for deceased holders of Asbestos PI Claims.

[4] "Significant Occupational Exposure" is defined in Section 5.7(b)(2) below.

| | | |
|---|---|---|
| | | significant value, especially if the claimant is also a Smoker.[5] In any event, no presumption of validity shall be available for any claims in this category. |
| Other Cancer (Level V) | $30,000 | (1) Diagnosis of a primary colorectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months THAN Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV) | $60,000 | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestosis, plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months THAN Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary impairment in question. |
| Asbestosis/Pleural Disease (Level III) | $8,000 | (1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months THAN Exposure prior to |

[5] There is no distinction between Non-Smokers and Smokers for either Lung Cancer 1 (Level VII) or Lung Cancer 2 (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer 1 (Level VII) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the Asbestos PI Trust. In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the Scheduled Value for Lung Cancer 1 (Level VII), shown above. "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

| | | December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary impairment in question. |
|---|---|---|
| Asbestosis/Pleural Disease (Level II) | $3,800 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months THAN Exposure prior to December 31, 1982, and (3) five years cumulative occupational exposure to asbestos. |
| Other Asbestos Disease (Level I Cash Discount Payment) | $500 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma, and (2) THAN Exposure prior to December 31, 1982. |

      (b)    <u>Individual Review Process</u>.

      (1)    <u>In General</u>.  Subject to the provisions set forth below, a claimant may elect to have his or her Asbestos PI Claim reviewed for purposes of determining whether the claim would be compensable in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in Section 5.3(a)(3) above.  In addition or alternatively, a claimant holding an Asbestos PI Claim involving Disease Levels IV, V, VII or VIII may elect to have a claim undergo the Individual Review Process for purposes of determining whether the liquidated value of the claim exceeds the Scheduled Value for the relevant Disease Level also set forth in said provision.  However, until such time as the Asbestos PI Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the Asbestos PI Trust's Expedited Review Process.  In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of all Foreign Claims payable under these Asbestos PI Trust Distribution Procedures shall be established only under the Asbestos PI Trust's Individual Review Process. Asbestos PI Claims of individuals exposed in Canada who were resident in Canada when such claims were filed ("Canadian Claims") shall not be considered Foreign Claims hereunder and shall be eligible for liquidation under the Expedited Review Process. Accordingly, a "Foreign Claim" is an Asbestos PI Claim with respect to which the claimant's exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which THAN has legal responsibility occurred outside of the United States and its Territories and Possessions and outside of the Provinces and Territories of Canada.

In reviewing Foreign Claims, the Asbestos PI Trust shall take into account all relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) below. The Asbestos PI Trust shall determine the liquidated value of a Foreign Claim based on historical settlements and verdicts in the Claimant's Jurisdiction as well as the other valuation factors set forth in Section 5.3(b)(2) below.

For purposes of the Individual Review Process for Foreign Claims, the Asbestos PI Trustees, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, may develop separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which shall be applicable to Foreign Claims channeled to the Asbestos PI Trust; provided, however, that such criteria, standards or requirements shall not effectuate substantive changes to the claims eligibility requirements under these Asbestos PI Trust Distribution Procedures, but rather shall

be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the Asbestos PI Trust has sufficient historical settlement, verdict and other valuation data for claims from a particular foreign jurisdiction, the Asbestos PI Trustees, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, may also establish a separate valuation matrix for any such Foreign Claims based on that data.

(A)     Review of Medical/Exposure Criteria.  The Asbestos PI Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of an Asbestos PI Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels I - V, VII or VIII.  In such a case, the Asbestos PI Trust shall either deny the claim, or, if the Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the Asbestos PI Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level.

(B)     Review of Liquidated Value.  Claimants holding claims in the five more serious Disease Levels IV-VIII shall also be eligible to seek Individual Review of the liquidated value of their Asbestos PI Claims, as well as of their medical/exposure evidence.  The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any Asbestos PI Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review.  Moreover, the liquidated value for a claim involving Disease Levels

IV– VIII shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim meets the requirements of an Extraordinary Claim described in Section 5.4(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value set forth in Section 5.4(a) for such claims. Because the detailed examination and valuation process pursuant to Individual Review requires substantial time and effort, claimants electing to undergo the Individual Review Process may be paid the liquidated value of their Asbestos PI Claims later than would have been the case had the claimant elected the Expedited Review Process. Subject to the provisions of Section 5.8, the Asbestos PI Trust shall devote reasonable resources to the review of all claims to ensure that there is a reasonable balance maintained in reviewing all classes of claims.

(2) <u>Valuation Factors to Be Considered in Individual Review</u>. The Asbestos PI Trust shall liquidate the value of each Asbestos PI Claim that undergoes Individual Review based on the historic liquidated values of other similarly-situated claims in the tort system for the same Disease Level. The Asbestos PI Trust shall thus take into consideration all of the factors that affect the severity of damages and values within the tort system including, but not limited to, credible evidence of (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages were (or were not) caused by asbestos exposure, including exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which THAN has legal responsibility, prior to December 31, 1982 (for example, alternative

causes, and the strength of documentation of injuries); (iv) the industry of exposure; (v) settlement and verdict histories and other law firms' experience in the Claimant's Jurisdiction for similarly-situated claims; and (vi) settlement and verdict histories for the claimant's law firm for similarly situated claims. In liquidating the value of an Asbestos PI Claim that undergoes Individual Review, the Asbestos PI Trust shall treat a claimant as living if the claimant was alive at the time the initial pre-petition complaint was filed, the claim was submitted to the Claims Reviewer in the Pre-Effective Date Claims Review process or the proof of claim form was filed with the Asbestos PI Trust even if the claimant has subsequently died.

For these purposes, the "Claimant's Jurisdiction" is the jurisdiction in which the claim was filed (if at all) against THAN in the tort system prior to the Commencement Date. If the claim was not filed against THAN in the tort system prior to the Commencement Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the Asbestos PI Trust; or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which THAN has legal responsibility.

With respect to the "Claimant's Jurisdiction" in the event a personal representative or authorized agent makes a claim under these Asbestos PI Trust Distribution Procedures for wrongful death with respect to which the governing law of the Claimant's Jurisdiction could only be the Alabama Wrongful Death Statute, the Claimant's Jurisdiction for such claim shall be the Commonwealth of Pennsylvania and such claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles. The choice of law provision in Section 7.4 below applicable to any

claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the Asbestos PI Trust and the claimant, and, to the extent the Asbestos PI Trust seeks recovery from any entity that provided insurance coverage to THAN, the Alabama Wrongful Death Statute shall govern.

With respect to the "Claimant's Jurisdiction" in the event a claim is made under these Asbestos PI Trust Distribution Procedures for compensatory damages that would otherwise satisfy the criteria for payment under these Asbestos PI Trust Distribution Procedures, but the claimant is foreclosed from payment because the governing law of the Claimant's Jurisdiction (the "Foreclosed Jurisdiction") describes the claim as a claim for "exemplary" or "punitive" damages and the claimant would have no other remedy for compensation under the law of the Foreclosed Jurisdiction, the claimant may elect the Commonwealth of Pennsylvania as the Claimant's Jurisdiction, and such claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles. The choice of law provision in Section 7.4 below applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the law of the Foreclosed Jurisdiction, shall govern only the rights between the Asbestos PI Trust and the claimant, and, to the extent the Asbestos PI Trust seeks recovery from any entity that provided insurance coverage to THAN, the law of the Foreclosed Jurisdiction shall govern.

(3)    <u>Scheduled, Average and Maximum Values</u>.  The Scheduled, Average and Maximum Values for claims involving Disease Levels I-VIII are the following:

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $150,000 | $238,000 | $900,000 |
| Lung Cancer 1 (Level VII) | $65,000 | $89,900 | $250,000 |
| Lung Cancer 2 (Level VI) | None | $20,000 | $75,000 |
| Other Cancer (Level V) | $30,000 | $50,000 | $70,000 |
| Severe Asbestosis (Level IV) | $60,000 | $67,600 | $250,000 |
| Asbestosis/Pleural Disease (Level III) | $8,000 | None | None |
| Asbestosis/Pleural Disease (Level II) | $3,800 | None | None |
| Other Asbestos Disease Cash Discount Payment (Level I) | $500 | None | None |

These Scheduled Values, Average Values and Maximum Values shall apply to all Asbestos PI Trust Voting Claims filed with the Asbestos PI Trust on or before the Initial Claims Filing Date as provided in Section 5.1 above.  Thereafter, the Asbestos PI Trust, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative pursuant to Sections 5.7(b) and 6.6(b) of the Asbestos PI Trust Agreement, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.

(4)  Claims Processing under Individual Review**.**  At the conclusion of the Individual Review Process, the Asbestos PI Trust shall: (i) determine the liquidated value, if any, of the claim; and (ii) advise the claimant of its determination.  If the Asbestos PI Trust establishes a liquidated value, it shall tender to the claimant an offer of payment of the aforementioned determined value multiplied by the applicable Payment Percentage, together with a form of release approved by the Asbestos PI Trust.  If the claimant accepts the offer of payment and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Asbestos PI Trust shall disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

5.4.     Categorizing Claims as Extraordinary and/or Exigent.

(a)     Extraordinary Claims.  "Extraordinary Claim" means an Asbesto PI Claim that otherwise satisfies the Medical Criteria for Disease Levels IV – VIII, and that is held by a claimant whose exposure to asbestos (i) occurred predominantly as a result of working in a facility of THAN during a period in which THAN was selling, distributing, processing, manufacturing or otherwise handling asbestos-containing product at that facility or (ii) was at least 75% the result of exposure to asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which THAN has legal responsibility, and in either case there is little likelihood of a substantial recovery elsewhere.   All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to a maximum extraordinary value of five (5) times the Scheduled Value set forth in Section 5.3(b)(3) for claims qualifying for Disease Levels IV – V, VII and VIII, and five (5) times the Average Value set forth in Section 5.3(b)(3) for claims in Disease Level VI, multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special panel established by the Asbestos PI Trust with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative (the "Extraordinary Claims Panel").  All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review.  An Extraordinary Claim, following its liquidation, shall be placed in the FIFO Payment Queue ahead of all other Asbestos PI Claims, except Exigent Claims (as defined in Section 5.4(b) below), based on its date of liquidation and shall be subject to the Maximum Available Payment and Claims Payment Ratio described above.

(b)     Exigent Claims.  At any time the Asbestos PI Trust may liquidate and pay

Asbestos PI Claims that qualify as Exigent Health Claims or Exigent Hardship Claims (together,

"Exigent Claims") as defined below.  Exigent Claims may be considered separately under the

Individual Review Process no matter what the order of processing otherwise would have been

under these Asbestos PI Trust Distribution Procedures.  An Exigent Claim, following its

liquidation, shall be placed first in the FIFO Payment Queue ahead of all other Asbestos PI

Claims and shall be subject to the Maximum Available Payment and Claims Payment Ratio

described above.

(1)     Exigent Health Claims.  An Asbestos PI Claim qualifies for payment as an

Exigent Health Claim if the claim meets the Medical/Exposure Criteria for Mesothelioma

(Disease Level VIII) and the claimant is living when the claim is filed.  A claim in Disease

Levels IV-VII qualifies as an Exigent Health Claim if the claim meets the Medical/Exposure

Criteria for the disease level, and the claimant provides a declaration or affidavit made under

penalty of perjury by a physician who has examined the claimant within one hundred twenty

(120) days of the date of declaration or affidavit in which the physician states (a) that there is

substantial medical doubt that the claimant will survive beyond six (6) months from the date of

the declaration or affidavit, and (b) that the claimant's terminal condition is caused by the

relevant asbestos-related disease.

(2)     Exigent Hardship Claims.  An Asbestos PI Claim qualifies for payment as

an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Severe

Asbestosis (Disease Level IV) or an asbestos-related malignancy (Disease Levels V – VIII), and

the Asbestos PI Trust, in its sole discretion, determines (i) that the claimant needs financial

assistance on an immediate basis based on the claimant's expenses and all sources of available

income, and (ii) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

5.5. <u>Secondary Exposure Claims</u>. If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant must seek Individual Review of his or her claim pursuant to Section 5.3(b) above. In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under these Asbestos PI Trust Distribution Procedures that would have been applicable had that person filed a direct claim against the Asbestos PI Trust. In addition, the claimant with secondary exposure must establish that he or she is suffering from one of the eight Disease Levels described in Section 5.3(a)(3) above or an asbestos-related disease otherwise compensable under these Asbestos PI Trust Distribution Procedures, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person was exposed to asbestos-containing products or conduct for which THAN has legal responsibility, and that such secondary exposure was a cause of the claimed disease. All other liquidation and payment rights and limitations under these Asbestos PI Trust Distribution Procedures shall be applicable to such claims.

5.6. <u>Indirect Asbestos PI Claims</u>. Indirect Asbestos PI Claims asserted against the Asbestos PI Trust shall be treated as presumptively valid and paid by the Asbestos PI Trust subject to the applicable Payment Percentage if (<u>a</u>) such claim satisfied the requirements of the Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Code or subordinated under Section 509(c) of the Code, and (<u>b</u>) the holder of such claim (the "<u>Indirect Claimant</u>") establishes to the satisfaction of the Asbestos PI Trustees that (<u>i</u>) the Indirect Claimant has paid in full the liability and obligation of

the Asbestos PI Trust to the individual claimant to whom the Asbestos PI Trust would otherwise have had a liability or obligation under these Asbestos PI Trust Distribution Procedures (the "Direct Claimant"), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Asbestos PI Trust and the Asbestos Protected Parties from all liability to the Direct Claimant and the Indirect Claimant, and (iii) the claim is not otherwise barred by a statute of limitations or repose or by other applicable law. In no event shall any Indirect Claimant have any rights against the Asbestos PI Trust superior to the rights of the related Direct Claimant against the Asbestos PI Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no Indirect Asbestos PI Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant in respect of such Direct Claimant's claim for which the Asbestos PI Trust would have liability.

To establish a presumptively valid Indirect Asbestos PI Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the Asbestos PI Trust and the Asbestos Protected Parties) or a Final Order provided that such claim is valid under the applicable state law. In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Asbestos PI Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Asbestos PI Trust and the Asbestos Protected Parties a release in form and substance satisfactory to the Asbestos PI Trustees.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Asbestos PI Trust and the Asbestos Protected Parties with a full release of the Direct Claimant's claim, the Indirect

Claimant may request that the Asbestos PI Trust review the Indirect Asbestos PI Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Asbestos PI Trust had to the Direct Claimant as of the Effective Date of these Asbestos PI Trust Distribution Procedures. If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the Asbestos PI Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled under these Asbestos PI Trust Distribution Procedures. Further, the liquidated value of any Indirect Asbestos PI Claim paid by the Asbestos PI Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Asbestos PI Claim that might be subsequently asserted by the Direct Claimant against the Asbestos PI Trust.

Any dispute between the Asbestos PI Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures. If such dispute is not resolved under the ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.11 and 7.6 below.

The Asbestos PI Trustees may develop and approve a separate proof of claim form for Indirect Asbestos PI Claims as provided in Section 6.1 below. Indirect Asbestos PI Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Asbestos PI Trustees consistent with the provisions of this Section 5.6, which procedures

(a) shall determine the validity, allowability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Asbestos PI Trust would have afforded the holders of the underlying valid Asbestos PI Claims.  Nothing in these Asbestos PI Trust Distribution Procedures is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect Asbestos PI Claim against the Asbestos PI Trust subject to the requirements set forth herein.

5.7.    Evidentiary Requirements.

(a)    Medical Evidence.

(1)    In General.  All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least 10 years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.[6]

(A)    Disease Levels I – IV.  Except for asbestos claims filed against THAN or any other defendant in the tort system prior to the Commencement Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I – IV) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease.  All living claimants must also provide: (i) for Disease Levels I – III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above), (ii) for Disease Level IV, an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iii) for Disease Levels III and IV, pulmonary

---

[6]    All diagnoses of Asbestosis/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy. However, the Asbestos PI Trust may refute such presumptions.

function testing.[7]  A finding by a physician after the Effective Date that a claimant's disease is "consistent with" or "compatible with" asbestosis will not alone be treated by the Asbestos PI Trust as a diagnosis.

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I – IV) shall be based upon either (i)  a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; or (ii) pathological evidence of the non-malignant asbestos-related disease; or (iii) in the case of Disease Levels I – III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above), and for Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis; or  (iv) for either Disease Level III or IV, pulmonary function testing.

(B)    Disease Levels V – VIII.  All diagnoses of an asbestos-related malignancy (Disease Levels V – VIII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").

---

[7]    "Pulmonary function testing" or "PFT" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration.  PFT performed in a hospital accredited by the JCAHO (as defined in Section 5.7(a)(1)(B) below), or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing.  If the PFT was not performed in a JCAHO-accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other party who is qualified to make a certification regarding the PFT, in the form provided by the Asbestos PI Trust, certifying that the PFT was conducted in material compliance with ATS standards.

(C)     Exception to the Exception for Certain Pre-Petition Asbestos PI Claims.  If the holder of an Asbestos PI Claim that was filed against THAN or any other defendant in the tort system prior to the Commencement Date has available a report of a diagnosing physician engaged by the holder or his or her law firm who conducted a physical examination of the holder as described in Section 5.7(a)(1)(A), or if the holder has filed such medical evidence and/or a diagnosis of the asbestos-related disease by a physician not engaged by the holder or his or her law firm who conducted a physical examination of the holder with another asbestos-related personal injury settlement trust that requires such evidence, without regard to whether the claimant or the law firm engaged the diagnosing physician, the holder shall provide such medical evidence to the Asbestos PI Trust notwithstanding the exception in Section 5.7(a)(1)(A).

(2)     Credibility of Medical Evidence.  Before making any payment to a claimant, the Asbestos PI Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The Asbestos PI Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable.  Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to THAN to settle for payment similar disease cases prior to THAN's bankruptcy, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge using the

same methodology and standard, is presumptively reliable, although the Asbestos PI Trust may seek to rebut the presumption. Notwithstanding the foregoing or any other provision of these Asbestos PI Trust Distribution Procedures, any medical evidence submitted by a physician or entity that the Asbestos PI Trust has determined, after consulting with the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, to be unreliable shall not be acceptable as medical evidence in support of any Asbestos PI Claim.

In addition, claimants who otherwise meet the requirements of these Asbestos PI Trust Distribution Procedures for payment of an Asbestos PI Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Asbestos PI Trust in any Individual Review proceeding conducted pursuant to 5.3(b) or any Extraordinary Claim proceeding conducted pursuant to 5.4(a).

(b)　　Exposure Evidence.

(1)　　In General. As set forth above in Section 5.3(a)(3), to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to asbestos-containing products, or to conduct that exposed the claimant to an asbestos-containing product, for which THAN has legal responsibility. Claims based on conspiracy theories that involve no exposure to an asbestos-containing product sold, distributed, marketed, handled, processed or manufactured by THAN are not compensable under these Asbestos PI Trust Distribution Procedures. To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.3(a)(3) above, the claimant must show (i) for all Disease Levels, THAN Exposure as defined in Section 5.7(b)(3) below prior to December 31, 1982; (ii) for Asbestos/Pleural Disease Level II, six (6)

months THAN Exposure prior to December 31, 1982, plus five (5) years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V) or Lung Cancer 1 (Disease Level VII), the claimant must show six (6) months of THAN Exposure prior to December 31, 1982, plus Significant Occupational Exposure to asbestos as defined below.  If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review of his or her claim based on exposure to asbestos-containing products, or to conduct that exposed the claimant to an asbestos-containing product, for which THAN has legal responsibility.

(2)     Significant Occupational Exposure.  "Significant Occupational Exposure" means employment for a cumulative period of at least five (5) years, with a minimum of two (2) years prior to December 31, 1982, in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

(3)     THAN Exposure.  The claimant must demonstrate meaningful and credible exposure, which occurred prior to December 31, 1982, (a) to an asbestos-containing product sold, distributed, marketed, handled, processed or manufactured by THAN or for which THAN otherwise has legal responsibility or (b) to conduct for which THAN has legal responsibility that exposed the claimant to an asbestos-containing product ("THAN Exposure").

That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant, by an affidavit or sworn statement of a co-worker or the affidavit or sworn statement of a family member in the case of a deceased claimant (providing the Asbestos PI Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence. The specific exposure information required by the Asbestos PI Trust to process a claim under either Expedited or Individual Review shall be set forth on the proof of claim form to be used by the Asbestos PI Trust. The Asbestos PI Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

Evidence submitted to establish proof of THAN Exposure is for the sole benefit of the Asbestos PI Trust, not third parties or defendants in the tort system. The Asbestos PI Trust has no need for, and therefore claimants are not required to furnish the Asbestos PI Trust, with evidence of exposure to specific asbestos products other than those for which THAN has legal responsibility, except to the extent such evidence is required elsewhere in these Asbestos PI Trust Distribution Procedures. Similarly, failure to identify THAN Exposure in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Asbestos PI Trust, provided the claimant satisfies the medical and exposure requirements of these Asbestos PI Trust Distribution Procedures.

5.8.    Claims Audit Program. The Asbestos PI Trust with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative may develop methods for auditing the reliability of medical evidence, including additional reading of X-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including THAN Exposure, prior to December 31, 1982. In the event that the Asbestos

PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence, it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided to the Asbestos PI Trust, the Asbestos PI Trust may penalize any claimant or claimant's attorney by disallowing the Asbestos PI Claim and/or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Asbestos PI Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. §152, and seeking sanctions from the Bankruptcy Court.

5.9.    Second Disease (Malignancy) Claims.  The holder of an Asbestos PI Claim involving a non-malignant asbestos-related disease (Disease Levels I through IV) may assert a new Asbestos PI Claim against the Asbestos PI Trust for a malignant disease (Disease Levels V - VIII) that is subsequently diagnosed.  Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease shall not be reduced by the amount paid for the non-malignant asbestos-related disease, provided that the malignant disease had not been diagnosed at the time the claimant was paid with respect to his or her original claim involving the non-malignant disease.

5.10.    Arbitration.

(a)    Establishment of ADR Procedures.  The Asbestos PI Trust, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, shall

develop and adopt the ADR Procedures, which shall provide for pro-bono evaluation, mediation and binding or non-binding arbitration to resolve disputes concerning whether the Asbestos PI Trust's outright rejection or denial of a claim was proper, or whether the claimant's medical condition or exposure history meets the requirements of these Asbestos PI Trust Distribution Procedures for purposes of categorizing a claim involving Disease Levels I – VIII.  Proceedings under the ADR Procedures shall also be available for resolving disputes over the liquidated value of a claim involving Disease Levels IV – VIII, as well as disputes over the validity of an Indirect Asbestos PI Claim.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.7 above.  In the case of an arbitration involving the liquidated value of a claim involving Disease Levels IV – VIII, the arbitrator shall consider the same valuation factors that are set forth in Section 5.3(b)(2) above.  In order to facilitate the Individual Review Process, the Asbestos PI Trust may from time to time develop a valuation model that enables the Asbestos PI Trust to efficiently make initial liquidated value offers in the Individual Review Process.  If the Asbestos PI Trust provides all data used to create the model to the claimant or his or her counsel not less than ten (10) days prior to the arbitration proceeding, the Asbestos PI Trust may (i) offer into evidence any such data and (ii) explain to the arbitrator that, in valuing the claim, the Asbestos PI Trust used a model developed based upon such underlying data.   The Asbestos PI Trust may not offer into evidence or describe (except as provided in the preceding sentence) the model nor assert that any information generated by the model has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration.  The claimant and his or her counsel may use the data that is provided by the Asbestos PI Trust in the arbitration and shall agree to

otherwise maintain the confidentiality of such information. Any disputes regarding confidentiality shall be resolved by the arbitrator.

With respect to all claims eligible for arbitration, the claimant, but not the Asbestos PI Trust, may elect either non-binding or binding arbitration. The ADR Procedures may be modified by the Asbestos PI Trust with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative. Such amendments may include the establishment of an Extraordinary Claims Panel to review such claims pursuant to Section 5.4(a) above.

(b)  Claims Eligible for Arbitration. In order to be eligible for arbitration, the claimant must first complete the Individual Review Process set forth in Section 5.3(b) above, as well as the pro bono evaluation or mediation process set forth in the ADR Procedures, with respect to the disputed issue. Individual Review shall be treated as completed for these purposes when the claim has been individually reviewed by the Asbestos PI Trust, the Asbestos PI Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the Asbestos PI Trust of the rejection in writing. Individual Review will also be treated as completed if the Asbestos PI Trust has rejected the claim.

(c)  Limitations on and Payment of Arbitration Awards. In the case of claims involving Disease Levels I – III, the arbitrator shall not return an award in excess of the Scheduled Value for such claims. In the case of a non-Extraordinary Claim involving Disease Levels IV – VIII, the arbitrator shall not return an award in excess of the Maximum Value for the appropriate Disease Level as set forth in Section 5.3(b)(4) above, and for an Extraordinary Claim involving one of those Disease Levels, the arbitrator shall not return an award greater than the

maximum extraordinary value for such a claim as set forth in Section 5.4(a) above. A claimant who submits to arbitration and who accepts the arbitral award will receive payments in the same manner as one who accepts the Asbestos PI Trust's original valuation of the claim.

5.11.  Litigation.  Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Asbestos PI Trust pursuant to Section 7.6 below. However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Asbestos PI Trust's available cash only as provided in Section 7.7 below.

**SECTION VI**
Claims Materials

6.1.  Claims Materials.  The Asbestos PI Trust shall prepare suitable and efficient claims materials ("Claims Materials") for all Asbestos PI Claims, and shall provide such Claims Materials upon a written request for such materials to the Asbestos PI Trust. In addition, a separate claim form for Indirect Asbestos PI Claims may be developed. The proof of claim form to be submitted to the PI Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies at the time of filing. The proof of claim form shall also include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. In developing its claim filing procedures, the Asbestos PI Trust shall make every effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the internet and electronically by disk or CD-rom. The proof of claim form to be used by the Asbestos PI Trust shall be developed by the Asbestos PI Trust and submitted to the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative for

approval; it may be changed by the Asbestos PI Trust with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative.

6.2.    <u>Content of Claims Materials</u>.  The Claims Materials shall include a copy of these Asbestos PI Trust Distribution Procedures, such instructions as the Asbestos PI Trustees shall approve, and a detailed proof of claim form.  If feasible, the forms used by the Asbestos PI Trust to obtain claims information shall be the same or substantially similar to those used by other asbestos claims resolution organizations.  Instead of collecting some or all of the claims information from a claimant or the claimant's attorney, the Asbestos PI Trust may obtain such information from electronic databases maintained by any other asbestos claims resolution organization, provided, however, that the Asbestos PI Trust first obtains the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative and the information is readily available from such organization.  If requested by the claimant, the Asbestos PI Trust shall accept information provided electronically.  The claimant may, but shall not be required to, provide the Asbestos PI Trust with evidence of recovery from other asbestos defendants and claims resolution organizations.

6.3.    <u>Withdrawal or Deferral of Claims</u>.  A claimant can withdraw an Asbestos PI Claim at any time upon written notice to the Asbestos PI Trust and file another claim subsequently without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing.  A claimant can also request that the processing of his or her Asbestos PI Claim by the Asbestos PI Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitations purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue.  During the

period of such deferral, a sequencing adjustment on such claimant's Asbestos PI Claim as provided in Section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant.  Except for Asbestos PI Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Asbestos PI Trust's offer is required, or an Asbestos PI Claim for which deferral status has been granted, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six (6) months of the Asbestos PI Trust's written offer of payment or rejection of the claim.  Upon written request and good cause, the Asbestos PI Trust may extend the withdrawal or deferral period for an additional six (6) months.

6.4.    <u>Filing Requirements and Fees</u>.  The Asbestos PI Trustees shall have the discretion to determine, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, (<u>a</u>) whether a claimant must have previously filed an asbestos-related personal injury claim in the tort system to be eligible to file the claim with the Asbestos PI Trust and (<u>b</u>) whether a filing fee should be required for any Asbestos PI Claims.

6.5.    <u>Confidentiality of Claimants' Submissions</u>.  All submissions to the Asbestos PI Trust by a holder of an Asbestos PI Claim, including the proof of claim form and materials related thereto, shall be treated as made in the course of settlement discussions between the holder and the Asbestos PI Trust and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including, but not limited to, those directly applicable to settlement discussions.  The Asbestos PI Trust shall preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only, with the permission of the holder, to another trust established for the benefit of asbestos personal injury claimants pursuant to Section 524(g) and/or Section 105 of the Bankruptcy Code or other

applicable law, to such other persons as authorized by the holder, or in response to a valid

subpoena.  Furthermore, the Asbestos PI Trust shall provide counsel for the holder a copy of any

such subpoena immediately upon being served.  The Asbestos PI Trust shall on its own initiative

or upon request of the claimant in question take all necessary and appropriate steps to preserve

any and all privileges.

**SECTION VII**
General Guidelines for Liquidating and Paying Claims

7.1.　Underline: Showing Required.  To establish a valid Asbestos PI Claim, other than a Qualified

Asbestos PI Claim, a claimant must meet the requirements set forth in these Asbestos PI Trust

Distribution Procedures.  The Asbestos PI Trust may require the submission of X-rays, CT scans,

laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence

to support or verify an Asbestos PI Claim, other than a Qualified Asbestos PI Claim, and may

further require that medical evidence submitted comply with recognized medical standards

regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

7.2.　Underline: Costs Considered.  Notwithstanding any provisions of these Asbestos PI Trust

Distribution Procedures to the contrary, the Asbestos PI Trustees shall always give appropriate

consideration to the cost of investigating and uncovering invalid Asbestos PI Claims so that the

payment of valid Asbestos PI Claims is not further impaired by such processes with respect to

issues related to the validity of the medical evidence supporting an Asbestos PI Claim.  The

Asbestos PI Trustees shall also have the latitude to make judgments regarding the amount of

transaction costs to be expended by the Asbestos PI Trust so that valid Asbestos PI Claims are

not unduly further impaired by the costs of additional investigation.  Nothing herein shall prevent

the Asbestos PI Trustees, in appropriate circumstances, from contesting the validity of any claim

against the Asbestos PI Trust whatever the costs, or declining to accept medical evidence from

sources that the Asbestos PI Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.8 above.

7.3. <u>Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity</u>. Consistent with the provisions hereof and subject to the FIFO Processing Queue and the FIFO Payment Queue, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio requirements set forth above, the Asbestos PI Trustees shall proceed as quickly as possible to liquidate valid Asbestos PI Claims, and shall make payments to holders of such claims in accordance with these Asbestos PI Trust Distribution Procedures promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the Asbestos PI Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants. However, the Asbestos PI Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Asbestos PI Trustees, the purposes of the Asbestos PI Trust, the established allocation of funds to claims in Categories A and B, and the practical limitations imposed by the inability to predict the future with precision. In the event that the Asbestos PI Trust faces temporary periods of limited liquidity, the Asbestos PI Trustees may, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, suspend the normal order of payment and may temporarily limit or suspend payments altogether, and may offer a Reduced Payment Option as described in Section 2.5 above.

7.4.    <u>Punitive Damages</u>.  Except as provided below for claims asserted under the Alabama Wrongful Death Statute or for claims asserted by a claimant for compensatory damages that would otherwise satisfy the criteria for payment under these Asbestos PI Trust Distribution Procedures, but the claimant is foreclosed from payment because the governing law of the Foreclosed Jurisdiction (as defined in Section 5.3(b)(2) above) describes the claim as a claim for "exemplary" or "punitive" damages and the claimant would have no other remedy for compensation under the law of the Foreclosed Jurisdiction, in determining the value of any liquidated or unliquidated Asbestos PI Claim, punitive or exemplary damages, *i.e.*, damages other than compensatory damages, shall not be considered or allowed, notwithstanding their availability in the tort system.  Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Asbestos PI Trust in the tort system pursuant to Sections 5.11 above and 7.6 below.  The only damages that may be awarded pursuant to these Asbestos PI Trust Distribution Procedures to Alabama Claimants who are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to its choice of law principles.  The choice of law provision in Section 7.4 herein applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the Asbestos PI Trust and the claimant including, but not limited to, suits in the tort system pursuant to Section 7.6, and to the extent the Asbestos PI Trust seeks recovery from any entity that provided insurance to THAN, the Alabama Wrongful Death Statute shall govern.

The only damages that may be awarded pursuant to these Asbestos PI Trust Distribution Procedures for claims asserted by a claimant for compensatory damages that would otherwise satisfy the criteria for payment under these Asbestos PI Trust Distribution Procedures, but the claimant is foreclosed from payment because the governing law of the Foreclosed Jurisdiction describes the claim as a claim for "exemplary" or "punitive" damages and the claimant would have no other remedy for compensation under the law of the Foreclosed Jurisdiction, shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to its choice of law principles. The choice of law provision in Section 7.4 herein applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the law of the Foreclosed Jurisdiction, shall govern only the rights between the Asbestos PI Trust and the claimant including, but not limited to, suits in the tort system pursuant to Section 7.6, and to the extent the Asbestos PI Trust seeks recovery from any entity that provided insurance to THAN, the law of the Foreclosed Jurisdiction shall govern.

7.5. <u>Sequencing Adjustments</u>.

(a) <u>In General</u>. Except for Asbestos PI Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) and subject to the limitations set forth below, a sequencing adjustment shall be paid on all Asbestos PI Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years on an unliquidated Asbestos PI Claim or in excess of one (1) year on a Qualified Asbestos PI Claim. The sequencing adjustment factor shall be 4.5% per annum for each of the first five (5) years after the Effective Date; thereafter, the Asbestos PI Trust shall have the discretion to change the annual

sequencing adjustment factor with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative.

(b) <u>Unliquidated Asbestos PI Claims</u>.  A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated Asbestos PI Claim that meets the requirements of Disease Levels II – V, VII and VIII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration.  No sequencing adjustment shall be paid on any claim involving Disease Level I or on any claim liquidated in the tort system pursuant to Section 5.11 above and Section 7.6 below.  The sequencing adjustment on an unliquidated Asbestos PI Claim that meets the requirements of Disease Level VI shall be based on the Average Value of such a claim.  Sequencing adjustments on all such unliquidated claims shall be measured from the date of payment back to the date that is one (1) year after the date on which the claim was placed in the FIFO Payment Queue, subject to the limitation that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years.

(c) <u>Qualified Asbestos PI Claims</u>.  A sequencing adjustment shall be payable on a Qualified Asbestos PI Claim only if such Qualified Asbestos PI Claim is paid after the date that is one (1) year after the Commencement Date.  Sequencing adjustments on Qualified Asbestos PI Claims shall be measured from the date of payment back to the date that is one (1) year after the Commencement Date, subject to the limitation that no claimant shall receive a sequencing adjustment for a period in excess of one (1) year.

7.6. <u>Suits in the Tort System</u>.  If the holder of a disputed claim disagrees with the Asbestos PI Trust's determination regarding the Disease Level of the claim, the claimant's exposure history or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.10 above, the holder may file a lawsuit

in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) above. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with respect to the Asbestos PI Trust, all defenses which could have been asserted by THAN) shall be available to both sides at trial; however, the Asbestos PI Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint was filed, the claim was submitted to the Claims Reviewer in the Pre-Effective Date Claims Review process or the proof of claim form was filed with the Asbestos PI Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

7.7. <u>Payment of Judgments for Money Damages</u>. If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final. Thereafter, the claimant shall receive from the Asbestos PI Trust an initial payment (subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio provisions set forth above) of an amount equal to the greater of (<u>i</u>) the Asbestos PI Trust's last offer to the claimant or (<u>ii</u>) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system. The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).

In the case of claims involving Disease Levels I, II and III, the total amounts paid with respect to such claims shall not exceed the relevant Scheduled Values for such claims. In the case of non-Extraordinary claims involving Disease Levels IV-VIII, the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.3(b)(3). In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the maximum extraordinary values for such claims set forth in Section 5.4 above. Under no circumstances shall (a) sequencing adjustments be paid pursuant to Section 7.5 or (b) interest be paid under any statute on any judgments obtained in the tort system.

7.8. <u>Releases</u>. The Asbestos PI Trustees shall have the discretion to determine the form and substance of the releases to be provided to the Asbestos PI Trust and the Asbestos Protected Parties in order to maximize recovery for claimants against other tortfeasors without increasing the risk or amount of claims for indemnification or contribution from the Asbestos PI Trust or the Asbestos Protected Parties with respect to the Asbestos PI Claim. As a condition to making any payment to a claimant, the Asbestos PI Trust shall obtain, for the benefit of the Asbestos PI Trust and the Asbestos Protected Parties, a general, partial, or limited release as appropriate in accordance with the applicable state or other law. If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a claimant may, in the discretion of the Asbestos PI Trust, constitute such a release.

7.9. <u>Third-Party Services</u>. Nothing in these Asbestos PI Trust Distribution Procedures shall preclude the Asbestos PI Trust from contracting with another asbestos claims resolution organization to provide services to the Asbestos PI Trust so long as decisions about the categorization and liquidated value of Asbestos PI Claims are based on the relevant provisions of

these Asbestos PI Trust Distribution Procedures, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

7.10.    Asbestos PI Trust Disclosure of Information.  Periodically, but not less often than once a year, the Asbestos PI Trust shall make available to claimants and other interested parties, the number of claims by Disease Levels that have been resolved both by the Individual Review Process and by arbitration as well as by litigation in the tort system indicating the amounts of the awards and the averages of the awards by jurisdiction.

**SECTION VIII**
Miscellaneous

8.1.    Amendments.  Except as otherwise provided herein, the Asbestos PI Trustees may amend, modify, delete, or add to any provisions of these Asbestos PI Trust Distribution Procedures (including, without limitation, amendments to conform these Asbestos PI Trust Distribution Procedures to advances in scientific or medical knowledge or other changes in circumstances), provided they first obtain the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative pursuant to the Consent Process set forth in Sections 5.7(b) and 6.6(b) of the Asbestos PI Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the restrictions in Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above.  Nothing herein is intended to preclude the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative from proposing to the Asbestos PI Trustees, in writing, amendments to these Asbestos PI Trust Distribution Procedures.  Any amendment proposed by the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative shall remain subject to Section 7.3 of the Asbestos PI Trust Agreement.

8.2.    <u>Severability</u>.  Should any provision contained in these Asbestos PI Trust Distribution Procedures be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these Asbestos PI Trust Distribution Procedures.  Should any provision contained in these Asbestos PI Trust Distribution Procedures be determined to be inconsistent with or contrary to THAN's obligations to any insurance company providing insurance coverage to THAN in respect of claims for personal injury based on exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which THAN has legal responsibility or products containing asbestos for which THAN has legal responsibility, the Asbestos PI Trust, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, may amend these Asbestos PI Trust Distribution Procedures and/or the Asbestos PI Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of  THAN to said insurance company.

8.3.    <u>Governing Law</u>.  Except for purposes of determining the liquidated value of any Asbestos PI Claim, administration of these Asbestos PI Trust Distribution Procedures shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing the liquidation of Asbestos PI Claims in the case of Individual Review, mediation, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.3(b)(2) above.

**EXHIBIT D**

**PROMISSORY NOTE**

**NEITHER THIS NOTE (AS DEFINED HEREIN) NOR ANY INTEREST HEREIN MAY BE SOLD, DISTRIBUTED, ASSIGNED, OFFERED, PLEDGED OR OTHERWISE TRANSFERRED WITHOUT THE PRIOR WRITTEN CONSENT OF THE OBLIGOR (AS DEFINED HEREIN), WHICH CONSENT MAY BE WITHHELD IN THE SOLE DISCRETION OF THE OBLIGOR.**

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  WITHOUT IN ANY WAY LIMITING THE TERMS OF THE FOREGOING PARAGRAPH, NO INTEREST IN THIS NOTE MAY BE SOLD, DISTRIBUTED, ASSIGNED, OFFERED, PLEDGED OR OTHERWISE TRANSFERRED UNLESS (A) THE OBLIGOR RECEIVES AN OPINION OF LEGAL COUNSEL FOR THE HOLDER OF THIS NOTE SATISFACTORY TO THE OBLIGOR, STATING THAT SUCH TRANSACTION IS EXEMPT FROM REGISTRATION, OR (B) THE OBLIGOR OTHERWISE SATISFIES ITSELF THAT SUCH TRANSACTION IS EXEMPT FROM REGISTRATION.**

**REORGANIZED T H AGRICULTURE & NUTRITION, L.L.C.**
**SECURED PROMISSORY NOTE**

_____, 200__                                                              $1,000,000

FOR VALUE RECEIVED, the undersigned, Reorganized T H Agriculture & Nutrition, L.L.C., a Delaware limited liability company (the "Obligor"), hereby promises to pay to the order of T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust, a Delaware statutory trust (together with its successors or permitted assigns, the "Holder"), the principal amount of $1,000,000.00, with simple interest thereon at the rate of 5% per annum,  subject to the terms and conditions hereof.

Capitalized terms used but not otherwise defined in Section 12 of this Secured Promissory Note (this "Note") have the meanings specified in the *Prepackaged Plan of Reorganization of T H Agriculture & Nutrition, L.L.C. Under Chapter 11 of the Bankruptcy Code*, dated _____, 200__ (as modified and/or amended from time to time, the "Plan"), as confirmed by the United States Bankruptcy Court for the Southern District of New York, or, as the case may be, the United States District Court for the Southern District of New York in a confirmation order entered on _____, 200__, together with the exhibits and schedules thereto.  This Note is the "Promissory Note" referred to in such Plan.

## 1.      PAYMENT OBLIGATIONS; SECURITY

1.1     *Scheduled Payments*.  The amount outstanding hereunder shall be due and payable in equal quarterly installments of $10,000.00 (the "Installment Payment"), commencing on the fifth anniversary of the Effective Date of the Plan, with each such subsequent Installment Payment due on the fifteenth (15th) day after the last date of each subsequent fiscal quarter, until _____, 2019 (the "Final Maturity Date"); *provided*, *however*, that the Final Maturity Date may be extended at the option of the Holder for any period deemed acceptable by the Holder; *provided*, *further*, *however*, that the Installment Payment for each quarter shall be paid only from such quarterly revenues as may remain (the "Quarterly Profits") after (i) all operating expenses of the Obligor for the quarter have been satisfied and (ii) the Obligor has charged such quarterly revenues as are necessary to maintain a reserve balance of $1,000,000.00.  All payments shall be applied first to accrued fees and expenses, then to interest accrued on this Note until all then outstanding accrued interest has been paid, and then to principal.

In the event the Quarterly Profits are insufficient to enable an Installment Payment to be paid in full, such lesser amount shall be paid in that quarter and the unpaid portion shall be paid on the Final Maturity Date, when the Obligor shall pay the entire remaining principal amount outstanding, together with all accrued unpaid interest, which amount may be paid from any assets in which the Obligor has a legal or equitable interest. Each payment pursuant to this Section 1.1 shall be made at par and without payment of any premium.

Notwithstanding anything else in this Note to the contrary, any failure to pay an Installment Payment in whole or in part due to insufficient Quarterly Profits shall not constitute a Default or Event of Default.

1.2 *Maturity, Surrender, Etc.* In the case of each payment pursuant to this Section 1, the principal amount to be paid shall mature and become due and payable on the date fixed for such payment. If this Note is paid, it shall be surrendered to the Obligor and cancelled and shall not be reissued.

1.3 *Method of Payment*. All payments made hereunder to the Holder shall be made not later than 12:00 noon (Eastern Time) on the day when due by wire transfer of immediately available funds for credit to such account or accounts as the Holder shall have designated by thirty (30) days' prior written notice to the Obligor. Anything in this Note to the contrary notwithstanding, any payment hereunder that is due on a date other than a Business Day shall be made on the next succeeding Business Day.

1.4 *Security*. On the date hereof, the Pledgor, as sole owner of 100% of the authorized, issued and outstanding equity interests in the Obligor, is entering into the Pledge Agreement, pursuant to which it agrees to secure all of the Obligor's obligations hereunder. The Pledge Agreement provides for the grant to the Holder of a security interest in 100% of the outstanding equity interests in the Obligor directly owned by the Pledgor (such pledged assets, the "Collateral").

## 2.  REPRESENTATIONS OF HOLDER

Each Holder, whether the initial Holder or any subsequent Holder, represents, and it is specifically understood and agreed, that the Holder is not acquiring the Note with a view for sale, or to sell, in connection with any distribution thereof within the meaning of the Securities Act, *provided* that the disposition of the Holder's property shall at all times be and remain within the Holder's control. The Holder hereby acknowledges that none of this Note, the Pledge Agreement or the Collateral have been registered, and in no event shall the Obligor be required to register any of the foregoing, under the Securities Act or any state securities laws.

## 3.  REPRESENTATIONS OF THE OBLIGOR

(a)     The Obligor is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation and has full corporate power to execute, deliver, and perform this Note.

(b)     The execution, delivery, and performance of this Note has been and remains duly authorized by all necessary organizational action on the part of the Obligor and does not result in a contravention by the Obligor of any provision of law or of the Obligor's organizational documents or any material contractual restriction binding on the Obligor or its assets.

(c)     All consents, authorizations, and approvals of, and registrations and declarations with, any governmental authority necessary for the due execution, delivery, and performance of this Note by the Obligor have been obtained and remain in full force and effect and all conditions hereof have been duly complied with, and no other action by, and no notice to or filing with, any government authority is required to be made or obtained by the Obligor in connection with the execution, delivery, or performance of this Note by the Obligor.

(d)     This Note constitutes the legal, valid, and binding obligation of the Obligor enforceable against the Obligor in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization, and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

## 4.     EVENTS OF DEFAULT

An "Event of Default" shall exist if any of the following conditions or events shall occur:

(a)     except as otherwise provided herein, the Obligor defaults in the payment of any principal or interest when the same becomes due and payable hereunder, whether at maturity or at a date fixed for payment or by declaration or otherwise;

(b)     the Obligor defaults in any material respect in the performance of or compliance with any term contained herein (other than those referred to in paragraph (a) of this Section 4) or the Pledgor defaults in any material respect in the performance or compliance with any term contained in the Pledge Agreement, and in each case such default is not remedied within fifteen (15) days after the earlier of (i) a Responsible Officer obtaining actual knowledge of such default and (ii) the Obligor receiving written notice of such default from the Holder (any such written notice to be identified as a "notice of default" and to refer specifically to this paragraph (b) of Section 4);

(c)     any representation or warranty by the Obligor in this Note or the Pledgor in the Pledge Agreement proves to have been false or incorrect in any material respect on the date hereof;

(d)     the Obligor or the Pledgor (i) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation, or to take advantage of any bankruptcy, insolvency, reorganization, moratorium, or other similar law of any jurisdiction, (ii) makes a general assignment for the benefit of its creditors, (iii) consents to the appointment of a custodian, receiver, trustee, or other officer with similar powers with respect to it or with respect to any substantial part of its property, (iv) is adjudicated as insolvent or to be liquidated, or (v) authorizes any of the foregoing;

(e)     a court or governmental authority of competent jurisdiction enters an order appointing, without consent by the Obligor or the Pledgor, a custodian, receiver, trustee, or other officer with similar powers with respect to it or with respect to any substantial part of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up, or liquidation of the Obligor or the Pledgor, or any such petition shall be filed against the Obligor or the Pledgor, in each case such order or petition remains unstayed and in effect for more than sixty (60) consecutive days;

(f)     Obligor sells or disposes of all or substantially all of its assets, without prior written consent of Holder; or

(g)     the liquidation or winding up of Reorganized THAN.

## 5.     REMEDIES UPON DEFAULT, ETC.

5.1     *Acceleration.*

(a)     Upon the occurrence of an Event of Default described in paragraph (d), (e), (f) or (g) of Section 4 above, this Note shall automatically become immediately due and payable.

(b)     If any other Event of Default has occurred and is continuing at the time the Holder seeks to exercise its rights hereunder, the Holder may, at its option, by notice or notices to the Obligor, declare this Note to be immediately due and payable.

Upon this Note becoming immediately due and payable under this Section 5, whether automatically or by declaration, this Note will forthwith mature and the entire unpaid principal amount of this Note shall be immediately due and payable, in each and every case without presentment, demand, protest, or further notice, all of which are hereby expressly waived by the Obligor.

5.2     *Other Remedies.*  If any Default or Event of Default has occurred and is continuing at the time the Holder seeks to exercise its rights hereunder, and irrespective of whether this Note has been declared immediately due and payable under Section 5.1 above, except as otherwise provided herein, the Holder may, at its option, exercise forthwith (to the extent and in such order as the Holder may elect, in its sole and absolute discretion) any or all rights and remedies provided for herein, or otherwise at law or in equity, by an action at law, suit in equity, or other appropriate proceeding or act, in each and every case without presentment, demand, protest, or further notice, all of which are hereby expressly waived by the Obligor.

## 6.     COLLATERAL EVENTS; REMEDY

6.1     *Collateral Events.*  A "Collateral Event" shall exist if any of the following conditions or events shall occur:

(a)     this Note becomes immediately due and payable under Section 5.1 hereof, whether automatically or by declaration; or

(b)     after the 5th anniversary of the Plan Effective Date, the assets held by the Holder are not sufficient to satisfy a minimum of 50% of the Scheduled Values of allowed Asbestos PI Claims under the Asbestos PI Trust Distribution Procedures, and such condition continues for a period of more than one year.

6.2     *Enforcement Against Collateral.*  Notwithstanding anything to the contrary in this Note, specifically including (but not limited to) Section 5.2 hereof, only if a Collateral Event has occurred and is continuing at the time the Holder seeks to exercise and enforce its rights against the Collateral hereunder, the Holder may, with the consent of the Future Claimants' Representative, proceed to protect and enforce its rights against the Collateral as provided in the Pledge Agreement and exercise all rights and remedies of a secured party under the UCC.

## 7. EXPENSES, ETC.

7.1 *Expenses*.  The Obligor agrees, whether or not the transactions contemplated hereby shall be consummated, to pay, and save the Holder harmless against liability for the payment of, (i) all document production and duplication charges and the fees and expenses of any special counsel engaged by the Holder in connection with this Note or the Pledge Agreement, the execution, delivery, and performance hereby and thereby and any subsequent proposed modification of, or proposed consent under, this Note or the Pledge Agreement, whether or not such proposed modification shall be effected or proposed consent granted, and (ii) the costs and expenses, including reasonable attorneys' fees, incurred by the Holder in enforcing any rights under this Note or the Pledge Agreement (whether in the context of a civil action, adversarial proceedings, workout or otherwise) or in responding to any subpoena or other legal process issued in connection with the enforcement of this Note or the Pledge Agreement or by reason of the Holder's having acquired this Note.

7.2 *Survival*.  The obligations of the Obligor under this Section 7 will survive the payment or transfer of this Note, the enforcement, amendment, or waiver of any provision of this Note, and the termination of this Note.

## 8. SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT

All representations and warranties contained herein shall survive the execution and delivery of this Note, the transfer of this Note and the payment of this Note, and may be relied upon by the Obligor, the Holder, and any subsequent Holder of this Note, regardless of any investigation made at any time by or on behalf of such person.  This Note embodies the entire agreement and understanding between the Holder and the Obligor and supersedes all prior agreements and understandings relating to the subject matter hereof.

## 9. AMENDMENT AND WAIVER

(a)      The Obligor agrees that the Holder may extend the time for repayment or performance or accept partial payment or performance an unlimited number of times without discharging or releasing the Obligor from its obligations under this Note.

(b)      No course of dealing, delay, or omission on the part of the Holder in exercising any right, power, or remedy in connection with this Note or the Pledge Agreement shall operate as a waiver thereof or otherwise prejudice such Holder's rights, powers, or remedies, nor shall any single or partial exercise of any such right or power or any abandonment or discontinuance of steps to enforce such a right or power preclude any other or further exercise thereof or the exercise of any other right or power.  No right, power, or remedy conferred by this Note upon the Holder shall be exclusive of any other right, power, or remedy referred to herein or now or hereafter available at law, in equity, by statute, or otherwise.

(c)      This Note may be amended, and the observance of any term hereof may be waived (either retroactively or prospectively), but only with the written consent of the party against whom enforcement thereof is to be sought (or such party's attorney-in-fact), and then such waiver shall be effective only in the specific instance and for the specific purpose for which given.

10. **NOTICES**

All notices and communications provided for hereunder shall be in writing and sent (a) by facsimile if the sender on the same day sends a confirming copy of such notice by a recognized overnight-delivery service (charges prepaid), or (b) by registered or certified mail with return receipt requested (postage prepaid), or (c) by a recognized overnight delivery service (with charges prepaid), as follows (or as otherwise directed in writing):

    (i)      if to the Holder,

        T H Agriculture & Nutrition, L.L.C.
        Asbestos Personal Injury Trust
        Wilmington Trust Company
        1100 N. Market Street
        Wilmington, Delaware 19890-1625
        Attn: Joseph B. Feil
        Email: jfeil@wilmingtontrust.com

        and

        T H Agriculture & Nutrition, L.L.C.
        Asbestos Personal Injury Trust
        Name(s)
        Address
        Address
        Attention: _____
        Facsimile: _____

        With a copy to:

        Name
        Address
        Address
        Attention: _____
        Facsimile: _____

    (ii)     if to the Obligor:

        Reorganized T H Agriculture & Nutrition, L.L.C.
        Address
        Address
        Attention: _____
        Facsimile: _____

        With a copy to:

        Name
        Address
        Address
        Attention: _____
        Facsimile: _____

## 11. MISCELLANEOUS

11.1   *Computation of Time Periods*.  In this Note in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and until" each means "to but excluding."

11.2   *Accounting Terms*.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP.

11.3   *Severability*.  Any provision of this Note that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

11.4   *No Recourse Against Others*.  No director, officer, employee, member, manager, or equity interest holder, partner or representative of the Obligor shall have any personal liability in respect of any obligations of the Obligor under this Note, or for any claim based on, with respect to, or by reason of such obligations or their creation, by reason of his/her or its status as such.  By accepting this Note, the Holder waives and releases all such liability, which waiver and release is part of the consideration for the issuance of this Note by the Obligor.

11.5   *Construction*.  Each covenant contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant contained herein, so that compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant.  Where any provision herein refers to action to be taken by any person, or which such person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such person.

11.6   *Acceptance by Holder*.  By its acceptance by the Holder, this Note shall become a binding agreement between the Obligor and the Holder.  Without limitation of the foregoing, the Holder will be deemed, by its acceptance hereof, (i) to have agreed to the provisions set forth in Sections 1 and 4 through (and including) 11 hereof, and (ii) to have made the representations set forth in Section 2 hereof.

11.7   *Governing Law, Jurisdiction, Etc.*

(a)     This Note shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would require the application of the laws of a jurisdiction other than such State.

(b)     The Obligor and the Holder each hereby irrevocably and unconditionally submits, for itself and its properties, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note, or for recognition or enforcement of any judgment, and the Obligor and the Holder each hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding may be heard and determined in such New York Sale court or, to the extent permitted by law, in such Federal court.  The Obligor and the Holder each agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other

jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Note shall affect any right that the Obligor or the Holder may otherwise have to bring any action or proceeding relating to this Note against the other or its properties in the courts of any jurisdiction.

(c)     The Obligor and the Holder each hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action, or proceeding arising out of or relating to this Note in any court referred to in Section 11.7(b) above. The Obligor and the Holder each hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     The Obligor and the Holder each irrevocably consents to service of process in the manner provided for notices in Section 10 hereof. Nothing in this Note shall affect the right of the Obligor or the Holder to serve process in any other manner permitted by law.

## 12.    DEFINITIONS

"Business Day" means any day other than a Saturday, a Sunday, or a day on which commercial banks in New York City are required or authorized to be closed.

"Default" means an event or condition the occurrence or existence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

"Event of Default" is defined in Section 4 hereof.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States of America.

"Plan Effective Date" means the "Effective Date" as defined in the Plan.

"Pledge Agreement" means, during such time as the Pledge Agreement is in effect, that certain Pledge and Security Agreement regarding this Note, dated as of _____, 200__ executed and delivered by T H Agriculture and Nutrition, L.L.C. Parent Trust, as the same may be amended from time to time.

"Pledgor" means, during such time as the Pledge Agreement is in effect, T H Agriculture and Nutrition, L.L.C. Parent Trust, a Delaware trust.

"Responsible Officer" means each of the chairman and chief executive officer, the president, the chief financial officer, the treasurer, the secretary or any vice president (whether or not further described by other terms, such as, for example, senior vice president or vice president-operations) of the Obligor or, if any such office is vacant, any person performing any of the functions of such office.

"Securities Act" means the Securities Act of 1933, as amended from time to time.

IN WITNESS WHEREOF, the Obligor has caused this Note to be executed by its duly authorized officer as of the date first written above.

Attest

REORGANIZED T H AGRICULTURE & NUTRITION, L.L.C.

By:_____
Name:
Title:

AGREED AND ACCEPTED
AS OF _____, 2008:

T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust

By:_____
Name:
Title:

**EXHIBIT E**

---

**PLEDGE AGREEMENT**

# PLEDGE AND SECURITY AGREEMENT

dated as of

_____, 200__

among

T H Agriculture and Nutrition, L.L.C. Parent Trust

and

T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust

and

Reorganized T H Agriculture and Nutrition, L.L.C. as Obligor

PLEDGE AND SECURITY AGREEMENT dated as of _____, 200__ (this "Agreement") among T H Agriculture and Nutrition, L.L.C. Parent Trust, a Delaware trust (the "Pledgor"), and T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust, a Delaware statutory trust (together with the successors and assigns thereof, the "Secured Party") and Reorganized T H Agriculture and Nutrition, L.L.C. as Obligor.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Pledgor has agreed to pledge and grant a security interest in the Collateral (as defined below) as security for the Obligations (as defined below).

Accordingly, the parties herein agree as follows:

Section 1. Definitions.

(a) As used in this Agreement, the terms defined in the preamble hereto shall have the meanings ascribed therein and the following terms have the meanings ascribed below:

"*Collateral*" has the meaning assigned to such term in Section 3.

"*Issuer*" means the issuer of such Pledged Interests, Reorganized T H Agriculture & Nutrition, L.L.C., a Delaware limited liability company.

"*Note*" means that certain Secured Promissory Note executed and delivered by the Obligor, dated as of _____, 200__, in the original principal amount of $1,000,000.00, as amended or modified from time to time, together with any Note executed and delivered in exchange, substitution or transfer thereof.

"*Obligations*" means any and all principal and other amounts now or hereafter from time to time owing by the Obligor to the holder of the Note pursuant to the Note.

"*Obligor*" means Reorganized T H Agriculture & Nutrition, L.L.C., a Delaware limited liability company, together with any successor or assignee.

"*Pledged Interests*" means all membership interests listed on Annex 2 together with all certificates evidencing the same.

"*Proceeds*" has the meaning assigned to such term in the UCC.

"*UCC*" means the Uniform Commercial Code as in effect from time to time in the State of New York.

(b) In addition, for all purposes hereof, capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed such terms (i) in the Note and (ii) if not defined therein, in the UCC.

(c) The foregoing definitions shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to

any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented, or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein or therein), (ii) references to any law, constitution, statute, treaty, regulation, rule, or ordinance (each a "law") shall refer to that law as amended from time to time and include any successor law, (iii) any reference herein to any person shall be construed to include such person's successors and permitted assigns, (iv) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (v) all references herein to Sections and Annexes shall be construed to refer to sections of, and annexes to, this Agreement, and (vi) the disjunctive shall include the conjunctive and vice versa.

Section 2. <u>Representations and Warranties</u>. The Pledgor represents and warrants to the Secured Party that:

(a) *Collateral*. The Pledgor is the sole beneficial owner of the Collateral, and no lien exists upon such Collateral other than the liens created hereby.

(b) *Creation, Perfection and Priority*. The security interest created hereby constitutes a valid and perfected security interest in the Collateral, and such perfected security interest in such Collateral is subject to no equal or higher priority lien.

(c) *Pledgor Information; Location*. <u>Annex 1</u> sets forth, as of date hereof, the exact name, the location of the chief executive office (including county or parish), the jurisdiction of organization, and the IRS tax identification number of the Pledgor.

(d) *Pledged Interests*.

(i) The Pledged Interests identified in <u>Annex 2</u> is, and all Pledged Interests acquired after the date hereof by the Pledgor and in which a security interest is created hereunder will be, duly authorized, validly issued, fully paid, and nonassessable.

(ii) The Pledged Interests identified an <u>Annex 2</u> constitute 100% of the issued and outstanding membership interests in the Issuer on the date hereof (whether or not registered in the name of the Pledgor), and <u>Annex 2</u> correctly identifies, as at the date hereof, the Issuer of such Pledged Interests, whether such Pledged Interests are certificated or uncertificated, and the respective class of the shares constituting such Pledged Interests.

(e) The Pledgor is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its creation and has full organizational power to execute, deliver, and perform this Agreement.

(f) The execution, delivery, and performance of this Agreement by the Pledgor have been, and remain, duly authorized by all necessary organizational action on the part of the Pledgor and do not result in a contravention by the Pledgor of any provision of law or of the Pledgor's organizational documents or any material contractual restriction binding on the Pledgor or its assets.

(g) All consents, authorizations, and approvals of, and registrations and declarations with, any governmental authority necessary for the due execution, delivery, and performance of this Agreement by the Pledgor have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental

authority is required to be made or obtained by the Pledgor in connection with the execution, delivery, or performance of this Agreement by the Pledgor.

(h) This Agreement constitutes the legal, valid, and binding obligation of the Pledgor enforceable against the Pledgor in accordance with its terms, subject as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights, and to general equity principles.

Section 3. Collateral. As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration, or otherwise) of the Obligations, whether now existing or hereafter from time to time arising, the Pledgor hereby grants to the Secured Party a security interest in all of the Pledgor's right and title to, and interest in, the Pledged Interests, whether now owned or hereafter acquired and whether now existing or hereafter coming into existence (such property described in this Section 3 being collectively referred to herein as the "Collateral").

Section 4. Further Assurances; Remedies. In furtherance of the pledge and grant of security interest pursuant to Section 3, the Pledgor agrees with the Secured Party as follows:

4.01 *Delivery and Other Perfection*. The Pledgor shall:

(a) deliver to the Secured Party all certificated Pledged Interests that constitute Collateral, endorsed and/or accompanied by such properly executed instruments of assignment and transfer in such form and substance as the Secured Party may reasonably request;

(b) give, execute, deliver, file, record, authorize, or obtain all such financing statements, notices, instructions, memoranda, acknowledgements, instruments, agreements, consents, or other documents as may be necessary or reasonably desirable in the reasonable judgment of the Secured Party to create, preserve, perfect, or validate the security interest granted pursuant hereto or to enable the Secured Party to exercise and enforce its rights hereunder or under the UCC or other applicable law with respect to such security interest, including (after the occurrence of a Collateral Event) causing any or all of the Pledged Interests that constitute Collateral to be transferred of record into the name of the Secured Party or its nominee (and the Secured Party agrees that if any such Pledged Interests are transferred into its name or the name of its nominee, the Secured Party will thereafter promptly give to the Pledgor copies of any notices and communications received by it with respect to such Pledged Interests); and

(c) take such other action as the Secured Party shall reasonably deem necessary to acquire a first priority, perfected lien on the Collateral under the UCC. The Pledgor shall not permit any other liens on the Collateral.

4.02 *Financing Statements*. The Pledgor hereby authorizes the Secured Party to file one or more financing statements in respect of the Pledgor as debtor in such filing offices in such jurisdictions with which such a filing is (a) required to perfect the security interest granted hereunder by the Pledgor or (b) reasonably desirable (in the Secured Party's discretion) to give notice of the security interest granted hereunder by the Pledgor.

4.03 *Other Financing Statements and Control*. Without the prior written consent of the Secured Party, the Pledgor shall not (a) authorize the filing in any jurisdiction of any financing statement or like instrument with respect to the Collateral in which the Secured Party is not named as the sole secured or (b) cause or permit any person other than the Pledgor or the Secured Party to acquire "control" (as

defined in Section 8-106 of the UCC or as otherwise construed for purposes of Article 8 or 9 of the UCC) over the Collateral.

4.04 *Special Provisions Relating to Pledged Interests.*

(a) Without limiting or otherwise affecting the security interest granted under Section 3, the Pledgor will, at all times, cause such security interest to be a perfected first-priority security interest on no less than 100% of the total number of membership interests of the Issuer then outstanding on a fully diluted basis.

(b) So long as no Collateral Event shall have occurred and the Secured Party shall not have exercised its rights pursuant to Section 6.2 of the Note, the Pledgor shall have the right to exercise all voting, consensual, and other powers of ownership pertaining to the Pledged Interests, and the Secured Party shall execute and deliver to the Pledgor or cause to be executed and delivered to the Pledgor all such proxies, powers of attorney, dividend and other orders, and all such instruments, without recourse, as the Pledgor may reasonably request for the purpose of enabling the Pledgor to exercise the rights and powers that it is entitled to exercise pursuant to this Section 4.04(b).

(c) Unless and until a Collateral Event has occurred and the Secured Party shall have exercised its rights pursuant to Section 6.2 of the Note, the Pledgor shall be entitled to receive and retain any and all dividends and distributions on the Pledged Interests subject to the terms of the T H Agriculture & Nutrition, L.L.C. Parent Trust Agreement dated as of _____, 2008.

(d) If any Collateral Event shall have occurred and the Secured Party shall have exercised its rights pursuant to Section 6.2 of the Note, all dividends and other distributions on the Pledged Interests shall be paid or distributed directly to the Secured Party, and, if the Secured Party shall so request in writing, the Pledgor agrees to execute and deliver to the Secured Party appropriate additional dividend, distribution and other orders and documents to that end.

4.05 *Collateral Events, Etc.* During the period during which a Collateral Event shall have occurred and be continuing:

(a) the Secured Party shall have all of the rights and remedies with respect to the Collateral of a secured party under the UCC (whether or not the UCC is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right, to the fullest extent permitted by applicable law, to exercise all voting, consensual, and other powers of ownership pertaining to the Collateral as if the Secured Party was the sole and absolute owner thereof (and the Pledgor agrees to take all such action as may be appropriate to give effect to such right); and

(b) the Secured Party may, upon ten (10) Business Days prior written notice to the Pledgor of the time and place, with respect to the Collateral or any part thereof that shall then be or shall thereafter come into the possession, custody or control of the Secured Party, sell, assign or otherwise dispose of all or any part of such Collateral at such place or places as the Secured Party deems best and for cash or for credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required above or by applicable statute and cannot be waived), and the Secured Party or anyone else may be the purchaser, assignee or recipient of any or all of the Collateral so disposed of at any public sale

(or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise) of the Pledgor, any such demand, notice and right or equity being hereby expressly waived and released. The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place in which the sale may be so adjourned.

The Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933 and applicable state securities laws, the Secured Party may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. The Pledgor acknowledges that any such private sales may be at prices and on terms less favorable to the Secured Party than those obtainable through a public sale without such restrictions and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the Issuer thereof to register it for public sale.

4.06 *Deficiency*. If the proceeds of sale, collection or other realization of or upon the Collateral pursuant to Section 4.05 are insufficient to cover the costs and expenses of such realization and the payment in full of the Obligations, the Pledgor shall not be liable for any deficiency in respect of the Obligations.

4.07 *Locations; Names*. Without at least thirty (30) days prior notice to the Secured Party, the Pledgor shall not change the location of its chief executive office, the jurisdiction or form of its organization, or its name from the same shown on Annex 1.

4.08 *Application of Proceeds*. Upon the occurrence and during the continuance of a Collateral Event, the proceeds of any sale of, or other realization upon, all or any part of the Collateral shall be applied by the Secured Party in the following order of priorities:

(a) to payment of the expenses of such sale or other realization, including any taxes arising from such sale or other realization and all expenses, liabilities and advances incurred or made by the Secured Party in connection therewith, and then ratably to pay any other unreimbursed expenses for which the Secured Party or any holder is to be reimbursed pursuant to Section 7.1 of the Note;

(b) to the ratable payment of unpaid principal of the Obligations;

(c) to the ratable payment of all other Obligations, until all Obligations shall have been paid in full; and

(d) to payment to the Pledgor or its successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds.

The Secured Party may make distributions hereunder in cash or in kind or, on a ratable basis, in any combination hereof.

4.09 *Attorney-in-Fact*. Without limiting any rights or powers granted by this Agreement to the Secured Party while no Collateral Event has occurred and is continuing, upon the occurrence and

during the continuance of any Collateral Event the Secured Party is hereby appointed the attorney-in-fact of the Pledgor for the purpose of carrying out the provisions of this Section 4 and taking any action and executing any instruments that the Secured Party may deem necessary or reasonably advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, so long as the Secured Party shall be entitled under this Section 4 to make collections in respect of the Collateral, the Secured Party shall have the right and power to receive, endorse and collect all checks made payable to the order of the Pledgor representing any dividend, payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same.

4.10 *No Marshalling*. Upon the occurrence and continuance of a Collateral Event, the Secured Party shall not be required to marshal the order of its enforcement of its security interest in any part of the Collateral for the benefit of any person.

Section 5. <u>Miscellaneous</u>.

5.01 *Notices*. All notices, responses, consents, waivers, requests, statements, and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows (or as otherwise directed in writing):

(a) if to the Pledgor:
T H Agriculture and Nutrition, L.L.C. Parent Trust

_____
_____
_____
Attention: _____
Facsimile: _____

with a copy to:

_____
_____
_____
Attention: _____
Facsimile: _____

(b) if to the Secured Party:
T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust
Wilmington Trust Company
1110 N. Market Street
Wilmington, Delaware 19890-1625
Attention: Joseph B. Feil
Email: jfeil@wilmingtontrust.com

and

T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust

_____
_____
_____
Attention: _____

Facsimile: _____

with a copy to:

_____
_____
_____
Attention: _____
Facsimile: _____

5.02 *No Waiver*. No failure on the part of the Secured Party to exercise, and no course of dealing with respect to, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by the Secured Party of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies herein are cumulative and are not exclusive of any remedies provided by law.

5.03 *Amendments, Etc.* Neither this Agreement nor any provision hereof may be changed, waived, discharged or (except as provided in Section 5.09) terminated except in writing signed by the Pledgor and the Secured Party.

5.04 *Successors and Assigns*. This Agreement is for the benefit of the Secured Party and its successors and permitted assigns, and in the event of an assignment of the Note, the rights hereunder, to the extent applicable to the indebtedness so assigned, shall be transferred with such indebtedness. This Agreement shall be binding on the Pledgor and its successors and assigns; *provided, however*, that neither the Pledgor nor Obligor shall have the right to assign its rights or obligations hereunder or any interest herein without the prior written consent of the Secured Party.

5.05 *Counterparts*. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart.

5.06 *Governing Law; Jurisdiction; Etc.*

(a) *Governing Law*. This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b) *Submission to Jurisdiction*. Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its properties, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court for the Southern District of New York. and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that either party may otherwise have to bring any action or proceeding relating to this Agreement against the other party hereto or its properties in the courts of any jurisdiction.

(c) *Waiver of Venue*. Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter

have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in Section 5.06(b). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) *Service of Process*. Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 5.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

5.07 *Captions*. The captions and Section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

5.08 *Severability*. If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (a) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Secured Party in order to carry out the intentions of the parties hereto as nearly as may be possible and (b) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

5.09 *Termination*. This Agreement shall terminate upon the earlier to occur of (i) payment in full of the Note, or (ii) exercise by the Secured Party, in accordance with Section 6.2 of the Note, of any of its rights under Section 4 hereof. Upon any such termination, the Secured Party will, at the expense of the Pledgor, execute and deliver to the Pledgor such documents as the Pledgor shall reasonably request to evidence the termination of this Agreement.

(a) The obligations of the Pledgor hereunder shall not constitute a debt or obligation of the Pledgor in any action to collect any amounts due under, or otherwise in respect of, the Note. The Pledgor shall not be liable under any theory for any amount due under this Agreement or the Note, and no holder shall seek a deficiency or personal judgment against the Pledgor (except in the event of fraudulent action by the Pledgor), including, without limitation, for payment of the Obligations or other amounts evidenced by this Agreement or the Note. No property or assets of the Pledgor, other than the Collateral pledged pursuant to this Agreement, shall be sold, levied upon or otherwise used to satisfy any judgment rendered in connection with any action brought against the Pledgor with respect to this Agreement.

(b) Notwithstanding the foregoing, nothing herein shall be construed to (i) impair or limit the rights of any holder against the Pledgor in the event of any fraudulent actions by the Pledgor, or (ii) prevent the commencement of any action, suit or proceeding against any person (or prevent the service of papers under any person) for the purpose of obtaining jurisdiction over the Pledgor.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

T H AGRICULTURE AND NUTRITION, L.L.C. PARENT TRUST

By: _____

Name: _____

Title: _____

T H AGRICULTURE & NUTRITION, L.L.C. ASBESTOS PERSONAL INJURY TRUST

By: _____

Name: _____

Title: _____

REORGANIZED T H AGRICULTURE AND NUTRITION, L.L.C.

By: _____

Name: _____

Title: _____

**Annex 1**

<u>Pledgor Information; Locations</u>

| Name | Chief Executive Officer/Trustee | Jurisdiction of Formation | I.D. No. |
|---|---|---|---|
| T H Agriculture and Nutrition, L.L.C. Parent Trust | | Delaware | |

**Annex 2**

<u>Pledged Interests</u>

| Issuer | Class | Percent Pledged |
|---|---|---|
| T H Agriculture & Nutrition, L.L.C. | Membership Interests | 100% |

**EXHIBIT F**

---

**SCHEDULE OF SHARED ASBESTOS INSURANCE POLICIES**[*]

---

[*]   The fact of inclusion or exclusion, and the classification of an insurance policy on this Exhibit to the Plan: (i) does not constitute a determination as to whether any particular insurance policy provides coverage for any matter resolved by the Plan or for any other matter; (ii) does not constitute a waiver of any position of any Entity with respect to any coverage determination; and (iii) is subject to any applicable Asbestos PI Insurer Coverage Defenses.

**EXHIBIT F TO THE PLAN[1]**
**SHARED ASBESTOS INSURANCE POLICIES**
**SCHEDULE 1: POLICIES ISSUED BY SOLVENT INSURERS**

| Insurance Provider | Policy Number | Start Date | End Date | Remaining Coverage[2] |
|---|---|---|---|---|
| Ace (formerly Aetna) | EX 000452 | 10/19/1971 | 12/31/1972 | $1,000,000 per applicable policy period |
| AIU Insurance Co. | 75-100659 | 7/1/1978 | 7/1/1979 | $2,000,000 |
| AIU Insurance Co. | 75-101116 | 7/1/1979 | 7/1/1980 | $5,000,000 |
| AIU Insurance Co. | 75-102421 | 7/1/1980 | 7/1/1981 | $5,000,000 |
| AIU Insurance Co. | 75-102631 | 7/1/1981 | 7/1/1982 | $5,000,000 |
| AIU Insurance Co. | 75-102185 | 7/1/1982 | 7/1/1983 | $5,000,000 |
| AIU Insurance Co. | 75-103051 | 7/1/1983 | 7/1/1984 | $5,000,000 |
| AIU Insurance Co. | 75-103875 | 7/1/1984 | 7/1/1985 | $20,000,000 |
| American Home Assurance Co. | CE 355776 | 3/31/1969 | 12/31/1969 | $2,000,000 |
| American Home Assurance Co. | CE 356559 | 12/31/1969 | 12/31/1970 | $3,000,000 |
| American Home Assurance Co. | CE 357721 | 12/31/1970 | 12/31/1971 | $3,000,000 |

---

[1] Each of the insurance policies listed on the Schedules are excess policies that, subject to their terms, generally provide coverage above underlying primary, umbrella and/or other excess insurance policies. The attachment points of the listed excess policies are not reflected on the Schedules. THAN contends that the limits of each of the insurance policies listed on these Schedules are currently available for at least a portion of the asbestos claims asserted against THAN or in the future will be available for at least a portion of the asbestos claims asserted against THAN once lower-level insurance in each policy year is exhausted or no longer available.

[2] THAN contends that each insurance policy covering multiple annual periods (*i.e.*, "multi-year" policies), a period of less than one year (*i.e.*, a "stub period"), or one or more annual periods and a stub period has a separate policy limit for each annual period or portion thereof. However, depending on the policy language of each of these policies and the applicable law, a court may, among other things, consider a policy covering more than one annual period to have a single policy limit, or it may find that the policy has multiple annual limits. With regard to policies with stub periods, a court may, among other things, apply separate limits to the stub period and any additional annual periods covered by the policy, it may find that a single policy limit applies to the stub period and one or more additional annual periods, or it may pro-rate the limits associated with the stub period to account for the shortened policy period of the stub policy.

| Insurance Provider | Policy Number | Start Date | End Date | Remaining Coverage[2] |
|---|---|---|---|---|
| American Home Assurance Co. | CE 2692153 | 12/31/1971 | 12/31/1972 | $3,000,000 |
| American Home Assurance Co. | CE 3380269 | 12/31/1972 | 12/31/1973 | $3,000,000 |
| American Re-Insurance Company | M 5756-0001 | 7/21/1965 | 3/31/1969 | $5,000,000 per applicable policy period |
| American Re-Insurance Company | M 0086590 | 6/24/1969 | 12/31/1970 | $1,000,000 per applicable policy period |
| American Re-Insurance Company | M 0371372 | 12/31/1970 | 12/31/1971 | $2,500,000 |
| Birmingham Fire Insurance Co. of Pennsylvania | SE 6073348 | 7/1/1977 | 7/1/1978 | $1,000,000 |
| Birmingham Fire Insurance Co. of Pennsylvania | SE 6073367 | 7/1/1978 | 7/1/1979 | $1,000,000 |
| Centennial Insurance Co. | 462 016836 | 7/29/1977 | 7/1/1978 | $1,000,000 |
| Centennial Insurance Co. | 462 017817 | 7/1/1978 | 7/1/1979 | $1,000,000 |
| Centennial Insurance Co. | 462 019495 | 7/1/1979 | 7/1/1980 | $2,000,000 |
| Continental Casualty Company | RDX-9654-998 | 7/17/1962 | 7/1/1965 | $1,975,000 per applicable policy period |
| Continental Casualty Company | RDX-893-72-52 | 12/31/1972 | 12/31/1973 | $2,000,000 |
| Employers Mutual Casualty Company | MMO-70864 | 7/1/1979 | 7/1/1980 | $5,000,000 |
| Employers Mutual Casualty Company | MMO–71473 | 7/1/1980 | 7/1/1981 | $5,000,000 |
| Employers Mutual Casualty Company | MMO-71853 | 7/1/1981 | 7/1/1982 | $5,000,000 |
| Federal Insurance Company | 7933-01-79 | 7/1/1977 | 7/1/1978 | $2,000,000 |
| Federal Insurance Company | (79) 7933-01-79 | 7/1/1978 | 7/1/1979 | $2,000,000 |
| Federal Insurance Company | (84) 7928-85-73 | 7/1/1983 | 7/1/1984 | $20,000,000 |
| Federal Insurance Company | (85) 7928-85-73 | 7/1/1984 | 7/1/1985 | $20,000,000 |

| Insurance Provider | Policy Number | Start Date | End Date | Remaining Coverage[2] |
|---|---|---|---|---|
| Fireman's Fund | XLX - 105 08 69 | 10/19/1971 | 12/31/1972 | $1,000,000 per applicable policy period |
| Fireman's Fund | XLX – 120 25 50 | 12/31/1972 | 12/31/1973 | $1,000,000 |
| Granite State Insurance Co. | SCLD 80-93286 | 7/29/1977 | 7/1/1978 | $2,000,000 |
| Granite State Insurance Co. | 6178-0423 | 7/1/1978 | 7/1/1979 | $2,000,000 |
| Granite State Insurance Co. | 6179-1466 | 7/1/1979 | 7/1/1980 | $4,500,000 |
| Granite State Insurance Co. | 6179-1467 | 7/1/1979 | 7/1/1980 | $3,000,000 |
| Granite State Insurance Co. | 6480-5024 | 7/1/1980 | 7/1/1981 | $4,500,000 |
| Granite State Insurance Co. | 6480-5025 | 7/1/1980 | 7/1/1981 | $3,000,000 |
| Granite State Insurance Co. | 6481-5211 | 7/1/1981 | 7/1/1982 | $5,000,000 |
| Granite State Insurance Co. | 6481-5212 | 7/1/1981 | 7/1/1982 | $5,000,000 |
| Granite State Insurance Co. | 6482-5445 | 7/1/1982 | 7/1/1983 | $10,000,000 |
| Granite State Insurance Co. | 6483-5659 | 7/1/1983 | 7/1/1984 | $10,000,000 |
| Granite State Insurance Co. | 6484-5836 | 7/1/1984 | 7/1/1985 | $2,000,000 |
| INA | XCP 3884 | 12/31/1972 | 12/31/1973 | $1,000,000 |
| INA | XCP 12379 | 7/29/1977 | 7/1/1978 | $5,000,000 |
| INA | XCP 14346 | 7/1/1978 | 7/1/1979 | $3,000,000 |
| INA | XCP 143536 | 7/1/1979 | 7/1/1980 | $3,000,000 |
| INA | XCP 143536 | 7/1/1980 | 7/1/1982 | $5,000,000 per applicable policy period |
| Lexington Insurance Co. | GC 402757 | 5/30/1969 | 12/31/1972 | $1,000,000 per applicable policy period |
| Lexington Insurance Co. | GC 403132 | 10/19/1971 | 12/31/1972 | $4,000,000 per applicable policy period |
| Lexington Insurance Co. | GC 403152 | 12/31/1971 | 12/31/1972 | $2,000,000 |

| Insurance Provider | Policy Number | Start Date | End Date | Remaining Coverage[2] |
|---|---|---|---|---|
| Lexington Insurance Co. | GC 403373 | 12/31/1972 | 12/31/1973 | $3,000,000 |
| Lexington Insurance Co. | GC 403373 | 12/31/1972 | 12/31/1973 | $4,000,000 |
| Lexington Insurance Co. | CE 5504115 | 12/31/1973 | 12/31/1974 | $1,349,000 |
| Lexington Insurance Co. | CE 5504745/ UFL 1782 | 12/31/1974 | 12/31/1975 | $1,424,858 |
| Lexington Insurance Co. | CE 5503335 | 12/31/1975 | 7/1/1977 | $2,250,000 per applicable policy period |
| Lexington Insurance Co. | CE 5506371/ UJL 0884 | 7/1/1977 | 7/1/1978 | $497,917 |
| Lexington Insurance Co. | 5510423 | 7/1/1978 | 7/1/1979 | $481,800 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 1228595 | 7/1/1977 | 7/1/1978 | $3,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 1229475 | 7/29/1977 | 7/1/1978 | $2,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 1229701 | 7/1/1978 | 7/1/1979 | $3,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 1229702 | 7/1/1978 | 7/1/1979 | $2,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 9782293 | 7/1/1979 | 7/1/1980 | $3,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 9782293 | 7/1/1979 | 7/1/1980 | $2,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 9910340 | 7/1/1980 | 7/1/1981 | $3,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 9910340 | 7/1/1980 | 7/1/1981 | $2,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 9602929 | 7/1/1981 | 7/1/1982 | $5,000,000 |
| North Star Reinsurance Corporation | NSX 7431 | 12/31/1968 | 3/31/1969 | $5,000,000 |
| North Star Reinsurance Corporation | NSX 7736 | 3/31/1969 | 12/31/1969 | $5,000,000 |

| Insurance Provider | Policy Number | Start Date | End Date | Remaining Coverage[2] |
|---|---|---|---|---|
| North Star Reinsurance Corporation | NSX 8220 | 12/31/1969 | 12/31/1970 | $3,000,000 |
| North Star Reinsurance Corporation | NSX 8961 | 12/31/1970 | 12/31/1972 | $3,000,000 per applicable policy period. |
| North Star Reinsurance Corporation | NSX 9035 | 12/31/1970 | 12/31/1972 | $2,000,000 per applicable policy period |
| North Star Reinsurance Company | NSX 10974 | 12/31/1972 | 12/31/1973 | $3,000,000 |
| North Star Reinsurance Corporation | NSX 10975 | 12/31/1972 | 12/31/1973 | $2,000,000 |
| Pacific Insurance Company | PI 33101 | 7/1/1984 | 7/1/1985 | $8,500,000 |
| Prudential Reinsurance Company (now Everest Reinsurance Company) | PMX 00131 | 7/1/1983 | 7/1/1984 | $15,000,000 |
| Prudential Reinsurance Company (now Everest Reinsurance Company) | PMX 00225 | 7/1/1984 | 7/1/1985 | $14,500,000 |
| Republic Insurance Company | CDE 1005 | 7/1/1984 | 7/1/1985 | $15,000,000 |
| Royal Indemnity | ED 102076 | 7/1/1983 | 7/1/1984 | $5,000,000 |
| United States Fire Insurance Company | XS-2426 | 10/19/1971 | 12/31/1972 | $2,000,000 per applicable policy period |

**EXHIBIT F TO THE PLAN[3]**
**SHARED ASBESTOS INSURANCE POLICIES**
**SCHEDULE 2: POLICIES ISSUED BY INSOLVENT INSURERS**

| Insurance Provider | Policy Number | Start Date | End Date | Original Coverage |
|---|---|---|---|---|
| Home Insurance Company | HEC 4165818 | 12/31/1971 | 12/31/1972 | $3,000,000 |
| Home Insurance Company | HEC 4356575 | 12/31/1972 | 12/31/1973 | $3,000,000 |
| Home Insurance Company | HEC 9306163 | 3/31/1969 | 12/31/1969 | $3,000,000 |
| Home Insurance Company | HEC 9791317 | 12/31/1969 | 12/31/1970 | $3,000,000 |
| Home Insurance Company | HEC 9919562 | 12/31/1970 | 12/31/1971 | $3,000,000 |
| Midland Insurance Company | Unknown | 12/31/1969 | 12/31/1970 | $1,000,000 |
| Midland Insurance Company | XL – 1365 | 12/31/1970 | 12/31/1972 | $1,000,000 per policy period |
| Midland Insurance Company | XL – 1365 | 12/31/1970 | 12/31/1972 | $1,500,000 for period 12/31/70 to 12/31/71<br><br>$2,000,000 for period 12/31/71 to 12/31/72 |
| Midland Insurance Company | XL – 1875 | 10/19/1971 | 12/31/1972 | $2,000,000 per policy period |
| Midland Insurance Company | XL 145353 | 12/31/1974 | 12/31/1975 | $30,000,000 |
| Midland Insurance Company | XL 145792 | 12/31/1975 | 7/1/1976 | $30,000,000 |
| Midland Insurance Company | XL 147448 | 7/1/1978 | 7/1/1979 | $5,000,000 |
| Midland Insurance Company | XL 147513 | 7/1/1979 | 7/1/1980 | $5,000,000 |
| Midland Insurance Company | XL 151788 | 7/1/1976 | 7/1/1977 | $30,000,000 |
| Midland Insurance Company | XL 152489 | 7/1/1977 | 7/1/1978 | $7,000,000 |
| Midland Insurance Company | XL 706715 | 7/1/1980 | 7/1/1981 | $5,000,000 |

---

[3] With regard to the policies on this Schedule, THAN contends that the limits of each listed policy are currently available. However, the insurers listed on this Schedule are insolvent. Thus, in addition to generally disputing THAN's rights to proceeds from these policies at this time, there may in any event be little to no money available for any claim THAN made in the past or intends to make in the future.

| Insurance Provider | Policy Number | Start Date | End Date | Original Coverage |
|---|---|---|---|---|
| Midland Insurance Company | XL11101728137-1 | 12/31/1973 | 12/31/1974 | $30,000,000 |
| Midland Insurance Company | XL111018281372-1 | 12/31/1972 | 12/31/1973 | $1,000,000 |
| Midland Insurance Company | XL111018281472-9 | 12/31/1972 | 12/31/1973 | $2,000,000 |
| Midland Insurance Company | XL111018281572-8 | 12/31/1972 | 12/31/1973 | $2,000,000 |
| Mission Insurance Company | M81746 | 12/31/1974 | 7/1/1976 | $4,000,000 per policy period |
| Mission Insurance Company | M833355 | 7/1/1976 | 7/1/1977 | $5,000,000 |

**EXHIBIT G**

---

**SCHEDULE OF INSURANCE SETTLEMENT
AGREEMENTS AND SETTLING ASBESTOS INSURANCE ENTITIES**

**EXHIBIT G TO THE PLAN**
**INSURANCE SETTLEMENT AGREEMENTS AND SETTLING ASBESTOS**
**INSURANCE ENTITIES**

I.  Confidential Agreement of Settlement and Release, dated September 21, 2005

    A.       The Travelers Indemnity Company

    B.       The Travelers Indemnity Company of Connecticut (f/k/a The Travelers Indemnity Company of Rhode Island)

    C.       Travelers Property Casualty Company of America (f/k/a The Travelers Indemnity Company of Illinois)

    D.       Travelers Casualty and Surety Company (f/k/a The Aetna Casualty and Surety Company)

Insurance Policies Covered by the Agreement:

| Insurance Company | Policy Numbers |
| --- | --- |
| Aetna | 07 XN 1 SCA |
| Aetna | 07 XN 2 SCA |
| Travelers | T-RNSL-949808-70 |
| Travelers | T-CUP-949813-70 |
| Travelers | T-EX-949818-70 |
| Travelers | T-RNSL-949808-71 |
| Travelers | T-CUP-949813-71 |
| Travelers | T-EX  949818-71 |
| Travelers | TR-NSL-949808-72 |
| Travelers | T-CUP-949813-72 |
| Travelers | T-EX-949818-72 |
| Travelers | TRNSL-110T922-5-73 |
| Travelers | T-CUP-110T924-9-73 |
| Travelers | TR-NSL-110T922-5-74 |
| Travelers | T-CUP-110T924-9-74 |
| Travelers | T-EX 131T631 - 8-74 |
| Travelers | TR-NSL-110T922-5-75 |
| Travelers | T-CUP-110T924-9-75 |
| Travelers | TR-NSL-110T922-5-76 |
| Travelers | TR-NSL-110T922-5-77 |
| Travelers | T-EX-148T889-6-77 |
| Travelers | TRK-SLG-110T922-5-78 |
| Aetna | 01XN1839 WCA |
| Aetna | 01XN1838 WCA |
| Travelers | TR-SLG-110T922-5-79 |
| Aetna | 01 XN 2277 WCA |
| Travelers | TREE-SLG-110T922-5-80 |
| Aetna | 01 XN 2693 WCA |
| Travelers | TREE-SLG-110T922-5-81 |
| Aetna | 01 XN 3304 WCA |
| Aetna | 01 XN 3060 WCA |
| Travelers | TREE-SLG-110T922-5-82 |
| Aetna | 01 XN 3427 WCA |
| Travelers | TREE-SLG-110T922-5-83 |

| | |
|---|---|
| Aetna | 01 XN 3782 WCA |
| Travelers | TREE-SLG-110T922-5-84 |
| Aetna | 01 XN 4299 WCA |
| Aetna | 01 XN 4300 WCA |

II.   Policy BuyBack and Limits Agreement and Release, dated August 6, 2004; including Defense and Indemnity Agreement and Release Concerning Asbestos Claims, dated August 6, 2004.

A.   Hartford Financial Services Group, Inc.

B.   Hartford Accident and Indemnity Company

C.   First State Insurance Company

Insurance Policies Covered by the Agreement:

| **Insurance Company** | **Policy Numbers** |
|---|---|
| Hartford | 10CL121095 or 10 CL 121096 |
| Hartford | 10CL122873 or 10 CL 128873 |
| Hartford | 10CL 135807 or 10 CL 135700 |
| Hartford | 10 CL 221551, 10 CL 221600, 10 CL 148654, or 10 CL 157147 |
| Hartford | 10 HU 100011 |
| Hartford | 10 HU 100468 |
| Hartford | 10 HU 100517 |
| Hartford | 10 CA 30101, 10 CA 30100, 10 CA 30106, or 10 CA 30108 |
| Hartford | 10 HUA 30100 |
| Hartford | 10 CL A30110 |
| Hartford | 10 HUA 30102 |
| Hartford | 37 WH 552776 |
| Hartford | 37 C 463565 |
| Hartford | 57 C 463566 |
| Hartford | 10 GA 30105 or 10 CA 30105 |
| Hartford | 10 CL 206999 |
| Hartford | 10 C 202382 |
| Hartford | 10 C 203865 |
| Hartford | 10 CL 206998 |
| Hartford | 10 C 201200 |
| Hartford | 10 C 205370 |
| Hartford | 10 HU 101654 |
| First State | EU 936326 |

III.   Confidential Settlement Agreement, Release and Buy-Back, dated September 30, 2005

     A.     Allstate Insurance Company

     B.     Northbrook Excess and Surplus Company (f/k/a Northbrook Insurance Company)

Insurance Policies Covered by the Agreement:

| Insurance Company | Policy Numbers |
|---|---|
| Northbrook | 63-003-383 |
| Northbrook | 63-004-845 |
| Northbrook | 63-005-772 |
| Northbrook | 63-005-773 |
| Northbrook | 63-006-905 |
| Northbrook | 63-008-150 |
| Northbrook | 63-008-824 |
| Northbrook | 63-008-825 |

IV.   Settlement Agreement and Full Release, dated June 1, 1999

     A.     Transit Casualty Company in Receivership (insolvent)

Insurance Policies Covered by the Agreement:

| Insurance Company | Policy Numbers |
|---|---|
| Transit Casualty | SCU 955197 |
| Transit Casualty | SCU 955 628 |
| Transit Casualty | SCU 955964 |
| Transit Casualty | SCU 956258 |
| Transit Casualty | SCU 956 528 |
| Transit Casualty | UMB 950393 |

V.   Confidential Settlement and Policy Release Agreement, dated February 5, 2007

     A.     TIG Insurance Company, as successor by merger to International Insurance Company

Insurance Policies Covered by the Agreement:

| Insurance Company | Policy Numbers |
|---|---|
| International Insurance | 522 0361206 |
| International Insurance | 522 0539064 |

VI.    Settlement Agreement, dated June 30, 2008

    A.    ACE European Group Limited

    B.    AGF Insurance Ltd.

    C.    Aviva International Insurance Ltd. (f/k/a CGU International Insurance Plc.)

    D.    AXA Global Risks (UK) Ltd.

    E.    AXA Schade N.V.

    F.    Chubb Insurance Company of Europe S.A.

    G.    Fortis Corporate Insurance N.V.

    H.    Generali Schadeverzekering Maatschappij, N.V.

    I.    HDI-Gerling Verzekeringen N.V. (f/k/a HDI Verzekeringen N.V.)

    J.    HDI-Gerling Industrie Versicherung A.G. (as successor under universal title of Gerling-Konzern Allgemeine Versicherungs-AG)

    K.    Royal & Sun Alliance Insurance (Global) Ltd.

    L.    Winterthur Schadeverzekering Maatschappij N.V.

    M.    XL Insurance Company Limited

    Insurance Policies Covered by the Agreement:

    **Policy Numbers**
    V0100016907

    V0100016906

VII.    Confidential Settlement Agreement and Release, dated November 7, 1995

    A.    Accident & Casualty Insurance Company

    B.    American Home Assurance Company

    C.    Argonaut Northwest Insurance Company

    D.    Assicurazioni Generali Spa (U.K. Branch)

    E.    British National Insurance Company

F.      Certain Underwriters at Lloyd's London who severally subscribed to policies issued to Philips Electronics North America Corporation

G.      CNA Reinsurance of London, Ltd.

H.      Compagnie Europeene D'Assurances Industrielles S.A.

I.      Delta-Lloyd Non-Life Insurance Company, Ltd.

J.      Dominion Insurance Company

K.      Eagle Star Insurance Company

L.      Excess Insurance Company

M.      Folksam International Insurance Company (U.K.) Ltd.

N.      General Reinsurance Syndicate (GRS)

O.      Hawk Insurance Company, Ltd.

P.      Highlands Insurance Company, Ltd.

Q.      Insco Bermuda

R.      London & Edinburgh General Insurance Company, Ltd.

S.      National Casualty Company

T.      National Casualty Company of America, Ltd

U.      New London Insurance Company

V.      Nissan Fire & Marine Insurance Company

W.      St. Katherine Insurance Company, Ltd.

X.      Stronghold Insurance Company, Ltd.

Y.      Terra Nova Insurance Company, Ltd.

Z.      Tower Underwriting

AA.      Turegum Insurance Company

BB.      Unionamerica Insurance Company, Ltd

CC.      Winterthur Swiss Insurance Company

DD.      The Yasuda Fire & Marine Insurance Company of Europe, Ltd

Insurance Policies Covered by the Agreement:

**Policy Numbers**
U 14838
UD26323
CK 3809
CX 3809
CK 3810
CX 3810
K 23940 or E23940
CX 4919
CX4920
K24775
K 25793
K 25794
K 26646
881/UFL 1782 or UFL 1782
881/UGL 1243 or UGL 1243
881/UJL 0882 or UJL 0882
881/UJL 0884 or UJL 0884
881/UJL 0883 or UJL 0883
881/UKL 0978 or UKL 0978
79DD1254C or  79DD1254
509/80DD1637C or 80DD1637
or 80DD1637C
PYO 29481
PY 288185
PY 288285
PY 288285A

VIII.    Settlement Agreement with Philips Electronics North America Corporation, dated September 29, 2004

       A.    The Bermuda Fire & Marine Insurance Company Limited (In Liquidation)

       B.    El Paso Insurance Company Limited

       C.    Kingscroft Insurance Company Limited (formerly Dart Insurance Company Limited, Dart and Kraft Insurance Company Limited, and Kraft Insurance Company Limited)

       D.    Lime Street Insurance Company, Limited (formerly Louisville Insurance Company Limited)

       E.    Mutual Reinsurance Company Limited

F.       Southern American Insurance Company (In Liquidation)

G.      Walbrook Insurance Company Limited

Insurance Policies Covered by the Agreement:

**HSW Policy References:**
1969 CCLL 40099
1970 CCLL 50019
1970 CCLL 50204
1970 CCLL 00215
1971 CCLL 00214
1970 CCLL 50019
1970 CCLL 50204
1970 CCLL 00040
1971 CCLL 01578
1970 CCLL 50019
1970 CCLL 50204
1972 CCLL 04343
1972 CCLL 04344
1973 CCLC 06994
1974 CCLD 10529
1974 CCLD 13553
1977 CCLB 00134
1977 CCLD 00135
1978 CCLD 01395
1979 N041B 29929
1981 N041B 34982
1982 N043X 38968
1985 L003B 51048
1985 L003D 51054
1986 L003C 55988
1986 L003D 56586
1986 L003E 56587
1987 L003C 61454
1987 L003D 61455
1987 L003C 61454
1988 L003C 67762
1988 L003D 67763
**BLUA Policy Reference:**

78 CAS 0320

**EXHIBIT H**

**INSURANCE SETTLEMENT PROCEEDS TRUST AGREEMENT**

# THAN/PENAC JOINT INSURANCE SETTLEMENT PROCEEDS TRUST AGREEMENT

TRUST AGREEMENT, dated as of March 7, 2008 (this "Agreement"), by and among T H Agriculture & Nutrition, L.L.C. ("THAN"), Philips Electronics North America Corporation, on behalf of itself and certain of its affiliates and subsidiaries that are insureds under the Insurance Policies (defined below) ("PENAC" and together with THAN, the "Trust Beneficiaries") and Citibank, N.A. ("Citibank"), as trustee.

WHEREAS, each of the Trust Beneficiaries is an insured under the insurance policies identified on Schedule 1 to this Agreement (collectively, the "Insurance Policies," and the issuers thereof, collectively, the "Insurers").

WHEREAS, the Insurance Policies provide coverage over claims asserted against the Trust Beneficiaries, including, among other things, claims for alleged exposure to asbestos, other products liability and toxic tort claims, and defense costs related thereto (the "Covered Claims").

WHEREAS, the Trust Beneficiaries and certain of the Insurers dispute the nature and extent of coverage provided by certain of the Insurance Policies.

WHEREAS, the Trust Beneficiaries and certain of the Insurers have entered, and may in the future enter, into agreements to settle their coverage disputes and/or to commute certain of the Insurance Policies (the "Settlements"), pursuant to which such Insurers have paid or will pay a cash amount in lump sum or over time (the "Settlement Amounts") in exchange for release from certain of their obligations under the Insurance Policies being settled or commuted.

WHEREAS, all or some portion of the Settlement Amounts reflects available insurance under the Insurance Policies for which neither THAN nor PENAC has billed the Insurers or incurred any liabilities that could be billed under the Insurance Policies (the "Net Proceeds").

WHEREAS, each of THAN and PENAC has historically billed the Insurers upon establishing a potentially Covered Claim in connection with coverage for defense costs, or establishing a Covered Claim and the amount of the Covered Claim in connection with coverage for indemnity costs, and the Insurers, at least when adhering to their contractual obligations, paid under the Insurance Policies upon receipt of a demand for such payment on a "first-billed, first-paid" basis (the "First-Billed, First-Paid Process").

WHEREAS, with respect to those Covered Claims within the scope of the Settlements (the "Settlement Claims"), the Trust Beneficiaries desire to preserve their historical practice of drawing from the Insurance Policies by the First-Billed, First-Paid Process, by depositing all Net Proceeds into a trust account (the "Trust") that will pay Settlement Claims in the identical manner in which the Covered Claims were paid heretofore under the Insurance Policies, and

WHEREAS, Citibank is willing to act as trustee (the "Trustee") in respect of the Net Proceeds deposited into the Trust and earnings on such amounts (collectively, the "Trust Funds") upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by each of the parties hereto, the parties hereto, intending to be legally bound, do hereby agree as follows:

Section 1.     Creation and Name.  As of the date above, the Trustee and Trust Beneficiaries hereby constitute and create a Trust known as the "THAN/PENAC Joint Insurance Settlement Proceeds Trust."

Section 2.     Purpose.  The Trust is organized for the primary purpose of holding and administering the Trust Funds in trust for the Trust Beneficiaries, and to preserve and maintain the Trust Beneficiaries' historical practice of being paid under the Insurance Policies by the First-Billed, First-Paid Process.

Section 3.     Appointment of Trustee.  Citibank is hereby appointed as the Trustee in accordance with the terms and conditions set forth herein, and the Trustee hereby accepts such appointment.

Section 4.     Deposit into the Trust.  Effective upon the execution of this Agreement, all Net Proceeds resulting from the settlement of coverage disputes or commutation of Insurance Policies shall be deposited directly into the Trust.

Section 5.     Investment of the Trust Funds.  During the term of this Trust Agreement, the Trust Funds shall be invested and reinvested by the Trustee in JP Morgan Fund #675 and in the event JP Morgan Fund #675 is not available, Goldman Fund 524, and in the event JP Morgan Fund #675 and Goldman Fund 524 are not available, Federated Investors US Treasury Cash Reserves Institutional Service Shares (632). The Trustee shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Agreement.  The Trustee shall have no liability for any loss, fee, tax, cost or other charge sustained as a result of any investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Trust Beneficiaries to give the Trustee instructions to invest or reinvest the Trust Fund.  Receipt, investment and reinvestment of the Trust Funds shall be confirmed by the Trustee as soon as practicable, and any discrepancies in any such account statement shall be noted by Trust Beneficiaries to Trustee within 30 calendar days after receipt thereof.

Section 6.     Trust Beneficiaries' Rights to the Trust Funds.

(a)     Subject to subsection (b) below, the rights of THAN and PENAC to draw on the Trust Funds shall be identical in every respect to the rights they held to draw on the Insurance Policies, except that neither THAN nor PENAC shall have any right to draw on the Trust Funds with respect to Covered Claims that are not Settlement Claims.  Each of THAN and PENAC shall draw on the Trust Funds in the same manner in which they historically drew on the Insurance Policies, including without limitation, under the First-Billed, First-Paid Process,

irrespective of the amounts previously drawn by THAN or PENAC; *provided, however*, the Trustee shall have no obligation to monitor the manner in which each of THAN and PENAC draw on such Trust Funds for compliance with historic practice. In the event the Trust Funds are not sufficient in amount to satisfy a bill submitted by THAN or PENAC, the unpaid portion of the bill must be paid as soon as additional Net Proceeds are deposited into the Insurance Trust, before any other bill submitted by THAN or PENAC may be paid.

(b)     Pursuant to a Confidential Settlement Agreement, Release and Buy-Back entered into between and among Allstate Insurance Company ("Allstate"), THAN, and PENAC dated September 30, 2005 (the "Settlement Agreement"), the parties thereto resolved certain disputes relating to remaining coverage available to both THAN and PENAC. Under the Settlement Agreement, Allstate agreed to pay to THAN and PENAC certain sums (the "Payment") through a stream of payments over a period of time in accordance with a schedule set forth in the Settlement Agreement. The remaining Payment(s) made after the effective date of this Agreement will be paid either directly or indirectly into the Insurance Trust.

Section 7.     Distribution of Trust Funds.     The Trustee shall hold the Trust Funds in its possession until instructed hereunder to deliver the Trust Funds, or any specified portion thereof, as follows:

(a)     Upon receipt by THAN or PENAC of documentation establishing a potentially Covered Claim that is a Settlement Claim in connection with coverage for defense costs, or establishing a Settlement Claim and the amount of the Settlement Claim against THAN or PENAC in connection with coverage for indemnity costs, in accordance with the First-Billed, First-Paid Process, either THAN or PENAC may deliver to the Trustee a written notice with respect to the required release of Trust Funds, substantially in the form of Exhibit B attached hereto and signed by either: (i) the person(s) designated on Exhibit C hereto, or any other person designated in a writing signed by PENAC and delivered to the Trustee in accordance with the notice provisions of this Agreement, to act as PENAC's representative under this Agreement (each a "PENAC Representative"), or (ii) the person(s) so designated on Exhibit C hereto, or any other person designated in a writing signed by THAN and delivered to the Trustee in accordance with the notice provisions of this Agreement, to act as THAN's representative under this Agreement (each a "THAN Representative"), as applicable, and the Trustee shall release the Trust Funds (or such portion thereof requested by the requesting Trust Beneficiary) to the parties referenced in such notice within three (3) Business Days after receipt of such notice. For purposes of this Agreement, "Business Day" shall mean any day that is not a Saturday or Sunday or a day on which banks are required or permitted by law or executive order to be closed in the State of New York.

(b)     All expenses of administering the Trust, including (but not limited to) the Trustee's fees and expenses, shall be paid by the Trustee (or its designee) from the Trust Funds. The Trustee shall have a right of set-off against the Trust Funds for any such amounts. Payments made to administer the Trust Funds and any payments to or on behalf of a Trust Beneficiary will be made first out of current earnings, next out of undistributed net income from prior years (if any), and then from corpus. The right of the Trustee to compensation and indemnification under this Agreement shall survive its resignation or removal hereunder, or termination of the Trust.

(c)     The Trust Funds, including earned income and capital appreciation, shall be used solely to pay: (i) settlements or judgments relating to Settlement Claims; (ii) expenses of the Trust Beneficiaries, consisting of attorneys' fees and expenses and other defense costs, and expenses incurred by any third-party administrators of claims and consultants, in connection with Settlement Claims; and (iii) the fees and expenses of the Trustee and the Trust as provided herein.

(d)     Any income earned on the Trust Funds will be added to the corpus of the Trust. The Trustee shall invest or distribute such earned income in accordance with the terms of this Agreement applicable to the Trust Funds.

Section 8.     Final Distribution of Trust Funds.  Upon termination of the Trust as provided in Section 15 hereof, the Trustee shall distribute the remaining balance of the Trust Funds (if any), including any income earned and capital appreciation, in accordance with the unanimous direction of the Trust Beneficiaries or their respective designees.  The Trust Beneficiaries will notify the Trustee, in writing, naming their respective designees.

Section 9.     Resignation of Trustee.  The Trustee may resign and be discharged from its duties hereunder at any time by giving written notice of such resignation to the Trust Beneficiaries, specifying the date when such resignation shall take effect, which in no event shall occur prior to delivery of the Trust Funds to a successor trustee, which shall be an independent trustee designated by the Trust Beneficiaries.  If no successor is designated, a court of competent jurisdiction may be petitioned by the resigning Trustee, at the expense of the Trust Beneficiaries, to appoint a successor Trustee.  The resigning Trustee shall continue to serve until its successor accepts its appointment hereunder and receives the Trust Funds from the resigning Trustee. Upon its resignation and delivery of the Trust Funds, as set forth in this Section 9, the Trustee shall be discharged of and from any and all further obligations arising in connection with the Trust and Trust Funds contemplated by this Agreement, and the successor Trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor under this Agreement and with like effect as if originally named as Trustee.

Section 10.     Removal of Trustee.  The Trust Beneficiaries may remove the Trustee and designate a successor Trustee at any time by giving written notice of such removal to the Trustee, specifying (i) the date when such removal shall take effect, which date shall not be less than thirty (30) days from the date of such notice of removal, and (ii) the name of the successor Trustee.  The Trustee shall continue to serve until its successor accepts its appointment hereunder and receives the Trust Funds from the Trustee, and shall be entitled to compensation for such service.  If no successor is designated, a court of competent jurisdiction may be petitioned by the resigning Trustee, at the expense of the Trust Beneficiaries, to appoint a successor Trustee. Upon its removal and delivery of the Trust Funds, as set forth in this Section 10, the Trustee shall be discharged of and from any and all further obligations arising in connection with the Trust and Trust Funds contemplated by this Agreement, and the successor Trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor under this Agreement and with like effect as if originally named as Trustee.

Section 11.    Successor Trustee.  Any successor Trustee designated by the Trust Beneficiaries, as provided in Section 9 or 10 hereof, shall be a bank, trust company or other financial institution having capital and surplus of $500,000,000 or more, all of whose publicly held, long term debt securities, if any, are rated "A2" or higher by Moody's and "A" or higher by Standard & Poor's.  Any successor Trustee shall execute, acknowledge and deliver to the Trust Beneficiaries and its predecessor Trustee a written instrument accepting such appointment under this Agreement.

Section 12.    Duties and Indemnification of Trustee.

(a)    The Trustee shall have no duties or responsibilities whatsoever with respect to the Trust or the Trust Funds except as are specifically set forth herein.  The Trustee shall neither be responsible for or under, nor chargeable with knowledge of the terms and conditions of, any other agreement, including, without limitation any such agreements identified herein, instrument or document in connection herewith.  The Trustee may conclusively rely upon, and shall be fully protected from all liability, loss, cost, damage or expense in acting or omitting to act pursuant to any written notice, instrument, request, consent, certificate, document, letter, telegram, opinion, order, resolution or other writing hereunder without being required to determine the authenticity of such document, the correctness of any fact stated therein, the propriety of the service thereof or the capacity, identity or authority of any party purporting to sign or deliver such document.  The Trustee shall have no responsibility for the contents of any such writing contemplated herein and may conclusively rely without any liability upon the contents thereof.

(b)    The Trustee shall not be liable for any action taken or omitted by it in good faith and reasonably believed by it to be authorized hereby or with the rights or powers conferred upon it hereunder, nor for action taken or omitted by it in good faith, and in accordance with advice of counsel (which counsel may be of the Trustee's own choosing), and shall not be liable for any mistake of fact or error of judgment or for any acts or omissions of any kind except for its own willful misconduct or gross negligence.

(c)    The Trust Beneficiaries shall jointly and severally indemnify, defend and save harmless the Trustee and its directors, officers, agents and employees (the "Indemnitee") from and against any and all loss, liability or expense (including the fees and expenses of in-house or outside counsel and experts and their staffs and all expense of document location, duplication and shipment) arising out of or in connection with (i) the Trustee's execution and performance of this Trust Agreement, except in the case of any Indemnitee to the extent that such loss, liability or expense is finally adjudicated to have been primarily caused by the gross negligence or willful misconduct of such Indemnitee, or (ii) its following any instructions or other directions from the Trust Beneficiaries, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof.  All such claims for which the Trustee is entitled to indemnity from the Trust Beneficiaries shall be satisfied from the Trust.

(d)    To the extent that the Trust assets are not adequate to provide the coverage as set forth in paragraph (c) of this Section 12, the Trust Beneficiaries will assume jointly and severally any remaining liabilities of the Trust under said paragraph (c).  The Trustee shall use its best efforts to notify the Trust Beneficiaries and the Trust of the written assertion of a claim

against it or of any action commenced against it, promptly after it shall have received any such written assertion of a claim or shall have been served with the summons or other first legal process, giving information as to the nature and basis of the claim; *provided, however,* that the Trustee's failure to so notify the Trust Beneficiaries shall not affect the obligations of the Trust or the Trust Beneficiaries hereunder unless such failure results in material prejudice to the Trust or the Trust Beneficiaries. In case any such suits are brought against any Indemnitee and it notifies the Trust Beneficiaries of the commencement thereof, the Trust Beneficiaries shall be entitled to participate therein and, to the extent that the Trust Beneficiaries may elect by written notice delivered to such Indemnitee, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnitee, provided that if the defendants in any such suits include both such Indemnitee and Trust Beneficiaries and such Indemnitee shall have concluded, based on the written opinion of its counsel, that there may be legal defenses available to it that are different from or additional to those available to the Trust Beneficiaries, such Indemnitee shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such suits on behalf of such Indemnitee. Upon receipt of notice from the Trust Beneficiaries to such Indemnitee of the Trust Beneficiaries' election so to assume the defense of such suits and approval by such Indemnitee, which shall not be unreasonably withheld, delayed or conditioned, the Trust Beneficiaries shall not be liable to such Indemnitee for expenses incurred by such Indemnitee in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnitee shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Trust Beneficiaries shall not be liable for the expenses of more than one separate counsel (in addition to any required local counsel) approved by the Indemnitees who are parties to such suits, except to the extent the use of one counsel to represent all Indemnitees would present such counsel with an actual or potential conflict of interest), or (ii) the Trust Beneficiaries have authorized in writing the employment of counsel for such Indemnitee. This indemnity shall survive the termination of this Agreement and any related transaction documents, and the Trustee's resignation or removal.

(e)     The Trustee is authorized, in its sole discretion, to comply with orders issued or process entered by any court with respect to the Trust and the Trust Funds, without determination by the Trustee of such court's jurisdiction in the matter. If any portion of the Trust Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Trustee is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Trustee complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(f)     The Trustee undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. The Trustee shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Trust Agreement. The Trustee may conclusively rely upon and shall not be liable for acting or refraining from acting upon any

written notice, document, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper party or Trust Beneficiaries. The Trustee shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Trustee shall have no duty to solicit any payments which may be due it or the Trust Fund. The Trustee shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Trustee's gross negligence or willful misconduct was the cause of any loss to the Trust Beneficiaries or Trust Funds. The Trustee may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it. The Trustee shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons. In the event that the Trustee shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Trust Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in writing by all of the other Trust Beneficiaries hereto or by a final order or judgment of a court of competent jurisdiction.

The Trustee may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or inaction based on such declaratory judgment. The Trust Beneficiaries agree to pursue any redress or recourse in connection with any dispute without making the Trustee a party to the same. Anything in this Trust Agreement to the contrary notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

Section 13.    Compensation of Trustee. The Trustee shall be entitled to payment from the Trust Funds for customary fees and expenses for all services rendered by it hereunder, in accordance with Exhibit A attached hereto (as such exhibit may be amended from time to time by the Trustee and the Trust Beneficiaries). The Trust Beneficiaries agree jointly and severally to (i) pay the Trustee upon execution of this Trust Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing shall be as described in Exhibit A attached hereto, and in the event the Trust Funds are not adequate to cover the fees set forth in Exhibit A, the Trust Beneficiaries agree to (ii) pay or reimburse the Trustee upon request for all expenses, disbursements and advances, including reasonable attorney's fees and expenses, incurred or made by it in connection with the preparation, execution, performance, delivery, modification and termination of this Trust Agreement. This indemnity shall survive the termination of this Agreement and any related transaction documents, and the Trustee's resignation or removal.

Section 14.    Further Assurances.    On the date hereof and from time to time thereafter, the Trust Beneficiaries shall deliver or cause to be delivered to the Trustee such

further documents and instruments and shall do and cause to be done such further acts as the Trustee shall reasonably request (it being understood that the Trustee shall have no obligation to make any such request) to carry out more effectively the provisions and purposes of this Agreement, to evidence compliance herewith, or to assure itself that it is protected in acting hereunder.

Section 15. Termination of Trust and Agreement. The Trust and this Agreement will exist for a term of 20 years, unless terminated earlier as the Trust Beneficiaries unanimously determine, upon notice to the Trustee; provided that the rights of the Trustee and the obligations of the Trust Beneficiaries under Sections 12 and 13 shall survive the termination hereof and the resignation or removal of the Trustee. Any Trust Funds remaining at the termination of the Trust and this Agreement will be remitted by the Trustee to the Trust Beneficiaries pursuant to Section 8 above.

Section 16. Amendments, Modifications or Waivers. This Agreement may not be amended, modified or waived unless such amendment, modification or waiver is in writing and signed by each of the Trust Beneficiaries, and consented to by the Trustee, the Trustee's consent not to be unreasonably withheld.

Section 17. Tax Matters.

(a) The Trust Beneficiaries each represent that its correct Taxpayer Identification Number ("TIN") assigned by the Internal Revenue Service ("IRS") or any other taxing authority is set forth on the signature page hereof. All interest or other income earned under the Trust Agreement shall be allocated and/or paid as directed in a joint written direction of the Trust Beneficiaries and reported by the Trustee and the recipient to the IRS or any other taxing authority as required by any law or regulation or, to the extent consistent therewith, as directed in writing by the Trust Beneficiaries. If the Trustee is required under any applicable law or regulation to deduct or withhold any taxes from or in respect of any sum allocable or payable under this Agreement to the Trust Beneficiaries, the Trustee shall make all such deductions or withholdings in respect of taxes and pay the full amount deducted or withheld in respect of taxes to the relevant taxation authority or other governmental authority in accordance with the applicable law or regulation. In the absence of timely direction, all proceeds of the Trust Funds shall be retained in the Trust and reinvested from time to time by the Trustee as provided in Section 5. Any tax returns or reports required to be prepared and filed on behalf of or by the Trust will be prepared and filed by the Trust Beneficiaries, and the Trustee shall have no responsibility for the preparation and/or filing or any tax return with respect to any income earned by the Trust. In addition, any tax or other payments required to be made pursuant to such tax return or filing will be paid by the Trust Beneficiaries, as appropriate. The Trustee shall have no responsibility for making such payments unless directed in writing to do so by the appropriate authorized party and provided with the necessary funds therefor.

(b) It is the intention of the parties hereto that the Trust shall be treated as a partnership for U.S. federal income tax purposes. Unless it is determined by the IRS or applicable state or local authorities that an alternative treatment is required, all provisions shall be construed to achieve the foregoing treatment and all parties hereto agree to take no action inconsistent with this treatment.

Section 18.    Unanimous Consent.  Unless specified otherwise, in every instance in this Agreement where the consent, approval or direction of the Trust Beneficiaries is required, such consent, approval or direction of the Trust Beneficiaries shall be given based on the unanimous agreement between THAN and PENAC.

Section 19.    Consents to Service of Process.  Each of the parties hereto hereby irrevocably consents to the jurisdiction of the courts of New York County located in New York, New York in connection with any action, suit or other proceeding arising out of or relating to this Agreement or any action taken or omitted hereunder.  Each such party further waives personal service of any summons, complaint or other process and agrees that the service thereof may be made by certified or registered mail directed to such person at such person's address for purposes of notices hereunder.

Section 20.    Reporting.  The Trustee shall produce monthly activity statements and will deliver such statements to the Trust Beneficiaries.

Section 21.    Miscellaneous.

(a)    This Agreement embodies the entire agreement and understanding among the parties relating to the subject matter hereof.

(b)    All notices and other communications under this Agreement shall be in writing and shall be sent by facsimile or overnight delivery service, costs prepaid, to the parties hereto at the following addresses (or to such other address as a party may have specified by notice given to the other parties pursuant to this provision):

If to the Trustee, to:

Citibank, N.A.
388 Greenwich Street, 14th Floor
New York, NY 10013
Phone:  (212) 816-5648
Fax: (212)-657-3866
Attention: Agency & Trust

If to THAN, to:

T H Agriculture & Nutrition, L.L.C.
300 Westage Business Center Suite 370
Fishkill, New York  12524 , Jr.
Attention:  Joseph L. Wolf, President
            Steven L. Carter, Secretary

If to PENAC, to:

Philips Electronics North America Corp.
1251 Avenue of the Americas
New York, New York 10020-1104
Attention: Joseph E. Innamorati, Esq.

(c)　Notwithstanding anything to the contrary herein, any and all communications (both text and attachments) by or from the Trustee that the Trustee in its sole discretion deems to contain confidential, proprietary, and/or sensitive information and sent by electronic mail will be encrypted. The recipient of the email communication will be required to complete a one-time registration process. Information and assistance on registering and using the email encryption technology can be found at Citibank, N.A.'s secure website at www.citigroup.com/citigroup/citizen/privacy/email.htm or by calling (866) 535-2504 (in the U.S.) or (904) 954-6181 at any time.

(d)　The headings of the Sections of this Agreement have been inserted for convenience and shall not modify, define, limit or expand the express provisions of this Agreement.

(e)　This Agreement and the rights and obligations hereunder of the parties hereto may not be assigned except with the prior written consent of the other parties hereto. This Agreement shall be binding upon and inure to the benefit of each party's respective successors and permitted assigns. Except as expressly provided herein, no other person shall acquire or have any rights under or by virtue of this Agreement.

(f)　The Trustee makes no representation as to the validity, value, genuineness or collectibility of any security or other document or instrument held by or delivered to it, the validity or enforceability of this Agreement, or the validity of the Trust.

(g)　The Trustee shall not be called upon to advise any party as to the wisdom in selling or retaining, or taking or refraining from any action with respect to, any securities or other property deposited hereunder.

(h)　This Agreement shall be governed by and construed in accordance with the laws of New York without reference to the principles of conflict of laws.

(i)　This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

Section 22.　Identifying Information. The Trust Beneficiaries acknowledge that a portion of the identifying information set forth on Exhibit A is being requested by the Trustee in connection with the USA Patriot Act, Pub. L. 107-56 (2001) (codified as amended at 12 U.S.C. § 1829(b) (2004)) (the "Act"), and the Trust Beneficiaries agree to provide any additional information requested by the Trustee in connection with the Act or any similar legislation or regulation to which Trustee is subject, in a timely manner. The Trust Beneficiaries represent that all identifying information set forth on Exhibit A, including without limitation, its respective Taxpayer Identification Number assigned by the IRS or any other taxation authority, is true and

complete on the date hereof [and will be true and complete at the time of any disbursement of the Trust Funds.]

Section 23.    Compliance With Court Orders.  In the event that any Trust Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Trustee is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction; and in the event that the Trustee obeys or complies with any such writ, order or decree, it shall not be liable to any of the Trust Beneficiaries hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

Section 24.    Force Majeure.  No party to this Agreement shall be liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Citibank, N.A.
as Trustee

By: _____
    Name: NY CHENG
    Title: President

Philips Electronics North America Corporation,
as Trust Beneficiary

By: _____
    Name: Joseph E. Innamorati, Esq.
    Title: Senior Vice President

---

**Tax Certification:** Taxpayer ID#: _____

Entity is a (check one):

___ Corporation     ___ Municipality ___ Partnership ___ Non-profit or Charitable Org
___ Individual      ___ REMIC      ___ Trust      ___ Other _____

*Under the penalties of perjury, the undersigned certifies that:*

*(1) the entity is organized under the laws of the United States;*

*(2) the number shown above is its correct Taxpayer Identification Number (or it is waiting for a number to be issued to it), and*

*(3) it is not subject to backup withholding because: (a) it is exempt from backup withholding or (b) it has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified it that it is no longer subject to backup withholding.*

*(If the entity is subject to backup withholding, cross out the words after the (3) above.)*

*Investors who do not supply a tax identification number will be subject to backup withholding in accordance with IRS regulations*

**Note: The IRS does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Citibank, N.A.
as Trustee

By: _____
    Name:
    Title:

Philips Electronics North America Corporation,
as Trust Beneficiary

By: _____
    Name: Joseph E. Innamorati, Esq.
    Title: Senior Vice President

By: _____
    Name: Pamela Dunlap
    Title: Senior Vice President

---

**Tax Certification:** Taxpayer ID#: _____

Entity is a (check one):

___ Corporation     ___ Municipality   ___ Partnership   ___ Non-profit or Charitable Org
___ Individual       ___ REMIC        ___ Trust        ___ Other _____

*Under the penalties of perjury, the undersigned certifies that:*

*(1) the entity is organized under the laws of the United States;*

*(2) the number shown above is its correct Taxpayer Identification Number (or it is waiting for a number to be issued to it); and*

*(3) it is not subject to backup withholding because: (a) it is exempt from backup withholding or (b) it has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified it that it is no longer subject to backup withholding.*

*(If the entity is subject to backup withholding, cross out the words after the (3) above.)*

*Investors who do not supply a tax identification number will be subject to backup withholding in accordance with IRS regulations.*

**Note: The IRS does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

T H Agriculture & Nutrition, L.L.C.,
as Trust Beneficiary

By: _____
Name: Joseph L. Wolf, Jr.
Title: President

**Tax Certification:** Taxpayer ID#: _____

Entity is a (check one):

___ Corporation     ___ Municipality    ___ Partnership    ___ Non-profit or Charitable Org
___ Individual            ___ REMIC           ___ Trust             ___ Other _____

*Under the penalties of perjury, the undersigned certifies that:*

*(1) the entity is organized under the laws of the United States;*

*(2) the number shown above is its correct Taxpayer Identification Number (or it is waiting for a number to be issued to it); and*

*(3) it is not subject to backup withholding because: (a) it is exempt from backup withholding or (b) it has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified it that it is no longer subject to backup withholding.*

*(If the entity is subject to backup withholding, cross out the words after the (3) above.)*

*Investors who do not supply a tax identification number will be subject to backup withholding in accordance with IRS regulations.*

**Note: The IRS does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

## Exhibit A

1.    Trust.            THAN/PENAC Joint Insurance Settlement Proceeds Trust[1]

2.    Trustee.         Citibank, N.A.

3.    Trust Funds.     Trust Funds wiring instructions:

4.    Trustee Fees.

Acceptance Fee:    $ _____
Annual Trust Fee:[*]  $ _____
Transaction Costs:   $ _____

The Acceptance Fee and the Annual Trust Fee are payable upon execution of the Trust documents. In the event the Trust is not funded, the Acceptance Fee and all related expenses, including attorneys' fees and expenses, remain due and payable, and if paid, will not be refunded. Annual fees cover a full year in advance, or any part thereof, and thus are not pro-rated in the year of termination.

The fees quoted in this schedule apply to services ordinarily rendered in the administration of a trust account and are subject to reasonable adjustment based on final review of documents, or when the Trustee is called upon to undertake unusual duties or responsibilities, or as changes in law, procedures, or the cost of doing business demand. Services in addition to and not contemplated in this Agreement, including, but not limited to, document amendments and revisions, non-standard cash and/or investment transactions, calculations, notices and reports, and legal fees, will be billed as extraordinary expenses.

Unless otherwise indicated, the above fees relate to the establishment of one trust account. Additional sub-accounts governed by the same Trust Agreement may incur an additional charge. Transaction costs include charges for wire transfers, checks, internal transfers and securities transactions.

5.    Taxpayer Identification Numbers.

THAN:    ____-____ ____
PENAC:  ____-____

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the THAN/PENAC Joint Insurance Settlement Proceeds Trust Agreement dated as of [_____ __, 2008].

[*] Fees are not pro-rated for partial years.

6.  Investment Instructions.

    _____

    _____
    _____
    _____

7.  Representative Information.  The following information should be provided to the Trustee separately by each PENAC Representative or THAN Representative or their respective future representatives:

    (i)    Date of Birth
    (ii)   Address
    (iii)  Mailing Address, if different
    (iv)   Social Security Number

Exhibit B

Release of Trust Funds Notice

Citibank, N.A.
388 Greenwich Street, 14th Floor
New York, NY 10013
Phone: (212) 816-5648
Fax: (212)-657-3866

Attention: Agency & Trust

Re:     THAN/PENAC Joint Insurance Settlement Proceeds Trust

Ladies and Gentlemen:

As the duly authorized agent of [name of Trust Beneficiary], [name of THAN Representative or PENAC Representative] and pursuant to the Trust Agreement creating the above-referenced Trust, the undersigned hereby certifies as follows:

No other request has been submitted to the Trustee for reimbursement for this matter.

_____ has not previously been reimbursed for this matter.

Trust Funds released will be used only for purposes as set forth in Section 7(d) of the Trust Agreement.

The invoice(s) and/or report(s) concerning the disbursements is (are) attached.

The undersigned hereby requests and authorizes release of the following funds from the Trust as follows:

Release Requested:
Date for Release:
Release to be made payable to:

Release to be mailed to Payee at
the following address:
or
Release to be remitted to Payee by wire
transfer in accordance with the
following wire transfer instructions:

Additional Instructions:

Dated:    this ____ day of _____ 200__ .

By:_____

CONFIRMATION OF RECEIPT OF INSTRUCTION:


Citibank, N.A., as Trustee


By: _____
    Name:
    Title:

Exhibit C

Signature Authorization
THAN/PENAC Joint Insurance Settlement Proceeds Trust

I, _____, hereby certify that I am [Secretary] of _____, and am authorized and empowered to identify to _____ persons who have authority with respect to the transaction of affairs of the THAN/PENAC Joint Insurance Settlement Proceeds Trust (the "Trust"). Each of the identified persons, whose names and signatures appear herein, acting alone, are authorized and empowered to act on behalf of [name of Trust Beneficiary] for purposes of authorizing release of funds from the Trust.

Release of Funds

Required Signatures

Name                                    Signature

_____               _____

_____               _____

This authorization supersedes all prior authorizations and shall remain in effect until _____ is notified to the contrary.

IN WITNESS WHEREOF, I have hereto subscribed my name on this ____ day of _____ 200__.


_____
[Secretary]

Schedule 1

Insurance Policies

| Insurance Provider | Policy Number | Start Date | End Date | Remaining Coverage[2] |
|---|---|---|---|---|
| Ace (formerly Aetna) | EX 000452 | 10/19/1971 | 12/31/1972 | $1,000,000 per applicable policy period |
| AIU Insurance Co. | 75-100659 | 7/1/1978 | 7/1/1979 | $2,000,000 |
| AIU Insurance Co. | 75-101116 | 7/1/1979 | 7/1/1980 | $5,000,000 |
| AIU Insurance Co. | 75-102421 | 7/1/1980 | 7/1/1981 | $5,000,000 |
| AIU Insurance Co. | 75-102631 | 7/1/1981 | 7/1/1982 | $5,000,000 |
| AIU Insurance Co. | 75-102185 | 7/1/1982 | 7/1/1983 | $5,000,000 |
| AIU Insurance Co. | 75-103051 | 7/1/1983 | 7/1/1984 | $5,000,000 |
| AIU Insurance Co. | 75-103875 | 7/1/1984 | 7/1/1985 | $20,000,000 |
| American Home Assurance Co. | CE 355776 | 3/31/1969 | 12/31/1969 | $2,000,000 |
| American Home Assurance Co. | CE 356559 | 12/31/1969 | 12/31/1970 | $3,000,000 |
| American Home Assurance Co. | CE 357721 | 12/31/1970 | 12/31/1971 | $3,000,000 |

---

[1] Each of the insurance policies listed on the Schedules are excess policies that, subject to their terms, generally provide coverage above underlying primary, umbrella and/or other excess insurance policies. The attachment points of the listed excess policies are not reflected on the Schedules. THAN contends that the limits of each of the insurance policies listed on these Schedules are currently available for at least a portion of the asbestos claims asserted against THAN or in the future will be available for at least a portion of the asbestos claims asserted against THAN once lower-level insurance in each policy year is exhausted or no longer available.

[2] THAN contends that each insurance policy covering multiple annual periods (i.e., "multi-year" policies), a period of less than one year (i.e., a "stub period"), or one or more annual periods and a stub period has a separate policy limit for each annual period or portion thereof. However, depending on the policy language of each of these policies and the applicable law, a court may, among other things, consider a policy covering more than one annual period to have a single policy limit, or it may find that the policy has multiple annual limits. With regard to policies with stub periods, a court may, among other things, apply separate limits to the stub period and any additional annual periods covered by the policy, it may find that a single policy limit applies to the stub period and one or more additional annual periods, or it may pro-rate the limits associated with the stub period to account for the shortened policy period of the stub policy.

| Insurance Provider | Policy Number | Start Date | End Date | Remaining Coverage[2] |
|---|---|---|---|---|
| American Home Assurance Co. | CE 2692153 | 12/31/1971 | 12/31/1972 | $3,000,000 |
| American Home Assurance Co. | CE 3380269 | 12/31/1972 | 12/31/1973 | $3,000,000 |
| American Re-Insurance Company | M 5756-0001 | 7/21/1965 | 3/31/1969 | $5,000,000 per applicable policy period |
| American Re-Insurance Company | M 0086590 | 6/24/1969 | 12/31/1970 | $1,000,000 per applicable policy period |
| American Re-Insurance Company | M 0371372 | 12/31/1970 | 12/31/1971 | $2,500,000 |
| Birmingham Fire Insurance Co. of Pennsylvania | SE 6073348 | 7/1/1977 | 7/1/1978 | $1,000,000 |
| Birmingham Fire Insurance Co. of Pennsylvania | SE 6073367 | 7/1/1978 | 7/1/1979 | $1,000,000 |
| Centennial Insurance Co. | 462 016836 | 7/29/1977 | 7/1/1978 | $1,000,000 |
| Centennial Insurance Co. | 462 017817 | 7/1/1978 | 7/1/1979 | $1,000,000 |
| Centennial Insurance Co. | 462 019495 | 7/1/1979 | 7/1/1980 | $2,000,000 |
| Continental Casualty Company | RDX-9654-998 | 7/17/1962 | 7/1/1965 | 1,975,000 per applicable policy period |
| Continental Casualty Company | RDX-893-72-52 | 12/31/1972 | 12/31/1973 | $2,000,000 |
| Employers Mutual Casualty Company | MMO-70864 | 7/1/1979 | 7/1/1980 | $5,000,000 |
| Employers Mutual Casualty Company | MMO-71473 | 7/1/1980 | 7/1/1981 | $5,000,000 |
| Employers Mutual Casualty Company | MMO-71853 | 7/1/1981 | 7/1/1982 | $5,000,000 |
| Federal Insurance Company | 7933-01-79 | 7/1/1977 | 7/1/1978 | $2,000,000 |
| Federal Insurance Company | (79) 7933-01-79 | 7/1/1978 | 7/1/1979 | $2,000,000 |
| Federal Insurance Company | (84) 7928-85-73 | 7/1/1983 | 7/1/1984 | $20,000,000 |
| Federal Insurance Company | (85) 7928-85-73 | 7/1/1984 | 7/1/1985 | $20,000,000 |

| Insurance Provider | Policy Number | Start Date | End Date | Remaining Coverage[2] |
|---|---|---|---|---|
| Fireman's Fund | XLX - 105 08 69 | 10/19/1971 | 12/31/1972 | $1,000,000 per applicable policy period |
| Fireman's Fund | XLX – 120 25 50 | 12/31/1972 | 12/31/1973 | $1,000,000 |
| Granite State Insurance Co. | SCLD 80-93286 | 7/29/1977 | 7/1/1978 | $2,000,000 |
| Granite State Insurance Co. | 6178-0423 | 7/1/1978 | 7/1/1979 | $2,000,000 |
| Granite State Insurance Co. | 6179-1466 | 7/1/1979 | 7/1/1980 | $4,500,000 |
| Granite State Insurance Co. | 6179-1467 | 7/1/1979 | 7/1/1980 | $3,000,000 |
| Granite State Insurance Co. | 6480-5024 | 7/1/1980 | 7/1/1981 | $4,500,000 |
| Granite State Insurance Co. | 6480-5025 | 7/1/1980 | 7/1/1981 | $3,000,000 |
| Granite State Insurance Co. | 6481-5211 | 7/1/1981 | 7/1/1982 | $5,000,000 |
| Granite State Insurance Co. | 6481-5212 | 7/1/1981 | 7/1/1982 | $5,000,000 |
| Granite State Insurance Co. | 6482-5445 | 7/1/1982 | 7/1/1983 | $10,000,000 |
| Granite State Insurance Co. | 6483-5659 | 7/1/1983 | 7/1/1984 | $10,000,000 |
| Granite State Insurance Co. | 6484-5836 | 7/1/1984 | 7/1/1985 | $2,000,000 |
| INA | XCP 3884 | 12/31/1972 | 12/31/1973 | $1,000,000 |
| INA | XCP 12379 | 7/29/1977 | 7/1/1978 | $5,000,000 |
| INA | XCP 14346 | 7/1/1978 | 7/1/1979 | $3,000,000 |
| INA | XCP 143536 | 7/1/1979 | 7/1/1980 | $3,000,000 |
| INA | XCP 143536 | 7/1/1980 | 7/1/1982 | $5,000,000 per applicable policy period |
| Lexington Insurance Co. | GC 402757 | 5/30/1969 | 12/31/1972 | $1,000,000 per applicable policy period |
| Lexington Insurance Co. | GC 403132 | 10/19/1971 | 12/31/1972 | $4,000,000 per applicable policy period |
| Lexington Insurance Co. | GC 403152 | 12/31/1971 | 12/31/1972 | $2,000,000 |

| Insurance Provider | Policy Number | Start Date | End Date | Remaining Coverage[2] |
|---|---|---|---|---|
| Lexington Insurance Co. | GC 403373 | 12/31/1972 | 12/31/1973 | $3,000,000 |
| Lexington Insurance Co. | GC 403373 | 12/31/1972 | 12/31/1973 | $4,000,000 |
| Lexington Insurance Co. | CE 5504115 | 12/31/1973 | 12/31/1974 | $1,349,000 |
| Lexington Insurance Co. | CE 5504745/ UFL 1782 | 12/31/1974 | 12/31/1975 | $1,424,858 |
| Lexington Insurance Co. | CE 5503335 | 12/31/1975 | 7/1/1977 | $2,250,000 per applicable policy period |
| Lexington Insurance Co. | CE 5506371/ UJL 0884 | 7/1/1977 | 7/1/1978 | $497,917 |
| Lexington Insurance Co. | 5510423 | 7/1/1978 | 7/1/1979 | $481,800 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 1228595 | 7/1/1977 | 7/1/1978 | $3,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 1229475 | 7/29/1977 | 7/1/1978 | $2,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 1229701 | 7/1/1978 | 7/1/1979 | $3,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 1229702 | 7/1/1978 | 7/1/1979 | $2,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 9782293 | 7/1/1979 | 7/1/1980 | $3,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 9782293 | 7/1/1979 | 7/1/1980 | $2,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 9910340 | 7/1/1980 | 7/1/1981 | $3,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 9910340 | 7/1/1980 | 7/1/1981 | $2,000,000 |
| National Union Fire Insurance Co. of Pittsburgh, PA | 9602929 | 7/1/1981 | 7/1/1982 | $5,000,000 |
| North Star Reinsurance Corporation | NSX 7431 | 12/31/1968 | 3/31/1969 | $5,000,000 |
| North Star Reinsurance Corporation | NSX 7736 | 3/31/1969 | 12/31/1969 | $5,000,000 |

| Insurance Provider | Policy Number | Start Date | End Date | Remaining Coverage[2] |
|---|---|---|---|---|
| North Star Reinsurance Corporation | NSX 8220 | 12/31/1969 | 12/31/1970 | $3,000,000 |
| North Star Reinsurance Corporation | NSX 8961 | 12/31/1970 | 12/31/1972 | $3,000,000 per applicable policy period. |
| North Star Reinsurance Corporation | NSX 9035 | 12/31/1970 | 12/31/1972 | $2,000,000 per applicable policy period |
| North Star Reinsurance Company | NSX 10974 | 12/31/1972 | 12/31/1973 | $3,000,000 |
| North Star Reinsurance Corporation | NSX 10975 | 12/31/1972 | 12/31/1973 | $2,000,000 |
| Pacific Insurance Company | PI 33101 | 7/1/1984 | 7/1/1985 | $8,500,000 |
| Prudential Reinsurance Company (now Everest Reinsurance Company) | PMX 00131 | 7/1/1983 | 7/1/1984 | $15,000,000 |
| Prudential Reinsurance Company (now Everest Reinsurance Company) | PMX 00225 | 7/1/1984 | 7/1/1985 | $14,500,000 |
| Republic Insurance Company | CDE 1005 | 7/1/1984 | 7/1/1985 | $15,000,000 |
| Royal Indemnity | ED 102076 | 7/1/1983 | 7/1/1984 | $5,000,000 |
| United States Fire Insurance Company | XS-2426 | 10/19/1971 | 12/31/1972 | $2,000,000 per applicable policy period |

## POLICIES ISSUED BY INSOLVENT INSURERS[3]

| Insurance Provider | Policy Number | Start Date | End Date | Original Coverage |
|---|---|---|---|---|
| Home Insurance Company | HEC 4165818 | 12/31/1971 | 12/31/1972 | $3,000,000 |
| Home Insurance Company | HEC 4356575 | 12/31/1972 | 12/31/1973 | $3,000,000 |
| Home Insurance Company | HEC 9306163 | 3/31/1969 | 12/31/1969 | $3,000,000 |
| Home Insurance Company | HEC 9791317 | 12/31/1969 | 12/31/1970 | $3,000,000 |
| Home Insurance Company | HEC 9919562 | 12/31/1970 | 12/31/1971 | $3,000,000 |
| Midland Insurance Company | Unknown | 12/31/1969 | 12/31/1970 | $1,000,000 |
| Midland Insurance Company | XL – 1365 | 12/31/1970 | 12/31/1972 | $1,000,000 per policy period |
| Midland Insurance Company | XL – 1365 | 12/31/1970 | 12/31/1972 | $1,500,000 for period 12/31/70 to 12/31/71<br><br>$2,000,000 for period 12/31/71 to 12/31/72 |
| Midland Insurance Company | XL – 1875 | 10/19/1971 | 12/31/1972 | $2,000,000 per policy period |
| Midland Insurance Company | XL 145353 | 12/31/1974 | 12/31/1975 | $30,000,000 |
| Midland Insurance Company | XL 145792 | 12/31/1975 | 7/1/1976 | $30,000,000 |
| Midland Insurance Company | XL 147448 | 7/1/1978 | 7/1/1979 | $5,000,000 |
| Midland Insurance Company | XL 147513 | 7/1/1979 | 7/1/1980 | $5,000,000 |
| Midland Insurance Company | XL 151788 | 7/1/1976 | 7/1/1977 | $30,000,000 |
| Midland Insurance Company | XL 152489 | 7/1/1977 | 7/1/1978 | $7,000,000 |
| Midland Insurance Company | XL 706715 | 7/1/1980 | 7/1/1981 | $5,000,000 |
| Midland Insurance Company | XL11101728137-1 | 12/31/1973 | 12/31/1974 | $30,000,000 |

---

[3] With regard to the policies on this Schedule, THAN contends that the limits of each listed policy are currently available. However, the insurers listed on this Schedule are insolvent. Thus, in addition to generally disputing THAN's rights to proceeds from these policies at this time, there may in any event be little to no money available for any claim THAN made in the past or intends to make in the future.

| Insurance Provider | Policy Number | Start Date | End Date | Original Coverage |
|---|---|---|---|---|
| Midland Insurance Company | XL111018281372-1 | 12/31/1972 | 12/31/1973 | $1,000,000 |
| Midland Insurance Company | XL111018281472-9 | 12/31/1972 | 12/31/1973 | $2,000,000 |
| Midland Insurance Company | XL111018281572-8 | 12/31/1972 | 12/31/1973 | $2,000,000 |
| Mission Insurance Company | M81746 | 12/31/1974 | 7/1/1976 | $4,000,000 per policy period |
| Mission Insurance Company | M833355 | 7/1/1976 | 7/1/1977 | $5,000,000 |

**EXHIBIT I**

---

**KNOWN ENVIRONMENTAL LIABILITIES**

# Exhibit I:  Known Environmental Liabilities

| Site | Location | Known Conditions |
|------|----------|------------------|
| 1 | Albany, GA | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 2 | Brea, CA | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 3 | Chicago, IL | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 4 | Daitom, Kansas City, KS | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 5 | Dallas, TX | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 6 | Davenport, IA | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 7 | Denver, CO | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 8 | Fresno, CA | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 9 | Greenville, MS | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 10 | Houston, TX | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 11 | Indianapolis, IN | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 12 | Jackson, MS | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 13 | Kansas City (Speaker Road branch) Includes 5200 Speaker Road + Process Building | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 14 | Kansas City Pond (5020 Speaker Road) | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 15 | Llano, TX (E. Hamilton St.) | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 16 | Llano, TX Tarrant Street (and Harned Property) | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |

| Site | Location | Known Conditions |
|------|----------|------------------|
| 17 | Memphis, TN | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 18 | Montgomery, AL | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 19 | Mundy, TX | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 20 | New Orleans, LA | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 21 | Oklahoma City, OK | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 22 | Pecos, TX | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 23 | Pleasant Hill, IA | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 24 | Powder Springs, GA | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 25 | San Antonio, TX | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 26 | Sanford, FL | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 27 | St. Louis, MO | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 28 | St. Paul (aka Minneapolis), MN Cost Center 332 | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 29 | Tampa, FL (2 sites next to each other that were combined) | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 30 | Waukegan, IL | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |
| 31 | Wichita, KS | All environmental conditions known on or before the date of binding of the Unknown Environmental Liability Insurance Policy noted in the schedule of disclosed documents to the Unknown Environmental Liability Insurance Policy. |

**Exhibit B**

**to Disclosure Statement**

## Exhibit B

## Liquidation Analysis

*Scope, Intent, and Purpose of the THAN Liquidation Analysis*

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the Plan satisfies the "best interests of creditors" test, THAN has prepared the following hypothetical liquidation analysis (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Plan and in the notes accompanying the Liquidation Analysis. *Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan*.

The Liquidation Analysis was developed utilizing THAN's balance sheet as of August 31, 2008 and represents THAN's current estimates for asset recovery, assuming a chapter 7 liquidation occurs with no material changes to asset values between the date of the balance sheet used in the Liquidation Analysis and the date of a hypothetical chapter 7 liquidation. While THAN would expect certain additional claims to be incurred between August 31, 2008 and the date of a hypothetical liquidation (which have not been reflected herein), the ultimate inclusion of such additional claims is not expected to change the result of the Liquidation Analysis in any material form or fashion.

The Liquidation Analysis assumes the status of asbestos-related insurance coverage (as described in Section II.F of the Disclosure Statement) and the status of environmental-related insurance (as described in Section II.C of the Disclosure Statement) do not materially change between the date of the Plan and the date of a hypothetical chapter 7 liquidation, and that THAN's claims on such insurance coverage is not materially affected as a result of a chapter 7 liquidation.

American Securities Advisors LLC ("ASA"), THAN's financial advisors, assisted THAN in the compilation of the Liquidation Analysis. ASA received information on potential asset and insurance coverage recovery from various company personnel and outside counsel who have relevant market knowledge and experience to determine potential recoveries. THAN does not provide any assurance of such recoveries but has prepared its best estimates for the Liquidation Analysis.

The Liquidation Analysis is premised upon a number of estimates and assumptions that, although developed and considered reasonable by THAN, are inherently subject to significant business, economic and competitive uncertainties beyond the control of THAN, and upon assumptions which could be subject to change. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if THAN were, in fact, to undergo such a liquidation. In addition, any liquidation ultimately undertaken would take place under future circumstances that cannot be predicted with certainty. Accordingly, although the analysis that follows is necessarily presented with numerical specificity, if THAN's estate and related insurance policy coverage were in fact liquidated as described herein, the actual liquidation proceeds could vary significantly from the amounts set forth in the Liquidation Analysis. Such

actual liquidation proceeds could be materially different from the amounts set forth in the Liquidation Analysis, and no representation or warranty can be or is being made with respect to the actual proceeds that would be generated in the liquidation of THAN and its relevant insurance coverage under chapter 7 of the Bankruptcy Code. The liquidation valuations have been prepared solely for purposes of estimating the proceeds available in chapter 7 and do not represent values that may be appropriate for any other purpose. Nothing contained in these valuations is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical liquidation analysis.

*General Notes to the THAN Liquidation Analysis*

- The Liquidation Analysis assumes that THAN enters chapter 7 liquidation and that the Bankruptcy Court would appoint one chapter 7 trustee to oversee the liquidation of THAN's estate and insurance coverage, the proceeds of which will be used to pay claims. Should multiple chapter 7 trustees be appointed to administer THAN's estate and insurance coverage, lower recoveries and higher administrative costs could result and distributions to holders of claims against THAN could be delayed.

- The Liquidation Analysis assumes that THAN's liquidation takes place with a balance sheet not materially different from the one as of August 31, 2008, and with claims on insurance coverage not materially impacted by the chapter 7 liquidation. The timing, costs, and amount of payments received in connection with the liquidation of THAN's assets and insurance coverage could vary substantially from what is estimated in the Liquidation Analysis and recoveries to claims could be materially impacted. Proceeds from assets sold and insurance coverage recoveries, net of liquidation-related costs, would be distributed to holders of claims.

- Unless otherwise stated herein, the book values of THAN's assets and liabilities used in the Liquidation Analysis are the un-audited net book values of THAN as of August 31, 2008 and are assumed to be the proxy for THAN's assets and liabilities during the Liquidation Analysis.

- **The aggregate amount of insurance coverage available to satisfy Asbestos PI Claims is unliquidated, and in the event of a potential chapter 7 liquidation, the amount ultimately collectible under such unliquidated insurance coverage policies is unknown. As such, the Liquidation Analysis has been developed using a range of possible recoveries for such insurance coverage. Even assuming that the full face amount of asbestos insurance coverage is recovered, confirmation of the Plan will provide creditors with a recovery that is greater than creditors would receive pursuant to a liquidation of THAN under chapter 7 of the Bankruptcy Code.**

THAN
Hypothetical Liquidation Analysis
(Unaudited)

| | Note | Potential Recovery | |
| | | Low | High |
|---|---|---|---|
| **Assets** | | | |
| Assets For All Claims Split Pro Rata | | | |
|    Investment Asset | A | $4,000,000 | $5,000,000 |
|    Non-Investment Assets | B | 90,433 | 90,433 |
|      Subtotal | | $4,090,433 | $5,090,433 |
| | | | |
| Assets Solely for the Benefit of Asbestos PI Claims | | | |
|    Solvent Pre-1986 Product Liability/Completed Operations Coverage | C(i) | $0 | $382,000,000 |
|    Insolvent Pre-1986 Product Liability/Completed Operations Coverage | C(ii) | 0 | - |
|    Coverage-in-Place Settlement Agreements | C(iii) | 0 | 112,000,000 |
|    THAN/PENAC Joint Insurance Settlement Proceeds Trust | C(iv) | 170,500,000 | 170,500,000 |
|      Subtotal | | $170,500,000 | $664,500,000 |
| | | | |
| Assets Solely For the Benefit of Known Environmental Liabilities | | | |
|    Environmental Insurance for Known Environmental Liabilities | D | $0 | $0 |
| | | | |
| **Liquidation Costs** | | | |
|    Trustee Fees | E | [$5,237,713] | [$20,087,713] |
|    Professional Fees, Assets for All Claims Split Pro Rata | F | [61,357] | [76,357] |
|    Litigation Costs, Asbestos Insurance | G | [0] | [6,000,000] |
| | | | |
| **Potential Recovery to Asbestos PI Related Claims** | | | |
|    Asbestos PI Claims | H | $900,000,000 | $900,000,000 |
|    Intercompany Claim Due to PENAC Related to Asbestos | I | 124,073,010 | 124,073,010 |
|      Total Asbestos Related Claims | | $1,024,073,010 | $1,024,073,010 |
| | | | |
|    Proceeds Available for Asbestos PI Related Claims | J | $168,844,228 | $642,869,915 |
|      Potential Recovery | | 16.5% | 62.8% |
| | | | |
| **Potential Recovery to Environmental Related Claims** | | | |
|    Known Environmental Liabilities | K | $62,000,000 | $62,000,000 |
|    Intercompany Claim Due to PENAC Related to Environmental | I | 62,221,670 | 62,221,670 |
|      Total Environmental Related Claims | | $124,221,670 | $124,221,670 |
| | | | |
|    Proceeds Available for Environmental Related Claims | L | $419,610 | $522,193 |
|      Potential Recovery | | 0.3% | 0.4% |
| | | | |
| **Potential Recovery to General Unsecured Claims** | | | |
|    Pre-Petition Accounts Payables | M | $2,667,275 | $2,667,275 |
|    Pre-Petition Accrued Liabilities | N | 5,481,557 | 5,481,557 |
|      Total Unsecured | | $8,148,832 | $8,148,832 |
| | | | |
|    Proceeds Available for General Unsecured Claims | O | $27,526 | $34,255 |
|      Potential Recovery | | 0.3% | 0.4% |

*Notes to the THAN Liquidation Analysis*

A. <u>Investment Asset</u>: At the commencement of the chapter 7 filings, THAN will own one revenue-generating commercial real property in New York that will be leased under a long-term triple-net lease to a AAA-rated tenant. The purchase price of the property was approximately $4.9 million. The monthly rents from the lease will generate approximately $302,000 in annual revenue. The potential recovery value is based upon an approximate 7.5% capitalization rate in the low scenario and 6.1% capitalization rate in the high scenario.

B. <u>Non-Investment Assets</u>: THAN currently owns 6 properties currently undergoing environmental remediation in the following locations: Albany, Georgia; Montgomery, Alabama; Fresno, California; and Llano, Texas. The potential recovery value is based on the book value of THAN's property, plant, and equipment as of the August 31, 2008 balance sheet.

C. <u>Asbestos Related Insurance Coverage</u>: **The aggregate amount of available insurance coverage to satisfy Asbestos PI Claims is unliquidated, and in the event of a potential chapter 7 liquidation, the amount ultimately collectible under such unliquidated insurance coverage policies is unknown. As such, the Liquidation Analysis has been developed using a range of possible recoveries for such insurance coverage. Even assuming that the full face amount of asbestos insurance coverage is recovered, confirmation of the Plan will provide Asbestos PI Claims with a recovery that is greater than Asbestos PI Claims would receive pursuant to a liquidation of THAN under chapter 7 of the bankruptcy code. Additionally, even if THAN were able to collect on the full face amount of coverage available, the timing of such recovery is unknown with the exception of the amounts in the Insurance Settlement Proceeds Trust. However, for the purpose of the Liquidation Analysis, the amounts of any such recovery have not been discounted for the time value of money. For a more complete discussion of THAN's asbestos related insurance coverage, please refer to Section II.F of the Disclosure Statement**.

   i. <u>Solvent Pre-1986 Product Liability/Completed Operations Coverage</u>: As of the Commencement Date, there remains approximately $382 million of solvent pre-1986 product liability/completed operations coverage available under the comprehensive general liability policies purchased by PENAC between 1960 and 1985, depending on how the limits under those policies are interpreted. Several factors may reduce the availability and delay the timing of any recoveries of insurance coverage, including the following: insurance coverage litigation, policy rights of co-insureds including PENAC, and multi-year and stub policies.

   THAN is currently involved in insurance coverage litigation with various of its pre-1986 excess-layer insurance carriers, which is pending in the Circuit Court of Cook County, Illinois, County Department, Chancery Division. THAN's First Amended Complaint in this action sets forth, among other causes of action, claims for declaratory relief against the defendant excess-layer insurance carriers. THAN seeks a declaration of insurance coverage for past, present and future asbestos-related liabilities under excess layer general liability policies covering the period 1965 through 1985. The defendant

excess insurers have denied the allegations of THAN's First Amended Complaint and dispute that their policies provide coverage for some or all of the liabilities at issue. If the defendant excess insurers prevail on any of their defenses, this could limit or eliminate some or all of the coverage available under their policies to cover Asbestos PI Claims against THAN.

PENAC and many of its corporate affiliates are insured by the same pre-1986 policies under which THAN is seeking coverage for the Asbestos PI Claims. As a result, there may be competing claims for such shared coverage, with respect to which THAN and PENAC have historically sought payment from insurers on a first-come, first-served basis. THAN is not aware of any existing claims by PENAC or any other additional insured that are likely to materially impact the coverage for the Asbestos PI Claims asserted against THAN. In addition, PENAC has been named as a defendant in many of the Asbestos PI Claims arising from THAN's activities. Like THAN, PENAC has rights to seek coverage for these Claims under the pre-1986 policies. Finally, PENAC may seek coverage in the future for Claims that involve liabilities arising during the 1961-through-1985 time period.

THAN's potentially available, solvent insurance coverage also may be reduced because numerous policies within THAN's potential insurance coverage block for Asbestos PI Claims cover multiple annual periods (*i.e.*, "multi-year" policies) or one or more annual periods and a period of less than one year (*i.e.*, the "stub" period). Depending on the policy language of each of these policies and the applicable law, a court may consider a given multi-year policy to have a single policy limit, or it may find that the policy has multiple annual limits. With regard to policies with stub periods, a court may apply separate limits to each annual period and the stub period, it may find that a single policy limit applies to the annual period and stub period, or it may prorate the limits associated with the stub period to account for the shortened policy period of the stub policy. Significantly, taking into account all of the insurance policies where multi-year/stub period issues arise, the potential difference in coverage depending on whether a court were to apply one limit or multiple limits may be as much as approximately $48 million.

**Under the Plan, such insurance is not being contributed to the Asbestos PI Trust. Accordingly, contributions to be made by THAN and PENAC to the Asbestos PI Trust under the Plan, and therefore the amount of available funds to pay Asbestos PI Claims, will not be affected by the amount of proceeds, if any, ultimately received from the insurance carriers.**

ii. <u>Insolvent Pre-1986 Product Liability/Completed Operations Coverage</u>: Excluding comprehensive general liability policies that have been exhausted through settlements, as of the Commencement Date, there are approximately $185 million in product liability/completed operations limits under the comprehensive general liability policies purchased by PENAC between 1960 and 1985 that were issued by insurers that are in rehabilitation or liquidation proceedings, subject to an insolvent scheme of arrangement and/or have been declared insolvent. Recovery under policies issued by such insolvent insurers is subject to the uncertainties that result from each of the insolvent insurers'

respective liquidation or rehabilitation proceedings or foreign schemes of arrangement; therefore, THAN believes it is not possible to predict amounts, if any, that may be recovered ultimately from the insolvent insurers. In addition to generally disputing THAN's rights to proceeds from these policies, there may in any event be little to no money available for any claim THAN made in the past or intends to make in the future.

**Under the Plan, such insurance is not being contributed to the Asbestos PI Trust. Therefore, contributions to be made by THAN and PENAC to the Asbestos PI Trust under the Plan, and therefore the amount of available funds to pay Asbestos PI Claims, will not be affected by the amount of proceeds, if any, ultimately received from the insurance carriers.**

iii.  <u>Coverage-in-Place Settlement Agreements</u>: During the past twenty years, PENAC and THAN have engaged in insurance coverage litigation and other proceedings to secure coverage and payment from their insurers for a variety of claims. THAN and PENAC have been successful in resolving disputes with many insurers. Several of the settlement agreements that PENAC and/or THAN have entered into affect the insurance coverage available for Asbestos PI Claims. Some of the agreements PENAC and/or THAN entered into were "buy-back" settlements, meaning that, in exchange for a specified dollar amount, the settlement agreement constituted a full policy buyback and completely released the insurer from any and all liability under the relevant insurance policies to the same effect as if the policies had never existed and were never issued. Other settlement agreements were "coverage-in-place" agreements, wherein the insurer agreed to provide coverage to THAN for applicable asbestos-related liabilities as they are incurred up to a specified amount, pursuant to a negotiated allocation methodology. With respect to those coverage-in-place settlements, up to approximately $112 million of remaining insurance limits are available for asbestos-related claims asserted against THAN.

**Under the Plan, such insurance is not being contributed to the Asbestos PI Trust. Therefore, contributions to be made by THAN and PENAC to the Asbestos PI Trust under the Plan, and therefore the amount of available funds to pay Asbestos PI Claims, will not be affected by the amount of proceeds, if any, ultimately received from the insurance carriers.**

iv.  <u>Insurance Settlement Proceeds Trust</u>: THAN and/or PENAC have been engaged in numerous insurance coverage litigations and alternative dispute resolution proceedings to secure coverage and payment from their insurers for a variety of claims. THAN and PENAC have also engaged in negotiations with certain of their insurers for the purpose of entering into agreements to settle various coverage disputes or agreements to settle coverage under certain of the insurance policies. To date, THAN and PENAC have entered

into 7 such agreements with approximately 68[1] insurers. Under the terms of those agreements, the insurers pay THAN and PENAC a cash amount up front or over time in exchange for a release under the insurance policies being settled or commuted. As of the Commencement Date, THAN and PENAC have received approximately $304 million in cash. The majority of this amount has already been used to fund settlements and in the defense of Asbestos PI Claims. There remains approximately $170 million in cash that constitutes available insurance for PENAC or THAN to fund settlements and defenses against Asbestos PI Claims.

D. <u>Environmental Insurance For Known Environmental Liabilities</u>: In the 1990s, PENAC entered into approximately 25 confidential insurance coverage settlement agreements with various of its pre-1986 insurers in connection with liabilities arising out of then-known environmental remediation claims and various THAN historical work sites which had been the subject of environmental remediation claims prior to the settlements. Subject to applicable policy terms and limits, as well as the terms of the prior settlement agreements, some of PENAC's pre-1986 insurance policies may still provide coverage for future environmental remediation claims involving historical THAN work sites. Generally speaking, such coverage would be available only if the claims involve sites that were not known to be the subject of prior environmental remediation claims at the time PENAC settled with its pre-1986 insurers. The total limit of potentially available coverage is in excess of $400 million. However, much of the potentially available insurance may be triggered only by very large claims and THAN believes it will not be able to collect additional proceeds in the event of a liquidation. As such, the Liquidation Analysis assumes no further recoveries from environmental insurance coverage for Known Environmental Liabilities.

E. <u>Trustee Fees</u>: Estimated at 3% of the proceeds from the sale of Assets For All Claims Split Pro Rata and 3% of the proceeds from Assets Solely for the Benefit of Asbestos PI Claims and from Assets Solely for the Benefit of Environmental Claims.

F. <u>Professional Fees</u>: Estimated at 1.5% of the proceeds from the sale of Assets For All Claims Split Pro Rata.

G. <u>Litigation Costs, Asbestos Insurance</u>: Estimated at $250,000 per month for litigation in connection with the solvent pre-1986 product liability/completed operations coverage. A period of twenty four months in the high case scenario is assumed.

H. <u>Asbestos PI Claims</u>: The aggregate amount of the Asbestos PI Claims is unliquidated and therefore the ultimate aggregate amount of the Asbestos PI Claims is unknown. As such, the Liquidation Analysis estimates the aggregate Asbestos PI Claims based on the value of the Asbestos PI Trust of $900 million as described in the Disclosure Statement.

I. <u>Intercompany Claims Due to PENAC</u>: From time to time, certain of the insurance policies' providers have failed to timely honor their obligations to make payments to

---

[1] Of the 68 settling insurers, approximately 37 are London market insurers that are all parties to a single settlement agreement with THAN.

THAN under the policies, or have disputed the existence or extent of such obligations. In order to maintain THAN's ability to satisfy its third-party liabilities, both asbestos-related and environmental, PENAC has provided loans and advances to THAN in order to bridge the period between THAN's payment of settlements, judgments, defense costs and other liabilities, and its receipt of amounts owed to it under the insurance policies. As of the Commencement Date, THAN has received from PENAC approximately $124 million attributable to the loans related to Asbestos PI Claims, and $62 million attributable to the loans related to environmental claims, with such Intercompany Claims being pari passu to Asbestos PI Claims and Known Environmental Liabilities.

**In conjunction with the Plan, THAN will be released from the Intercompany Claims Due to PENAC and such Intercompany Claims will have no claim on the Asbestos PI Trust.**

J. <u>Proceeds Available to Asbestos PI Related Claims</u>: Represents (i) Assets Solely for the Benefit of Asbestos PI Claims plus (ii) the pro rata share of Assets For All Claims Split Pro Rata less (iii) Trustee Fees associated with the liquidation of the Assets Solely for the Benefit of Asbestos PI Claims and Assets For All Claims Split Pro Rata less (iv) Litigation Costs associated with the Assets Solely for the Benefit of Asbestos PI Claims less (v) the pro rata share of Professional Fees associated with the liquidation of Assets For All Claims Split Pro Rata. The below table provides an overview of the net proceeds available:

| | | |
|---|---|---|
| Insurance Asset Recovery | $170,500,000 | $664,500,000 |
| Pro Rata Asset Recovery | 3,622,228 | 4,507,765 |
| Less: Asbestos Trustee Costs | (5,115,000) | (25,935,000) |
| Less: Pro Rata Asset Costs | (163,000) | (202,849) |
| Net Proceeds | $168,844,228 | $642,869,915 |

K. <u>Known Environmental Liabilities</u>: THAN has estimated its environmental remediation costs (including its costs for project management) associated with Known Environmental Liabilities to be approximately $62 million over a maximum period of the next twenty years. This estimate was prepared by the project managers of each site and is reviewed and revised on at least an annual basis and then audited by an independent audit firm.

**In connection with the Plan, PENAC will assume all Known Environmental Liabilities.**

Other than potential Known Environmental Liabilities discussed in detail in Section II.C.1 of the Disclosure Statement and set forth on Exhibit I to the Plan, THAN lacks sufficient information to determine whether any of its remaining branch locations or satellite warehouses will result in Environmental Liabilities. THAN also shipped hazardous material to landfills, recycling facilities, or other properties not currently or previously owned, used or operated by THAN. Whether THAN has any Environmental Liabilities with respect to such activity is currently unknown and cannot be reasonably estimated. As such, the Liquidation Analysis assumes no claims associated with Unknown Environmental Liabilities. As described in Section II.C.4 of the Disclosure Statement, THAN has procured insurance with respect to Unknown

Environmental Liabilities, to enhance or supplement existing insurance related to Unknown Environmental Liabilities.

L. <u>Proceeds Available for Environmental-Related Claims</u>: Represents (i) Assets Solely for the Benefit of Environmental Liabilities plus (ii) the pro rata share of Assets For All Claims Split Pro Rata less (iii) Trustee Fees associated with the liquidation of the Assets Solely for the Benefit of Environmental Liabilities and Assets For All Claims Split Pro Rata less (iv) Litigation Costs associated with the Assets Solely for the Benefit of Environmental Liabilities less (v) the pro rata share of Professional Fees associated with the liquidation of Assets For All Claims Split Pro Rata. The below table provides an overview of the net proceeds available:

| | | |
|---|---:|---:|
| Insurance Asset Recovery | $0 | $0 |
| Pro Rata Asset Recovery | 439,382 | 546,799 |
| Less: Environmental Trustee Costs | 0 | 0 |
| Less: Pro Rata Asset Costs | (19,772) | (24,606) |
| Netr Proceeds | $419,610 | $522,193 |

M. <u>Pre-Petition Accounts Payable</u>: Primarily legal bills. Assumed to be General Unsecured Claims.

N. <u>Pre-Petition Accrued Liabilities</u>: Primarily accrued legal liabilities. Assumed to be General Unsecured Claims.

O. <u>Proceeds Available for General Unsecured Claims</u>: Represents (i) the pro rata share of Assets For All Claims Split Pro Rata less (ii) Trustee Fees associated with the liquidation of the Assets For All Claims Split Pro Rata less (iii) the pro rata Professional Fees associated with the liquidation of Assets For All Claims Split Pro Rata. The below table provides an overview of the net proceeds available:

| | | |
|---|---:|---:|
| Pro Rata Asset Recovery | $28,823 | $35,870 |
| Less: Pro Rata Asset Costs | (1,297) | (1,614) |
| Net Proceeds | $27,526 | $34,255 |

**Exhibit C**

**to Disclosure Statement**

# Exhibit C

# Projections Analysis

*Note Regarding Forward-Looking Statements*

Some matters discussed herein contain forward-looking statements that are subject to certain risks, uncertainties or assumptions and may be affected by certain other factors which may impact future results and financial condition. In some cases, you can identify forward-looking statements by terminology such as "may," "should," "could," "expects," "plans," "projected," "anticipates," "believes," "estimates," "predicts," "potential," or "continues," or the negative of these terms or other comparable terminology. In addition, except for historical facts, the "Projections Analysis" provided in Exhibit C herein, and the "Certain Factors To Be Considered" provided in Section XI of the Disclosure Statement, should be considered forward-looking statements. Should one or more of these risks, uncertainties or other factors materialize, or should underlying assumptions prove incorrect, actual results, performance or achievements of Reorganized THAN may vary materially from any future results, performance or achievements expressed or implied by such forward-looking statements.

Forward-looking statements are based on beliefs and assumptions of THAN's management and on information currently available to such management. Forward-looking statements speak only as of the date they are made, and THAN undertakes no obligation to update publicly any of them in light of new information or future events. Undue reliance should not be placed on such forward-looking statements, which are based on current expectations. Forward-looking statements are not guarantees of performance.

*Introduction to the Projections Analysis*

As a condition to confirmation of the Plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Reorganized THAN. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this "feasibility" requirement of section 1129(a)(11) of the Bankruptcy Code, THAN's management has analyzed the ability of Reorganized THAN to meet its obligations under the Plan while retaining sufficient liquidity and capital resources to conduct its business after the Effective Date. As part of such analysis, THAN's management developed and prepared certain projections (the "Projections") of Reorganized THAN's operating profit, free cash flow, and certain other items for the 5 years following the Effective Date of the Plan. *Capitalized terms used but not defined in the Projections shall have the meaning ascribed to them in the Plan.*

The Projections should be read in conjunction with Section XI of the Disclosure Statement, entitled "Certain Factors to Be Considered," and with the assumptions, qualifications and footnotes to the Projections set forth herein, and with the historical consolidated financial information attached as Annex 1 hereto.

The Projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the Securities And Exchange Commission regarding projections. Furthermore, the Projections have not been audited by an independent accountant.

THAN does not, as a matter of course, publish projections of its anticipated financial position, results of operations or cash flows. Accordingly, THAN does not intend, and disclaims any obligation to, (a) furnish updated projections to holders of claims or membership interests prior to or after the Effective Date, (b) include such updated information in any document that may be required to be filed with the Securities and Exchange Commission, or (c) otherwise make such updated information publicly available.

*Principal Assumptions*

The Projections are based on, and assume the successful implementation of, the Plan. The Projections have been prepared exclusively by THAN's management. The Projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions that, though considered reasonable by management at the time made, may prove not to be accurate, and are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond THAN's control. THAN cannot make any representations as to Reorganized THAN's ability to achieve the results set forth in the Projections. Some assumptions on which the Projections are based may not materialize, and events and circumstances occurring subsequent to the date on which the Projections were prepared may be different from those assumed or anticipated, and may materially and adversely impact Reorganized THAN's future financial performance. The Projections, therefore, cannot be relied upon as a guarantee or other assurance of Reorganized THAN's actual future financial performance.

*Principal Operating and Financials Assumptions – Pro Forma Balance Sheet as of emergence*

- <u>Cash</u>: Reorganized THAN will be capitalized with $1.0 million at emergence.

- <u>Prepaid Expenses</u>:  Prepaid expense is in connection with prepaid rent expense for Reorganized THAN's corporate office.

- <u>Insurance Receivable Current</u>: No value post emergence. Any amount in the insurance receivable account will be contributed to Asbestos PI Trust.

- <u>Insurance Receivable Non-Current</u>: No value post emergence. Any amount in the insurance receivable account will be contributed to Asbestos PI Trust.

- <u>Net Property Plant and Equipment – Non-Investment</u>: Represents the fully-depreciated book value of the 6 properties currently undergoing environmental remediation in the following locations: Albany, Georgia; Montgomery, Alabama; Fresno, California; and Llano, Texas.

- <u>Net Property Plant and Equipment – Investment</u>: Represents the book value of Reorganized THAN's ownership of two revenue-generating commercial real properties in New York that will be leased under a long-term triple-net lease to a AAA-rated tenant.

- <u>Accounts Payable and Accrued Liabilities</u>: Outstanding accounts payable and accrued liabilities will be paid from available Cash or borrowings under the DIP Agreement. At emergence, accounts payable and accrued liabilities that are in connection with Reorganized THAN's post-emergence operating activities will be assumed by Reorganized THAN.

- <u>Accrued Liabilities for Contingencies (Asbestos PI Claims) – Current</u>: Will be eliminated in connection with the Plan and assumed by the Asbestos PI Trust.

- <u>Accrued Liabilities for Contingencies (Asbestos PI Claims) – Non-Current</u>: Will be eliminated in connection with the Plan and assumed by the Asbestos PI Trust.

- <u>Due to Parent/Affiliates</u>: PENAC will forgive THAN of all due to parent/affiliates liabilities in connection with the Plan.


*Principal Operating and Financial Assumptions – Income Statement*

- <u>Revenue</u>: As of the Commencement Date, THAN owns one revenue-generating commercial real property.  On the Effective Date, as part of the PENAC Debtor Contribution, PENAC will contribute an additional revenue-generating commercial real property to Reorganized THAN.  Both properties will be leased under separate, long-term triple-net leases to a AAA-rated tenant (a chain drugstore).  The monthly rents from the two leases together will generate approximately $666,000 in fixed annual revenue. In addition, the tenant will also pay 2.0% in percentage rent from gross sales except from food and prescription items, and 0.5% of the gross receipts on food and prescription items for sales that exceed the amount of the total fixed rent for each year (the "Percentage

Rent"). The Projections do not assume any additional revenue associated with the Percentage Rent.

- <u>Salaries</u>:  Staff of Reorganized THAN will consist of 1 individual. Costs include salary and fringe benefits. Assumes 3% annual increase after initial year.

- <u>Legal and Settlement Fees</u>: THAN cannot accurately predict the future rate of non-asbestos claims brought against Reorganized THAN.  Based on the historical experience of THAN and management's estimates, the Projections assume 5 non-asbestos legal cases per year. Estimated cost includes related legal fees and settlements. Assumes 3% annual increase after initial year.

- <u>Unknown Environmental Liabilities Remediation Costs</u>: Other than the potential Known Environmental Liabilities discussed in Section II.C.1 of the Disclosure Statement and set forth on Exhibit I to the Plan, THAN lacks sufficient information to determine whether any of its remaining branch locations or satellite warehouses will result in Environmental Liabilities. THAN also shipped hazardous material to landfills, recycling facilities, or other properties not currently or previously owned, used or operated by THAN.  Whether THAN has any Environmental Liabilities with respect to such activity is currently unknown and cannot be reasonably estimated. For purposes of the Projections, THAN has reviewed the historical rate of notification to THAN of new alleged environmental liability with respect to historical worksites over the past 10 years.  While THAN cannot predict the future rate at which it may receive notification of alleged environmental liability, in the event Reorganized THAN were to receive notification of alleged environmental liabilities at a similar rate to the notifications that it received over the past 10 years, Reorganized THAN can expect the average annual cost to be approximately $254,000 per year, reflecting deductibles per claim under the Unknown Environmental Liability Insurance Policy.  Any amount above $254,000 would be covered by the Unknown Environmental Liability Insurance Policy, subject to applicable policy limits. For a more complete discussion of Reorganized THAN's environmental insurance coverage, please refer to as described in Section II.C.4 of the Disclosure Statement.

- <u>Other Costs</u>: Includes rental expense for corporate office, storage expense for documentation, and other costs. Assumes 3% annual increase after initial year.

- <u>Other Administrative Expense</u>: Includes costs relating to annual audit, tax, and bookkeeping.  Assumes 3% annual increase after initial year.

- <u>Depreciation Expense</u>: Assumes 50-year straight line depreciation of investment properties. Non-investment properties are fully depreciated.

- <u>Interest Income</u>: The Projections do not assume that Reorganized THAN generates interest income.

- <u>Taxes</u>: Reorganized THAN will not be a tax-paying entity on a standalone basis.  The Parent Trust will be taxed on its earnings, including those of the Reorganized THAN, at the statutory rate of the Parent Trust.

- The Asbestos PI Trust shall be the sole beneficiary of the Parent Trust, as described in the Disclosure Statement, and any distributions therefrom shall be paid to the Asbestos PI Trust in accordance with the Parent Trust Documents; *provided*, *however*, that the Parent Trust shall only make distributions upon receipt of dividends from Reorganized THAN, and such dividends shall only be paid under applicable law and only if funds are available after meeting Reorganized THAN's operating expenses, financing obligations, and certain reserve requirements.

- Rather than illustrating potential dividends being paid by Reorganized THAN to the Parent Trust, the Projections illustrate the projected cash flow generated by Reorganized THAN as a standalone entity and a build-up of cash on Reorganized THAN's balance sheet.

- It is anticipated that Reorganized THAN will operate with a minimum cash reserve requirement of $1 million.

THAN
Pro Forma Balance Sheet as of Emergence
(Unaudited)

|  | Pro Forma<br>As of Emergence |
|---|---|
| Assets | |
| Current Assets: | |
| Cash | $1,000,000 |
| Prepaid expenses | 5,000 |
| Insurance receivable - current | 0 |
| Total Current Assets | $1,005,000 |
| Net property and equipment - non-investment | 90,433 |
| Net property and equipment - investment | 10,320,671 |
| Insurance receivable - non-current | 0 |
| Total Assets | $11,416,104 |
| | |
| Liabilities and Equity | |
| Current Liabilities: | |
| Account payable | $25,000 |
| Accrued liabilities | 20,000 |
| Accrued liabilities for contingencies - current | 0 |
| Total Current Liabilities | 45,000 |
| Due to parent / affiliates | 0 |
| Accrued liabilities for contingencies non-current | 0 |
| Total Liabilities | $45,000 |
| Partnership Capital | 11,371,104 |
| Total Liabilities and Partnership Capital | $11,416,104 |

THAN
Projected Income Statement
(Unaudited)

| | Projected Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Revenue (Rental Income) | $666,000 | $666,000 | $666,000 | $666,000 | $666,000 |
| Less Expenses: | | | | | |
| Salaries | $110,800 | $114,124 | $117,548 | $121,074 | $124,706 |
| Legal and settlement fees | 100,000 | 103,000 | 106,090 | 109,273 | 112,551 |
| Unknown Environmental Liabilities remediation costs | 254,200 | 254,200 | 254,200 | 254,200 | 254,200 |
| Other cost | 44,700 | 46,041 | 47,422 | 48,845 | 50,310 |
| Other administrative | 25,000 | 25,750 | 26,523 | 27,318 | 28,138 |
| Depreciation expense | 194,413 | 194,413 | 194,413 | 194,413 | 194,413 |
| Total Expenses | $729,113 | $737,528 | $746,196 | $755,123 | $764,319 |
| Net income (loss) | ($63,113) | ($71,528) | ($80,196) | ($89,123) | ($98,319) |
| EBITDA | $131,300 | $122,885 | $114,218 | $105,290 | $96,095 |

| | Projected Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| **Assets** | | | | | |
| Current Assets: | | | | | |
| Cash | $1,131,300 | $1,254,185 | $1,368,403 | $1,473,693 | $1,569,787 |
| Prepaid expenses | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Total Current Assets | 1,136,300 | 1,259,185 | 1,373,403 | 1,478,693 | 1,574,787 |
| Net property and equipment - non-investment | 90,433 | 90,433 | 90,433 | 90,433 | 90,433 |
| Net property and equipment - investment | 10,126,258 | 9,931,844 | 9,737,431 | 9,543,017 | 9,348,604 |
| Total Assets | $11,352,991 | $11,281,463 | $11,201,267 | $11,112,143 | $11,013,825 |
| | | | | | |
| **Liabilities and Equity** | | | | | |
| Current Liabilities: | | | | | |
| Account payable | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Accrued liabilities | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Total Current Liabilities | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 |
| | | | | | |
| Partnership Capital | $11,307,991 | $11,236,463 | $11,156,267 | $11,067,143 | $10,968,825 |
| Total Liabilities and Partnership Capital | $11,352,991 | $11,281,463 | $11,201,267 | $11,112,143 | $11,013,825 |

THAN
Projected Cash Flow Statement
(Unaudited)

| | Fiscal Year Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Net income (loss) | ($63,113) | ($71,528) | ($80,196) | ($89,123) | ($98,319) |
| Add back depreciation expense | 194,413 | 194,413 | 194,413 | 194,413 | 194,413 |
| Cash from operations | $131,300 | $122,885 | $114,218 | $105,290 | $96,095 |
| | | | | | |
| Cash at beginning of year | $1,000,000 | $1,131,300 | $1,254,185 | $1,368,403 | $1,473,693 |
| Cash at end of year | $1,131,300 | $1,254,185 | $1,368,403 | $1,473,693 | $1,569,787 |

# Historical Financial Statements

THAN
Historical Balance Sheets
(Unaudited)

| | As of December 31, | | | | As of August 31, |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 |
| Assets | | | | | |
| Current Assets: | | | | | |
| Cash | $2,500 | $2,027 | $2,017 | $1,427 | ($50,491) |
| Prepaid expenses | 6,688 | 6,271 | 5,033 | 1,969 | 8,926 |
| Receivables | 29,846 | 29,846 | 29,846 | 0 | 0 |
| Insurance receivable - current | 11,000,000 | 36,999,982 | 34,037,566 | 20,971,241 | 6,630,770 |
| Total Current Assets | 11,039,034 | 37,038,126 | 34,074,462 | 20,974,636 | $6,589,206 |
| Net property and equipment | 90,434 | 90,434 | 90,434 | 90,433 | 90,433 |
| Insurance receivable - non-current | 21,235,000 | 19,594,000 | 72,000,000 | 71,309,935 | 71,309,935 |
| Total Assets | $32,364,468 | $56,722,560 | $106,164,896 | $92,375,005 | $77,989,574 |
| | | | | | |
| Liabilities and Equity | | | | | |
| Current Liabilities: | | | | | |
| Account payable | $3,999,999 | $2,326,440 | $4,740,486 | $4,631,563 | $2,667,275 |
| Accrued liabilities | 2,697,966 | 2,086,860 | 2,388,107 | 5,301,981 | 5,481,557 |
| Accrued liabilities for contingencies - current | 48,000,000 | 48,000,000 | 48,000,000 | 42,000,000 | 42,000,000 |
| Total Current Liabilities | 54,697,965 | 52,413,300 | 55,128,593 | 51,933,544 | 50,148,832 |
| Due to parent / affiliates | 103,433,826 | 136,906,407 | 142,612,764 | 177,682,011 | 121,308,071 |
| Accrued liabilities for contingencies non-current | 66,538,892 | 59,357,806 | 453,325,492 | 425,999,993 | 405,305,993 |
| Total Liabilities | $224,670,683 | $248,677,513 | $651,066,849 | $655,615,548 | $576,762,896 |
| Partnership Capital | (192,306,215) | (191,954,953) | (544,901,953) | (563,240,543) | (498,773,322) |
| Total Liabilities and Partnership Capital | $32,364,468 | $56,722,560 | $106,164,896 | $92,375,005 | $77,989,574 |

Note: The cost of environmental remediation / clean up have been recorded by THAN as incurred. Accordingly, the Balance Sheet does not include a liability for the probable and reasonably estimatable remediation costs.

THAN
Historical Income Statements
(Unaudited)

| | Fiscal Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | 2007 |
| Revenue | $0 | $0 | $0 | $0 |
| Less: Expenses | | | | |
|   Salaries | $556,526 | $556,526 | $533,143 | $208,061 |
|   Legal fees | 17,048,491 | 20,087,342 | 16,565,927 | 32,050,773 |
|   Other cost | 2,162,563 | 1,896,476 | 1,277,120 | 1,258,065 |
|   Provision for asbestos claims | 82,644,480 | 22,362,000 | 421,504,000 | 0 |
|   Environmental remediation net of recoveries | 2,839,751 | 3,664,050 | 5,714,306 | 8,027,052 |
|     Total Expenses | $105,251,811 | $48,566,394 | $445,594,496 | $41,543,950 |
| Plus: Insurance Recoveries | $55,237,450 | $48,917,662 | $92,647,496 | $23,205,361 |
| Net income (loss) | ($50,014,361) | $351,268 | ($352,947,000) | ($18,338,590) |